UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------- --x
STATE OF NEW YORK,

                Plaintiff,

       vs.

GRAND RIVER ENTERPRISES SIX
NATIONS, LTD., and NATIVE
WHOLESALE SUPPLY COMPANY INC.,

           Defendants.
------------------------------------------------------- --x

Civil Action No. 14 CV 00910 (RJA)

**SECOND AMENDED COMPLAINT**

    With knowledge of its own actions and on information and belief as to the actions of the defendants, plaintiff State of New York, by its attorney Eric Schneiderman, Attorney General of the State of New York, respectfully alleges as follows:

## INTRODUCTION

    1.    This case involves the ongoing illegal distribution, shipment, and sale of contraband cigarettes.  Defendants Grand River Enterprises Six Nations, Ltd. ("Grand River," or "GRE") and Native Wholesale Supply Co., Inc. ("Native Wholesale," or "NWS") have sold, shipped, and distributed, and continue to sell, ship, and distribute, large quantities of unstamped and unreported cigarettes into the State of New York as part of a joint venture.

    2.    Defendants' actions undermine New York's public health efforts and violate numerous state and federal laws, including the Contraband Cigarette Trafficking Act, 18 U.S.C. §§

2341-2346 (the "CCTA"); the Prevent All Cigarette Trafficking Act ("PACT Act"), 15 U.S.C. §§ 375-378; and New York Tax Law §§ 471, 1814, and 480-b.

3.     In bringing this civil action for defendants' violations of these laws, plaintiff respectfully requests this Court for an order (1) enjoining the defendants from making such sales and shipments in and into the State of New York; (2) granting plaintiff's request for civil penalties, attorney fees, and costs; and (3) granting any additional relief that this Court deems proper.

## JURISDICTION AND VENUE

4.     Pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2346, and 15 U.S.C. § 378, this Court has original jurisdiction over plaintiff's claims made under the CCTA and the PACT Act.

5.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's state law claims. These claims are so related to the plaintiff's CCTA and PACT Act claims that they form part of the same case or controversy under Article III of the United States Constitution.

6.     Pursuant to 28 U.S.C. § 1391(b), venue within this judicial district is proper. A substantial part of the events or omissions giving rise to the claims occurred within this judicial district, and these events are material to plaintiff's claims.

## PARTIES

7.     Plaintiff State of New York is a sovereign entity that brings this action on behalf of its citizens and residents to protect public health, safety, and welfare, and to enforce federal and state law for that purpose.

8.     Defendant Grand River Enterprises Six Nations, Ltd. is a corporation formed under the laws of the Six Nations of Indians. Grand River is engaged in the business of manufacturing, selling, transferring, transporting and shipping its cigarettes for profit throughout the United States,

including in and into New York. Its principal place of business is located at Ohsweken, Ontario, Canada.

9.     Defendant Native Wholesale is a corporation formed under the laws of the Sac and Fox Nation of Oklahoma.  Native Wholesale is a for-profit corporation, and is not controlled by the Sac and Fox Nation of Oklahoma tribe or operated for government purposes.  Native Wholesale is engaged in the business of purchasing, transporting, distributing and reselling Grand River tobacco products for profit throughout the United States, including in New York.  Its principal place of business is located at 10955 Logan Road, Perrysburg, New York.

10.     Upon information and belief, based upon documents filed by Grand River in an arbitration it initiated pursuant to the North American Free Trade Agreement ("NAFTA"), as well as, *inter alia*, other documentation filed in Native Wholesale's bankruptcy proceedings in the United States Bankruptcy Court for the Western District of New York, defendants Grand River and Native Wholesale acted, and continue to act, in concert as joint venturers in conducting business in New York in violation of state and federal law.  Though they may be separate legal entities, they purposefully act as a single enterprise whose purpose is to manufacture and distribute tobacco products, specifically Seneca brand cigarettes, into the New York market.  As co-venturers, each of their principals share in the profits of both entities, deriving their income from the enterprise relationship between Grand River and Native Wholesale, and, upon information and belief, correspondingly share in any losses of the joint venture.  The income and profits from the partnership are shared through an informal allocation process which distributes profits to defendants' companies and their owners and shareholders.  Grand River is the manufacturer of the Seneca brand cigarettes.  By their own admission, the only tobacco products Native Wholesale imports into the United States are those which are manufactured by Grand River.   Upon information and belief,

Native Wholesale was Grand River's sole importer and distributer of Seneca brand cigarettes to Indian lands in New York and remains a primary importer of Seneca brand cigarettes to the present. Upon information and belief, Native Wholesale does not import or distribute any other brand of cigarette in New York besides Seneca, and in fact, Native Wholesale holds the Seneca brand trademark. Each defendant's activity, collectively and individually, violates the state and federal laws referenced herein.

## **FACTUAL BACKGROUND**

11.     Cigarettes are a deadly and costly public health problem. Smoking causes a host of crippling and deadly diseases, including cardiovascular disease, coronary heart disease, emphysema, aortic aneurysms, and a wide range of cancers. *Report on the Global Tobacco Epidemic* 8 (WHO 2008 Reports).[1] Each year, tobacco-related illnesses kill approximately 440,000 people in the United States. CDC, *Smoking-Attributable Mortality, Years of Potential Life Lost, and Productivity Losses--United States, 2000-2004* (2008);[2] Statement of Vice Admiral Richard H. Carmona, U.S. Surgeon General, *reprinted at* 155 Cong Rec. S6000 (June 3, 2009). In other words, tobacco kills more people than AIDS, alcohol, drug abuse, car crashes, murders, suicides, and fires combined.

12.     Children are particularly vulnerable to the dangers of tobacco. As the Supreme Court has observed, "tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 161 (2000). "Everyday, approximately 4,000 children under age 18 experiment with cigarettes for the first time; another 1,500 become regular smokers. Of those who become regular smokers, about half eventually die from a disease caused by tobacco use." President's

---

[1] *Available at* http://www.who.int/tobacco/mpower/en/.
[2] *Available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5745a3.htm.

Cancer Panel, "Promoting Healthy Lifestyles," at 64 (2007).[3]  In addition, tobacco use may function as a "gateway drug" to the use of illegal substances such as cocaine and heroin.  *See, e.g.*, Shenghan Lai et al., *The Association Between Cigarette Smoking and Drug Abuse in the United States*, J. of Addictive Diseases, Dec. 2000, at 11.

13.     Tobacco is also a substantial drain on the public fisc.  Tobacco-related disease and death cost $193 billion a year in health-care spending and loss of productivity.  *Smoking-Attributable Mortality, Years of Potential Life Lost, and Productivity Losses—United States, 2000-2004*, *supra*.  Smoking costs the Medicaid program an estimated $30 billion annually and the Medicare program an estimated $27 million.  CDC, *Sustaining State Programs for Tobacco Control: Data Highlights 2006*, at 17 (Medicaid)[4]; Xiulan Zhang et al., *Cost of Smoking to Medicare Program, 1993*, 20 Health Care Financing Rev. 1-19 (1999) (Medicare).

14.     Given these enormous public-health and economic costs associated with tobacco, the states and federal government have a strong interest in regulating the sale and use of tobacco.

15.     In New York, such regulations take several forms.  *See, e.g.*, N.Y. Pub. Health Law § 1399-*ll* (banning delivery of cigarettes to consumers); *see also* N.Y. Tax Law §§ 480 (licensing of wholesalers), 480-a (registration of retail dealers); N.Y. Pub. Health Law §§ 1399-*ll*(3) (labeling), 1399-cc (age-verification); N.Y. Tax Law §§ 483-489 (marketing); N.Y. Exec. Law § 156-c (fire safety standards); *see also, generally,* N.Y. Pub. Health Law §§ 1399-aa-1399-mm.

16.     One such regulation is the taxing of cigarettes possessed for sale within the state.  *See* N.Y. Tax Law § 471(1).

17.     New York imposes such a tax because "[i]t is well established that an increase in the price of cigarettes decreases their use and that raising tobacco excise taxes is one of the most

---

[3] *Available at* http://deainfo.nci.nih.gov/advisory/pcp/ pcp07rpt/pcp07rpt.pdf.
[4] *Available at* http://www.cdc.gov/tobacco/data_statistics/state_data/data_highlights/2006/pdfs/dataHighlights06rev.pdf.

effective policies for reducing the use of tobacco." Inst. of Med., *Ending the Tobacco Problem:  A Blueprint for the Nation* 80, 182 (2007); Report of the Surgeon General, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease*, at 654 (2010)[5] (noting that "increases in the price of cigarettes through excise taxes […] are an effective policy intervention to prevent smoking initiation among adolescents and young adults, reduce cigarette consumption, and increase the number of smokers who quit").

18.     It is estimated that a ten-percent increase in prices reduces cigarette demand among adults by three to five percent.  Frank J. Chaloupka & Rosalie Liccardo Pecula, *The Impact of Price on Youth Tobacco Use*, National Cancer Institute Monograph No. 14, at 194 (Nov. 2001).[6]  Youth response to price increases is even greater; a ten-percent uptick in cigarette prices is estimated to reduce the number of youth smokers by at least six or seven percent.  *See* Prevent All Cigarette Trafficking Act of 2007, and the Smuggled Tobacco Prevention Act of 2008: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 110 Cong. 50, 52 (May 1, 2008) (Statement of Matthew L. Myers, President, Campaign for Tobacco-Free Kids).

19.     Indeed, "[i]t is well established that an increase in the price of cigarettes decreases their use and that raising tobacco excise taxes is one of the most effective policies for reducing the use of tobacco."  Inst. of Med., *Ending the Tobacco Problem:  A Blueprint for the Nation* 80, 182 (2007).  Furthermore, "limit[ing] smuggling and the availability of untaxed tobacco products is essential to maximizing the effectiveness of higher taxes in reducing tobacco use[.]" Report of the Surgeon General, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease* (2010), at 654.

---

[5] *Available at* http://www.surgeongeneral.gov/library/tobaccosmoke/report/chapter9.pdf.
[6] *Available at* http://cancercontrol.cancer.govTCRB/ monographs/14/m14_12.pdf.

20.     The federal government also imposes a cigarette tax, and has legislated other regulations and restrictions pertaining to the sale and advertising of cigarettes.  *See*, *e.g.*, Family Smoking Prevention and Tobacco Control Act of 2009, Pub. L. No. 111-31 (authorizing the federal Food and Drug Administration to regulate the content, marketing and sale of tobacco products); Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-1341.

21.     The two federal statutes of importance in this case, the CCTA and the PACT Act, assist the States with enforcing their own tobacco laws.

## STATUTORY BACKGROUND

### New York Tax Law

22.     New York Tax Law § 471 ("Section 471") imposes an excise tax on all cigarettes possessed for sale within the State.

23.     Section 471(1) requires that tax be paid on "all cigarettes possessed in the state by any person for sale," unless the state lacks the power to tax.  The state lacks the power to tax when cigarettes are sold "to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation," or sold to the United States government or armed forces.  N.Y. Tax L. § 471(1).

24.     The cigarette excise tax and prepaid sales tax are advanced and paid by state-licensed cigarette stamping agents.  N.Y. Tax Law §§ 471(2) and 1103; N.Y. Comp. Codes R. & R. ("NYCRR") tit. 20, § 74.1(b)(1).  A stamping agent must be a person licensed by the Commissioner of Taxation and Finance to purchase tax stamps and to affix tax stamps to packages of cigarettes.  N.Y. Tax Law §§ 470(11) and 472(1); 20 NYCRR § 70.2(g)(1).

25.     The amount of the cigarette excise tax and prepaid sales tax, the payment of both of which is evidenced by the affixation of a state cigarette tax stamp to each pack, is added to, and

collected as a part of, the stamping agent's sale price of the cigarettes to subsequent dealers or the consumer.  N.Y. Tax Law §§ 471(2) & (3), and 1103; 20 NYRCC § 74.1(b)(1).  Every dealer receiving stamped packages of cigarettes shall, in turn, advance and pay the cigarette taxes as part of such dealer's purchase price and shall pass the taxes through to subsequent purchasers as part of such dealer's sale price.  N.Y. Tax Law §§ 471(2) & (3); 20 NYCRR § 74.1(b)(2).

26.     With exceptions not relevant here, all cigarettes possessed for sale in New York must be stamped.  Section 471 requires that the tax be prepaid by stamping agents, and that packages of cigarettes possessed for sale within the State bear a tax stamp affixed by such an agent.  The tax stamps serve as evidence that the cigarette excise tax has been paid.  *See* N.Y. Tax L. §§ 471(2) and 473.

27.     The only entities licensed by the state to receive and possess unstamped cigarettes and to purchase and affix tax stamps to cigarette packages are New York State-licensed stamping agents.  With exceptions not relevant here, any manufacturer or importer shipping unstamped cigarettes in or into New York to anyone other than a state-licensed stamping agent is in violation of Section 471(1).  The possession in New York State by any person other than a licensed New York stamping agent or distributor[7] of more than four hundred (400) unstamped cigarettes at any one time is presumptive evidence that the cigarettes are subject to tax.  N.Y. Tax Law § 481(2)(a).

28.     At all times relevant to this Complaint, the New York State cigarette excise tax has been $4.35 per pack for a New York state tax stamp, or $43.50 per carton of ten packs.

---

[7] "Distributor" is defined as any person who imports or causes to be imported into New York any "tobacco product" for sale, and any person within or without the state who is authorized by the Commissioner of Taxation and Finance to make returns and pay the tax on "tobacco products" sold, shipped or delivered by him to any person in the state.  N.Y. Tax Law § 470(12).  "Tobacco product", in turn, is defined as "[a]ny cigar … or tobacco, *other than cigarettes*, intended for consumption by smoking, chewing or snuff."  *Id.*, § 470(2) (emphasis added).  As defendants specifically sell cigarettes, they are not "distributors" under the Tax Law.  Because defendants are neither stamping agents nor distributors, they are not exempted from Section 481(2)'s presumption that possession of more than 400 unstamped cigarettes in New York State means that the cigarettes are subject to tax.

29.     Notably, under N.Y. Tax Law § 471(1), "[i]t shall be presumed that all cigarettes within the state are subject to tax until the contrary is established, and the burden of proof that any cigarettes are not taxable [t]hereunder shall be upon the person in possession thereof."

30.     Historically, despite having the power to tax on-reservation sales of cigarettes to the public (*i.e.*, to persons who were not members of the tribe on whose reservation the cigarettes were being sold), *see Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros.*, 512 U.S. 61 (1994), the New York State Department of Taxation and Finance (the Department) had adopted a long-standing policy of forbearance that allowed untaxed cigarettes to be sold from New York State licensed cigarette stamping agents to recognized Indian Nations or tribes and reservation cigarette sellers making retail sales on qualified Indian reservations."

31.     On February 23, 2010, the New York Department of Taxation and Finance ("DTF") revoked its forbearance policy and sought to collect taxes on reservation cigarette sales to non-members of the nation or tribe and to non-Indians.

32.     On June 21, 2010, a bill was signed amending, among other statutes, New York Tax Law §§ 471 and 471-e (collectively, the "amended tax law").  2010 Sess. Law News of N.Y. Ch. 134, Part D and Ch. 136.  The amendment reflected the revocation of the forbearance policy and provides for two alternative systems to ensure that members of an Indian nation or tribe can buy cigarettes tax-free on their own reservation for their own personal use.  The amended tax law became effective on September 1, 2010, but was preliminarily enjoined.  The injunction was lifted, and implementation of the amended tax law began on June 21, 2011.

33.     The amended tax law continues to require state-licensed stamping agents to prepay the excise and sales taxes and to affix tax stamps on all cigarette packs transported to, and sold for

resale on, Indian reservations, *including those cigarettes intended for resale to tax-exempt tribal members*.

34.     Under the 2010 Amendments, DTF issued a "Technical Memorandum" explaining aspects of the new taxation scheme.  Under the amended tax law and the corresponding regulations, stamping agents are required to collect both the excise and prepaid sales tax for all cigarettes transported to and sold for resale on an Indian reservation to non-Indians and non-members of the Indian Nation or tribe.  Though stamped, cigarettes sold to members of the Indian Nation or tribe *for their own personal use* are tax-exempt.

35.     The amended Sections 471 and 471-e establish two alternative mechanisms by which Indian nations or tribes can make appropriate quantities of tax-exempt cigarettes available to their members for their personal use and consumption.  These alternatives are referred to, respectively, as the Indian tax-exemption coupon system, and the prior approval system.  Both of these systems contemplate that qualified members may obtain *tax-stamped but tax-free* cigarettes for their personal use.  The tax is pre-paid by the stamping agent and a tax stamp is affixed.  The tax-stamped cigarettes are rendered tax-free by means of a refund to the licensed stamping agents of the taxes paid.  To prevent non-exempt purchasers from obtaining tax-free cigarettes, thus evading the tax, the amended tax law limits the quantity of tax-free cigarettes that may be sold to Indian nations, tribes, and tribal retailers, based on each tribe's "probable demand," which is based on tribal population and the United States averages of cigarette consumption per-capita.  *See* Section 471-e(2)(b).

36.     The amended tax law was scheduled to take effect September 1, 2010; however, temporary restraining orders were issued and in effect until June 21, 2011, when the last of the restraining orders was vacated by the New York Appellate Division, Fourth Department, in *Seneca Nation of Indians, et al v. State of New York, et al*, Docket # CA 11-01193. *See also Oneida v.*

*Paterson*, 645 F.3d 154 (2d Cir. 2011) (affirming district court orders which denied motions for preliminary injunctions of amended tax law and vacating district court order which preliminarily enjoined the amended tax law).  The amended tax law thus went into effect on June 21, 2011.

37.     Under the amended tax law, any cigarettes transported to qualified reservations for sale must have a cigarette tax stamp affixed to the package.

38.     As a result, cigarettes shipped, delivered, or otherwise transferred to reservations in New York State by manufacturers, distributors, wholesalers, or stamping agents, must be tax stamped, regardless of whether they are to be sold to an Indian nation or tribe or its members or reservation cigarette sellers.

39.     Furthermore, Executive Law § 63(12) empowers the Attorney General to seek injunctive relief, restitution, damages, and costs when any person or business entity has engaged in or otherwise demonstrated repeated fraudulent or illegal acts in the transaction of business.

**The Contraband Cigarette Trafficking Act ("The CCTA")**

40.     The Contraband Cigarette Trafficking Act focuses on large-scale smuggling by making it a felony, punishable by up to five years of imprisonment, for any unauthorized person to ship, transport, receive, possess, sell, distribute or purchase more than 10,000 cigarettes that do not bear the tax stamp of the jurisdiction in which they are found.  18 U.S.C. §§ 2341(2), 2342.

41.     The CCTA authorizes a State, through its attorney general, to obtain appropriate relief for CCTA violations from any person (or by any person controlling such person), which includes seeking civil penalties, money damages, and injunctive or other equitable relief.  18 U.S.C. §§ 2346(b)(2) and (b)(3).

42.     The CCTA provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco."  18 U.S.C. § 2342(a).  "Contraband cigarettes" are:

> a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in the possession of any person.....

18 U.S.C. § 2341(2).

43.     The Second Circuit has recognized four elements to a CCTA violation:  "that a party (1) knowingly ship, transport, receive, possess, sell, distribute or purchase (2) more than 10,000 cigarettes (3) that do not bear tax stamps, (4) under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps."  *City of New York v. Golden Feather Smoke Shop, Inc.*, 2009 U.S. Dist. LEXIS 20953, at *33 (E.D.N.Y. March 16, 2009) (citing *City of New York v. Milhem Attea & Bro*s., Inc., 550 F. Supp. 2d 332, 345 - 46 (E.D.N.Y. 2008)).  Accordingly, a CCTA violation occurs when any person engages in transactions with the requisite quantity of cigarettes that do not bear a tax stamp required by law.  If a jurisdiction imposes a cigarette tax, and uses stamps to evidence payment of that tax, statutory quantities of unstamped cigarettes present in that jurisdiction are "contraband cigarettes."  *See City of New York v. Golden Feather*, 597 F.3d 115, 120-21 (2d Cir. 2010).  "[T]he definition of 'contraband cigarettes' depends only upon the absence of indicia of state tax payment and location in a state requiring such indicia."  *United States v. Elshenawy*, 801 F.2d 856, 858 (6th Cir. 1986); *see United States v. Approximately Three Million Six Hundred Nine Thousand Eight Hundred Twenty Cigarettes of Assorted Brands*, 2009 WL 773868, at *5 (W.D. Wash. Mar. 20, 2009) ("Because...state taxes were required on the cigarettes, and state

law always required stamps indicating the payment of applicable state taxes, the cigarettes are contraband under 18 U.S.C. § 2341(2).").  CCTA liability is imposed whether or not a person has any statutory duty connected to payment of the tax. "The federal statute makes it a crime for <u>any person</u> knowingly to possess contraband cigarettes.…The [CCTA] does not apply only to the person whom the state law requires to pay the stamps [*sic*], but to anyone who possesses more than [1]0,000 cigarettes without the stamp in violation of the state tax law." *United States v. Skoczen*, 405 F.3d 537, 547 (7th Cir. 2005) (emphasis added).

44.     Manufacturers are required to know whether the persons to whom they ship cigarettes for sale in New York are licensed stamping agents, because simply put, such agents are the only persons to whom unstamped cigarettes are permitted to be sold in the first instance, even if the cigarettes are ultimately bound for an Indian reservation. *See* N.Y. Comp. Codes. R & R., tit. 20, § 74.3(a)(1)(iii); N.Y. Tax Law §§ 471 and 471(2); *see also United States v. Elshenawy*, 801 F.2d at 859 & n.3 (given the high probability of regulation when dealing in large quantities of cigarettes, persons dealing with such quantities, as opposed to casual smugglers, are presumed to know cigarette tax requirements and regulations) (citation omitted)); *United States v. Baker*, 63 F.3d 1478, 1492 (9th Cir. 1995) (knowledge of cigarette tax requirements can be presumed when dealing with statutory quantities of cigarettes under CCTA).

**The PACT Act**

45.     The PACT Act amended its predecessor, the Jenkins Act, 15 U.S.C. §§ 375-378 (1955).  The Jenkins Act required any person who sold and shipped cigarettes across a state line or Indian reservation to a buyer other than a licensed distributor (typically a state-licensed tax stamping agent) to report the sale to the buyer's state tobacco tax administrator.  Failure to comply with the

Jenkins Act's requirements constituted a federal misdemeanor; violators were subject to fines and up to six months' imprisonment. *See former* 15 U.S.C. § 377 (1955).

46.     On June 30, 2010, the PACT Act amended the Jenkins Act by imposing broader and stricter regulations and penalties for interstate sales and shipments of cigarettes. For instance, the PACT Act makes it unlawful to deliver cigarettes and smokeless tobacco through the U.S. Postal Service. 18 U.S.C. § 1716E.

47.     The PACT Act requires any person who "sells, transfers, or ships for profit cigarettes … in interstate commerce, whereby such cigarettes … are shipped into a State … taxing the sale or use of cigarettes" to first register with both the Attorney General of the United States and with the tobacco tax administrator of the State into which such shipment is made. 15 U.S.C. § 376(a)(1). The registration statement must include the registrant's "name and trade name (if any), and the address of his principal place of business and of any other place of business, as well as telephone numbers of each place of business, a principal [email] address, any website addresses, and the name, address and telephone number of an agent in the State authorized to accept service on behalf of the person."

48.     In addition to registration with the state tobacco tax administrator, the registrant must file monthly reports with such administrator detailing every shipment of cigarettes made in the previous calendar month into the State, including the name and address of the recipient, the brand and quantity of cigarettes in each shipment, and the address and phone number of the person delivering the shipment to the recipient. 15 U.S.C. § 376(a)(2).

49.     Notably, the PACT Act broadly defines "person" as "an individual, corporation, company . . . *Indian tribal government, governmental organization of such a government,* or joint stock company," and "interstate commerce" as "commerce between a State and any place outside the

State, commerce *between a State and any Indian country in the State*, or commerce between points in the same State but through any place outside the State *or through any Indian county*." 15 U.S.C. § 375(9) and (10) (emphasis added).

50.     Moreover, Native American wholesalers, distributors, or delivery sellers are included in the definition of "persons" under the PACT Act and are required to make the requisite registrations under the PACT Act, even if they are transferring, selling or shipping for profit cigarettes to other Native American wholesalers, distributors, or delivery sellers or otherwise.

51.     Penalties for violations of the PACT Act were increased to up to three years in prison, and civil penalties are recoverable, as well as "any other damages, equitable relief, or injunctive relief …, including the payment of any unpaid taxes to the appropriate Federal, State, local, or tribal governments." 15 U.S.C. § 377.

52.     The States were also given the power to enforce the Act's provisions. 15 U.S.C. § 378(c).

**New York Tobacco Product Manufacturer Certification Statute**

53.     Under New York law, "[e]very tobacco product manufacturer … whose cigarettes are sold for consumption in this state shall annually certify under penalty of perjury that, as of the date of such certification, such tobacco product manufacturer: (a) is a participating manufacturer [in the nationwide 1998 Tobacco Master Settlement Agreement ("MSA")]; or (b) is in full compliance with subdivision two of section thirteen hundred ninety-nine-pp of the public health law." N.Y. Tax L. § 480-b(1) ("Section 480-b"). New York Public Health Law § 1399-pp requires that manufacturers not participating in the MSA pay a certain amount into an escrow fund for each cigarette it sells in the state, roughly equal to the amount it would pay in an annual settlement payment under the MSA if it were a participating manufacturer.

54.     The annual certification under Section 480-b "shall be executed and delivered to the commissioner [of Taxation and Finance], the attorney general and any agent who affixes New York state cigarette tax stamps to cigarettes of such tobacco product manufacturer, no earlier than the sixteenth day of April and no later than the thirtieth day of April of each year, and shall be accompanied by a list setting forth each of the cigarette brands of such tobacco product manufacturer sold for consumption in New York state."  N.Y. Tax L. § 480-b(1).

## Actions of the Defendants

55.     Grand River manufactures Seneca brand cigarettes in Ontario, Canada.  In a joint venture, Grand River then sells, transfers or assigns the cigarettes to Native Wholesale FOB Canada in Canada.  Upon information and belief, title to the cigarettes transfers from Grand River to Native Wholesale in Canada.

56.     Native Wholesale, holding title for the Grand River cigarettes, then imports and distributes the cigarettes inside the United States, including in New York State.

57.     In fact, as Native Wholesale itself acknowledges, the only tobacco products it imports into the United States are manufactured by Grand River.

58.     Since November 22, 2011,[8] which is well after New York's amended tax law took effect, and continuing through to the present, the defendants have knowingly shipped, transported, transferred, sold and distributed millions of unstamped and unreported cigarettes to various on-reservation wholesalers in New York State, such as Seneca Imports, Tonawanda Seneca Nation Distribution, and Tuscarora Nation, among others.  Such continuing actions by defendants constitute

---

[8] As in the Amended Complaint, because of defendant NWS's bankruptcy case and the automatic stay imposed by the bankruptcy court pursuant to 11 U.S.C. § 362(a) with respect to New York's effort to collect pre-petition debt from debtor NWS, which remains in effect, plaintiff has limited the claims raised in the Second Amended Complaint to post-petition activities of defendants.  Notwithstanding the Second Amended Complaint, plaintiff reserves the right to pursue these claims against defendants for pre-petition activities at the appropriate time and should the automatic stay be lifted.

violations of Sections 471 and 480-b of the New York Tax Law. Defendant Grand River has shipped, transported, transferred, sold and distributed cigarettes to Native Wholesale, an entity that is not a New York State licensed stamping agent. These Grand River cigarettes were not tax stamped and were intended for sale in and into the state of New York.

59.     Native Wholesale, having purchased cigarettes directly from Grand River and not through a New York State licensed stamping agent as required, received and possessed unstamped and untaxed cigarettes in violation of the CCTA and New York State Tax Law Section 471. Native Wholesale then proceeded to sell these untaxed and unstamped cigarettes to reservation cigarette retailers in New York in further violation of these federal and state laws.

60.     Based on the prior course of dealings between Grand River and Native Wholesale, defendant Grand River knew and in fact intended that the cigarettes it sold to Native Wholesale would be sold into New York without going through a New York State licensed stamping agent for pre-payment of the state taxes, and thus would be neither stamped nor taxed as required under New York law.

61.     Large quantities of these contraband Grand River cigarettes have been offered for sale at several reservation cigarette retailers in New York State, including Hank's Smoke Shop in Lewiston, Lake Erie Tobacco in Buck Kill, Onondaga Nation Smoke Shop in Onondaga, OJ's Smoke shop in Steamburg, Steamburg Smoke shop in Cattaraugus, Arrowhawk Smoke Shop in Basom, Rising Native Sisters in Mastic, Turning Stone Casino in Oneida, and Mikey G's in Cattaraugus, among others.

62.     In the period from November 22, 2011 through February 2013, Native Wholesale paid $47,323,758 to Grand River, which includes amounts paid to purchase cigarettes from Grand River. For the same time period, invoices indicate that Native Wholesale sold or distributed some or

all of these Grand River cigarettes to on-reservation wholesalers, such as Seneca Imports, Tonawanda Seneca Nation Distribution, and Tuscarora Nation, amounting to over $221,254,107.

63.    Further, these payments by Native Wholesale to Grand River, as well as Native Wholesale's distribution to on-reservation wholesalers, continued after February 2013, until as recently as August 2014, as evidenced by the most recent operating report filed by Native Wholesale in their Chapter 11 bankruptcy proceeding.

64.    None of defendants' cigarette packages was stamped with the required New York State cigarette excise tax stamp, and none was reported to DTF.

65.    In addition, no New York state-licensed stamping agent has reported any sales of Grand River's Seneca brand cigarettes to DTF.

**"Joint Venture" Between Grand River and Native Wholesale to Do Business in New York**

66.    At all times, defendants have engaged in this conduct of manufacturing, selling and distributing Seneca brand cigarettes in New York as a single enterprise, *i.e.*, as a joint venture.

67.    Sworn statements filed jointly by Grand River, along with its principals Jerry Montour and Kenneth Hill, and by Arthur Montour, the sole shareholder, officer and director of Native Wholesale, in an arbitration initiated by these parties pursuant to NAFTA, plainly establish that Grand River and Native Wholesale are engaged in a joint venture that integrates manufacturing and distribution of the Seneca brand of cigarettes to the United States, and more specifically, to Indian lands in New York State.

68.    For example, defendants and their principals describe themselves as being "co-venturers," and further discuss the "collective nature" of their "underlying business venture in the United States": [9]

---

[9] *See* the Notice of Arbitration, pertaining to an arbitration between Grand River Enterprises Six Nations, Ltd., Jerry Montour, Kenneth Hill, and Arthur Montour, Jr., and the Government of the United States, under the United Nations

a. "*Jerry Montour, Kenneth Hill, Arthur Montour and Grand River* [the principals of GRE and NWS] are, individually and *as co-venturers*, investors of a Party, Canada, *whose* investments and investment *enterprises include*, without limitation, the assets of *Grand River and Native Wholesale Supply* (including operations facilities, real property, machinery, inventory, contractual, intellectual property and distribution rights and good will) and their business associations in the Free Trade Area, *including in the United States*." Ex. A, GRE Notice of Arbitration, ¶ 7 (emphasis added).

b. "Since 1999, Claimants have maintained and expanded their investments in the United States through two legally distinct corporate branches: Grand River for manufacturing and [Native Tobacco Direct ("NTD")]/NWS for distribution. The individual Claimants decided together to adopt this corporate structure in order to minimize their tax liability and to formally assign their respective areas of primary responsibility. *The fact that Grand River and NWS constitute separate legal entities cannot and does not change the <u>collective nature of the Claimants' underlying business venture</u> in the United States*. . . ." Ex. B GRE Claimants' Memo, ¶ 111 (emphasis added) (footnote omitted).

69.    Defendants' joint venture is aimed, in part, to vertically integrate manufacturing tobacco products and distributing tobacco products to the United States; an endeavor to which both defendants invested, and continue to invest, a significant amount of money, time, skill and effort:

a. "Claimants [principals of GRE and NWS] have collectively made significant investments in the United States, effected through their calculated effort to establish, promote, manufacture and distribute unique, proprietary brands of tobacco products known as Seneca® and, to a lesser extent, Opal®. These investments include, but are not limited to, investments made in connection with a *vertically integrated enterprise, which Claimants organized and operated to promote and distribute their proprietary cigarette brands in the United States*." Ex. B GRE Claimants' Memo, ¶ 5 (emphasis added).

b. "*Claimants* [principals of GRE and NWS] *have at various times since 1990, and continuously in one form or another since that time, associated themselves through corporations, partnerships, sole proprietorships, a joint venture, and other mutually beneficial and co-dependent business relationships for the purpose of carrying on the production and distribution of proprietary tobacco products in the United States* and Canada." *Id.* at ¶ 95 (emphasis added).

---

Commission on International Trade Law and the NAFTA Agreement, dated Mar. 10, 2004, attached hereto as Exhibit A (hereinafter "GRE Notice of Arbitration"); Claimants' Memorial by Claimants' Grand River Enterprises Six Nations, Ltd., Jerry Montour, Kenneth Hill, and Arthur Montour, Jr., dated July 10, 2008, in an Arbitration with the Government of the United States, under the United Nations Commission on International Trade Law and the NAFTA Agreement, attached hereto as Exhibit B (hereinafter "GRE Claimants' Memo").

c. "Jerry Montour and Kenneth Hill maintained a consistent *objective of* establishing manufacturing facilities and *distribution networks* to serve First Nations territories *in both Canada and the United States.*" *Id.* at ¶ 15 (emphasis added) (footnote omitted).

70. Defendants' joint venture is specifically to manufacture and distribute Seneca brand cigarettes in the United States:

a. "*Claimants' business venture and interests in the United States* have been, at all times since 1998, principally *focused on the successful development, production, promotion and distribution of their Seneca® brand* of cigarettes." Ex. B GRE Claimants' Memo, ¶ 102 (emphasis added) (footnote omitted).

b. "*NWS succeeded to all the rights and obligations of NTD* under the Claimants' agreement, and it continues to this day *to operate as the U.S. marketing and distribution facility for Claimants' Seneca® business venture.*" *Id.* at ¶ 26 (emphasis added) (footnotes omitted).

71. Grand River and Native Wholesale entered into an agreement that formalized the joint venture, including a designation of NWS as the exclusive distributor of the Seneca brand of cigarettes:

a. "The nature of this venture is first and foremost illustrated by the fact that the individual Claimants directed their respective companies to enter into a contractual relationship under which Grand River was designated by NWS as the exclusive manufacturer and packager of Seneca® branded products and *NWS was designated by Grand River as the (then) exclusive importer and distributor of Seneca® products in the United States,*" with NWS as the exclusive distributor per the agreement "until the end of 2002." Ex. B GRE Claimants' Memo, ¶ 112 (emphasis added) (footnotes omitted).

72. The distributorship for defendants' joint venture is structured such that Native Wholesale is responsible for distributing Seneca brand cigarettes on Indian lands in the United States, and possess the brand's trademark in order to do so:

a. "[I]n 1999 Claimants continued pursuit of their goals with respect to the U.S. market. To this end, they memorialized some of the particulars of the roles each had assumed amongst themselves, by adopting a corporate structure and concluding written agreements in respect of the possession and use of intellectual property rights supporting their current and planned brands. Specifically, *Native Tobacco Direct would be established and would register and acquire a U.S.*

*trademark for Claimants' new Seneca® brand of cigarettes, and would be responsible for the distribution of those products on Native American land in the United States.*" Ex. B GRE Claimants' Memo, ¶ 21 (emphasis added) (footnotes omitted).

73.     The joint venture between Grand River and Native Wholesale has at all times been focused, *inter alia*, on the sale and distribution of Seneca cigarettes to Indian lands in New York State:

    a.   "*Jerry Montour and Kenneth Hill are the controlling shareholders of Claimant Grand River Enterprises* Six Nations, Ltd. ("Grand River"), a corporation established under the laws of Canada. *Arthur Montour is the sole shareholder of Native Wholesale Supply* ("NWS"), a corporation established under the laws of the Sac and Fox Nation. *Individually and as partners, Jerry Montour and Kenneth Hill first became involved in the tobacco industry in or about 1988, through various informal and formal business relationships and associations that principally involved the manufacture and distribution of tobacco products on Native American land in northern New York State.*" Ex. B GRE Claimants' Memo, ¶¶ 9, 10 (emphasis added) (footnote citations to sworn statements of J. Montour, A. Montour and Kenneth Hill omitted).

74.     Upon information and belief, after the expiration of the original joint venture agreement in 2002, the two defendants have continued to operate as joint venturers to manufacture and distribute Seneca brand cigarettes in the United States; a relationship in which both defendants exert significant control over the venture's operations:

    a.   "Thus, in order to refocus their business interests in the United States in 1999, Claimants *established the basic structure of the business enterprise that continues to exist today*." Ex. B GRE Claimants' Memo, ¶ 23 (emphasis added).

    b.   "*NWS succeeded to all the rights and obligations of NTD under the Claimants' agreement, and it continues to this day to operate as the U.S. marketing and distribution facility for Claimants' Seneca® business venture.* Arthur Montour continues to draw salary and income derived from Native Wholesale Supply's sale and distribution of Seneca® cigarettes manufactured exclusively by Grand River; Grand River and its shareholders continue to receive revenue from the production and sale of those cigarettes." *Id.* at ¶ 26 (emphasis added) (footnotes omitted).

    c.   "After formally incorporating their manufacturing and distribution arms, the individual Claimants have continued, and are required, to consult with each other

before making important strategic decisions about marketing and distribution of the Seneca® brand, just as they had always worked together." *Id.* at ¶ 113 (emphasis added) (footnotes omitted).

75.     Grand River and Native Wholesale, as part of the joint venture, share in the income and profits enjoyed from the partnership:

   a.   "Thus, in order to refocus their business interests in the United States in 1999, Claimants established the basic structure of the business enterprise that continues to exist today.  Revenues from this enterprise were divided pursuant to a formula . . . ." Ex. B GRE Claimants' Memo, ¶ 23.

   b.   "[O]ver the years, as the individual Claimants have shared a common interest in the establishment and growth of the Seneca® brand, they have each contributed their own know-how and the resources of their respective companies towards its success. They have *each also shared in the profits generated by the brand, and each has re-invested significant amounts of those profits in order to benefit from its continued growth.*" *Id.* at ¶ 107 (emphasis added) (footnotes omitted).

76.     Grand River and Native Wholesale are also financially dependent upon one another, with Grand River extending continuous loans to Native Wholesale as part of the joint venture, and as a result, availing itself to losses suffered by Native Wholesale.

   a.   "[B]etween 1999 and 2006, Claimants caused Grand River to forward millions of dollars in inventory to NTD and then NWS, and to concurrently extend millions of dollars in credit for these advances of inventory, such that this practice has effectively constituted a *continuous loan of over $1,000,000 to NWS for periods lasting well over three years.*" Ex. B GRE Claimants' Memo, ¶ 115 (emphasis added) (footnotes omitted).

   b.   "Grand River assisted in financing the buyout of NTD by Arthur Montour and NWS . . . ." *Id.* at ¶ 116.

   c.   Grand River "contribute[d] chattel property to their collective business venture, in the form of a delivery truck worth approximately $30,000, which has been used by NWS to conduct its distribution activities." *Id.* at ¶ 114.

77.     Further indicia of the managerial overlap of the two defendants can be found in checks attached hereto as Exhibit C.

78.     Peter Montour, a current and/or former shareholder and director of Defendant Grand River, and father of Grand River CEO Jerry Montour, in at least two instances, and upon information and belief on numerous other occasions, signed checks drawn on the Operating Account of Defendant Native Wholesale. *See* Ex. C.

79.     Upon information and belief, Peter Montour was previously an officer of Grand River, and although no longer listed as an officer, still collected, and may continue to collect, management bonuses from GRE.

80.     Filings by Native Wholesale in its chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Western District of New York contain additional statements that further demonstrate Grand River and Native Wholesale's ongoing joint venture to sell and distribute Seneca brand cigarettes in New York.

81.     For example, in its June 13, 2014 First Amended Chapter 11 Disclosure Statement, attached hereto as Exhibit D, Native Wholesale describes its importation of cigarettes and tobacco products to Indian Nations and Tribes within the United States as only involving products that are manufactured by Grand River:

> NWS is engaged in the business of importing cigarettes and other tobacco products from Native Americans in Canada and selling them to Indian Nations and Tribes within the United States. *The tobacco products the Debtor imports are manufactured by Grand River Enterprises Six Nations, Ltd. ("GRE") on the Grand River Reservation in Ontario, Canada.*

Ex. D at 8 (emphasis added).

82.     In addition, at the time of Native Wholesale's initial Chapter 11 bankruptcy filing on November 21, 2011, Native Wholesale owed a debt to Grand River of "approximately $19,200,000," which "is secured by blanket lien" by Grand River over all of Native Wholesale's assets.  As a result of this debt, Grand River is the "only secured creditor" in the bankruptcy.  Ex. D at 9-10.

83.     Moreover, as of the June 2014 filing of Native Wholesales Disclosure Statement, Grand River "*continues to sell the tobaccos products to* [*Native Wholesale*] *that* [*Native Wholesale*] imports and sells in Indian Country," including within New York State. Ex. D at 10.

**November 6, 2012 Purchase by OAG Investigators**

84.     On November 6, 2012, investigators from the New York State Office of the Attorney General entered the Poospatuck Reservation in Mastic, New York, for the purpose of purchasing Seneca brand cigarettes.

85.     One of investigators entered the Rising Native Sisters smoke shop located on the reservation at 114 Poospatuck Lane in Mastic.  The smoke shop had Grand River's Seneca brand cigarettes for sale, as well as other brands.

86.     There were more than fifty cartons of Seneca brand cigarettes for sale on display shelves in the smoke shop at the time.

87.     While in the smoke shop, the investigator purchased a carton of Seneca brand cigarettes for $28.00.

88.     None of the packs in the carton of Seneca cigarettes which the investigator purchased bore a New York State cigarette tax stamp.

**June 5, 2013 Purchases by OAG Investigators**

89.     On June 5, 2013, investigators from the New York State Office of the Attorney General again entered the Poospatuck Reservation in Mastic, New York, for the purpose of purchasing Seneca brand cigarettes.

90.     One of investigators entered the Rising Native Sisters smoke shop located on the reservation at 114 Poospatuck Lane in Mastic, and observed that the smoke shop had Grand River's Seneca brand cigarettes for sale, as well as other brands.

91.     There were more than fifty cartons of Seneca brand cigarettes for sale on display shelves in the smoke shop at the time.

92.     While in the smoke shop, the investigator purchased a carton of Seneca brand cigarettes for $28.00.

93.     This same investigator then entered the Native Delight Smoke Shop at 149C Squaw Lane in Mastic, New York, and observed that the smoke shop had Grand River's Seneca brand cigarettes for sale.

94.     There were also more than fifty cartons of Seneca brand cigarettes for sale on display shelves in the smoke shop at that time.

95.     While in the smoke shop, the investigator purchased a carton of Seneca brand cigarettes for $25.00.

96.     None of the packs in the carton of Seneca cigarettes which the investigator purchased at these smoke shops on June 5, 2013 bore a New York State cigarette tax stamp.

**January 16, 2013 Seizure by BATF Agents**

97.     Pursuant to a search and seizure warrant issued on January 15, 2013, agents of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATF") entered the Skydancer Smoke Shop located at 126 E. Bayard St., Seneca Falls, New York on January 16, 2013 for the purpose of furthering their investigation into the possession and sale of contraband cigarettes at this location.

98.     During this search and seizure, BATF agents discovered 16,230 cartons of Grand River's Seneca brand cigarettes.  Each carton contained 10 cigarette packs and each pack contains 20 cigarettes; thus there were over 3 million Grand River cigarettes seized.

**Volume of Cigarettes Distributed and Sold by Defendants**

99.     A pack of cigarettes contains twenty cigarettes, and a carton contains ten packs, or two hundred cigarettes.  The state excise tax alone on a pack of cigarettes in New York is $4.35, or $43.50 per carton.

100.     For the period of November 22, 2011 through February 2013, Native Wholesale paid $47,323,758 to Grand River, which includes amounts paid to purchase cigarettes from Grand River, the only manufacturer for which Native Wholesale imported tobacco products, including cigarettes.

101.     Moreover, for the period of November 22, 2011 through February 2013, invoices indicate that Native Wholesale sold or distributed some or all of these Grand River cigarettes to on-reservation wholesalers, such as Seneca Imports, Tonawanda Seneca Nation Distribution, and Tuscarora Nation, among others, amounting to $221,254,107.  Even if the cigarettes were sold to the wholesalers at the retail price of $28.00 per carton—which they undoubtedly were not—this accounts for 7,901,932 cartons, or approximately 79,019,320 packs of cigarettes, or over 1.5 billion cigarettes.

102.     In light of the statistical calculations of the quarterly probable demand for cigarettes by New York State recognized Indian nations or tribes, the quantity of cigarettes shipped to reservation cigarette sellers by defendants is more than could reasonably be consumed by New York State tribal members themselves.

103.     The New York Department of Taxation and Finance has relied on several data sources to estimate the probable demand for cigarettes of New York's  Indian nations or tribes for each quarter during specified time periods, including: the U.S. Census adult population (18 years old and greater) for New York State,  *Table 2. Annual Estimates of the Resident Population for Selected Age Groups by Sex for the United States: April 1, 2010 to July 1, 2011 (NC-EST2011-02)*; and the

Federal excise tax paid cigarette volumes (converted to packs), The U.S. Department of Treasury, Alcohol and Tobacco Tax and Trade Bureau (Monthly Statistical Release, summed for 2011).  DTF calculated that for each quarter during the period of September 1, 2011 to August 31, 2012, the following Indian nations or tribes in New York State would have a total probable demand of 479,100 packs of cigarettes, with the following break down: Cayuga (15,000 packs); Oneida (23,100 packs); Onondaga (45,000 packs); Poospatuck (Unkechauge) (6,000 packs); Seneca (Allegany, Cattaraugus, Oil Springs) (124,500 packs); Shinnecock (30,000 packs); St. Regis Mohawk (215,100 packs); Tonawanda Band of Senecas (4,200 packs); and Tuscarora (16,200 packs).

104.    DTF made a similar calculation for the September 1, 2012 to August 31, 2013 time period, and determined that the Indian nations or tribes in New York State would have a total probable quarterly demand of 462,000 packs of cigarettes, with the following break down: Cayuga (14,400);  Oneida (22,200);  Onondaga (43,200);  Poospatuck (Unkechauge) (5,700);  Seneca (Allegany, Cattaraugus, Oil Springs) (120,000); Shinnecock (29,100); St. Regis Mohawk (207,900); Tonawanda Band of Senecas (3,900); and Tuscarora (15,600).

105.    Based on information contained in invoices and operating reports, during the year 2012, Native Wholesale paid Grand River $43,769,642.00, which includes monies paid for the purchase of cigarettes.  For the same time period, invoices indicate that Native Wholesale was owed $132,576,662.70 for cigarettes sold and/or shipped to the three main distributors in New York.  Additionally, invoices indicate that Native Wholesale was owed $43,725,655.20 for cigarettes sold and/or shipped to various smaller distributors, including in New York.  At the retail price of $28.00 per carton, during the year 2012, Native Wholesale sold or shipped at least 4,734,880.80 cartons, or 47,348,808 packs of cigarettes to their top three customers/distributors in New York, and overall sold or shipped 6,296,511 cartons, or 62,965,113 packs of cigarettes during the year 2012, including

into New York.  These numbers well exceed the aggregated probable demand as estimated by DTF for distribution and/or sales in New York State for the year.  These cigarettes that NWS sold or shipped were purchased from defendant Grand River.

106.    Thus, defendants were aware, both actually and constructively, that the bulk of the unstamped, untaxed, and unreported cigarettes they sell and distribute to reservation cigarette sellers would be sold to non-Indian consumers in New York State.

107.    Thus, defendants' distribution and sales of unstamped cigarettes to wholesale dealers and retailers in New York for profit, evidences their intent, understanding and expectation that their cigarettes will be sold to non-tribal consumers in New York State.

108.    Further, these payments from Native Wholesale to Grand River and distribution to on-reservation wholesalers did not end in February 2013.  Rather, according to the monthly operating reports submitted in the bankruptcy proceeding, this conduct continued through at least August 2014, the month of the last filed operating report, and, upon information and belief, has continued up until the present.

109.    For example, according to the August 2014 operating report, Native Wholesale paid Grand River $2,933,256.85.  In that same period, Native Wholesale also sold or distributed some or all of these Grand River cigarettes to on-reservation wholesalers.  For instance, in August 2014 alone, Native Wholesale accrued invoices for its customer Tonawanda Seneca Nation Distribution totaling $8,066,884.20.

110.    Moreover, as recently as July 2012, defendant Grand River filed a certification with the New York Department of Homeland Security and Emergency Services, Office of Fire Prevention and Control, certifying that its Seneca brand cigarettes are in compliance with the New York Cigarette Fire Safety Act, N.Y. Exec. L. § 156-c.  Pursuant to that Act, fire-safe certifications are

required to be filed for all cigarette brands and brand styles offered for sale to consumers in New York State.  Grand River's New York State fire-safe certification is further evidence that it fully knew, expected, and intended that the Seneca brand cigarettes it manufactures and sells to defendant Native Wholesale would be imported to, distributed and then sold in New York State to New York consumers by Native Wholesale.

111.     Defendants' transfers and shipments of cigarettes take place between various Indian lands in New York, as well as between locations both inside and outside New York State. As a result, they are in "interstate commerce" as defined in the PACT Act.  *See* 15 U.S.C. § 375(9).

112.     Despite shipping hundreds of millions of cigarettes in interstate commerce into New York, neither defendant Grand River nor Native Wholesale has registered with DTF pursuant to the PACT Act.

113.     Nor has either Grand River or Native Wholesale filed any reports whatsoever with DTF pursuant to PACT.

114.     Moreover, defendants Grand River and Native Wholesale are "tobacco product manufacturers" within the meaning of New York Tax Law § 480-b, the above-mentioned certification statute.  That section incorporates New York Public Health Law § 1399-oo's definition of tobacco product manufacturer to include any entity that directly (and not exclusively through an affiliate):

> (a) manufactures cigarettes anywhere that such manufacturer intends to be sold in the United States, including cigarettes intended to be sold in the United States through an importer …;
>
> (b) is the first purchaser anywhere for resale in the United States of cigarettes manufactured anywhere that the manufacturer does not intend to be sold in the United States; or
>
> (c) becomes a successor of an entity described in paragraph (a) or (b) of this subdivision.

N.Y. Public Health L. § 1399-oo(9).

115.     Grand River manufacturers Seneca brand cigarettes which it intends to be sold in the United States, as evidenced by its filing of a fire-safe certification for the brand and by other documents referenced herein.  As such, Grand River is a tobacco product manufacturer within the meaning of the certification statute.

116.     Though it could not do so credibly, if Grand River were to claim that it did not intend for Seneca brand cigarettes to be sold in the United States, then Native Wholesale would nonetheless incur the certification obligation as a tobacco product manufacturer under the statute because the latter would be the first purchaser anywhere for resale in the United States of cigarettes which the manufacturer (Grand River) did not intend to be sold in the United States.  N.Y. Public Health L. § 1399-oo(9)(b).

117.     Neither Grand River nor Native Wholesale has, as required by Section 480-b, ever certified under penalty of perjury--to the Commissioner of DTF, the Attorney General, or to any New York-licensed stamping agent--that it is either a participating manufacturer under the MSA or is in full compliance with New York Public Health Law § 1399-pp(2) by having deposited the required amount of escrow per cigarette sold in the state.  Nor has either Grand River or Native Wholesale submitted to any of these officials the list setting forth each of the cigarette brands they sell for consumption in New York state, as required by Section 480-b(1).

## FIRST CLAIM FOR RELIEF

## VIOLATION OF THE CONTRABAND CIGARETTE TRAFFICKING ACT, 18 U.S.C. §§ 2341-2346

118.     Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

119.    The CCTA requires that packs of cigarettes to be sold in New York State bear a state tax stamp to evidence payment of the excise tax.

120.    Defendants have violated the CCTA by knowingly shipping, transporting, receiving, possessing, selling, and distributing contraband cigarettes within New York State.

121.    Defendant Grand River possessed, sold and shipped cigarettes to Native Wholesale, an entity that is not a New York State licensed stamping agent.  These untaxed and unstamped Grand River cigarettes were to be sold in and into the state of New York by Native Wholesale as part of a joint venture with Grand River.  Native Wholesale received, possessed and distributed untaxed and unstamped Grand River cigarettes in violation of the CCTA.  Native Wholesale then proceeded to sell these untaxed and unstamped cigarettes to reservation cigarette retailers in New York.

122.    Based on a prior course of dealings between Grand River and Native Wholesale, defendant Grand River knew and in fact intended that cigarettes sold to defendant Native Wholesale would be sold into New York without going through a New York State licensed stamping agent, and thus would be neither stamped nor taxed as required by New York law.

123.    As detailed in paragraphs 1 through 94 above, defendants Grand River and Native Wholesale have distributed, shipped, possessed, and sold, and continue to distribute, ship, possess, and sell, hundreds of millions of untaxed and unstamped cigarettes in and into the state of New York far in excess of the 10,000-cigarette limit imposed by the CCTA.

WHEREFORE, plaintiff prays for the relief as hereinafter set forth.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE PACT ACT, 15 U.S.C. §§ 375-378

124.    Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

125.    Defendants' sales, transfers and shipments of cigarettes for profit to reservation sellers in New York State violate the PACT Act.

126.    Defendants sell, transfer, and otherwise ship such cigarettes to reservation cigarette sellers in New York State for profit.  Such sales, transfers, and shipments have been made between the Province of Ontario and the State of New York, between New York and Indian country within New York, and/or between two points in New York through Indian country.  As a result, defendants' sales, transfers and shipments of cigarettes are considered to be made in "interstate commerce" under the PACT Act.  *See* 15 U.S.C. § 375(9).

127.    Specifically, defendant Grand River sold, transferred, and shipped cigarettes to defendant Native Wholesale that were not tax stamped and were to be sold in and into the state of New York by Native Wholesale as part of a joint venture with Grand River.  Based on prior dealings between Grand River and Native Wholesale, defendant Grand River knew and in fact intended that cigarettes sold to defendant Native Wholesale would be sold into New York, that they would not go through a New York State licensed stamping agent, and thus would be neither stamped nor taxed per New York law.

128.    Native Wholesale, in its joint enterprise with Grand River and/or its independent capacity, having purchased cigarettes from Grand River, received and possessed cigarettes that were not tax stamped in violation of the CCTA.  Native Wholesale then proceeded to sell these untaxed cigarettes to reservation cigarette retailers in New York.

129.    Accordingly, defendants were required to submit certain filings to the tobacco tax administrator for the State of New York, *i.e.*, the New York Department of Taxation and Finance.

130.    Neither Grand River nor Native Wholesale submitted to DTF any of the filings required under the PACT Act for any of their sales, transfers and/or shipments of cigarettes to reservation retailers in New York State.

131.    Specifically, each defendant failed to file with DTF "a statement setting forth his name and trade name (if any), and the address of his principal place of business and of any other place of business, as well as telephone numbers for each place of business, a principal electronic mail address, any website addresses, and the name, address, and telephone number of an agent in the State authorized to accept service on behalf of the person." 15 U.S.C. § 376(a)(1).

132.    In addition, each defendant failed to file with DTF "a memorandum or a copy of the invoice covering each and every shipment of cigarettes or smokeless tobacco made during the previous calendar month into such State; the memorandum or invoice in each case to include the name and address of the person to whom the shipment was made, the brand, the quantity thereof, and the name, address, and phone number of the person delivering the shipment to the recipient on behalf of the delivery seller, with all invoice or memoranda information relating to specific customers to be organized by city or town and by zip code[.]"  15 U.S.C. § 376(a)(2).

WHEREFORE, plaintiff prays for the relief as hereinafter set forth.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF N.Y. TAX LAW §§ 471 and 471-e

133.    Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

134.    Defendants have violated, and continue to violate, New York Tax Law §§ 471 and 471-e by possessing cigarettes for sale in New York State, namely Seneca brand cigarettes

manufactured by Grand River and imported and distributed by Native Wholesale, upon which no state excise tax has been paid, and the packages of which have no tax stamps affixed.

135.     Each defendant likewise violates Section 471's implementing regulations discussed above by failing to ship its unstamped cigarettes from outside New York directly to a New York-licensed stamping agent so that the excise tax can be paid and tax stamps properly affixed.

WHEREFORE, plaintiff prays for the relief as hereinafter set forth.

## FOURTH CLAIM FOR RELIEF

## VIOLATION OF NEW YORK TAX LAW § 480-b

136.     Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

137.     Grand River and/or Native Wholesale are "tobacco product manufacturers" as that term is defined in New York Public Health Law § 1399-oo(9) and referenced in New York Tax Law § 480-b.

138.     As explained in detail above, Section 480-b requires a tobacco product manufacturer to file annual certifications with the Commissioner of DTF, the state Attorney General, and any state-licensed cigarette stamping agent who affixes state cigarette tax stamps to the manufacturer's cigarettes, accompanied by a list of the manufacturer's cigarette brands sold for consumption in New York State.

139.     Despite having sold millions of cigarettes in New York, neither Grand River nor Native Wholesale has filed any such certifications in accordance with New York Tax Law Section 480-b.  Nor has either entity provided the requisite list of brands they sell for consumption in New York State.

140.     Grand River and Native Wholesale are therefore jointly and independently continuing to violate Section 480-b.

WHEREFORE, plaintiff prays for the relief as hereinafter set forth.

## PRAYER FOR RELIEF

**WHEREFORE**, the Attorney General respectfully prays that the Court issue and order and judgment:

a.     Permanently enjoining defendants from violating the CCTA by receiving, possessing or purchasing contraband cigarettes, or shipping, transporting, selling, or distributing contraband cigarettes to New York residents or other persons in New York not authorized to possess unstamped cigarettes, *i.e.*, any person other than a New York state-licensed stamping agent.

b.     Authorizing the Attorney General to seize, forfeit, and otherwise destroy any unstamped cigarettes that are (i) manufactured by Grand River, (ii) found in New York, and (iii) are being delivered to, or otherwise in the possession of, a person not authorized by the State of New York to possess unstamped cigarettes.

c.     Directing defendants to comply with the registration and reporting requirements of the PACT Act, 15 U.S.C. § 376.

d.     Directing the defendants to comply with the certification requirements mandated by New York Tax Law § 480-b, for the time period of November 2011 through the present. *See* N.Y. Exec. L. § 63(12).

e.  Directing the defendants to pay to plaintiff civil penalties and money

damages as authorized by the CCTA and the PACT Act. *See* 18 U.S.C. §

2346(b), 15 U.S.C. §§ 377(b), and 15 U.S.C. § 378(c)(1)(A).

f.  Directing the defendants to pay to plaintiff the Attorney General's fees

and costs incurred in bringing this action, and any other injunctive or other

equitable relief this Court deems proper pursuant to the PACT Act. 15

U.S.C. § 378(c)(1)(A).

g.  Granting all such other and further relief as this Court deems appropriate.

Dated:  December 15, 2014  ERIC SCHNEIDERMAN
        New York, New York  Attorney General of the State of New York

        By: _____
        Dana Biberman
          Assistant Attorney General
          Chief, Tobacco Compliance Bureau
        Joshua S. Sprague
        Assistant Attorney General
        120 Broadway, 3rd Floor
        New York, New York 10271
        Telephone: (212) 416-6343
        Facsimile: (212) 416-8877

# EXHIBIT A

L/CID

DEPARTMENT OF STATE

2004 MAR 11 P 2: 46

# Notice of Arbitration
## Under The Arbitration Rules
### Of The
## United Nations Commission on International Trade Law
### And
## The North American Free Trade Agreement

Between:

## GRAND RIVER ENTERPRISES SIX NATIONS, LTD., JERRY MONTOUR, KENNETH HILL and ARTHUR MONTOUR

Claimants/Investors

**- And -**

## GOVERNMENT OF THE UNITED STATES OF AMERICA

Respondent / Party

March 10, 2004

Pursuant to Article 3 of the United Nations Commission on International Trade Law ("UNCITRAL") and Articles 1116 and 1120 of the North American Free Trade Agreement ("NAFTA"), the Claimants initiate recourse to arbitration under the UNCITRAL Rules of Arbitration (Resolution 31/98 Adopted by the General Assembly on December 15, 1976).

## A.    DEMAND THAT THE DISPUTE BE REFERRED TO ARBITRATION

Pursuant to Article 1120(1)(c) of the NAFTA, the Claimants hereby demand that the dispute between them and the Respondent be referred to arbitration under the UNCITRAL Rules of Arbitration.

## B.    NAMES AND ADDRESSES OF THE PARTIES

| | |
|---|---|
| Claimants/<br>Investors | **Grand River Enterprises Six Nations, Ltd.**<br>**2176 Chiefswood Road**<br>**Ohsweken, Ontario, Canada** |
| | **Jerry Montour & Kenneth Hill**<br>**c/o Grand River Enterprises Six Nations, Ltd.**<br>**2176 Chiefswood Road**<br>**Ohsweken, Canada** |
| | **Arthur Montour**<br>**c/o Native Wholesale Supply**<br>**11037 Old Logan Drive**<br>**Seneca Nation Territory**<br>**Perrysburg, New York  14129** |
| Respondent/<br>Party | **Government of the of the United States of America**<br>**Executive Director**<br>**Office of the Legal Advisor**<br>**United States Department of State**<br>**Room 5519**<br>**2201 C. Street NW.**<br>**Washington, D.C.**<br>**20520** |

### C.   REFERENCE TO THE ARBITRATION CLAUSE OR THE SEPARATE ARBITRATION AGREEMENT THAT IS INVOKED

The Claimants invoke Section B of Chapter 11 of the NAFTA, and specifically Articles 1116, 1117, 1120 and 1122 of the NAFTA, as authority for the arbitration. Section B of Chapter 11 of the NAFTA sets out the provisions agreed concerning the settlement of disputes between a Party and an investor of another Party.

### D.   REFERENCE TO THE CONTRACT OUT OF OR IN RELATION TO WHICH THE DISPUTE ARISES

The dispute arises from measures adopted by 46 States relating to Claimants and their investments in the United States and the damages caused by Respondent's breaches of its obligations under Section A of Chapter 11 of the NAFTA.

### E.   THE GENERAL NATURE OF THE CLAIM AND AN INDICATION OF THE AMOUNT INVOLVED

### (I)   <u>Facts</u>

***Background of the Investors and their Investments***

1. Grand River Enterprises Six Nations, Ltd. ("Grand River") is a Canadian corporation organized under the laws of Canada on April 29, 1996. Grand River has at all relevant times since its incorporation maintained a principal office and tobacco products production facility located in Ohsweken, Ontario, Canada. Ohsweken comprises part of the territory of the Six Nations of North America (also known as the Iroquois Confederacy), whose land spans both sides of the U.S. - Canadian border. Grand River currently provides for the employment and income of over two hundred native Canadians and their families in addition to numerous other non-native Canadian individuals in its employ.

2. Jerry Montour and Kenneth Hill are aboriginal Canadian nationals, born in Canada and currently residing in Ontario, Canada. Arthur Montour is an aboriginal Canadian national, born in Canada, who currently resides in New York State. Messrs. Montour, Hill and Montour are also members of the Six Nations of North America.

3. Jerry Montour and Kenneth Hill are shareholders of Grand River. They are also former partners in several enterprises, including, among others, Traditional Trading, Grand River Enterprises (a partnership previously owned and operated by Grand River shareholders), and a third partnership that operated on Native American land in the State of Nebraska.

4.  Arthur Montour is the sole named shareholder of Native Tobacco Direct and ·
    Native Wholesale Supply -- companies operating under charters granted by the
    Sac and Fox Nation of Oklahoma on January 13, 1999, and February 25, 2000,
    respectively. Native Tobacco Direct and Native Wholesale Supply have at all
    times maintained their principal operations on Six Nations land in Northern New
    York in association with Grand River and Messrs. Jerry Montour and Kenneth
    Hill.  Prior to owning Native Tobacco Direct and Native Wholesale Supply,
    Arthur Montour did business individually and under the proprietorship name
    Native American Wholesale, both separately and in association with Jerry
    Montour, Kenneth Hill and the entities described in the immediately preceding
    paragraph.

5.  Messrs. Montour, Hill and Montour (and, later, Grand River) have been engaged
    at all times since 1992, individually or as co-venturers in and through the
    foregoing entities, in the licensing, manufacture, packaging, production,
    importation and sale of tobacco products sold in the Free Trade Area, including
    the United States and Canada.

6.  Specifically, beginning in 1992 and thereafter, Jerry Montour, Kenneth Hill,
    Arthur Montour, Grand River, and the entities they chartered and associations
    they established, did, individually and as co-venturers operating exclusively on
    Native American land in the Free Trade Area, invest, contribute and dedicate --
    and have continued to invest, contribute and dedicate -- significant capital and
    resources into establishing and maintaining the foregoing businesses, operations,
    good will and intellectual property rights in the Free Trade Area, including the
    United States.  To date, the total amount invested has been approximately
    $70,000,000 - $80,000,000 (USD).

7.  By reason of the foregoing, Jerry Montour, Kenneth Hill, Arthur Montour and
    Grand River are, individually and as co-venturers, investors of a Party, Canada,
    whose investments and investment enterprises include, without limitation, the
    assets of Grand River and Native Wholesale Supply (including operations
    facilities, real property, machinery, inventory, contractual, intellectual property
    and distribution rights, and good will) and their business associations in the Free
    Trade Area, including in the United States.

8.  Thus, since 1992, the foregoing Investors have possessed and maintained
    investments in the United States, Canada and Mexico which include or included,
    without limitation, investment enterprises, operations facilities, real property,
    machinery, inventory, contractual, intellectual property and distribution rights,
    and good will.

9.  The foregoing investments and relationships exist and existed, without limitation, in respect of the manufacture and sale of tobacco products commonly known or described by the brand names Seneca, Omaha, Sago, DKs and Putters, in addition to other tobacco products manufactured or licensed to be manufactured or sold by or for Investors since 1992 in the United States.

### *Acts of Expropriation and Discriminatory Treatment*

10. In November 1998, attorneys general and state officials representing forty-six States and six U.S. territories (the "MSA States") entered into a master settlement agreement ("MSA") with the four largest U.S.-based manufacturers of cigarettes, namely: Philip Morris Inc., R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corp., and Lorillard Tobacco Company (collectively, the "Majors"). A copy of the MSA is annexed as Exhibit "1."

11. The MSA settled and resolved over forty lawsuits and claims that these officials had filed and asserted against the Majors, beginning in or about May 1994.[1]

12. In consideration of the States' dismissal of the lawsuits, the Majors agreed under the MSA to make annual "settlement" payments to the MSA States totaling $206 billion over the first 25 years following the MSA's execution, and $9 billion thereafter, annually, subject to certain contingencies, adjustments and offsets.

13. During the MSA's negotiation in the summer and fall 1998, however, and unbeknownst to the Investors or their investment enterprises, the MSA States and Majors had occasion to discuss and did discuss and enter into agreements affecting the future of competition and trade in the cigarette industry within the Free Trade Area, particularly in the United States.

14. Specifically, during the negotiations and discussions leading up to the execution of the MSA, the Majors and the MSA States discussed the fact that the Majors would be raising the price of their tobacco products after the MSA's execution to fund the MSA's settlement payments.

15. In the context of those discussions, the Majors expressed a concern that they would lose market share to existing and potential competitors in the U.S. market, including the Investors and their investment enterprises, who would not need to

---

[1]     The lawsuits sought primarily to recoup Medicaid expenses the States had incurred for the treatment of smoking-related illnesses of indigent smokers, including cancer and emphysema, and were premised principally on theories of conspiracy, fraud and deception. The States' claims focused on allegations that the Majors targeted youth in their advertising; knew of, controlled, and failed to disclose research into the harmful effects of smoking; and knew nicotine in cigarettes was addictive and marketed their cigarettes with those addictive properties in mind. *Report to Senate U.S. Comm. on Commerce, Science & Trans.*, States' Use of MSA Payments, GAO-01-851, at 8 (June 2001), Exhibit "2."

raise prices or maintain higher price levels for their tobacco products subsequent to the MSA's execution.

16. The reason that the Majors' competitors would not need to raise their prices subsequent to the MSA is that these smaller competitors were never sued nor accused of the wrongdoing that gave rise to the States' claims against the Majors. Accordingly, they could not rightfully be made the subject of the burdens and costs associated with the MSA's annual settlement payments.

17. Thus, the Majors refused to agree to the MSA unless the MSA's payment obligations were also imposed on *all other* competitors whose cigarettes would be sold in the U.S. after the MSA's execution.

18. Consistent with these demands, the MSA's payment obligations were drafted to apply, and currently do apply, not only to the Majors but to all other competitors whose cigarettes are sold in the United States, despite the fact that these smaller competitors have never been, and may never be, sued or threatened with suit, nor accused of the wrongdoing that gave rise to the claims asserted against the Majors and settled under the MSA.

19. The device, artifice and contrivance employed by the Majors and the MSA States to make the MSA's "payment scheme" applicable to the Majors' competitors constitutes the principal gravamen of the Investors' claims. This scheme was designed, and currently operates in each individual MSA state, to restrict the sale of smaller competitors' products to the point that these competitors will effectively be put out of business.

20. The MSA's payment scheme is expressly made applicable to the Majors' competitors through two interrelated provisions of the MSA.

21. First, the Majors and the MSA States included provisions in the MSA "permitting" other competitors (who were never sued nor accused of any wrongdoing) to nonetheless join the MSA as Subsequent Participating Manufacturers or "SPMs." MSA §IX(i).[2] Thus, under what are called the "Renegade Clause" provisions of the MSA, competitors of the Majors may join the MSA as SPMs and make *pro rata* settlement payments to the MSA States based on their annual sales volume *vis-à-vis* the Majors in the United States.

22. The second provision applicable to the Majors' competitors is model legislation annexed as Exhibit "T" to the MSA, which the drafting parties intended to be enacted (and which has been enacted) as an "Escrow Statute" in each of the MSA States. MSA, Ex. "T."

---

[2]     The Majors are defined as Original Participating Manufacturers or "OPMs" under the MSA.

23. The Escrow Statutes require each tobacco product manufacturer that does not join the MSA as an SPM to establish a "Qualified Escrow Fund" for the benefit of the MSA States, into which the manufacturer must deposit annually an amount equivalent to that which the manufacturer would have paid the States had it joined the MSA as an SPM.

24. In simplest terms, the Escrow Statutes incorporate the Renegade Clause's payment requirements (with one exception)[3] and makes them applicable to all competitors that do not join the MSA, *i.e.*, non-participating manufacturers or "NPMs."

25. For the reasons explained below, none of the Investors or their investment enterprises has joined the MSA as an SPM. Consequently, Grand River, Native Tobacco Direct and Native Wholesale Supply have been classified by the MSA States as "NPMs" under the Escrow Statutes and subjected to that legislation's payment requirements. The result has been devastating and has damaged and continues to cause significant damage to the Investors and their investments.

### *The Renegade Clause*

26. Notwithstanding that the MSA was drafted by the Majors and the MSA States, and presented to the public as a settlement of lawsuits that were asserted only against the Majors, the MSA expressly provides that other manufacturers and competitors of the Majors may join the MSA as SPMs. MSA § IX(i).

27. Inducing manufacturers and competitors that had never been accused of, nor sued for, any wrongdoing to enter into a settlement agreement, however, required an incentive. That incentive came in the form of a payment exemption set forth in the MSA's Renegade Clause and, further, from the threat that electing not to join the MSA would subject an NPM to substantial, non-exempt payment obligations under the Escrow Statutes.[4]

---

[3]        The one exception, explained immediately *infra*, is that certain SPMs benefit from a payment exemption that is not similarly afforded to other SPMs nor NPMs.

[4]        As North Dakota Attorney General Heidi Heitkamp and Washington Attorney General Christine Gregoire explained at the press conference announcing the MSA: "We are deeply concerned about so-called renegades or rogue manufacturers who are not subject to the [MSA] .... And so consequently, there are incentives built into this deal all around for us to bring as many [manufacturers] in as we can .... [W]e believe there is an incentive for [these manufacturers] to come in, to live consistently [with] the advertising and marketing restrictions that are placed here. We've tried to give them economic incentives." Press Conference of Attorneys General announcing MSA, *Federal News Service,* November 16, 1998 (hereafter "MSA Press Conference"), Exhibit "3."

28. Under the MSA's Renegade Clause, a tobacco product manufacturer (which includes a manufacturer or importer of record) that elects to join the MSA as an SPM must make *pro rata* annual "settlement" payments to the MSA States based on the SPM's comparative U.S. market share *vis-à-vis* the Majors' market share. MSA §IX(i)(1). The Renegade Clause contains an exemption, however, pursuant to which an SPM that agreed to sign on to the MSA within 90 days of its Execution Date (November 23, 1998) would not be required to make any MSA payments, provided its sales in any given year do not exceed the greater of 100% of its 1998 U.S. market share or 125% of its 1997 U.S. market share. MSA § IX(i)(1),(4).

29. In contrast to the early signing SPMs, any manufacturer that signed the MSA more than 90 days after the Execution Date is deemed to have 0% U.S. market share for both 1997 and 1998; hence, any manufacturer that became an SPM subsequent to the 90-day deadline, or which now becomes an SPM, must make MSA payments based on every cigarette it sells -- no exemption applies.

30. None of the Investors nor their investment enterprises were privy to the MSA negotiations, nor were they ever notified of the 90-day deadline. Indeed, none of the Investors or their investment enterprises was ever notified that the MSA -- a settlement agreement between States and private third parties -- could be signed by any manufacturer other than those accused of wrongdoing or sued, *i.e.*, the Majors.

31. Yet, as the statements of the attorneys general that negotiated the MSA make clear, the MSA States and Majors had been secretly negotiating before the MSA's execution with a select few of the Majors' competitors to join the MSA as SPMs within the 90-day deadline, so that they would receive the benefit of the foregoing exemption and favorable treatment under the MSA:

> *MSA Press Conference at 8* ("I'm delighted to say that just before I came in here today, we received a call and a fax from Commonwealth [Tobacco] ... who was not sued by any of the states, but has decided they, too, will be a signatory to the agreement ... *We're in negotiations with a number of other manufacturers*.") (emphasis added).

32. In 1998, the Majors accounted for approximately 96% – 98% of the U.S. cigarette market. The intent and purpose of the Renegade Clause's exemption was to induce a select group of smaller competitors (hereinafter "Exempt SPMs") to join the MSA under a grant that effectively safeguarded their existing market share, while simultaneously and effectively taking the share held by other competitors, including the Investors and their investment enterprises, for the benefit of these Exempt SPMs. The Exempt SPM's would thus be provided with the exclusive entitlement to the remaining 2% – 4% of the U.S. market and subsequent increases in market share beyond those levels. This result was engineered through a secret arrangement only offered to Exempt SPMs.

33. The statements of the MSA States' officials reveal the deception and discrimination inherent in their treatment of other competitors, particularly the Investors and their investments, *vis-à-vis* Exempt SPMs. Even prior to the MSA's Execution Date in November 1998, the MSA States had already negotiated and reached agreement with Exempt SPMs to sign on to the MSA within 90 days of the Execution Date, and thus receive the benefit of the foregoing exemption from the MSA's payment requirements.

34. Notice of the foregoing negotiations or an invitation to join as an Exempt SPM was never given to the Investors nor to their investment enterprises, and no explanation exists for the MSA States' failure to do so. In short, the Majors and the MSA States selected an exclusive group of smaller competitors with whom they would negotiate privately, and secretly, to obtain this favorable treatment. The MSA States did so to the exclusion and considerable detriment of all other smaller competitors, including the Investors and their investments.

35. Moreover, the States were well aware that the tobacco products of other competitors, including the Investors and their investment enterprises, were sold in the United States. Yet, the MSA States did not invite or give notice to these entities to participate in the MSA under the same favorable terms as those secretly offered to and negotiated with Exempt SPMs, including Ligget Corp. and Commonwealth Tobacco Company, which are U.S.-based manufacturers. [5]

36. Without an exemption, if the Investors or their investments join the MSA, their payment obligation to the MSA States would amount to tens of millions of dollars annually. To illustrate, if Grand River and Native Wholesale Supply, individually or as co-venturers, sold cigarettes in 1999 equivalent in amount to the market share devised and allocated to Exempt SPMs (3.8%), and they chose now to join the MSA, they would be required to make retroactive MSA payments for that year in the approximate amount of $158 million, despite the fact that Exempt SPMs were required to make *no* MSA payments for selling the same number of cigarettes in 1999.

37. Similarly, assuming current sales trends, if Grand River and Native Wholesale Supply, individually or as co-venturers, now or hereafter join the MSA, they will incur tens of millions of dollars in MSA payments for their 2002 and 2003 sales, *alone*, despite the fact that Exempt SPMs incurred $0 for selling the same number

---

[5]     In 1999, Exempt SPMs sold approximately 3.8% of all the cigarettes sold in the U.S. -- 16.6 billion cigarettes -- without incurring any MSA payment obligations with respect to those sales. These SPMs also were, and continue to be, exempt from Escrow Statute payment obligations (discussed *infra*) with respect to those and equivalent future sales. In short, the Renegade Clause's annual exemption for these Exempt SPMs continues *pro rata* in perpetuity under the MSA

of cigarettes. In addition, if Grand River and Native Wholesale Supply "join" the MSA today, they must pay on average approximately 12.5% more per carton annually than the Majors must pay under the MSA.

38. Thus, the Investors and their investment enterprises have been effectively precluded from "joining" the MSA on the same terms that have been made available to their competitors. Moreover, as demonstrated below, even if the Investors and their investment enterprises do not join the MSA, they are still required to make the equivalent, multi-million dollar payments annually under what are called Escrow Statutes -- while Exempt SPMs are required to make *no* payments under the MSA or under the Escrow Statutes for selling the same number of cigarettes.

### *The Escrow Statutes*

39. The MSA contains, in Exhibit "T," model legislation that was drafted by the MSA's parties to be enacted in every MSA State and applicable to every tobacco product manufacturer whose cigarettes are sold in the MSA States. Each of the 46 MSA States has enacted this model legislation, which is commonly known as the "Escrow Statue." These measures effectively gave force to the discriminatory and anticompetitive provisions of the MSA in each State.

40. The Escrow Statutes require a tobacco product manufacturer whose cigarettes are sold in an MSA State to do one of two things. First, it may join the MSA as an SPM (without an exemption.) Alternatively, it may remain a "Non-Participating Manufacturer" or "NPM." As an NPM, the manufacturer must establish and maintain a "Qualified Escrow Fund," *i.e.*, an escrow arrangement with a qualified financial institution, into which the manufacturer must make annual payments that are held for twenty-five years for the benefit of the MSA State.

41. To illustrate, for each carton of cigarettes manufactured and distributed by Investors and their investment enterprises that are sold in MSA States, the Escrow Statutes require them to place into a Qualified Escrow Fund by April 15th of the year following the year in which such sales are made: $1.88482 for cigarettes sold in 1999; $2.09424 for cigarettes sold in 2000; $2.7225 for cigarettes sold in 2001 and 2002; $3.35078 for cigarettes sold in 2003 through 2006; and $3.76964 for cigarettes sold in 2007 and thereafter. Each of the foregoing per carton amounts are further subject to cumulative inflation adjustments of no less than 3% per year, as calculated per the terms of the MSA.

42. The total amount an NPM must deposit and maintain in the Qualified Escrow Fund is capped by, and ultimately calculated based on, what it would have paid as an SPM under the MSA, *with no exemption*.

43. The purported purpose of each Escrow Statute is to create a fund that may be accessed by an MSA State to satisfy any judgment that it might receive in the

event it successfully sues the NPM in the future. Such lawsuits must be for claims similar to those asserted against the Majors, and the NPM must be found by a court to have acted "culpably." The funds deposited may not be accessed by the NPM for twenty-five years after their deposit, except to the extent needed to satisfy such judgments.

44. Thus, despite having never been accused of any wrongdoing nor sued or alleged to have engaged in the kind of misconduct allegedly engaged in by the Majors, anywhere in the Free Trade Area, the Escrow Statutes require the Claimants and their investment enterprises to deposit millions of dollars annually into a Qualified Escrow Fund to secure claims that presently do not exist, may never arise, and which currently have no legal basis. The Claimants do not receive the benefit of a fair and equitable hearing (assessing their likely culpability – for which such payments are ostensibly to be made). They do not even hear any claim against them. They are simply ordered to make tens of millions of dollars in annual payments for the benefit of these MSA States, which are to be held for twenty-five years in the event at some point in the future a State recovers a judgment against them for acting culpably (a term nowhere defined).

45. As indicated in the MSA, however, the Escrow Statutes' true purpose is to "effectively and fully neutralize the cost disadvantages that the [Majors and SPMs] experience *vis-à-vis* [NPMs] within each [MSA State] as a result of the provisions of [the MSA]." MSA IX(d)(2)(E).

46. The Escrow Statutes have this "neutralizing" effect because the escrow payments they require are prohibitive, *i.e.*, the per carton payments required under the Escrow Statutes are greater than the per carton profits of Investors or their investment enterprises.

47. Thus, the Investors and their investment enterprises are forced to raise prices if they wish to comply with the Escrow Statutes; they cannot maintain pre-MSA price levels for their cigarettes and stay in business. If they increase prices, however, their ability to offer significant price competition to the Majors and SPMs -- particularly Exempt SPMs -- is materially and adversely compromised. The effect of compliance, accordingly, is the complete destruction of the Investors' business and their investments.

48. On the other hand, if an NPM does not make the payments required under a State's Escrow Statute, the NPM is subject to civil penalties and its products will be prohibited from being sold in the State. The effect of non-compliance, accordingly, is a complete prohibition against the operation of the Investors' business and their investments within the territory claimed by the USA, again resulting in its complete destruction.

### *The Contraband Laws*

49. In or about the beginning of 2002, the MSA States started to enact and adopt what the MSA States call "complementary legislation" and regulations -- defined herein collectively as "Contraband Laws." They are defined herein as Contraband Laws because cigarettes that are manufactured by an NPM that has not complied with the Escrow Statutes are considered contraband. These laws were and are designed to provide a further, immediate means of neutralizing competition from NPMs, and they were drafted and proposed for legislation by the National Association of Attorneys General ("NAAG") and the Majors.[6]

50. Penalties under the Contraband Laws are severe and, unlike the Escrow Statutes, explicitly apply to distributors as well as NPMs. Violation of a Contraband Law subjects a distributor to civil monetary penalties and suspension or cancellation of its license to stamp cigarettes. Cigarettes that are stamped in violation of a Contraband Law are also subject in some States to immediate seizure by state officials and a forfeiture action similar to those involving pre-conviction forfeiture crimes.

51. The Contraband Laws also provide that an NPM's products may not be sold in an MSA State unless the NPM appoints a representative statutory agent for service of process in the State. In addition, these laws provide for the public posting and publication of lists of NPMs who have not complied with the Escrow Statutes – a black list – that lists those manufacturers whose products can and cannot be sold in the State. If an NPM has not complied with an escrow statute, its products are "black listed," meaning they are posted on an attorney general's website and cannot be sold in the State.

### *MSA States' Actions Against the Investors and their Investments*

52. Within the past twenty-four months, the MSA States have undertaken enforcement and coordinated enforcement of the Escrow Statutes and Contraband Laws against and relating to the Investors and their investment enterprises.[7] Thus

---

[6] Under the Escrow Statutes, an NPM and others selling its cigarettes may be enjoined from selling cigarettes in an MSA State only after the NPM is found to have knowingly withheld escrow payments for two separate years. Under the Contraband Laws, however, there is an immediate prohibition against the stamping and sale of an NPM's cigarettes if the NPM is not in compliance with the State's Escrow Statute.

[7] Each Escrow Statute provides that the State's Attorney General is authorized to bring a civil action on behalf of the State against an NPM if it fails to make required escrow payments, and seek a civil penalty of up to 300% of the amount required to paid into escrow in the case of a knowing violation. The Escrow Statutes also provide that each failure to make an annual escrow payment constitutes a separate violation, and, in the case of a second knowing violation, the NPM is to be prohibited from selling cigarettes to consumers within the applicable MSA State for a period not to exceed two years.

far, a number of MSA States have commenced litigation against these entities under the Escrow Statutes, and many more have demanded escrow payments from these entities and threatened suit.

53. To date, approximately $1,100,000 in escrow and penalties (for alleged untimely compliance with the Escrow Statutes) has been paid by or for the Claimants under the Escrow Statutes, without prejudice and under a full reservation of their rights under U.S. law.

54. More importantly, the Investors and their investment enterprises face numerous additional lawsuits and demands for tens of millions of dollars in escrow payments and penalties from other MSA States, all under similar threats that, if the escrow and penalties are not paid, the Claimants will be prosecuted and their products deemed contraband in the MSA States.

55. The foregoing enforcement efforts are coordinated and implemented through various committees and task forces of NAAG that are comprised of officials from the attorneys general offices of the MSA States and the personnel and attorneys employed by NAAG, who are paid from an enforcement fund that is funded separately under the MSA by the Majors.

56. The MSA States' enforcement actions and demands are based on the claim that the Investors and their investment enterprises manufacture and sell cigarettes that they "intend to be sold in the United States," irrespective of whether they "intend" their cigarettes to be sold in any particular MSA State.[8]

57. The Investors and their prior and current investment enterprises have produced, sold and distributed tobacco products that have been sold on Native American land in the United States since long before the MSA's execution or the States' enactment of the Escrow Statutes. None of the Investors or their investment enterprises has ever been sued for, nor accused of, any of the claims asserted against the Majors and settled under the MSA.

58. There is no basis whatsoever for the MSA States, for the first time in the history of the U.S. tobacco industry, to require competitors such as the Investors and their investment enterprises to make multi-million dollar escrow payments for the States' benefit as herein described. Moreover, there is no legally permissible or

---

[8]    Indeed, *even if Investors' products are sold only in one of the four non-MSA States*, they would be subject to an MSA State's Escrow Statute if the cigarettes are subsequently sold in that MSA State "whether directly or through a distributor, retailer or similar intermediary or intermediaries" -- irrespective of how such products find their way into the State, by whom they are sold, and even if Investors or their investment entities did not direct or take part in any sale in the State.

internationally acceptable basis for the MSA States to select those competitors that are to receive favorable treatment in the form of payment exemptions under the MSA and Escrow Statutes -- significantly to the disadvantage and detriment of other competitors, particularly the Investors and their investment enterprises herein.

### *Additional State Measures Designed to Secure the MSA Cartel Price*

59. On January 8, 2004, Michigan promulgated Act Nos. 285 and 286, which renew the escrow obligations of all NPMs whose cigarettes are sold in Michigan and impose a new "equity assessment" on such sellers. This "equity assessment" must be "pre-paid" by March 1st of each year, at a rate of 175 mills per cigarette (i.e. ¢35 per 20-cigarette pack) for all cigarettes likely to be sold in the State (based upon the past year's performance) or $10,000.00 (whichever is higher).

60. Measures such as those imposed by Michigan should be considered as part of the ongoing application of the MSA by the 46 MSA States to preserve the market share of their settlement partners (i.e. the Majors), to the detriment of NPMs such as the Claimants and their investment enterprises. The Claimants reserve their rights to include the impact of these, and any other related measures imposed by any of the MSA States before this claim is heard, in their analysis of damages suffered as a result of their imposition.

## (II)   Issues

61. The Government of the United States, through each of its MSA States, has breached its obligations under NAFTA Articles 1102 (National Treatment), 1103 (Most Favored Nation Treatment), Article 1104 (Standard of Treatment), Article 1105 (Treatment in Accordance with International Law), and Article 1110 (requiring Compensation for Expropriation). The claimants have incurred damage by reason of that breach, including in relation to their investments as hereinbefore and hereafter described.

## Article 1102 - National Treatment

62. NAFTA Article 1102 requires the States of the United States to accord to Canadian investors and their investments treatment no less favorable than that accorded, in like circumstances, to U.S. investors and their investments with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

63. The Investors and their investments have been accorded less favorable treatment than that accorded to investors of the United States and their investments with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of their investments. The best treatment

available to investors operating in like circumstances with the Claimants and their investments is offered to virtually every other person conducting business in the U.S.A. – i.e. the freedom to transact business without being forced to make prohibitive payments into an escrow fund to secure payments of judgments arising from vaguely unspecified "culpable conduct" which has never been committed, nor even  accused of having been committed.

64. In addition, the Investors and their investments have not been provided with the best treatment available to their U.S. competitors. The best treatment provided under these measures is accorded to those who are exempted from the payment requirements of the MSA and Escrow Statutes as described above.

65. The operation and effect of the MSA, Escrow Statutes and Contraband Laws has been to unreasonably discriminate against the Investors and their investments, thereby compromising their ability to compete and operate their businesses and investment enterprises, including in territory claimed by the U.S.A., and causing them financial loss, to the corresponding benefit of U.S. competitors who have received and continue to receive more favorable treatment under the MSA and these laws.

## Article 1103 – Most-Favored Nation Treatment

66. NAFTA Article 1103 requires the States of the United States to accord to the Investors and their investments treatment no less favorable than that they accord, in like circumstances, to investors or investments of any other Party or non-Party with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

67. Neither the Federal Government nor any of the MSA States  requires foreign investors to maintain qualified escrow funds to secure judgments that may be rendered against them for unspecified wrongs.  Under Article 1103, the MSA States must provide this level of treatment to the claimants, who are operating their business in like circumstances; i.e. never having had a claim made out, much less proved, against them in a U.S. court.

68. Moreover, foreign competitors of the Investors and their investments have been provided with an exemption under the aforementioned measures in breach of Article 1103.  As a result, the Investors and their investments have not been accorded the best treatment available with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments. The Investors and their investments have suffered loss and harm as a result of the imposition of these measures in breach of Article 1103.

## Article 1104 - Standard of Treatment

69. Article 1104 of the NAFTA requires each NAFTA Party, and the states or

provinces of such Party, to accord to investors and the investments of another Party the better of the treatment required by Articles 1102 and 1103.

70. None of the MSA States has thus far accorded to the Investors and their investments the better of the treatment required by Articles 1102 and 1103.

## Article 1105 - Minimum Standard of Treatment

71. Article 1105 requires each NAFTA Party to accord to investments of investors of another Party treatment in accordance with international law, including fair and equitable treatment and full protection and security.

72. The investments of the Investors have been accorded treatment which falls far below the minimum standard of treatment which is required under customary international law.

73. The MSA States have imposed measures relating to the investments of the Investors that require the establishment of an escrow fund to secure claims that do not exist or that have never been asserted against them. These measures have been imposed in a manner that is so arbitrary as to be completely unjust. Arbitrariness is an anathema to the international rule of law.

74. In addition, international law requires that for treatment to be fair and equitable, a certain minimum degree of transparency will be required. As the degree of interference with the investment increases, so too does the obligation to provide notice and an opportunity to be heard. No such notice, much less an opportunity to be heard, was provided to the Investors before these measures were imposed upon their investments and in favor of their competitors. The Investors and their investments have suffered loss and harm as a result of the imposition of these measures in breach of Article 1105.

75. Similarly, the good faith requirement to provide fair and equitable treatment prohibits States from acting in a way specifically intended to favor one participant in the business community better than another similarly situated participant. It does not matter why such conduct is engaged in, or whether it is performed *ultra vires* any official grant of authority. It certainly does matter, however, if such conduct is engaged in by stealth – as it was in this case – because it evidences an utter lack of good faith in the administration of public office.

## Article 1110 – Expropriation

76. Under Article 1110 of the NAFTA, no Party may directly or indirectly expropriate an investment of an investor without the prompt payment of effective compensation. This obligation is extended to the states and provinces of a Party through the application of NAFTA Article 105.

77. By essentially banning the purchase and sale of the Investors' products in the MSA States and the operation of their investment enterprises unless they make prohibitive MSA or escrow payments, the MSA States have effectively expropriated their business as hereinabove described.

78. Currently, cigarettes produced and sold by the Investors and their investment enterprises are banned from sale in numerous MSA States. Additional MSA States continue to demand and sue the Investors or their investment enterprises, seeking damages in the amount of escrow and penalties claimed to be due and injunctive relief preventing the sale of their cigarettes in these States.

79. In short, if the Investors fail to comply with the arbitrary and unjustifiable demands imposed by these measures, they will lose their business. If they comply with these unconscionable demands, they will still lose their business.

80. The claimants only remain in business today, and their products are only sold in a few States, because they have fought the application of these measures, and mitigated their effect by making certain "without prejudice" escrow payments, but their products have been banned in numerous States and their business will fail if the measures continue in force against them. Accordingly, the result of the conduct of these MSA states has been effectively to expropriate the business of the Investors, without any of the MSA States' having paid effective compensation to the claimants.

## (III)   **Relief Sought and Damages Claimed**

81. The Investors claim damages for the following:

   i.   Damages of not less than US$340 million, as compensation for the damages caused by, or arising out of, the United States' measures that are inconsistent with its obligations contained within Part A of NAFTA Chapter 11;

   ii.   Costs associated with these proceedings, including all professional fees and disbursements;

   iii.   Fees and expenses incurred to oppose the promulgation of the infringing measures;

   iv.   Pre-award and post-award interest at a rate to be fixed by the Tribunal;

   v.   Payment of a sum of compensation equal to any tax consequences of the award, in order to maintain the award's integrity; and

vi.   Such further relief as counsel may advise and that this Tribunal may deem appropriate.

Dated: New York, New York
March 10, 2004

WINDELS MARX LANE & MITTENDORF, LLP

By: _____
Leonard Violi
156 W. 56th Street
New York, New York 10019
(212) 237-1000

Counsel to Grand River Enterprises Six Nations, Ltd., Jerry Montour, Kenneth Hill and and Arthur Montour

-----
Todd Weiler
NAFTALaw.org
Of Counsel

-----
Served To:

United States Department of State

# EXHIBIT B

---

UNDER THE ARBITRATION RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW
AND
THE NORTH AMERICAN FREE TRADE AGREEMENT

BETWEEN:

## GRAND RIVER ENTERPRISES SIX NATIONS, LTD.,
## JERRY MONTOUR, KENNETH HILL AND ARTHUR MONTOUR, JR.

Claimants / Investors

– AND –

## GOVERNMENT OF THE UNITED STATES OF AMERICA

Respondent / Party

---

## CLAIMANTS' MEMORIAL

## MERITS PHASE

---

10 July 2008

# TABLE OF CONTENTS

Introduction  ........................................................................................................1

PART I          THE FACTS ........................................................................3

The Claimants and Their Investments......................................................6

Establishing an Investment in the Seneca® Brand. ...............................8

Adoption of the Escrow Statutes .............................................................12

Enforcement of the Original Escrow Statutes........................................18

Adoption of the Contraband Laws ...........................................................19

Adoption of the Allocable Share Amendments ......................................23

Application of the Amended Escrow Statutes to
Claimants and Theirs Investments..........................................................30

Discriminatory Impact Upon and Expropriation of Off-Reserve Investment ..........32

PART II         THE ARGUMENT .............................................................35

SECTION I  Claimants Have Satisfied the Requirements
of NAFTA Chapter 11 ...............................................................................35

A.      Claimants are Investors Entitled to the Protections of the NAFTA .................35

B.      Claimants have made Investments Recognized under the NAFTA ...................35

          a.  Goodwill and Intellectual Property Embodied
              in Claimants' Seneca® and Opal® Brands .................................38

          b.  The Claimants' Business Enterprise.............................................41

          c.   Claimants' Contribution of Capital to Escrow and Penalties...................44

          d.  Conclusion ......................................................................................45

C.      The Dispute Falls Within the Scope of NAFTA Chapter 11 ...............................46

SECTION II  Interpretation of NAFTA Chapter 11 ....................................................49

A.      Interpretation of the NAFTA Must be in Accordance
          with Applicable Rules of International Law ........................................................49

**B.    Customary International Law Rules of Treaty
        Interpretation as Applied to the NAFTA**................................................**50**

**C.    Applicable International Law Concerning the Individual Rights
        and Protection of Indigenous Peoples** ....................................................**53**

**SECTION III   RESPONDENT HAS BREACHED ITS OBLIGATIONS
        UNDER ARTICLE 1105 OF NAFTA**........................................................**58**

**A.    NAFTA Article 1105 and the Customary International Law
        Standard of Fair and Equitable Treatment** ............................................**58**

        **a.  Good Faith, Legitimate Expectations and Detrimental Reliance**.............**62**

        **b.  Stability and Transparency of the Host State's Legal Regime**.................**63**

        **c.  Respect for the Customary International Law Rights
            of Indigenous People** ........................................................................**66**

        **d.  Even-Handedness and Fair Dealing in the Prevention of
            Discrimination Against First Nations Investors**..........................**71**

        **e.  Fundamental Due Process, Equality and the Right to be Heard**.............**77**

**B.    Respondent's Breaches of Article 1105**........................................................**80**

        **a.  Respondent Failed to Provide a Transparent and Predictable
            Business and Regulatory Climate**..................................................**81**

        **b.  Respondent Breached its Obligation to Proactively Consult
            First Nations Investors** .....................................................................**87**

        **c.  Claimants had a Legitimate Expectation that Respondent
            Would Honor its Obligations Toward Haudenosaunee Investors
            Under Applicable International and Domestic Laws** ................................**89**

        **d.  Equality and Due Process:  Claimants had a Right to
            their Day in Court**..........................................................................**93**

**SECTION IV   RESPONDENT HAS BREACHED ITS OBLIGATIONS
        UNDER NAFTA ARTICLES 1102 AND 1103 OF THE NAFTA.** ....................**95**

**A.    Respondent's Obligations Under Articles 1102 and 1103** ...................**95**

        **a.  Identification of Appropriate Comparators**.................................**99**

        **b.  Treatment No Less Favourable** ......................................................**101**

        **c.  Like Circumstances**........................................................................**103**

**B.    Respondent's Breaches of Articles 1102 and 1103** ............................**106**

    **a.   Comparators** ................................................................**106**

    **b.   Treatment No Less Favorable** ....................................**107**

        **i.    The Allocable Share Amendments Have Accorded Better Treatment to Exempt SPMs** ................................**108**

        **ii.   The Ongoing Regulatory Dialogue Launched With the MSA Accorded Better Treatment to OPMs** ........................**111**

        **iii. Michigan's Equity Assessment Measure Accords Better Treatment to All Other Tobacco Enterprises, Other Than NPMs** ............................................**111**

    **c.   Like Circumstances** ....................................................**112**

**SECTION V   EXPROPRIATION** ........................................................**116**

**A.    Respondent's Obligations Under Article 1110** ......................**116**

**B.    Respondent's Breaches of Article 1110** ..................................**121**

**SECTION VI   DAMAGES** ..................................................................**126**

**A.    Damages for the Loss of Off-Reserve Sales in Five State Markets Because of the Allocable Share Amendments** ..............**130**

**B.    Impairment of On-Reserve Sales** ..........................................**131**

**C.    Professional Fees** ....................................................................**134**

**PART III - RELIEF REQUESTED** ....................................................**135**

**TABLE 1-1 CHRONOLOGY OF CLAIMANTS INVESTMENTS IN THE U.S.** ...**141**

**TABLE 1-2 CHRONOLOGY OF STATE MEASURES** ........................**144**

**ADDENDUM A** ....................................................................................**146**

*Grand River, et al v. U.S.A.*                                                                                    /1
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

## <u>INTRODUCTION</u>

1.      In this arbitration, Claimants seek damages from the Government of the United States pursuant to Chapter 11 of the North American Free Trade Agreement ("NAFTA").  At issue is a regulatory scheme that imposes discriminatory payment burdens on Claimants in comparison to competing tobacco companies in the U.S. market.  In addition to applying to Claimants as investors, the measures expropriate and treat Claimants' investments in an unjust and discriminatory manner, by imposing an *in rem* ban on the sale of Claimants' trademarked products in any State where the offending regulatory payments have not been made.

2.      In contravention of NAFTA, the measures do not operate even-handedly with respect to all investors and their investments in the Free Trade Area or the United States.  Indeed, for the reasons and under the circumstances explained below, Claimants were entitled to a heightened level of vigilance and care with respect to receiving at least parity treatment under the measures at issue.  The record demonstrates, however, that the purpose and effect of these measures, as recently amended, is to discriminate against Claimants and their investments in favor of a defined group of investors that Respondent has arbitrarily chosen to receive such favorable treatment.  The further effect of these measures has been to expropriate Claimants' investments for the benefit of the aforementioned group of favored investors, in return for what one State Senator identified – rightfully so – as 'protection' money.

3.      Respondent's measures have resulted in four basic types of breach under the NAFTA:

- ▪ **Articles 1102 & 1103**: Respondent has failed to provide Claimants and Claimants' investments in their proprietary cigarette brands 'treatment no less favorable' than has been provided competing tobacco companies and their investments; and

- ▪ **Article 1105**:  Respondent has treated Claimants and their investments in an arbitrary and discriminatory manner, contrary to basic principles of fairness and due process and contrary to the basic human rights norms that condition how the customary international law standard of fair and equitable treatment should be interpreted particularly when the interests of First Nations members and communities are at stake;

*Grand River, et al v. U.S.A.*                                                                                    /2
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

- **Article 1105**:  In establishing or expanding their investment, Claimants were entitled to rely on the transparency and stability of the law in the Host State. Claimants shared legitimate expectations that Respondent would not radically change the legal framework for tobacco distribution without effective notice or consultation, and certainly not with intent to drive them out of the market or depart from the obligations it holds to Native Americans under law;

- **Article 1110**:  Respondent has expropriated Claimants' investment in specific markets within the United States without the payment of effective compensation or respect for due process under international law.

4. In defense of these claims, Respondent has raised collateral arguments alleging that Claimants are not "investors" who have made "investments" in the United States, and that the measures at issue do not relate to Claimants or their investments.

5. The evidence demonstrates that Claimants have collectively made significant investments in the United States, effected through their calculated effort to establish, promote, manufacture and distribute unique, proprietary brands of tobacco products known as Seneca® and, to a lesser extent, Opal®.  These investments include, but are not limited to, investments made in connection with a vertically integrated enterprise, which Claimants organized and operated to promote and distribute their proprietary cigarette brands in the United States.

6. Respondent's contention that its measures do not "relate to" Claimants and their investments is belied, first and foremost, by the fact that Respondent has banned the sale of Claimants' U.S.-trademarked cigarette brands pursuant to the Contraband Laws and injunctions obtained under amended Escrow Statutes in many states, and has threatened to ban the sale of those products in most of the states where they are currently sold.  If the measures did not "relate to" Claimants or their investments, Respondent would not have sought, and would not be continuing to seek, their enforcement against Claimants, their brands, and the distribution of those brands inside the customs territory of the United States.

7. As Claimants demonstrate in this Memorial on the Merits ("**Memorial**"), the measures have caused material harm to Claimants and substantially impaired the value of their investments in the United States.

*Grand River, et al v. U.S.A.*                                                    /3
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

## PART I:
## THE FACTS

### The Claimants and Their Investments

8.      Claimants Jerry Montour, Kenneth Hill, and Arthur Montour are citizens of Canada and members of two of the First Nations that comprise the Six Nations of North America, also known as the Iroquois Confederacy and amongst themselves as the Haudenosaunee.[1]

9.      Jerry Montour and Kenneth Hill are the controlling shareholders of Claimant Grand River Enterprises Six Nations, Ltd. ("Grand River"), a corporation established under the laws of Canada.[2] Arthur Montour is the sole shareholder of Native Wholesale Supply ("NWS"), a corporation established under the laws of the Sac and Fox Nation.

10.     Individually and as partners, Jerry Montour and Kenneth Hill first became involved in the tobacco industry in or about 1988, through various informal and formal business relationships and associations that principally involved the manufacture and distribution of tobacco products on Native American land in northern New York State. These business relationships included, among others, a contract manufacturing relationship with a Delaware corporation known as Star Scientific, Inc. ("Star Scientific"), pursuant to which Star Scientific manufactured Mr. Montour's and Mr. Hill's proprietary DKs®

---

[1]     Statement of Jerry Montour, sworn to July 10, 2008, at 1. (hereafter   "J. Montour Stmt."); Statement of Kenneth Hill, sworn to July 8, 2008, at para 1. (hereafter  "Hill Stmt."). Statement of Arthur Montour, sworn to July 10, 2008 at para 1. (hereafter "A. Montour Stmt.") Despite the similarity in their family names, Jerry Montour and Arthur Montour do not have a familial relationship.  J. Montour Stmt at 12.

[2]     J. Montour Stmt. at 2; Hill Stmt, at para 2. For the reasons explained further herein, Jerry Montour and Kenneth Hill are investors with standing under the NAFTA in their own right – separate and apart from the investment interest of all Grand River shareholders in bringing this claim (which, in any event, is also represented in the claim brought on behalf of Grand River by Messer's Montour and Hill, as its controlling shareholders under Article 1117).   Jerry Montour and Kenneth Hill share a relationship with Arthur Montour and his distribution company in the United States, which is distinct from the arrangements agreed to by and among that company and Grand River, as a matter of domestic law.

*Grand River, et al v. U.S.A.*                                          /4
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

and Putters® cigarette brands for subsequent distribution on Native American land principally in northern New York.

11.     Building on the experience they gained in the marketing and distribution of their DKs® and Putters® brands, and using the profits from that business, Claimants subsequently expanded into manufacturing these brands in 1990, in their own right. To that end, they entered into a formal business relationship with a fellow Mohawk Nation member, named Lawrence Skidders, for the purpose of establishing a manufacturing facility that would take over production of these two brands from Star Scientific.[3] ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ They also contributed their distribution expertise and general knowledge of the tobacco business as well, while Mr. Skidders contributed land, construction expertise, and administrative and operational skills.[4] Together, Jerry Montour, Kenneth Hill ██████████████████████████ ██████████████████████████████████ successfully constructed the cigarette manufacturing plant in Racket Pointe, New York on the Akwasesne Territory of the Mohawk Nation. This territory includes lands located within the borders of two Canadian Provinces, Ontario and Quebec, and one U.S. State, New York.[5]

12.     Larry Skidders had previously owned and operated a successful construction company that became a model of First Nations success, employing a number of First Nations peoples to complete construction projects designed to advance the cause of First Nations members in North America. The First Nations people employed by Mr. Skidders in his construction company at that time included Claimant Arthur Montour ██████████ ████████████████████████████████████████████████████████ ████ With the added enthusiasm of a young Arthur Montour, the industry experience

---

[3]     J. Montour Stmt at 12.

[4]     J. Montour Stmt. at 13.

[5]     J. Montour Stmt. at 9-11. The Akwesasne Territory is also known as the "St. Regis Reservation" by residents of upper New York State.

*Grand River, et al v. U.S.A.*                                                                    /5
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

of Jerry Montour and Kenneth Hill, and the facility and administrative acumen of Larry Skidders, the venture was seen, as described by Arthur Montour, as representing their collective future.[6]

13.    In January 1991, at 40 years of age, Larry Skidders died suddenly while driving home from an American Football Superbowl sporting event in Tampa, Florida.[7] The parties' business relationship with the Skidders estate deteriorated shortly thereafter, and as such it no longer became feasible to maintain production at the recently launched facilities on Racket Pointe.[8] Accordingly, starting in 1993, Messrs. Montour and Hill began the process of moving production of their DKs[®] and Putters[®] brands to the Six Nations of the Grand River Territory in Ontario, Canada. Meanwhile, Arthur Montour had been developing a fairly successful tobacco distribution network among Native American traders in the United States, which he continued to serve subsequent to his departure from Racket Pointe, both in an individual capacity and through various associations with other Native American suppliers.[9] Arthur Montour's contacts and distribution networks also allowed him to branch out into trading commodities other than tobacco products.[10]

14.    In 1994, Jerry Montour, Kenneth Hill ███████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████ form a partnership known as "Grand River Enterprises," for the purpose of constructing a new cigarette manufacturing facility on Six Nations land, in Ontario, Canada.[11] The contemporaneous resolutions of the Band Councils and Assembly of First Nations attached to this memorial acknowledge a principal goal of Grand River Enterprises that parallels the intent and spirit of NAFTA: *i.e.*, to promote trade and commerce among *all First*

---

[6]      A. Montour Stmt. at 7 .

[7]      A. Montour Stmt. at 8.

[8]      J. Montour Stmt. at 13.

[9]      A. Montour Stmt. at 9 .

[10]      A. Montour Stmt. at 9 .

[11]      J. Montour Stmt. at 14.

*Grand River, et al v. U.S.A.*                                                                                                                                   /6
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

*Nations members throughout North America*, as if there were no borders among these respective member nations.[12]

15.     As the video attached to Jerry Montour's statement demonstrates,[13] the intent behind Claimants' investments in the tobacco industry has always been to improve economic development among First Nations peoples in an area of commerce for which Six Nations traders had been involved for centuries, long before the arrival of European settlers and colonists.[14]   Thus, in transitioning from Racket Pointe to the Six Nations of the Grand River Territory, Jerry Montour and Kenneth Hill maintained a consistent objective of establishing manufacturing facilities and distribution networks to serve First Nations territories in both Canada and the United States.[15]   Their first efforts in the United States were hindered to some extent by a partner's premature death.   After their manufacturing facility was relocated to Six Nations in Canada, however, they had to deal with a different obstacle: a legal dispute with the Government of Canada over taxation of their business.   The Grand River partners wanted to ensure that the proceeds of any amounts paid in relation to their sales would actually benefit members of their community.   The Government of Canada claimed that the Grand River partners could not manufacture cigarettes without a federal license and payment of taxes to the Federal Government, without restriction as to what community would benefit from its collection.[16]   The Grand River partners maintained that they had a sovereign right, exercised since time immemorial, to manufacture and trade in tobacco products among Six Nations members, and other First Nations generally, free of such taxation.[17]

---

[12]     Appendix of Claimants' Evidence, Ex. 15.

[13]     J. Montour Stmt., Ex 1.

[14]     J. Montour Stmt at 3.   Statement of Professor Gary Warrick, at page 46; Statement of Prof. Jose Antonio Brandao, at page 17; Statement of Professor Robert Clinton, at page 16.

[15]     J. Montour Stmt at 11-12.

[16]     Hill Stmt at 5-6; J. Montour Stmt at 17.

[17]     J. Montour Stmt at 18.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 67 of 270

*Grand River, et al v. U.S.A.*                                                    /7
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

16.     As part of dealing with their dispute with the Government of Canada, the partners
        undertook to incorporate under the laws of Canada in 1996, as Grand River Enterprises
        Six Nations Ltd. (hereinafter "Grand River").[18]   Thereafter, Grand River remitted federal
        excise taxes and duties to the Government of Canada.   However, its, shareholders (still
        considered by Claimants essentially to be partners) remained personally exempt from
        government taxation relating to Grand River's operations, including compensation that
        they would receive from those operations.[19]

17.     With some of their Canadian legal issues addressed, and their relationship with the
        Skidders Estate terminated, the Grand River partners turned their sights again on
        expanding their investment in the United States tobacco industry.   In 1996, Jerry
        Montour, on behalf of some of his partners, entered into a venture relationship with the
        Omaha Tribe of Nebraska ("Omaha Tribe") to manufacture and distribute proprietary
        cigarette brands through Native American channels in the United States.[20]   Profits of the
        venture were to be divided equally amongst the Omaha Tribe and Jerry Montour.[21]   It
        was also agreed that Arthur Montour would be the person principally responsible for the
        distribution of any proprietary products manufactured by the venture for Claimants and
        would receive his share of compensation from that venture from those distribution
        proceeds.[22]

18.     As part of their venture, Jerry Montour moved to, and resided in, Macy, Nebraska,
        between 1996 and 1998.   His presence was required in the territory to oversee
        construction of the manufacturing facility and management of its initial operations.[23]

---

[18]     J. Montour Stmt at 18. To be clear, the partners' incorporation of Grand River did not mean that they
         willingly submitted themselves or their enterprise to taxation by the Government of Canada.  As part of
         their understanding with the Six Nations Band Council, they had planned to, and did, remit payments to the
         Council for the benefit for the Band.  There is also no question that the Province in which the Band's
         territory was located had no authority to impose taxes upon Claimants or their enterprise.

[19]     J. Montour Stmt. at 18.

[20]     J. Montour Stmt. at 19.

[21]     J. Montour Stmt. at 19.

[22]     J. Montour Stmt. at 20.

[23]     J. Montour Stmt. at 20.

*Grand River, et al v. U.S.A.*                                                                                /8
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

Jerry Montour also personally guaranteed the financial obligations of the venture with respect to the refurbishing of the machinery acquired to equip that production facility.[24]

19.    After dedicating two years to the Omaha Tribe venture, however, it became apparent to Jerry Montour that fundamental business differences required that he and Claimants part company with the Omaha Tribe, and that Claimants would have to seek an alternative source for their manufacturing needs and distribution goals relative to the U.S. market.[25]

**Establishing an Investment in the Seneca® Brand,**

20.    By the end of 1998, Jerry Montour returned to Canada and took the reins of Grand River as Chief Executive Officer. His first order of business was to work with Grand River's president, Steve Williams, in areas of the business that needed most attention, and to focus on a plan for meeting Claimant's U.S. production and distribution goals out of Grand River's facility in Ohsweken, Ontario.[26] To that end, in 1999 Grand River entered into a formal venture with Claimant Arthur Montour ▇▇▇▇▇▇, who were operating under the trade name Iroquois Tobacco Direct. In commencing this new relationship, Messr's Montour and John founded Native Tobacco Direct ("NTD"), a company incorporated under the laws of the Sac and Fox Nation.[27] Arthur Montour had been previously engaged in tobacco and other businesses ▇▇▇▇▇▇, and financed his capital contribution in Native Tobacco Direct by assigning his interest in those other companies ▇▇▇▇▇.[28]

21.    Despite the setbacks they had endured in their relationships with the Skidders Estate and then the Omaha Tribe, in 1999 Claimants continued pursuit of their goals with respect to the U.S. market. To his end, they memorialized some of the particulars of the roles each

---

[24]    J. Montour Stmt at 19.

[25]    J. Montour Stmt. at 20.

[26]    J. Montour Stmt. at 21.

[27]    J. Montour Stmt. at 21 and 24; A. Montour Stmt. 2.

[28]    A. Montour Stmt. 13.

*Grand River, et al v. U.S.A.*                                                                                    /9
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

had assumed amongst themselves, by adopting a corporate structure and concluding written agreements in respect of the possession and use of intellectual property rights supporting their current and planned brands.[29]   Specifically, Native Tobacco Direct would be established and would register and acquire a U.S. trademark for Claimants' new Seneca® brand of cigarettes, and would be responsible for the distribution of those products on Native American land in the United States.[30]   In addition, NTD would hold that trademark beneficially for all Claimants as investors in this constituted enterprise.[31]

22.     In 1999, NTD also applied for and received a U.S. tobacco importer permit issued by the U.S. Bureau of Alcohol, Tobacco and Firearms.  The agreement among the parties also memorialized Grand River's exclusive rights with respect to the Seneca® brand, pursuant to an express cross-licensing arrangement.[32]   Thus, Grand River held  (and continues to hold) exclusive US manufacturing rights for the Seneca® brand of cigarettes, while NTD possesses the distribution rights for that brand in the United States. Together, Claimants have at all times possessed and controlled all of the property rights associated with the Seneca® brand and exercised those rights jointly, not severally.[33] Moreover, these exclusivity rights and obligations were to be similarly accorded to each party in respect of any other brands and attendant trademark and associated property interests that the parties might subsequently develop or acquire for the U.S. market.[34]

23.     Thus, in order to refocus their business interests in the United States in 1999, Claimants established the basic structure of the business enterprise that continues to exist today. Revenues from this enterprise were divided pursuant to a formula that provided the remaining Grand River partners (now as shareholders of the corporation) with

---

[29]     Claimants' Evidentiary Submissions, Ex. 17.

[30]     The Seneca® brand name was an original idea of Arthur Montour, while the logo and style for its packaging was created jointly by and among all Claimants.  A. Montour Stmt. at 10 and 11.

[31]     J. Montour Stmt. at 25; A. Montour Stmt. at 13; Claimants' Evidentiary Submissions, Ex. 18.

[32]     Claimants' Evidentiary Submissions, Ex. 17; A. Montour Stmt. at 13.

[33]     A. Montour Stmt. at 13.

[34]     Claimants' Evidentiary Submissions, Ex. 17.

*Grand River, et al v. U.S.A.* /10
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

compensation derived from sales to NTD, while Arthur Montour ████████ would receive compensation in the form of salary and income from sales revenues earned by NTD.[35] ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

24. In connection with their U.S. business enterprise, Grand River also initially loaned equipment to NTD, including a truck that NTD used to make deliveries to its Native American customers throughout the United States.[37]  In addition, in order assist NTD to commence business, Grand River agreed to allow NTD's bank to collateralize inventory in NTD's possession, but for which Grand River had yet to be paid, ████████████

████████████████████████████████████

████████████████████████████████.[38]

25. Grand River also supported the firm establishment of NTD and then NWS by providing both with access to an inventory loan with open-ended terms.  The loan was constantly in use between 1999 and 2006, providing interest free access to inventory on a revolving basis ████████████████████████████████

████████████████████████████████████

████████████████████

26. NWS succeeded to all the rights and obligations of NTD under the Claimants' agreement, and it continues to this day to operate as the U.S. marketing and distribution

---

[35] A. Montour Stmt. at 14; J. Montour Stmt. at 26.

[36] J. Montour Stmt. at 26; A. Montour Stmt. 15.

[37] A. Montour Stmt. at 14;  J. Montour Stmt. at 29; Claimants' Evidentiary Submissions, Ex. 19.

[38] Claimants' Evidentiary Submissions, Ex. 20.   This collateralization reflected a concession and subordination by Grand River of the accounts receivable it necessarily ceded to a priority lien and claim of its bank.

[39] A. Montour Stmt. at 18; J. Montour Stmt. at 31; Claimants' Evidentiary Submissions, Ex. 21.

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 71 of 270

*Grand River, et al v. U.S.A.*                                                    /11
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

facility for Claimants' Seneca® business venture.[40] Arthur Montour continues to draw salary and income derived from Native Wholesale Supply's sale and distribution of Seneca® cigarettes manufactured exclusively by Grand River; Grand River and its shareholders continue to receive revenue from the production and sale of those cigarettes ███████████████████████████████████████ ███████████████████████████████.[41]

27.    After Arthur Montour took over 100% of the ownership interest in NTD and formed NWS in 2000, it was necessary for him to complete his buy-out of his former partner, ███████████████████████. NWS took advantage of the inventory loan from Grand River to finance the regularly scheduled payments it was obliged to make ████ ████ between May 31, 2001 to November 15, 2002 ████████████████████████ ████████████████████.

28.    Also in 2000, Grand River began to produce cigarettes on a private label basis for other importers in the U.S. market.[42] Unlike the Seneca® brand, Grand River did not possess any trademark or property rights in these brands, nor did it advance credit or otherwise invest in the promotion or successful distribution of these other brands.[43] Nonetheless, Grand River became contractually bound to produce certain of these other brands and generated revenue from their production until Respondent's enforcement of the measures at issue herein caused Grand River to take steps to discontinue their production.[44]

29.    As the financial statements, balance sheets, and accounting records of Grand River and NTD/NWS reflect, Claimants' investment efforts and enterprise relative to the U.S.

---

[40]    A. Montour Stmt. at 2; Claimants' Evidentiary Submissions, Ex. 22.

[41]    A. Montour Stmt. at 15; J. Montour Stmt. at 26; Claimants' Evidentiary Submissions, Exs. 22 & 23.

[42]    J. Montour Stmt. at 33.

[43]    J. Montour Stmt. at 33.

[44]    J. Montour Stmt. at 34; Claimants' Evidentiary Submissions, Ex. 24.

*Grand River, et al v. U.S.A.*                                                        /12
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

market grew from humble beginnings in 1990, to achieve considerable success and profitability for Claimants.[45]

30.     Please see table 1-1, attached, which provides a timeline and chronology of Claimants' business activities and their investments described above.

## Adoption of the Escrow Statutes

31.     The measures relating to Claimants' claims arose in the context of a litigation settlement agreement that forty-six (46) of Respondent's state governments entered into in November 1998, with the four largest U.S. cigarette manufacturers, and legislation subsequently adopted to implement that agreement.[46]

32.     Beginning in 1994, several of Respondents' state governments commenced filing lawsuits in the United States against the major U.S. cigarette manufacturers:  Philip Morris, Inc.;  R.J. Reynolds Tobacco Company;  Brown & Williamson Tobacco Company;  and Lorrilard Tobacco Company (collectively, the "Major U.S. Manufacturers").  Together, the Major U.S. Manufacturers accounted for approximately 96-98% of the U.S. tobacco market in terms of cigarette sales.[47]

33.     The lawsuits alleged that the Major U.S. Manufacturers had targeted youth in their advertising and marketing; knew of the addictive and adverse health consequences of smoking but failed to disclose that information to consumers; and conspired to withhold that information from the consuming public for the purpose of preserving their sales and revenue.[48]  Respondent's state governments claimed that the aforementioned bad acts resulted in the States unfairly incurring Medicaid expenses relating to treatment of smoking-related illnesses of indigent smokers.[49]  Notably, whatever may have been the

---

[45]     Expert Report of Wayne R. Wilson, Jr. dated July 10, 2000 ("Wilson Report").

[46]     The subject States are sometimes referred to interchangeably herein as "Settling States."

[47]     Claimants' Evidentiary Submissions, Ex. 25.

[48]     Claimants' Evidentiary Submissions, Ex. 26.

[49]     Claimants' Evidentiary Submissions, Ex. 26.

*Grand River, et al v. U.S.A.*                                                                                      /13
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

justification or pretense for commencing these lawsuits, smaller tobacco companies, including Grand River, were not sued by Respondent's state governments, nor ever accused of such wrongdoing.

34.     In 1997, in lieu of having these claims decided on the merits, the state governments proposed a resolution of the lawsuits through Congressional legislation that incorporated the terms of a settlement agreement (hereafter the "Federal Proposal"), which would impose a future fee on all manufacturers based on the quantity of their cigarette sales in the United States – including those that had not been sued.[50] Significantly, however, the Federal Proposal would treat all cigarette manufacturers, that agreed to the terms of the proposed settlement, equally.   It would have imposed equal, per-unit payment requirements on all manufacturers pursuant to a rate schedule that did not deviate based on the market share of one group of competitor in comparison to others or their historical market shares.[51]   The total payments under the Federal Proposal during the first twenty-five (25) years after its effective date were estimated to be approximately $368.5 billion.[52]

35.     While the Federal Proposal was being considered by Respondent's Congress, some state governments entered into individual settlements with the Major U.S. Manufacturers, pursuant to terms that did not implicate or involve manufacturers other than those that had been sued.  These States included Florida, Minnesota, Mississippi and Texas.[53]

36.     Separately, and while the Federal Proposal was being negotiated, the Liggett Tobacco Company  (which was the next largest manufacturer in the U.S. market after the Major U.S. Manufacturers) also entered into multistate settlement agreements with twenty-two state governments.[54]  Pursuant to the terms of these settlements, those state governments

---

[50]     Claimants' Evidentiary Submissions, Ex. 27.

[51]     Claimants' Evidentiary Submissions, Ex. 25.

[52]     Claimants' Evidentiary Submissions, Ex. 25.

[53]     Claimants' Evidentiary Submissions, Ex. 28.

[54]     Claimants' Evidentiary Submissions, Ex. 29.

*Grand River, et al v. U.S.A.*                                                                    /14
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

agreed to terminate their lawsuits in return for relatively minor payments *plus* an agreement by Liggett Tobacco Company to turn over highly confidential industry documents that apparently evidenced a conspiracy among the Major U.S. Manufacturers that had been concealed through their in-house counsel under an inter-company committee called "The Committee of Counsel."[55]

37.     It was alleged that the Major U.S. Manufacturers used a committee composed of their counsel to undertake research into the health consequences of smoking, which was then withheld from the public under a claim of "attorney-client privilege."[56]  It was also alleged that, through this 'Committee of Counsel,' these manufacturers conspired not to develop or market cigarettes that could be considered safer to the consuming public, because such developmental efforts might be interpreted as an admission that cigarettes were unsafe for consumption and that the manufacturers had known about their deleterious effects all along.[57]

38.     Ultimately, the Federal Proposal was rejected by Respondent's Congress in April 1998, after Congress had commissioned a study by Respondent's Federal Trade Commission that concluded the Federal Proposal was likely to lead to anticompetitive conduct.[58] What followed next can best be described as evidence of a perverse dynamic in which the enforcement divisions of the state governments' executive branches reacted to rejection of the Federal Proposal.  These officials remained undeterred in their desire for a mechanism that would allow them to avoid facing a judicial determination of their claims on the merits.[59]  After all, their claims were unprecedented and had never been

---

[55]     Claimants' Evidentiary Submissions, Ex. 30.

[56]     Claimants' Evidentiary Submissions, Ex. 30.

[57]     Claimants' Evidentiary Submissions, Ex. 30.

[58]     Claimants' Evidentiary Submissions, Ex. 25.

[59]     Claimants' Evidentiary Submissions, Ex. 31.

*Grand River, et al v. U.S.A.*                                                                    /15
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

tested in the courts.  The prospect of having a court or tribunal decide those claims on the merits presented too great a risk for Respondent's States to take.[60]

39.    The States gave the task of principal negotiator for their settlement efforts to the Attorney General of the State of Washington, Christine Gregoire, whose claims against the Major U.S. Manufacturers were about to commence trial.   Assisting Ms. Gregoire were the Attorneys General of seven (7) other States and their private trial attorneys.[61] The non-government lawyers representing the States – some of whom it was later discovered were former law partners and personal friends of the Attorneys General – stood to gain an astonishing, aggregate amount of over twelve billion dollars ($12,000,000,000) in attorneys fees if the settlement were concluded.[62]

40.    It was apparent, then, that when the Major U.S. Manufacturer's demanded that their settlement with the remaining forty-six States be premised on the following two (2) conditions, the state officials and their non government lawyers capitulated with virtually no resistance.  First, all of the remaining States had to be included in one final settlement (as the Major U.S. Manufacturers would not agree to settle on a piecemeal basis).  Second, the States would be required to enact measures limiting competition from smaller tobacco manufacturers that had never been sued and who would accordingly not be directly subject to the conditions of any settlement agreement, including payment requirements.[63]

41.    Between May 1998 and November 1998, through a secret negotiation process that involved a core group of eight Attorneys General and their non-government lawyers,

---

[60]    In fact, subsequent cases revealed that these claims had no basis in fact or law, as Respondent's Justice Department later discovered when its case was tried to an ultimate determination on the merits – a conclusion and fate that every other sovereign experienced when they had their similar claims finally adjudicated on the merits.  United States v. Philip Morris, Inc. 116 F. Supp. 2d 131, 134 (D.D.C. 2000); Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc., 3 N.Y. 3d 200, 818 N.E. 2d 1140, 3 N.Y. 3d 200, 2004 N.Y. Lexis 2440, 785 N.Y.S. 2d 399 (2004).

[61]    Claimants' Evidentiary Submissions, Ex. 31.

[62]    Claimants' Evidentiary Submissions, Ex. 32.

[63]    Claimants' Evidentiary Submissions, Ex. 31.

*Grand River, et al v. U.S.A.*                                                                                    /16
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

Respondent's state governments negotiated, and ultimately concluded, a settlement deal on behalf of forty-six states and six U.S. territories (hereafter "Settling States") that became known as the Tobacco Master Settlement Agreement ("MSA"), effective as of November 23, 1998.[64]   The MSA, in its final form, was concluded beyond the purview of Respondent's Federal Government; and it did not have, nor was it purported by the Settling States to require, approval or sanction from Respondent's Federal Government.

42.     The contemporaneous accounts of the MSA's settlement negotiations, and Respondent's complete lack of document production in this proceeding with respect to those accounts, also reveals that the Settling States did not review, analyze, or evaluate whether the MSA was permissible under U.S. competition laws, nor under international law, including NAFTA Chapter 11.[65]

43.     As consideration for resolving the Settling State's claims and dismissal of their lawsuits, the four Major U.S. Manufacturers that negotiated the MSA (identified in the MSA as "Original Participating Manufacturers" or "OPMs") agreed to make annual "settlement" payments to the States and refrain from certain forms of advertising and marketing of their products.[66]   In exchange, the Settling States agreed to include language in the MSA at the behest of the OPMs that made the MSA's payment terms and burdens applicable to *all* tobacco product manufacturers whose cigarettes would thereafter be sold in the United States.[67]   That is, the Settling States agreed to enact model legislation annexed as Exhibit "T" to the MSA, which was intended to have the purpose and effect of "neutralizing" any alleged cost disadvantages that the MSA's Participating Manufacturers might experience as a result of the MSA, when they raised their prices to fund the settlement payments to the Settling States.[68]

---

[64]     Claimants' Evidentiary Submissions, Ex. 33.

[65]     Claimants' Evidentiary Submissions, Ex. 31.

[66]     Claimants' Evidentiary Submissions, Ex. 33.

[67]     Claimants' Evidentiary Submissions, Ex. 31.

[68]     Claimants' Evidentiary Submissions, Ex. 34 at, (d)(2)(E).

*Grand River, et al v. U.S.A.*                                                                /17
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

44.     The model legislation is commonly known as an "Escrow Statute," because it requires any tobacco product manufacturer whose cigarettes are sold in a Settling State to either join the MSA as a Subsequent Participating Manufacturer ("SPM"), or remain a non-party and make payments into an escrow account which are to be held for twenty-five (25) years for the benefit of that Settling State.[69] Companies choosing not to join the MSA are identified in the MSA and Escrow Statutes as "Non Participating Manufacturers" or "NPMs."

45.     As recited in the MSA, the purpose of the Escrow Statute is to neutralize the alleged cost advantages that a NPM purportedly would otherwise experience *vis-à-vis* the MSA's Participating Manufacturers, and, second, to create a fund to secure payment of "Released Claims" (defined in the MSA) in the event a Settling State sues the NPM in the future and the NPM is found to have acted "culpably" by the courts.[70] Theoretically, if no such claim and determination of culpability was made, the escrow payments were to be returned to the NPM twenty-five (25) years after they were deposited.

46.     Under the MSA, the annual payments due from a SPM are calculated based on the aggregate cigarette sales volumes of the OPMs in the United States during the prior calendar year, and, second, the ratio of the SPM's market share in comparison to the aggregate market shares of the OPMs in the United States during that year.[71]

47.     Under the Escrow Statutes as originally enacted, the amount that a NPM was required to deposit and hold in escrow for a given State in any year was ultimately based on the amount that the State would have received from the NPM for that year had it been a SPM under the MSA.   The escrow payment process involved two steps.   First, a manufacturer was required to make a payment into escrow based on the number of units of that NPM's cigarettes sold in that State.   Next, the NPM was entitled to an immediate return (i.e. 'release') of that payment, to the extent the payment exceeded the amount the

---

[69]     Claimants' Evidentiary Submissions, Ex. 35.

[70]     Claimants' Evidentiary Submissions, Ex. 34 and 35.

[71]     Claimants' Evidentiary Submissions, Ex. 36 at (i).

*Grand River, et al v. U.S.A.*                                                                /18
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

Settling State would have received from the NPM had it been an SPM under the MSA during that year.

48.     Unbeknownst to Claimants, just prior and subsequent to execution of the MSA, the non-government lawyers that represented the Settling States set out to solicit smaller tobacco product manufacturers into joining the MSA as SPMs and be bound by its payment and conduct restrictions.[72]   As an inducement to join the MSA, the Settling States offered these smaller tobacco companies exemptions from the MSA and Escrow Statute's payment requirements.   The MSA provided, however, that agreement to join the MSA had to be undertaken within ninety (90) days of the MSA's execution date.[73]

49.     Specifically, the MSA provides that any SPM that joined the MSA within ninety (90) days after its execution date *shall not have any payment obligation under the MSA or Escrow Statutes* for its volume of sales in any year that is equivalent to one hundred percent (100%) of its 1998 U.S. market share, or one-hundred twenty-five percent (125%) of its 1997 U.S. market share in terms of national cigarette sales.[74]   Companies that were offered such an inducement and joined the MSA within such 90 days are called "Exempt SPMs."

50.     Respondent has not provided any explanation, reason, or justification for if its granting exemptions only to a select group of manufacturers with whom its state officials and their attorneys chose to deal within ninety (90) days after the MSA's execution, other than to say in a self-serving, perfunctory way that the exemptions were offered to induce those manufacturers to join the MSA.[75]

---

[72]     R. Parloff, "Is the $200 Billion Tobacco Deal Going Up in Smoke?"  Fortune Magazine March 7, 2005 at 126; found at Tab 1, Factual Materials, Claimants' Counter Memorial on Jurisdiction.

[73]     Claimant's Evidentiary Submission, Ex. 34 at (i) "&" 33 at Amendment 2.

[74]     Claimant's Evidentiary Submission, Ex. 34 at (i).

[75]     Incredibly, if an Exempt SPM thus possessed 1% of the U.S. cigarette market in terms of cigarette sales in 1997, it would be permitted to continue to sell as much as 1.25% of all the cigarettes sold in the United States every year, in perpetuity, without ever having to make any payment under the MSA or Escrow Statutes.  So, for example, if the MSA and Escrow Statute payment requirements were $5.00 per carton of cigarettes in any year, and the total volume of cigarettes sold in that year by all manufacturers in the U.S.

(continued…)

*Grand River, et al v. U.S.A.*                                                                                /19
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

## Enforcement of the Original Escrow Statutes

51.   As noted above, for any manufacturer that chose not to join the MSA, the original model Escrow Statute provided the NPM with an immediate release of funds deposited into escrow for a given Settling State, if the amounts deposited in a given year exceeded the State's "allocable share" of the payments the manufacturer would have otherwise made as a non-exempt SPM under the MSA.   Under the MSA, a non-exempt SPM makes one payment to all the Settling States based on its national market share of cigarette sales. The Settling States then divide the payment among them, according to the allocable share percentage for each State.[76]

52.   Under the original Escrow Statute, if the percentage of an NPM's sales in a Settling State in comparison to all its sales in the U.S. market was greater than that Settling State's allocable share, the NPM would generally receive some form of immediate release of the escrow it deposited in that year.[77]

---

(…continued)

market was 1,750,000,000 cartons, the Exempt SPM in this example would pay $0 for the first 21,875,000 cartons of cigarettes it sold in that year.  In contrast, any non-exempt SPM or NPM (including Claimants) whose cigarettes accounted for 1.25% of the U.S. cigarette sales in that year would be forced to pay $109,375,000 under the MSA or Escrow Statutes for those same sales.

Similarly, using the example above, if the Exempt SPM sold 2.5% of all the cigarettes sold in the U.S. market, its payment obligation under the MSA would average $2.50 per carton, for a total $109,375,000 on 43,750,000 cartons sold.  In contrast, in selling the same amounts under the Seneca brand, Claimants would have to pay double that amount under the MSA or Escrow Statues – $218,750,000.

[76]   New York, for example, has an allocable share of 12.7620310% under the MSA.  MSA, Annex "A."  This means that, for every million dollars ($1,000,000) paid by a SPM under the MSA, New York would receive $127,620.31; each of the Settling States would similarly receive its "allocable share" of that same one million dollars.

[77]   For example, if 2,000,000 cartons of a manufacturer's cigarettes were sold in the U.S. market, then using the figures noted in the footnote above, the maximum amount that New York would receive from that manufacturer had it joined the MSA would be $1,276,203.10 (2,000,000 cartons x $5.00 per carton x 12.7620310% = $1,276,203.10).  Under the Escrow Statutes, if the manufacturer sold 1,000,000 cartons in New York and 1,000,000 cartons elsewhere in the United States, the manufacturer would initially have to deposit $5,000,000 into escrow for New York (1,000,000 cartons sold in New York x $5.00), but it would be entitled to an immediate release of $3,723,796.90 from those funds ($5,000,000 – $1,276,203.10 = $3,723,796.90).

*Grand River, et al v. U.S.A.*                                                                 /20
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

53.    Thus, as an NPMs cigarettes were sole in fewer States, its net escrow obligation in each
       State and in the aggregate decreased under the terms of the Original Escrow Statute.

**Adoption of the Contraband Laws**

54.    Claimants have obtained documents from other sources demonstrating that Respondent
       refused to produce evidence in this arbitration proceeding, indicating an oppressive
       pattern and practice of the Settling States to concentrate enforcement efforts on NPMs of
       foreign origin.  Specifically, Claimants have come into possession of memoranda,
       initially exchanged among the Settling States shortly after adoption of the measures at
       issue, which admit that officials themselves were in doubt as to whether they even had
       the necessary authority, under their measures, to subject either foreign 'tobacco product
       manufacturers' or Native American tobacco enterprises to escrow payment demands, or
       court action.

55.    Respondent took pains to stress during the jurisdictional phase of the arbitration that
       Claimants were very much an object of attention for enforcement officials from a large
       number of Settling States.   As the memorandum cited in the immediately preceding
       footnote demonstrates, there was considerable uncertainty amongst the lawyers working
       for the Settling States' Attorneys General over whether they had authority to adopt one
       of the enforcement strategies they appear to have preferred.   Nonetheless, they seemed
       to have had little compunction about zealously prosecuting NPMs whom they were not
       even convinced they could legitimately pursue.   Adoption of the Contraband Laws was
       intended to dispel such doubt, providing the Attorneys General with much stronger
       means for banning the brands of out-of-jurisdiction NPMs.'

56.    NAAG officials have actually been more candid about their authority under Escrow
       Statutes when speaking amongst themselves.   For example, in an undated document
       circulated by NAAG, entitled: "Model NPM Statute: Frequently Asked Questions," a
       state representative poses a question whether "… in the case of a foreign manufacturer,
       do the states have jurisdiction to require the foreign manufacturer to make escrow
       payments?"   The official notes the answer "…is a legal determination that we cannot

*Grand River, et al v. U.S.A.*                                              /21
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

make…"  Such equivocation is remarkable given that it comes in the form of a 17 page, 57 paragraph advisory document distributed by the National Association of Attorneys General to its members, who are obviously lawyers working in the enforcement divisions of Settling States.  The same memo continues:

Q.    If the manufacturer is out-of-state, we may not have jurisdiction over the company and may not be able to require it to make escrow payments.  Likewise, if an importer is out-of-state and sells imported product through an out-of-state intermediary (e.g., an off-shore corporation) to an out-of-state wholesaler, we may not have jurisdiction over the importer and could not require it to make escrow payments.

A:     **Correct.**

Q:     We have limited practical ability to enforce a statute like the Model Statute on an Indian reservation.  There are Non-Participating Manufacturers located on reservations.  As a practical matter, it is not possible to make these manufacturers comply.  How will this affect the MSA payments?

A:     It is possible that taxable sales by NPMs on Indian reservations could result in a reduction of MSA payments if those sales result in a decrease in the Participating Manufacturers' market shares.  However, if those sales on Indian reservations are nontaxable or nonescrowable, they should not affect the MSA payments.[78]

57.    To be clear, the targeting of out-of-jurisdiction 'tobacco product manufacturers' was motivated by the Settling States' desire to locate and prosecute the NPMs who were least likely to contest enforcement activities against them, as it was assumed that enterprises without a physical presence in a jurisdiction would either be: (1) disinclined to appear (assuming that it would be very difficult for a settling state to enforce any judgment it obtained, in another jurisdiction); or (2) unaware that a case had even been filed against it (because of inadequate service of documents).   From a functional perspective, it did not matter if the targeted NPM was located in a foreign jurisdiction or operating on Native American land, as the same result could be, and was, expected. Regardless of why the targeted NPM might choose not to oppose an action brought against it, the Settling States' attorneys could still expect to obtain the positive result

---

[78]    Claimant's Evidentiary Submissions Ex. 37 at ¶¶39-40 & 11.

*Grand River, et al v. U.S.A.*                                                    /22
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

they sought – a judgment and an injunction against the NPM and all brands allegedly manufactured by it.

58.   Accordingly, unsatisfied with pursuing a strategy of targeted enforcement against certain types of NPM, the Settling States elected to go further with adoption of the Contraband Laws. The Contraband Laws were drafted by the Settling States in collaboration with the OPMs and SPMs and represented the next logical step in the logic of their campaign against out-of-jurisdiction NPMs.  The Contraband Laws were designed to operate in a manner that obviated the need for an attorney general to go to the trouble of bringing suit under an Escrow Statute in order to ban the brands of a targeted NPM from its market.  The Contraband Laws mandated that, before any brand could be legally sold in that Settling State, an entity capable of being deemed by its Attorney General to be its 'tobacco product manufacturer' was required to submit a substantive application to the Settling States, certifying that it was in compliance with its Escrow Statute.  Failure to receive certification would result in designation of the brand as contraband in a given Settling State, no matter how the products in question came to be sold there.

59.   The Contraband Laws were the natural extension of the Settling States' enforcement strategy, to target a certain group of NPMs first, because they demonstrate the Settling States' continued commitment to diligent enforcement of the Escrow Statutes, as required by the MSA.  The Contraband Laws simply make it easier for the Settling States to identify, and exclude the brands of, any NPM that is not resident within their territorial jurisdiction.  As stated by the Assistant Attorney General for Alaska in support of that State's passage of its Contraband Law:

> Mr. Barnhill explained that under the settlement agreement, Alaska's revenues are reduced in certain circumstances.  To avoid those reductions, Alaska enacted an NPM (non-participating manufacturers) statute, AS 45.53, in 1999, an actively enforces the statute.  Unfortunately, he stated it's difficult to enforce the statute because the tobacco manufacturer that is failing to comply may be a small manufacturer located in a *far-flung jurisdiction*, such as India or the Philippines.  Alaska has, on occasion, filed suit against a tobacco manufacturer in India, hiring a process server to serve the summons and complaint in India, and has ultimately

*Grand River, et al v. U.S.A.*                                                                 /23
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

obtained a default judgment.  But that's the difficult way of [enforcing the statute], he said.[79] (emphasis added).

60.     In other words, adopted as a natural extension of the arbitrary and discriminatory enforcement practices of most Settling States, the Contraband Laws were designed to confer upon each of their attorneys general the power of judge, jury, and executioner in respect of the continued presence of a brand in a Settling State's market.  They did so by allowing an attorney general to ban the sale of a manufacturer's brands if he or she deemed that a NPM was not in compliance with an Escrow Statute.  These Contraband Laws also required a foreign manufacturer to establish a legal presence in each Settling State by appointing an agent for service of judicial process, before its products could even be distributed or sold in that Settling State.

61.     Reinforced with the addition of the Contraband Laws to their arsenals, most Attorneys General renewed their strategy of targeting out-of-jurisdiction 'tobacco product manufacturers.'  The had an incentive to do so, because the MSA required all Settling States to demonstrate vigilance in respect of enforcing MSA implementation measures against NPMs.  Through the simple expedient of this "easy kill" strategy, the Settling States would be assured of a default by the foreign manufacturer under the Escrow Statutes, which would then permit the Attorneys General to obtain an injunction and ban against the sale of the manufacturer's products for two years under the Escrow Statutes and, permanently, under the Contraband Laws, until the manufacturer complied with the Escrow Statute by paying any escrow allegedly due and penalties imposed for its apparent non-compliance.

62.     In short, it has become apparent that most Settling States have pursued any enterprise they believe to be an out-of-jurisdiction (i.e. in the eyes of Settling State enforcement officials:  "foreign") 'tobacco product manufacturer.'  When these targeted enterprises have not spent the millions of dollars required to defend themselves before each Settling

---

[79]     Michael Barnhill, Assistant Deputy Attorney General, Commercial Section, Civil Division, Department of Law, Government of Alaska, Committee Meetings on Alaska HB-224 – Cigarette Sales Requirements, April 9, 2003.

*Grand River, et al v. U.S.A.*                                                                                    /24
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

State's own court – to argue why the laws do not apply to them or their brands – the Settling States have obtained judgments against them, as well as injunctions banning the sale any cigarette brands alleged to have been manufactured by them, in their territories. This litigation strategy was clearly pursued for the purpose of driving brands from the U.S. market in order to protect sales of brands made by the MSA's OPMs and Exempt SPMs.

**Adoption of the Allocable Share Amendments**

63.    Additional documents withheld by Respondent, but obtained by Claimants from other sources, also evidence a concerted effort among the MSA's Participating Manufacturers, including Exempt SPMs and the Settling States, to amend the Escrow Statutes in a discriminatory manner.[80]

64.    In 2002 and thereafter, the Settling States began to insist that the Escrow Statutes and Contraband Laws directly related, and applied, to Grand River and NTD/NWS.  To that end, the Settling States asserted that Claimants had to comply with those laws by making the required payments under the Escrow Statutes and otherwise satisfying the certification requirements of the Contraband Laws.  Respondent's States made the foregoing demands and instituted such enforcement actions against both Grand River and NTD/NWS, notwithstanding that all of Claimants' sales of tobacco products, whether in support of their own US brands or under contract to produce private label products for third parties, were completed on Six Nations territory in Ohsweken, or in northern New York.  That is, Respondent's States asserted, and continue to assert, that Grand River would be held responsible for escrow payments under the Escrow Statutes, including when independent third parties that have taken title and possession of Claimants' products on First Nations territory and have subsequently sold those products outside of Native American territory in one of the Settling States.

---

[80]       Claimant's Evidentiary Stmt. Ex. 38.

*Grand River, et al v. U.S.A.*                                                                                                /25
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

65.     To be clear, in public there was no indication that most of the Settling States recognized that they lacked jurisdiction to interfere with Native American commerce.  Rather, their threats and subsequent actions demonstrated that they planned to take all steps necessary to impair Claimants' investment in the Seneca® brand in Native American territory.  Yet, their private legal memoranda candidly conceded that they had no such jurisdiction over out-of-state NPMs or NPMs operating on Native American Land.

66.     After conferring with counsel beginning in May 2002, Claimants endeavored to convince the Settling States through various means, including judicial processes, that requiring Grand River to make regulatory payments in every State where products it manufactured might be sold by independent third parties over whom Grand River exercised no control, or where it was distributing its own brand of products on sovereign Native American territories, violated United States law.  The Settling States rebuffed Claimants' position and Claimants were thus faced with a critical ultimatum:  to either comply with the Settling States' demands, or risk having their brands systematically banned from sale and distribution in the United States.[81]  Restricting their investment to Native American territory was not going to suffice.

67.     In searching for a means to comply with the Escrow Statutes that would still allow their own brands to remain competitive in pricing *vis-à-vis* those of Exempt SPMs and the premium brands offered by the OPMs, Claimants learned that they could mitigate the escrow compliance payments demanded by Respondent's and reduce the payments due under the Escrow Statutes, by phasing out production of non-proprietary brands and making an investment in expanding the sale of their proprietary brands to a limited number of States.[82]  That is, through the operation of the Allocable Share Release provisions explained above, Claimants could reduce their net escrow payment obligations on an annual basis, provided that sales of their brands were not dispersed nationwide.  In this way, Claimants could obtain immediate releases of their escrow

---

[81]     J. Montour Stmt. at 35.

[82]     J. Montour Stmt. at 34, 39, 42 and 43.

*Grand River, et al v. U.S.A.*                                                                    /26
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

payments in the few States where their cigarettes would be sold and factor those reduced payment obligations into the pricing of their brands at a level that would allow them to effectively compete with cigarette brands marketed by the MSA's Participating Manufacturers, especially the Exempt SPMs.

68.   Beginning in late 2002, Claimants thus restructured their focus and plans for the Seneca® and Opal® brands and the U.S. market.   Specifically, they instituted a plan to phase out production of all cigarettes manufactured under private label brand contracts from U.S. customers, and focus on expanding their investment in the Seneca® and Opal® brands.[83]   They continued the production of these proprietary brands for distribution through Native Wholesale Supply on Native American territory in the United States and they entered into an agreement with Tobaccoville USA, Inc. ("Tobaccoville"), pursuant to which Tobaccoville was granted a license for the use the Seneca® and Opal® trademarks in distribution of those brands outside of Native American territory in the United States.[84]

69.   The further understanding among Claimants and Tobaccoville was that Tobaccoville would limit the number of States in which these cigarettes were sold,[85] so as to reduce the escrow liability for these products in the manner explained above, which would, in turn, allow Claimants to keep the prices for their brands at a level that allowed them effectively to compete against the MSA's Participating Manufacturers, particularly Exempt SPMs.[86]

70.   In order to put this plan into effect, early in 2003 Claimants began to come into compliance with a select group of Settling States' Escrow Statutes on a without prejudice basis.   Chronologically, these States were: North Carolina, South Carolina, Oklahoma, Arkansas and Georgia.   By initially focusing and limiting the off-reservation

---

[83]      J. Montour Stmt. at 34, 40 and 41.

[84]      Statement of Larry Phillips, sworn to July 10, 2008, (hereinafter "Phillips Stmt.") at 4.

[85]      Phillips Stmt. at 7.

[86]      J. Montour Stmt. at 43-45.

*Grand River, et al v. U.S.A.*                                                    /27
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

sales of their Seneca® and Opal® brands to these five States, Claimants were able to reduce their net escrow obligations on average in all States from over $3.00 per carton, to approximately $.50 per carton.[87] This reduction allowed Claimants to price their brands at a level that allowed them to compete with the discount brands of Exempt SPMs, with which Claimants' products principally competed in those States and, to some extent, the discount and premium brands of the OPMs.[88]

71.    Unbeknownst to Claimants, however, around the same time Claimants adopted this reformulated business plan, the MSA's Participating Manufacturers had been communicating privately with the Settling States for the purpose of amending the Escrow Statutes.  Their object was to have the Settling States terminate the refunds available under the Escrow Statutes.  Again, through documents secured from other sources and which Respondent refused to produce in this case, Claimants have discovered that the MSA's Participating Manufacturers began to correspond and meet with the Settling States, in or about mid-2002, for purposes of drafting an amendment to the Escrow Statutes and promoting its adoption by each Settling States' legislature.[89]

72.    In 2003, certain Settling States began to adopt such an Amendment.  The MSA's Participating Manufacturers, and their private lobbyists, participated in the lobbying of these laws also in certain states.[90]  In short, the amendment agreed to by and among the MSA's Participating Manufacturers and the Settling States was intended to, and has had the effect of, increasing the escrow payments due for NPM brands, including Claimants' Seneca® and Opal® brands, in any Settling State that adopted such an amendment.

---

[87]    J. Montour Stmt. at 50.  As noted above, these net escrow obligations in any State were tied to sales volumes of Claimants' cigarettes nationwide, which included Native American land in the United States. Thus, as Claimants sold more cigarettes on Native American land, the net escrow burden in each State increased.

[88]    Claimant's Evidentiary Stmts. Ex. 7.

[89]    Claimant's Evidentiary Stmts. Ex. 38 (6/18/01).

[90]    Claimant's Evidentiary Stmts. Ex. 38 at Emails.

*Grand River, et al v. U.S.A.*                                                    /28
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

73.    In the words of the Settling States' Chairman of NAAG, this legislation was designed and intended to stop the alleged "proliferation" of NPM sales. According to the Chairman, any sale by any NPM, in any Settling State, hurts all States under the MSA as well as the four States that had separate agreements with the OPMs.  This was acknowledged to be true among all States, because the settlement payments under both the MSA and the separate State agreements were tied to the Participating Manufacturers' national market share.  In other words, *every State had an interest in reducing NPM sales – including sales of Claimants' brands – in all States*:

> These results underscore the urgency of all States taking steps to deal with the proliferation of NPM sales, including enactment of complementary legislation and allocable share legislation and consideration of other measures designed to serve the interests of the States in avoiding reductions in tobacco settlement payments.
>
> It should be stressed that NPM sales anywhere in the country hurt all States.  All payment calculations are done on the basis of cigarette sales nationally.  NPM sales in any state reduce payments to every other State.  All States have an interest in reducing NPM sales in every State.[91]

74.    For public consumption, Settling States explained that an amendment to the Escrow Statutes was needed to stop NPMs from taking advantage of the Escrow Statutes' release provisions and selling "cheap" cigarettes.[92]  The Settling States claimed that the releases permitted NPMs to lower their prices and unfairly compete with the MSA's Participating Manufacturers, thus causing a decline in the market share of Participating Manufacturers, which, in turn, caused a decline in the States' revenues under the MSA.

75.    Beneath the surface, however, and intentionally withheld from the public and the States' legislatures, was the actual reason for changing what was originally a fundamental and common element of every Escrow Statute.  The MSA's payment provisions are tied to the sales volumes and market shares of the OPMs.  Thus, if OPMs lose sales volumes

---

[91]    Claimant's Evidentiary Stmts. Ex. 40.

[92]    Claimant's Evidentiary Stmts. Ex. 37.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 89 of 270

*Grand River, et al v. U.S.A.*                                          /29
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

and market share to NPMs, the States' payments under the MSA decline.  Also, the MSA contains a provision that allows the OPMs to reduce their MSA payments by 3% for every 1% in market share that they lose to NPMs under certain circumstances.  At least two courts have described these MSA provisions as "coercive," in that they coerce the Settling States to adopt an Escrow Statute and enforce them against NPMs.[93]

76.    Following the MSA's execution in 1999, the OPMs implemented price increases, through 2003, that were several multiples of the amount needed to fund their MSA payments to the Settling States.[94]  The price increases caused a decline in the MSA payments, because, as noted above, MSA payments are tied to sales volumes and market shares of the OPMs.  Initially, the Settling States conceded that the cause of the decrease in MSA payments was attributable to the OPMs' price-gouging of consumers, which caused them to lose market share.  It was not due, as Settling State officials would candidly admit, to some unfair advantage possessed by NPMs under the Escrow Statutes or otherwise.  The following statements of Respondent's representative are enlightening in this regard:

> In fact, the major cigarette manufacturers raised prices by several multiples of their MSA costs. The price increase that created the market opportunity for NPMs is not attributable to the MSA, but rather to the decision by the OPMs to inflate per-pack profit margins at the cost of losing market share. The Report correctly notes that the market share of NPMs has risen.  As noted previously, this increase is principally the result of price increases by the OPMs far in excess of

---

[93]    A.D. Bedell Wholesale Co. v. Philip Morris Inc., Court of The United States 534 U.S. 1081, 1222. Ct. 813; 151 L. Ed. 2d 697, 2002 U.S. Lexis 255; 70 U.S. W.W. 3427, January 7, 2002; and Freedom Holdings, Inc., et al. v. Eliot Spitzer, et al., 02 Civ. 2939, 2004 U.S. Dist. Lexis 18296, 2001-2 Trade Cas. (CCH) P74.573. The coercive effect of these provisions may be best illustrated by the following:  If a State does not adopt and diligently enforce an Escrow Statute, it runs the risk of bearing the entire expense of the NPM Adjustment *even if the OPMs do not lose market share in that State*.  For example, assuming that OPMs are entitled to an NPM Adjustment of $1 billion for a given year because of their loss of market share nationwide, and all but one State has adopted an Escrow Statute, the MSA imposes that $1 billion adjustment on the one State that did not adopt the Escrow Statute, even if OPMs did not lose market share in that State.  Thus, a Settling State risks losing all of its annual MSA payments if it does not adopt and diligently enforce and Escrow Statute, notwithstanding that the State's failure to do so may have no effect on the OPMs' loss of market share giving rise to that adjustment.

[94]    Claimant's Evidentiary Stmts. Ex. 41.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 90 of 270

*Grand River, et al v. U.S.A.*                                                                /30
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

the costs imposed by the MSA and the decision by OPMs to widen their profit margins.

77.   According to the OPMs' representations at the time the Federal Proposal was under consideration, the OPMs should have lost nearly 60% of their market share as a result of the price increases they implemented after the MSA's execution through 2003.[95]  Instead, they lost substantially less.[96]

78.   This confirms that NPMs, including Claimants, did not enjoy any sort of unfair advantage under the Escrow Statutes. .[97]

79.   As General Sorrell advised Settling State officials in non-public communications, the Settling States needed to stop *all* NPM sales, because any NPM sales would reduce the MSA payments that the States could otherwise receive under the MSA.  The simple expedient and means of stopping the growth of NPM brands, including Claimants' Seneca® and Opal® brands, was accomplished by the Settling States through the uniform amendment of the Escrow Statute's Allocable Share Release provisions, which all the Settling States (except Missouri) had adopted by 2006.

80.   These amendments came to be known commonly as the "Allocable Share Amendment." and the initiative for their adoption grew from just a few States initially to an "all State" objective, as described by the Settling States' officials.  As these officials further described, because MSA payments are calculated based on *nationwide* sales, a "critical mass" of States was needed to adopt the Allocable Share Amendment for it to become effective in reducing NPM sales and preserving the *nationwide* market share of the OPMs and SPMs to which the MSA payments were tied.[98]

**Application of the Amended Escrow Statutes to Claimants and Theirs Investments**

---

[95]     Claimant's Evidentiary Stmts. Ex. 42.

[96]     Claimant's Evidentiary Stmts. Ex. 43.

[97]     Claimant's Evidentiary Stmts. Ex. 13.

[98]     Claimant's Evidentiary Stmts. Ex. 44 & 38 Meeting Notes 1/20/04.

*Grand River, et al v. U.S.A.*                                                                                      /31
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

81.    The effect of the Allocable Share Amendment has been to substantially impair the operation of Claimants' investment in Seneca® brand in off-reserve markets.[99]   In Arkansas alone, the Allocable Share Amendment increased Claimants' escrow obligation by 1,000%.   By way of example, the amount Arkansas was requesting Claimants to pay under the Allocable Share Amendment for each carton of their cigarettes sold in Arkansas was 10,000% greater than the amount Arkansas received for each carton of Participating Manufacturer cigarettes sold in Arkansas.[100]

82.    The obvious result and effect of the Allocable Share Amendment has been to deprive Claimants' of the investment-backed returns they were entitled to enjoy from having established their propriety Seneca® and Opal® brands in certain state markets located in the southeastern and central United States.   By immediately raising Claimants' escrow compliance costs from $0.50 to over $4.00 per carton, the Allocable Share Amendments had an instantaneous effect of requiring the price of Claimants' brands to increase to a level at which they could not compete with the brands of the MSA's Participating Manufacturers,[101] particularly the Exempt SPM brands that occupied a similar tier of the market as Seneca® and Opal® branded products.[102]

83.    Given the tier of the market in which Seneca® and Opal® branded products competed, it was simply not possible to indefinitely support the full escrow payment due for their sales and yet find a price point comparable or appropriate, vis-à-vis the brands of Exempt SPMs.[103]  Thus, when Claimants could not make the escrow payments that were claimed to be due under the Allocable Share Amendment, Settling States immediately banned the sale of Seneca® and Opal® brands in those markets under their Contraband Laws.   In addition, these States have initiated litigation against Claimants to collect tens

---

[99]       J. Montour Stmt. at 55 and 62.

[100]     Phillips Stmt. at 10.

[101]     Phillips Stmt. at 11.

[102]     Statement of Marvin Wesley, sworn to July 10, 2008, (hereinafter "Wesley Stmt.") at 4-9; Phillips Stmt. at 14.

[103]     Phillips Stmt. at 15.

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 92 of 270

*Grand River, et al v. U.S.A.*                                                    /32
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

of millions of dollars in escrow payments and penalties they claim are due under the amended Escrow Statutes, for sales in 2005 and thereafter.[104]

84.    In the States of North Carolina and South Carolina, Tobaccoville initiated a price increase effective January 1, 2006, to cover the full cost of the increased escrow attributable to the Allocable Share Amendment.   That price increase caused all wholesale purchases of Seneca® and Opal® branded products to cease in those States until prices were lowered (because Tobaccoville has taken out substantial loans to allow it make escrow payments in the short term, hoping that a remedy will soon be forthcoming).  Indeed, one regional distributor provided notice to all its corporate stores that it was replacing Claimants' brands with the brands of an Exempt SPM, which could now be offered at a price that was nearly $5.00 less under the Allocable Share Amendment. [105]

85.    Since the Allocable Share Amendment has taken effect in the U.S. markets identified above, Claimants have experienced a precipitous decline in the sales of their brands, which has had dramatic consequences to Claimants' good will, market share, and income streams.[106]  As stated above, the price at which Claimants' products needed to compete with Exempt SPMs could not be sustained, given the impact of the Allocable Share Amendment.  Claimants' and their brands were thus deprived of all their good will and market share in the States of Arkansas, Oklahoma and Kansas.[107]

86.    Sales of the Seneca® brand have been reduced to only North Carolina, South Carolina, Tennessee and Georgia, ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

---

[104]   J. Montour Stmt. at 56.

[105]   Claimant's Evidentiary Stmt. Ex. 45; Phillips Stmt. at 14.

[106]   J. Montour Stmt. at 55-62.

[107]   J. Montour Stmt. at 62.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 93 of 270

*Grand River, et al v. U.S.A.*                                              /33
NAFTA/UNCITRAL Arbitration
Memorial of the Investor



87.

.[109] Consistent with Claimants' experience to date, when

the price of Claimants' products are forced higher to bear the
full, increased expense imposed by the Allocable Share Amendment, most off-reserve
sales of Claimants' Seneca® and Opal® brands will be displaced in the relevant U.S.
markets.

**Discriminatory Impact Upon and Expropriation of Off-Reserve Investment**

88.   Respondent has not denied that all sales made by Claimants are completed at, or on,
      First Nations territories in Canada and the United States. Notwithstanding, the Settling
      States have enforced the Escrow Statutes against Claimants by proceeding under the
      fiction that Claimants are selling *to consumers* in any Settling State whenever products
      manufactured by them are sold to consumers by third-parties – even third-parties with
      whom Claimants are not, nor have never been, in privity.[110]

89.   For example, the State of Oklahoma is presently suing Claimants under the Oklahoma
      Escrow Statutes for products that Claimants sold, and were shipped, to Native American
      wholesalers doing business on Native American land located within the geographic
      boundaries of Oklahoma.[111] The Oklahoma Tax Commission has been harassing the
      Free Trade Zone in Northern, New York, with which Claimants does business, alleging

---

[108]   To facilitate the borrowing, Grand River has had to subordinate its right to payment for goods delivered to
        Tobaccoville to the lending institution that extended such financing.

[109]   Phillips Stmt. at 13.

[110]   This fiction is the legal and factual equivalent of the Maryland State Department of Assessments and
        Taxation imposing a tax on a Native American fabricator of clothing or other commodities doing business
        on Native American land in Arizona, when the fabricator's products are sold in Maryland by independent
        retailers who acquired the goods from an independent distributor or liquidator.

[111]   Claimant's Evidentiary Stmts. Ex. 46; A. Montour Stmt. at 23.

*Grand River, et al v. U.S.A.*                                                      /34
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

that Claimants are violating the Escrow Statutes any time they cause their products to be shipped to *any* persons or entities located within Oklahoma.[112]  Moreover, just this week the State of Oklahoma sued Native Wholesale Supply Company for more than $5 million, claiming that NWS violated Oklahoma's Contraband Laws by selling Claimants' products to Native-owned and operated businesses doing business on Native American land in Oklahoma, after Oklahoma deemed Grand River to be non-compliant with Oklahoma's Escrow Statute and Contraband Law.

90.    Other Settling States are now seeking to terminate all trade amongst Claimants and their Native American counterparts throughout Native American territory.   The Idaho Attorney General now claims, for example, that Claimants are prohibited from selling their products to Native American tobacco outlets in Idaho, because Claimants have allegedly failed to comply with the Idaho Escrow Statute.[113]  The State of California has similarly asserted that Claimants' sales to Native Americans located within the geographic borders of California are prohibited and in contempt of court under the Escrow Statute and Contraband Law.[114]  The latter is now seeking the enforcement of default judgments it allegedly obtained under its Escrow Statutes against Grand River for millions of dollars.

91.    Respondent's threats and harassment have caused Native American Tribes and wholesalers to cease, or refrain from, doing business with Claimants for fear of retribution instilled by the Settling States.[115]   Currently, Claimants are actively defending against seven separate lawsuits in the United States, arising out Respondent's imposition of the foregoing measures against them.[116]  The sum total of these measures and enforcement actions by Respondent's States has caused Claimants to incur and

---

[112]     A. Montour Stmt. at 23.

[113]     A. Montour Stmt. at 25.

[114]     A. Montour Stmt. at 24.

[115]     A. Montour Stmt. at 26-27; Claimant's Evidentiary Stmts. Ex. 12.

[116]     J. Montour Stmt. at 56.

*Grand River, et al v. U.S.A.*                                                    /35
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

suffer damages no less than $175 million to date, and such harm and damage is continuing.

92.   Please see table 1-2, attached, which provides a timeline and chronology of the events and measures giving rise to Claimants' claims.

*Grand River, et al v. U.S.A.*                                                                        /36
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

**PART II:**
**THE ARGUMENT**

**SECTION I   Claimants Have Satisfied the Requirements of NAFTA Chapter 11**

    **A.      Claimants are Investors Entitled to the Protections of the NAFTA**

93.     To bring a claim under Chapter 11 of the NAFTA, a claimant must be an "Investor of a Party."  NAFTA Article 1139 defines an "Investor of a Party" as:

> a Party or state enterprise thereof, or a national or an enterprise of such Party, that seeks to make, is making or has made an investment.

94.     Claimants are nationals of Canada and a Canadian corporation that have at all times since 1990 made tobacco-related investments in the United States and Canada; sought to make such investments in the United States and Canada; and have continued to make such investments in the United States and Canada.

95.     Claimants also comprise an *enterprise* within the meaning of the NAFTA's definition of an investor.  Specifically, NAFTA Article 201 defines an enterprise as:

> … any entity constituted or organized under applicable law ... including any corporation, trust, partnership, sole proprietorship, joint venture or other association.

As the record demonstrates, Claimants have at various times since 1990, and continuously in one form or another since that time, associated themselves through corporations, partnerships, sole proprietorships, a joint venture, and other mutually beneficial and co-dependent business relationships for the purpose of carrying on the production and distribution of proprietary tobacco products in the United States and Canada.

    **B.      Claimants have made Investments Recognized under the NAFTA**

96.     The term "investment" under the NAFTA is expansively articulated and is to be broadly interpreted.  Thus, NAFTA Article 1139 defines an "investment" in pertinent part as follows:

*Grand River, et al v. U.S.A.*                                                                                 /37
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

(a) an enterprise;

(b) an equity security of an enterprise;

(c) a debt security of an enterprise

     (i) where the enterprise is an affiliate of the investor, or

     (ii) where the original maturity of the debt security is at least three years,

     but does not include a debt security, regardless of original maturity, of a state enterprise;

(d) a loan to an enterprise

     (i) where the enterprise is an affiliate of the investor, or

     (ii) where the original maturity of the loan is at least three years,

     but does not include a loan, regardless of original maturity, to a state enterprise;

(e) an interest in an enterprise that entitles the owner to share in income or profits of the enterprise;

(f) an interest in an enterprise that entitles the owner to share in the assets of that enterprise on dissolution, other than a debt security or a loan excluded from subparagraph (c) or (d);

(g) real estate or other property, tangible or intangible, acquired in the expectation or used for the purpose of economic benefit or other business purposes; and

(h) interests arising from the commitment of capital or other resources in the territory of a Party to economic activity in such territory, such as under

     (i) contracts involving the presence of an investor's property in the territory of the Party, including turnkey or construction contracts, or concessions, or

     (ii) contracts where remuneration depends substantially on the production, revenues or profits of an enterprise.

97.    Previous tribunals have recognized that the NAFTA definitions of 'investment' and 'enterprise' are to be construed broadly, reflecting the object and purpose of the NAFTA. For example, the Tribunal that was convened to decide the NAFTA proceeding *Feldman* v. *Mexico* observed:

> A threshold question is whether there is an "investment" that is covered by NAFTA.  The term "investment" is defined in Article 1139, in exceedingly

*Grand River, et al v. U.S.A.*                                                                                      /38
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

broad terms.  It covers almost every type of financial interest, direct or indirect, except certain claims to money.[117]

98.     Broad constructions of the term of 'investment' under the NAFTA are consistent with the application of international law in similar contexts.  Thus, many investment treaty tribunals have construed the term 'investment,' found in treaties similar to the NAFTA, expansively.[118]  For example, in *Bayinder* v *Pakistan*, the tribunal recognized that an investor's contribution of know-how, equipment and personnel constituted a kind of asset that was to be considered an 'investment' under Article I of the Turkey - Pakistan BIT.[119]  Similarly, both the Tribunal and the Annulment Committee in *Mitchell* v. *Congo* determined that "movable property and any documents, like files, records and similar items, of [Mitchell's law] firm" and his "rights with respect to know-how and goodwill as well as the right to exercise his [legal services business]" all demonstrated the existence of an investment that fell "well within the scope of application" of the definition of 'investment' under Article I(c) of the BIT between the United States and the Democratic Republic of the Congo, which is similar in scope to the definition of 'investment' in Article 1139 of the NAFTA.[120]

99.     The Tribunal in *MCI Power Group* v. *Ecuador* also construed one of Respondent's BITs as providing "a broad definition of investment and that the rights and interests alleged by the Claimants to have subsisted as a consequence of the [investor's] project, after the entry into force of the BIT—such as the intangible assets of accounts receivable, the existence of an operating permit – would [also] fit that definition."

---

[117]   *Marvin Feldman* v *United Mexican States*, Award, ICSID Case No. ARB(AF)/99/1 (16 December 2002) at para. 96.

[118]   This is not an ICSID case, and therefore the jurisprudence of tribunals on the requirement of an 'investment dispute' pursuant to Article 25 of the New York Convention are not binding here. Nonetheless, there are persuasive examples from the case law demonstrating how other tribunals have applied a broad and remedial construction to investment definitions contained within other treaties.

[119]   *Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29 (14 November 2005), at para's. 115-116.

[120]   *Patrick Mitchell v Democratic Republic of Congo*, Annulment Decision, ICSID Case No. ARB/99/7 (27 October 2006) at para. 35.

*Grand River, et al v. U.S.A.*                                                                                    /39
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

100.    In *Sedelmayer* v. *Russia*, the Tribunal found that an "in kind contribution of chattels to [the] capital [of the investment enterprise] and vehicles and equipment" constituted an investment under Article 1(a) of the Germany-USSR BIT, which contains language similar to the US Model BIT.  For example, the definition in that treaty also included: 'claims to money invested to create economic value or to any performance having an economic value' and 'shares and other forms of participation in business enterprises and organizations.'[121]  The Tribunal in *Tradex Hellas* v. *Albania* also recognized in-kind contributions by an investor to the business venture being conducted in the host state as an investment.[122]  The Tribunal in *Alcoa Minerals* v. *Jamaica* likewise observed that a contribution of capital to commercial activity in the territory of the host state is also generally regarded as an investment in such cases.[123]

101.    In view of the NAFTA definitions and investment treaty jurisprudence set out above, it is clear that Claimants' activities – namely their establishment of an integrated commercial undertaking for the creation, establishment, manufacturing, marketing and distribution of their proprietary Seneca® and Opal® brands of tobacco products – clearly constitute significant "investments" in the territory of the United States.

   **a.   Goodwill and Intellectual Property Embodied in Claimants' Seneca® and Opal® Brands**

102.    Claimants' business venture and interests in the United States have been, at all times since 1998, principally focused on the successful development, production, promotion and distribution of their Seneca® brand of cigarettes.[124]  Claimants' Seneca® and Opal® brands, and the goodwill associated with them, are an intangible form of property that

---

[121]   *Franz Sedelmayer v. The Russian Federation*, Award, S.C.C. #07071998, (7 July 1998), at Sec. 3.2.

[122]   *Tradex Hellas S.A. v Republic of Albania*, Award, ICSID Case No. ARB/94/2 (29 April 1999) at para. 124.

[123]   *Alcoa Minerals of Jamaica, Inc. v. Jamaica*, ICSID Case No. ARB/74/2), Decision on Jurisdiction and Competence of July 6, 1975, 4 Yearbook Commercial Arbitration 206 (1979).

[124]   The Opal brand was established in order to satisfy US market demand for specialty '120' size cigarettes. Subsequently Claimants have shifted production to a new Seneca 120 product. Statement of Jerry Montour, at para. 41.

*Grand River, et al v. U.S.A.*                                                                                      /40
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

constitutes an investment under Article 1139(g).[125]  Similarly, the trademarks supporting

the Seneca® and Opal® brands also constitute a form of intangible property under Article

1139(g).

103.   In cases where proof of impairment has been used as a basis for awarding damages for

lost profits caused by the imposition of a measure, international tribunals have endorsed

the concept of goodwill as an asset requiring protection under investment treaties,.  As

explained by the *Sola Tiles* tribunal:

> Goodwill can best be defined, at least for the purposes of the present case, as that
> part of a company's value attributable to its business reputation and the relationship
> it has established with its suppliers and customers.[126]

104.   This is particularly true when brand goodwill is fundamental to the performance of an

enterprise in a certain industry.  The tobacco industry is exactly the kind of industry

where an investor's business depends upon the goodwill it has established in the brands

under which it sells its cigarettes.[127]

105.   In this case, Claimants created the trademarks supporting the Seneca® and Opal® brands

with the explicit intention of investing in the US market.[128]  Thus, the Seneca® trademark

---

[125]   *See* Patrick Mitchell v Democratic Republic of Congo, Annulment Decision, ICSID Case No. ARB/99/7
(27 October 2006) at para. 35.  Both the Tribunal and the Annulment Committee in *Mitchell* v. *Congo*
determined "rights with respect to know-how and goodwill as well as the right to exercise his [legal
services business]" all demonstrated the existence of an investment that fell "well within the scope of
application" of the definition of 'investment' under Article I(c) of the BIT between the United States and
the Democratic Republic of the Congo, which is similar in scope to the definition of 'investment' in Article
1139 of the NAFTA.[125]

[126]   *Sola Tiles Inc.* v. *Iran*, Partial Award, 14 IRAN-U.S.C.T.R. 223 (1987), at para. 62.  For lost profits
analysis, *see* paras. 161-164.  *See also Asian Agricultural Products* v. *Sri Lanka*, (1996) 4 ICSID Rep. 246
at 292; *See also, e.g.,: Patrick Mitchell v Democratic Republic of Congo*, Annulment Decision, ICSID Case
No. ARB/99/7 (27 October 2006) at para. 35; *Asian Agricultural Products Ltd v Republic of Sri Lanka*,
Final Award, ICSID Case No. ARB/87/3 (27 June 1990), at paras. 102-103; *Técnicas Medioambientales,
TECMED S.A. v United Mexican States*, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at 194-195.
And in *Ethyl Corporation* v. *The Government of Canada*, Award on Jurisdiction, UNCITRAL Arbitration
(24 June 1998), at para. 70, the respondent did not object to a claim for goodwill on the basis that it did not
constitute an 'investment' within the meaning of Article 1139, but only that the claimant could not claim
for impairment of "worldwide goodwill" for a measure imposed solely by Canada.

[127]   Wesley Stmt. at 11.

[128]   A. Montour Stmt. 10-13; J. Montour Stmt. 21.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 101 of 270

*Grand River, et al v. U.S.A.*                                              /41
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

is registered in the US, and held by NWS, ████████████████████, and their use is governed under cross-licensing arrangements effectively granting all Claimants joint and several control over them. Indeed, the intellectual property supporting the Seneca® brand is the combined product of Arthur Montour's concept for the brand name and Jerry Montour's leadership in commissioning the packaging, artwork, blending and taste of the products to be sold under the Seneca® name.[129] The Opal® brand, whose trademark was registered and is controlled by Grand River in the United States,[130] is a similar product of the joint efforts and know-how of the Individual Claimants.[131]

106.   This method of operation illustrates the collective nature of Claimants' business venture in the United States. Not unlike any other tobacco enterprise, the Claimants profited from establishing and expanding their own brands via the production and distribution of particular products, which bear the trademarks collectively developed and registered in support of the associated brand.[132] Also in keeping with standard practice in the tobacco industry, the products marketed under the Seneca® brand were designed specifically by Claimants to establish and create their own identity, in terms of composition, taste, packaging and price point.[133]

107.   Thus, over the years, as the individual Claimants have shared a common interest in the establishment and growth of the Seneca® brand, they have each contributed their own know-how and the resources of their respective companies towards its success.[134] They have each also shared in the profits generated by the brand, and each has re-invested significant amounts of those profits in order to benefit from its continued growth.[135]

---

[129]   A. Montour Stmt. at 10.

[130]   Claimant's Evidentiary Stmts. Ex. 18.

[131]   J. Montour Stmt. at 19.

[132]   J. Montour at 41.

[133]   A. Montour Stmt. at 11 and 12; J. Montour Stmt. at 22 and 23.

[134]   J. Montour Stmt. 22-27.

[135]   A. Montour Stmt. at 14 ; J. Montour Stmt. at 26.

*Grand River, et al v. U.S.A.*                                                                          /42
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

b.   **The Claimants' Business Enterprise**

108.   In addition to the intellectual property and the goodwill associated particularly with the Seneca brand, the business supported by that brand also constitutes an investment under NAFTA Article 1139(a), which states that 'investment' in the territory of another NAFTA Party includes an 'enterprise.'  In turn, NAFTA Article 201 defines 'enterprise' as "any entity constituted or organized under applicable law … including any corporation, trust, partnership, sole proprietorship, joint venture or other association."  This definition is as broad as the definition of investment itself, including "any … other association" by which investors choose to organize their business activities as an 'investment' under the NAFTA.

109.   Claimants' business venture, under which they have established and profited from the promotion of specific, trademarked brands, supporting specific products, tailored for a specific US clientele, is exactly the kind of 'association' that meets the NAFTA definition of 'enterprise,' and thereby constitutes an investment under the treaty.  This interpretation is also consonant with the plain meaning and general usage of the term 'enterprise,' which is defined in Black's Law Dictionary as "a business venture or undertaking."[136]

110.   In its Statement of Defense to Claimants' Allocable Share Claim, Respondent asserts that neither Jerry Montour, Kenneth Hill nor Grand River have made any investment in the United States.  Although Respondent has thus far failed to offer any further substantiation for this myopic assertion, it is apparent that Respondent has focused solely on the fact that Jerry Montour and Kenneth Hill do not own shares in either NWS or NTD.[137]  Such an analysis ignores the object and purpose of the NAFTA, disregarding the reality of Claimants' investment in the United States and the totality of the definition of investment contained in Article 1139.

---

[136]     Sixth Edition, at 531.

[137]     Statement of Defense, para. 22 "None of these Claimants has any ownership interest in any of the U.S. enterprises identified by Claimants"

*Grand River, et al v. U.S.A.*                                                                /43
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

111.    Since 1999, Claimants have maintained and expanded their investments in the United States through two legally distinct corporate branches: Grand River for manufacturing and NTD/NWS for distribution. The individual Claimants decided together to adopt this corporate structure in order to minimize their tax liability and to formally assign their respective areas of primary responsibility.[138] The fact that Grand River and NWS constitute separate legal entities cannot and does not change the collective nature of the Claimants' underlying business venture in the United States, or the fact that they are entitled to protection under Chapter 11.

112.    The nature of this venture is first and foremost illustrated by the fact that the individual Claimants directed their respective companies to enter into a contractual relationship under which Grand River was designated by NWS as the exclusive manufacturer and packager of Seneca® branded products and NWS was designated by Grand River as the (then) exclusive importer and distributor of Seneca® products in the United States.[139] As the exclusive distribution arm for Claimants' products until the end of 2002, NWS' warehouse also served as the headquarters for Claimants' marketing campaigns and other brand promotional activities in the United States.[140]

113.    In addition, after formally incorporating their manufacturing and distribution arms, the individual Claimants have continued, and are required, to consult with each other before making important strategic decisions about marketing and distribution of the Seneca® brand, just as they had always worked together.[141]  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

---

[138]    J. Montour Stmt. at 24-28.

[139]    J. Montour Stmt. at 27.

[140]    A. Montour Stmt. at 17.

[141]    A. Montour Stmt. at 19 ; J. Montour Stmt. at 32.

[142]    A. Montour Stmt. at 15

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 104 of 270

*Grand River, et al v. U.S.A.*                                          /44
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

███████████████████████████████████████████████
████████

114.   The cooperation between the Claimants has not been limited to mere consultation,
       however.  For example, in 1999 Kenneth Hill and Jerry Montour caused Grand River to
       contribute chattel property to their collective business venture, in the form of a delivery
       truck worth approximately $30,000, which has been used by NWS to conduct its
       distribution activities.[144]

115.   Furthermore, between 1999 and 2006, Claimants caused Grand River to forward millions
       of dollars in inventory to NTD and then NWS,[145] and to concurrently extend millions of
       dollars in credit for these advances of inventory, such that this practice has effectively
       constituted a continuous loan of over $1,000,000 to NWS for periods lasting well over
       three years.[146]  Indeed, but for Grand River's willingness to subordinate its interest in $1
       million of inventory ████████████████████████████████████████
       ████████, Arthur Montour would not have been able to buy out the interest of his then
       partner████████ in the distribution arm of the business.[147]

116.   By the time Arthur Montour incorporated NWS to replace NTD in 2000, Grand River's
       in-kind contribution of credit to the enterprise stood at approximately ████████ at the
       end of each month.  By August 2002, this revolving inventory loan had doubled to
       ██████████████████████.  Moreover, Grand River assisted in financing the buyout of
       NTD by Arthur Montour and NWS, by agreeing to subordinate its loans, capital

---

[143]   J. Montour Stmt. at 28.

[144]   J. Montour Stmt. at 29.

[145]   A. Montour Stmt. at 31.

[146]   These transactions are recorded as aged accounts receivable and payable in the corporations' respective
        accounting records.  A. Montour Stmt. at 18.

[147]   A. Montour Stmt. at 6.

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 105 of 270

*Grand River, et al v. U.S.A.* /45
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

commitments and receivables from NWS, to a priority lien and claim ███████████

███████████████████████████████████████████████████████

117.    Subsequently, between August 2002 and August 2006, as the effects of the Allocable
Share Amendments on Claimants' sales were becoming increasingly severe, the amount
of monthly in-kind credit extended by Grand River to NWS ranged between
███████████████████████.[149] The purpose of directing Grand River to
forward such large sums of inventory to NWS was clearly to contribute to, and subsidize,
the establishment and expansion of the Seneca® brand in the United States.[150]

118.    If the NAFTA Parties did not intend its Chapter 11 protections to apply to a territorially-
focused business venture such as the one operated by Messrs. Montour, Montour and Hill,
the Parties could easily have made this clear in the NAFTA text.  Instead, the Article 201
definition explicitly lists a number of forms of business associations that qualify as an
'enterprise,' including corporations, partnerships and joint ventures, before also including
the catch-all term: 'other association.'  Although Claimants may have chosen not to
evidence their relationship with respect to the U.S. market through a written partnership
agreement or formal parent-subsidiary corporate relationship, it is clear that the
association they chose led to their sharing and participation in numerous business
activities in the territory of the United States, including the execution of contracts, the
extension of loans and credit facilities, and the establishment of intellectual property and

---

[148]    A. Montour Stmt. at 6

[149]    J. Montour Stmt. at 31; Starting in January 2004, GRE accounting records specifically included a notation
indicating that the "credit limit" for NWS would be $4.2 million.

[150]    A. Montour Stmt. at 17.  Claimants forwarded approximately $1 million in inventory to their new
distributor, Tobaccoville, between December 2004 and April 2005.  Claimants did not maintain any
accounts receivable or provide credit to this new distributor because they wanted to be sure that it would be
able to meet its initial payment obligations.  They did so effectively maintaining control over their
inventory during that time, using the services of a free trade zone located in the United States.  Claimants
planned to divert this inventory to NWS, had Tobaccoville been unable to meet its first payment obligations
to GRE.  This inventory constituted tangible property used for the purpose of economic benefit in the
United States, conforming with the definition of investment found at subsection (g) of NAFTA Section
1139.

*Grand River, et al v. U.S.A.*                                                        /46
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

goodwill in the territory of the United States.  As such, Claimants' tobacco business in the United States it is an enterprise that constitutes an 'investment' under Article 1139(a).

### c.   Claimants' Contribution of Capital to Escrow and Penalties

119.    Although Claimants' establishment of the Seneca® brand, and their business venture to promote, manufacture and distribute Seneca® branded products in the US market are both more than sufficient to satisfy the requirements of Article 1116, it must be emphasized further that Claimants have deposited millions of dollars into escrow accounts in the US – the principal of which is currently the property of Claimants.  Like the money Claimants have paid as penalties under the measures, these funds constitute an investment under Article 1139(g), as property employed in the territory of the United States for the purpose of conducting business or investment in the territory of the United States.  These funds also represent a commitment of capital to the United States, contributed in furtherance of Claimants' ability to continue selling products in the markets it had established under the Seneca® brand.  As such, they also constitute an investment that meets the threshold definition under Article 1139(h) of the NAFTA.  Thus far, the payments made under these measures by Claimants or on behalf of the Seneca® brand as a condition to its continued sale and distribution in the United States total approximately ▮▮▮▮▮.[151]

### d.   Conclusion

120.    As discussed above, other tribunals have identified the elements present in this case as meeting the threshold definition of investment contained in similar treaties.  Trademark and intellectual property rights; multimillion-dollar aged accounts receivable; commitments of capital, inventory and know-how; and in-kind contributions of capital are all present in this case.  Moreover, as cases such as *Mitchell* demonstrate, intangible property such as goodwill also constitutes an investment under treaties based on the United States Model BIT, such as the NAFTA.

---

[151]        J. Montour Stmt. at 52.

*Grand River, et al v. U.S.A.*                                                    /47
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

121.    Finally, it is worth noting that Claimants' investment was also encouraged by, and completely consistent with, the explicit objectives of the NAFTA found in Article 102(1), including: promotion of 'fair competition in the free trade area' and increasing 'substantially investment opportunities in the territories of the Parties.'  In agreeing to the NAFTA, Respondent obliged itself and its state governments to 'ensure a predictable commercial framework for business planning and investment'; to 'promote trade in goods and services that are the subject of intellectual property rights'; and to 'create new employment opportunities and improve working conditions and living standards in their respective territories.'

122.    All of these objectives were promised by Respondent in the preambular text of the NAFTA and all had been realized with Claimants' investment in the territory of the United States.  By establishing and supplying a popular US brand to US markets, Claimants generated new employment opportunities and increased standards of living for many Six Nations members.

123.    Accoirdingly, there can be no question that Claimants have collectively established, operated and maintained exactly the sort of business interests in the United States that were intended by the contracting Parties to constitute an "investment" in the territory of the United States under Articles 1139 and 1101 of the NAFTA.

C.    **The Dispute Falls Within the Scope of NAFTA Chapter 11**

124.    Article 1101 establishes the scope of application for NAFTA Chapter 11.  Like all NAFTA provisions, its terms must be construed in light of the object and purpose of the treaty, which is to promote opportunities for investment and ensure fair competition in the territories of the NAFTA Parties.  Article 1101 states, in relevant part:

1.    This Chapter applies to measures adopted or maintained by a Party relating to:

(a) investors of another Party; and

*Grand River, et al v. U.S.A.*                                                                                          /48
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

(b) investments of investors of another Party in the territory of the Party.

125.  Article 1101 thus provides that Chapter 11 broadly applies when two elements are satisfied: (1) a Party has adopted or maintained measures; and (2) those measures relate to investors of another Party, or investments of those investors in the territory of the Party that has adopted the measures.

126.  "Measures" are defined in NAFTA Article 201 to include "any law, regulation, procedure, requirement or practice."  It is evident that the MSA, the Escrow Statutes, the Contraband Laws and the Allocable Share Amendments, as well as enforcement actions undertaken pursuant to any of the foregoing, all constitute "measures" for purposes of the NAFTA.  Measures "relate to investors" whenever a measure directly affects an investor or its investment in any manner.  Thus, where a measure can be seen as connected to the investor or the investment activities of the investor or its competitors, the measure falls within the parameters of Article 1101.[152]

127.  Each of the measures at issue in this case relates to Claimants.  The measures have been designed, implemented and enforced against Claimants and their investment in establishing and profiting from proprietary tobacco brands.  Moreover, the measures have plainly achieved their intended effect, resulting in severe damage to Claimants' business.  Respondent does not contest either the aim or the impact of the measures.  Instead, it asserts only that: (1) the measures cannot relate to Jerry Montour, Kenneth Hill or Grand River because they allegedly do not have an investment in the US; and (2) the measures cannot relate to Arthur Montour, Jr. because his companies "are not subject to the Escrow Statutes or the Allocable Share Amendments."[153]  In so doing, Respondent misreads both the letter and intent of the NAFTA text.

---

[152]  *See, e.g., S.D. Myers, Inc. v. Canada*, NAFTA/UNCITRAL, NAFTA/UNCITRAL Tribunal, First Partial Award (13 November 2000) at paras. 233-236.

[153]  See paras. 22-23 of Respondent's Statement of Defense to Claimants' Allocable Share Claim, dated 21 December 2006.

*Grand River, et al v. U.S.A.*                                                                      /49
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

128.   As demonstrated above, Claimants have made substantial investments and collectively engaged in a business venture since 1999, founded upon their collective collaboration and establishment, promotion, and distribution of the Seneca® brand in the US market. Indeed, Respondent has thus far been remarkably silent in addressing the fact that, if payments are not made by Claimants under the Escrow Statutes for products sold under the Seneca® brand (as specifically identified in various judgments obtained under Escrow Statutes and prohibitions arising from the application of Contraband Laws), Settling States have sought to ban sales or distribution of Seneca® branded products as a result.

129.   In view of the collective nature of Claimants' investments and the over-reaching application of Respondent's measures, Respondent's assertion that Arthur Montour's companies are not subject to the measures is plainly inaccurate.  There is no question as to whether the MSA States have sought to impose their measures directly upon Grand River by construing it as a "tobacco product manufacturer" under their legislation. However, demands issued and judgments obtained under an Escrow Statute always name both the alleged "tobacco product manufacturer" **and the brands** it is alleged to have produced.  Thus, whenever Grand River or any entity is found to be non-compliant with the Escrow Statutes' requirements with respect to sales of Seneca® brand cigarettes, all of the Claimants suffer and are harmed, because future sales of their Seneca® brand are banned and prohibited.

130.   Furthermore, in this case, the MSA states have not only made demands against Grand River, they have also applied the MSA-related measures *directly* to NWS as the rights-holder, importer and distributor of the Seneca® brand.  For example, within the past weeks and months, NWS received letters from the Attorneys General of California and Idaho, respectively, directing NWS to cease and desist the distribution of the Seneca® brand anywhere in their States under threat of contempt of court.[154]  Despite the fact that the state of California has no constitutional jurisdiction to regulate whether or how NWS distributes tobacco products on sovereign, First Nations territories, it is obvious that its

---

[154]      A. Montour Stmt. at 24-27.

*Grand River, et al v. U.S.A.*                                                    /50
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

Attorney General purports to possess the right to do so – thereby demonstrating a yet another way in which the measures relate to NWS and Arthur Montour, as enforced by Respondent.

131.  In similar disregard for Claimants' rights and expectations under US Federal Indian Law, the State of Oklahoma has also just launched a disgorgement lawsuit against NWS, seeking over $5 million in damages in respect of sales of Seneca® products it admits were sold by NWS in Native American territory to First Nations customers.[155]

132.  The importance under the NAFTA of the relationship between the harm caused to an investor when its products are adversely affected by a measure was best described by the Tribunal in the NAFTA arbitration *UPS* v. *Canada*:

> Canada's argument that the conduct of Canada Customs is at most treatment of items and not the investment or the investor is not correct.  That argument would essentially open an enormous hole in the protection of investments and investors....  Treatment is not only open to items but to enterprises.[156]

133.  In other words, when a measure applies to an investor's proprietary products, from which cash flows generated by that business support growth of those brands, the measure is deemed to relate to the investor and its investments under NAFTA.

## SECTION II          Interpretation of NAFTA Chapter 11

### A.    Interpretation of the NAFTA Must be in Accordance with Applicable Rules of International Law

134.  NAFTA Article 1131(1) states that a tribunal shall decide issues in dispute in accordance with the NAFTA and the applicable rules of international law.  NAFTA Article 102(2) further provides that NAFTA provisions shall be interpreted and applied in accordance

---

[155]   Claimant's Evidentiary Stmts. Ex. 46.

[156]   *United Parcel Service v. Canada*, UNCITRAL/NAFTA, Award (24 May 2007), at para. 85.

*Grand River, et al v. U.S.A.*                                                                        /51
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

with the applicable rules of international law and in light of the objectives of the NAFTA set out in Article 102(1).[157]

135.   It is well settled in the jurisprudence of NAFTA tribunals that the term "applicable rules of international law," used in Article 102(2) and 1131(1), includes the customary international law rules of treaty interpretation that are codified in the *Vienna Convention on the Law of Treaties* ("VCLT").[158]

136.   The VCLT further provides that "any relevant rules of international law applicable in the relations between the parties" to a treaty "shall be taken into account, together with the context" of the treaty, including its text and preamble, in interpreting the obligations owed by a party to that treaty.[159]  Accordingly, treaties in which the United States has undertaken certain obligations in respect of its treatment of the Haudenosaunee, constitute applicable international law rules that must be considered in the Tribunal's construction of NAFTA obligations where Claimants' rights and interests, as Haudenosaunee, are involved.

137.   Similarly, customary international law and international human rights norms may also constitute applicable rules of international law for the purposes of interpretation of a provision of NAFTA Chapter 11 as it pertains to Claimants, as Haudenosaunee investors, just as fundamental human rights norms, including but not limited to *jus cogens*

---

[157]   *United States – In the Matter of Cross-Border Trucking Service* (2001), USA-MEX-98-2008-01 at para. 218. See also: *Meltaclad Corporation v. The United Mexican States*, ICSID/NAFTA Case No. ARB(AF)/97/1, Award at para.70 (30 August 2000).

[158]   See generally *Ethyl Corporation v. Canada*, UNCITRAL/NAFTA, Award on Jurisdiction at para. 50 (24 June 1998); *Canfor Corp. v. the United States of America and Tembec Corp. v. the United States of America*, UNCITRAL/NAFTA, Decision on Preliminary Question at para. 177 (6 June 2006) [*Softwood Lumber*]; *Mondev International Ltd. v. United States of America*, Award, ICSID Case No. ARB(AF)/99/2 (11 October 2002), at para. 43; *Methanex Corporation v. United States*, UNCITRAL/NAFTA, Final Award (3 August 2005) Part II, Chapter B at paras. 15-23, and Part IV, Chapter B at para. 29; *United Parcel Service v. Canada*, UNCITRAL/NAFTA, Award on Jurisdiction (22 November 2002), at para's. 40-42; *Meltaclad* at para. 70, *supra* note 29; *Tariffs Applied by Canada to Certain U.S.-origin Agricultural Products* (1996), CDA-95-2008-01 at para. 119; *Grand River Enterprises et al v. United States of America*, UNCITRAL, Jurisdictional Decision at para. 34 (20 June 2006); and *International Thunderbird Gaming Corp. v. United Mexican States*, UNCITRAL Arbitration (26 January 2006), at paras. 89-91.

[159]   Vienna Convention on the Law of Treaties, art. 31(3)(c), May 23 1969, 1155 U.N.T.S. 331.

*Grand River, et al v. U.S.A.*                                                        /52
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

principles, must also inform a NAFTA tribunal's interpretation of the provisions before it wherever the claimant investor is an individual.

138.   Both the customary international law rules of treaty interpretation and the applicable rules of international law relevant to the interpretation of the NAFTA with respect to Claimants, as Haudenosaunee investors, are detailed below.

### B.   Customary International Law Rules of Treaty Interpretation as Applied to the NAFTA

139.   There is consensus that the customary international law rules of treaty interpretation have been accurately restated in VCLT Articles 31 and 32.[160]   VCLT Article 31(1) memorializes the general rule of treaty interpretation, providing that "a treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."   Under this general rule of interpretation, the text of the treaty is presumed to be the authentic expression of the parties' intentions. *Post facto* statements by a respondent party, about its alleged intent behind a particular treaty provision, must therefore be met with considerable doubt and scrutiny.   In any event, the starting place for any exercise in interpretation must be the treaty text itself.[161]

---

[160]   Vienna Convention on the Law of Treaties, May 23 1969, 1155 U.N.T.S. 331. The Tribunal is not obliged to follow the determinations of past tribunals in making any of its findings, as NAFTA Article 1136(1) confirms: awards issued by a tribunal "shall have no binding force except between the disputing parties and in respect of the particular case." Nonetheless, both in respect of the findings of other NAFTA tribunals, and those of other international adjudicatory bodies, their findings may prove helpful to the Tribunal in executing its interpretative role.   See e.g.: *Azurix Corp. v. Argentina*, ICSID Case No. ARB/01/12, Final Award at para. 391 (14 July 2006). See also Ian Brownlie, *Principles of Public International Law,* 6th ed. (Oxford University Press 2003) at 602.

[161]   *Suez, Sociedad General de Aguas de Barcelona S.A, and Interagua Servicios Integrales de Agua S.A and the Argentine Republic*, ICSID, ARB/03/17, Decision on Jurisdiction at para's 54-55 (16 May 2006).   See also: *Suez, Sociedad General de Aguas de Barcelona S.A. and Vivendi Universal S.A. v. Argentina*, ICSID Case No. ARB/03/19, Decision on Jurisdiction at para. 54 (3 August 2006); *National Grid PLC v. Argentina*, UNCITRAL/BIT Arbitration, Jurisdictional Decision at para. 80 (20 June 2006); and *United States – Countervailing Duties on Certain Corrosion-Resistant Carbon Steel Flat Products from Germany* (2002), WTO Doc. WT/DS213/AB/R and Corr.1 at para's 61-62.

*Grand River, et al v. U.S.A.*                                                                                          /53
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

140.     The ordinary meaning of the text is normally conclusive of the obligations owed by a
party to a treaty.  Such meaning is also informed by the context in which the subject text
appears and the object and purpose of the treaty in question.   As indicated by the
International Court of Justice:

> The Court considers it necessary to say that the first duty of a tribunal which is
> called upon to interpret and apply the provisions of a treaty, is to endeavor to
> give effect to them in their natural and ordinary meaning in the context in which
> they occur.  If the relevant words in their natural and ordinary meaning make
> sense in their context that is an end of the matter.[162]

141.     The object and purpose of a treaty provides interpreters with guidance as to how the
ordinary meaning of its text should be interpreted in context.[163]  NAFTA Article 102
explicitly sets forth its object and purpose:

> 1. The objectives of this Agreement, as elaborated more specifically through its
> principles and rules, including national treatment, most-favoured-nation treatment
> and transparency, are to:
>
> (a) eliminate barriers to trade in, and facilitate the cross-border movement of, goods
> and services between the territories of the Parties;
>
> (b) promote conditions of fair competition in the free trade area;
>
> (c) increase substantially investment opportunities in the territories of the Parties;
>
> (d) provide adequate and effective protection and enforcement of intellectual
> property rights in each Party's territory;
>
> (e) create effective procedures for the implementation and application of this
> Agreement, for its joint administration and for the resolution of disputes; and
>
> (f) establish a framework for further trilateral, regional and multilateral cooperation
> to expand and enhance the benefits of this Agreement.

---

[162]     *Competence of the General Assembly For The Admission Of A State To The United Nations*, [1950] I.C.J.
Rep. 4 at 8 (Advisory Opinion).

[163]     *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award at para. 52 (12 October 2005) [*Noble
Ventures*].

*Grand River, et al v. U.S.A.*                                                                          /54
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

142.    NAFTA Tribunals have consistently applied the objectives found in Article 102(1) when interpreting substantive provisions of Chapter 11.[164]   For example, the *Ethyl* Tribunal noted:

> Given the relevance under Article 31(1) of the Vienna Convention of NAFTA's "object and purpose," it is necessary to take note of NAFTA Article 102, particularly its (1)(c) and (e) […] The Tribunal reads Article 102(2) as specifying that the "object and purpose" of NAFTA within the meaning of those terms in Article 31(1) of the Vienna Convention are to be found by the Tribunal in Article 102(1), and confirming the applicability of Articles 31 and 32 of the Vienna Convention.[165]

143.    Interpretation of the objectives found in Article 102(1) can also be informed by text of the NAFTA preamble.[166]   Preambular text provides the context within which the specific terms of such a provision should be interpreted.   Other tribunals have had recourse to preambular text, using it to ascertain the object and purpose of a treaty where explicit objectives were not included in its text.[167]   For example, the *S.D. Myers* Tribunal has opined:

> The NAFTA provides internal guidance for its interpretation in a number of provisions. In the context of a Chapter 11 dispute, it is appropriate to begin with the Preamble to the treaty, which asserts that the Parties are resolved, inter alia, to … ***Create an expanded and secure market for the goods and services produced in their countries... to ensure a predictable commercial framework for business***

---

[164]    See e.g.: *Pope & Talbot v. Canada*, NAFTA/UNCITRAL, Award on the Merits, Phase 2, (10 April 2001), at para. 115.  See also: *United Parcel Service v. Canada*, Award, NAFTA/UNCITRAL (24 May 2007), at para's. 60-61,and *United States – In the Matter of Cross-Border Trucking Services*, Panel Report, USA-MEX-98-2008-01, 6 February 2001, at para. 222.

[165]    *Ethyl Corporation* v *Canada*, Award on Jurisdiction, 24 June 1988, 38 ILM 708, at para. 56.

[166]    VCLT Article 31(2) confirms that the preamble and annexes of a treaty are to be included in one's analysis of the context of treaty text.

[167]    See e.g.: *Siemens AG* v *Argentina*, Award, ICSID Case No ARB/02/8 (06 February 2007), at para. 81; *Continental Casualty Company. v. Argentine Republic*, ICSID Case No. ARB/03/9, Decision on Jurisdiction at para. 80, (22 February 2006); *Azurix, supra* note 33 at para. 307; and *SGS Société Générale de Surveillance v. Republic of the Philippines*, ICSID Case N° ARB/02/6, Jurisdiction at para. 116 (29 January 2004).   See also: *United States – Import Prohibition of Certain Shrimp and Shrimp Products*, WTO Doc., WT/DS58/AB/R at para. 153 (Appellate Body Report).

*Grand River, et al v. U.S.A.*                                                           /55
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> **planning and investment... and to do so in a manner consistent with
> environmental protection and conservation** […][168] [emphasis in original]

144.    And the Panel in *Cross-Border Trucking* has noted:

> The objectives develop the principal purpose of NAFTA, as proclaimed in its
> Preamble, wherein the Parties undertake, *inter alia*, to "create an expanded and
> secure market for the goods and services produced in their territories."[169]

145.    In summary, the jurisprudence of NAFTA Chapter 11 is settled: provisions found in
        NAFTA Chapter 11 are to be construed in a broad and remedial manner consistent with
        the object and purpose of the NAFTA.  As such, when interpreting the plain language of
        a provision, in context, if a tribunal is presented with two equally plausible meanings it
        should choose the one most in accord with the objectives of promoting investment and
        competitive opportunity as stated explicitly in Article 102(1) and the preambular
        language of the NAFTA.

### C.    Applicable International Law Concerning the Individual Rights and Protection of Indigenous Peoples

146.    As noted above, Article 31(3)(c) of the VCLT provides that "any relevant rules of
        international law applicable in the relations between the parties" to a treaty "shall be
        taken into account, together with the context" of the treaty, including its text and
        preamble, in interpreting the obligations owed by a party to that treaty.[170]  And as Lord
        McNair observed in his famous treatise:

> It is arguable that the relevance of a rule of international law in deciding upon the
> interpretation to be placed upon a treaty can be attributed either to the fact that a
> rule pertains to a legal system to which the contracting parties are subject or on a
> contractual basis.  The latter explanation was put forward in the *North Atlantic
> Coast Fisheries Arbitration* (Oral Argument, pp. 1073 and 1282) both by Sir
> William Robson (the British Attorney General) and by Senator Elihu Root on

---

[168]    *S.D. Myers, Inc. v. Canada*, NAFTA/UNCITRAL, NAFTA/UNCITRA, First Partial Award (13 November 2000) at para. 196 (13 November 2000).

[169]    *United States – In the Matter of Cross-Border Trucking Services*, Panel Report, USA-MEX-98-2008-01, 6 February 2001, at para. 219; citing: *In the Matter of Tariffs Applied by Canada to Certain United States Origin Agricultural Products*, CDA 95-2008-01, Final Panel at para. 122 (2 December 1996) [*Tariffs*].

[170]    Vienna Convention on the Law of Treaties, art. 31(3)(c), May 23 1969, 1155 U.N.T.S. 331.

*Grand River, et al v. U.S.A.*                                                                                /56
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

behalf of the United States of America.  The former said (at p. 1073): 'Of course in dealing with international law in relation to treaties – a subject with which I have already dealt at such length, -- I admitted that international law, when well established and clearly proved, like municipal law, may be taken as the basis of a contract, and may be read into a contract on those matters as to which the contract is silent because, no doubt, the parties were contracting with knowledge of the law.'  And Senator Elihu Root later said (p. 1282): 'The effect of a rule of international law, if such a rule there be, which may be relevant in any degree to the consideration of a treaty between two independent nations is rather that of a rule of construction than of statute upon which rights are based.  Again, I am indebted to the learned Attorney-General for the very just exposition of that relation.'[171]

147.    Claimants are Haudenosaunee, for whose benefit the United States and the United Kingdom undertook certain obligations in the *Jay Treaty* of 1794, which came into force in 1796.  The Parties reaffirmed the obligations they undertook to First Nations, and to the Haudenosaunee in particular, with the 1814 *Treaty of Ghent*.[172]  These obligations remain in force today[173] and accordingly constitute applicable rules of international law in cases where the economic interests of First Nations are at issue.  As such, these obligations should be considered by the Tribunal in its construction of NAFTA provisions at issue in this case.

148.    One of the Parties' obligations, found in Article III of the *Jay Treaty*, is to ensure that "Indians" can freely traverse the territorial boundary between the United States and Canada, and to freely carry on trade and commerce with each other thereby.  The "Indians" that the parties primarily had in mind when they undertook these obligations were the Haudenosaunee, whose traditional commerce and territories extended across what would become the border between Canada and the United States.[174]

---

[171]    A.D. McNair, *The Law of Treaties* (Oxford: Clarendon, 1961), at 466. See, e.g.: *Saipem S.p.A.* v *People's Republic of Bangladesh*, Decision on Jurisdiction, ICSID Case No. ARB/05/07, (21 March 2007) at para. 82.

[172]    Statement of Professor Robert Clinton, at page 26-27.

[173]    Statement of Professor Robert Clinton, at page 21-22 ; Canada acceded to all international law obligations of the United Kingdom in respect of the Dominion of Canada in1931.

[174]    Statement of Professor Robert Clinton, at pages 22, 24.

*Grand River, et al v. U.S.A.*                                                                                                                   /57
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

149.    When concluding the *Jay Treaty*, the Parties recognized that they each bore a special obligation to aboriginal peoples whose traditional territories were divided by the new borders they had created.  Indeed, the Parties had the Haudenosaunee specifically in mind when these obligations were affirmed in 1794 and 1814.[175]  In doing so, they were effectively promising not to treat the Haudenosaunee as if they were foreign nationals for the purposes of regulating their rights in land or their traditional commercial activities.[176]  This obligation is not only specifically enshrined in the *Jay Treaty* and affirmed in the *Treaty of Ghent*; Claimants assert that it is a rule of customary international law, as reflected in Article 32 of *ILO Convention No. 169*, which provides:

> Governments shall take appropriate measures, including by means of international agreements, to facilitate contacts and co-operation between indigenous and tribal peoples across borders, including activities in the economic, social, cultural, spiritual and environmental fields.[177]

150.    As an evolving norm of customary international law, the duty of States to respect and protect the rights and interests of First Nations across borders, in good faith, must be considered in the interpretation of treaty rights when the interests of First Nations individuals are directly involved.  The NAFTA provisions at issue in this case should be interpreted in conformity with such obligation, particularly given that the rights and interests of indigenous peoples specifically contemplated in the *Jay Treaty* – an instrument still in force as between the two NAFTA Parties concerned – are at issue.  This approach to interpretation of NAFTA provisions is also in accord with the customary international law obligation of States to honor obligations undertaken with respect to First Nations, as reflected in Article 40 of the United Nations *Declaration on the Rights of Indigenous Peoples*, which provides:

---

[175]    Statement of Professor Robert Clinton, at page 25-28, 47.

[176]    Statement of Professor Robert Clinton, at page 25-29, 47.

[177]    International Labour Organisation, *Convention Concerning Indigenous and Tribal Peoples in Independent Countries* (Sept. 5, 1991), adopted by the General Conference of the ILO on June 27, 1989, in force beginning Sept. 5, 1991; available at http://www.ilo.org/ilolex/english/convdisp1.htm; last visited 1 April 2008.

*Grand River, et al v. U.S.A.* /58
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> Indigenous peoples have the right to access to and prompt decision through just and fair procedures for the resolution of conflicts and disputes with States or other parties, as well as to effective remedies for all infringements of their individual and collective rights. Such a decision shall give due consideration to the customs, traditions, rules and legal systems of the indigenous peoples concerned and international human rights.[178]

151. Respondent's obligation to honor its NAFTA and *Jay Treaty* obligations in good faith, thereby promoting and protecting cross-border Haudenosaunee investments in its territory, is also supported by its customary international law obligation to respect the rights of indigenous peoples to occupy and enjoy their traditional territories. This obligation has also been recognized both in Article 14(2) of *ILO Convention 169* and by the Inter-American Court of Human Rights in *Mayagna (Sumo) Awas Tingni Community v. Nicaragua*.[179] Such obligation is also consonant with evolving customary international law norms for the protection of the rights of indigenous peoples whose traditional territories are today divided by 'international' borders. This principle of constant promotion and protection for First Nations members, in respect of their ability to benefit from undertaking their traditional commercial activities on their territories across borders, is also reflected in Article 36 of the *United Nations Declaration on the Rights of Indigenous Peoples*, which provides:

> 1. Indigenous peoples, in particular those divided by international borders, have the right to maintain and develop contacts, relations and cooperation, including activities for spiritual, cultural, political, economic and social purposes, with their own members as well as other peoples across borders.

> 2. States, in consultation and cooperation with indigenous peoples, shall take effective measures to facilitate the exercise and ensure the implementation of this right.[180]

152. The traditional territories of the Haudenosaunee, including the lands upon which the Six Nations of the Grand River Territory and the Seneca Nation Cattaraugus Territory sit today, exists on either side of the frontier that today represents the political border

---

[178] *United Nations Declaration on the Rights of Indigenous Peoples*, 13 September 2007, A/RES/61/295

[179] *The Mayagna (Sumo) Awas Tingni Community v. Nicaragua*, Judgment (31 August 2001), Inter-Am. Ct. H.R., (Ser. C) No. 79 (2001).

[180] *United Nations Declaration on the Rights of Indigenous Peoples*, 13 September 2007, A/RES/61/295.

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 119 of 270

*Grand River, et al v. U.S.A.* /59
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

between Canada and the United States.  As Professor Clinton explains, under the *Jay Treaty* Claimants have always been – and remain – entitled to be treated by Respondent as if all of their traditional territories were located on federally-recognized tribal land in the United States.[181]  These rights of commerce and free passage were promised to the Haudenosaunee by Respondent and the Crown after their military aggression against each other twice disturbed the territories of the Six Nations and severed the *Great Law of Peace* that served as the Haudenosaunee constitution since the 11th Century.[182]  In other words, Respondent and Claimants' forefathers understood that the Haudenosaunee were promised, in perpetuity, by both the Crown and the United States, that they would always be free to conduct their commercial, political and social affairs as if the border designated by these Europeans to separate themselves from each other had never existed.

153.  As noted above, in *Mayagna (Sumo) Awas Tingni Community* v. *Nicaragua*, the Inter-American Court of Human Rights interpreted the treaty provisions before it consistently with other applicable international law obligations.  The Court concluded that its interpretation of Article 21 of the *Inter-American Convention on Human Rights*[183] must be informed by evolving customary international law norms respecting the protection and promotion of the rights and interests of indigenous peoples.[184]  And as with the interpretation of NAFTA Chapter 11,[185] the Court also noted that its interpretation of the treaty text could not be unduly restrictive.[186]  In so doing, the Court determined that the term "property" found in Article 21 must be construed so as to include an OAS State's obligation to recognize and safeguard the communal property rights of indigenous peoples, such as the Awas Tingni, in the territories they have traditionally occupied, and

---

[181]  Statement of Professor Robert Clinton, at page 23;

[182]  Statement of Professor Robert Clinton, at page 15, 28;

[183]   O.A.S.Treaty Series No. 36, 1144 U.N.T.S. 123, entered into force July 18, 1978.

[184]  *Mayagna (Sumo) Awas Tingni Community* v. *Nicaragua*, 2001 Inter-Am. Ct. H.R. (ser. C) No. 79 ¶¶ 2, 148 (Aug. 31, 2001).

[185]  *See, e.g.: The Loewen Group, Inc. and Raymond L. Loewen* v. *United States of America*, Award on Jurisdiction, 5 January 2001, ICSID Case No. ARB(AF)/98/3, at ¶ 51, citing: *Ethyl Corporation* v *Canada*, Award on Jurisdiction, 24 June 1988, 38 ILM 708, at ¶ 83.

[186]  *Mayagna (Sumo) Awas Tingni Community* v. *Nicaragua*, at 148.

*Grand River, et al v. U.S.A.*  /60
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

did occupy prior to European contact.  The Inter-American Commission for Human Rights advocated this finding, arguing that: "there is an international customary international law norm which affirms the rights of indigenous peoples to their traditional lands."[187]  There is no reason for this Tribunal to adopt an interpretative approach different from that which has been observed in the Inter-American system.

## SECTION III    RESPONDENT HAS BREACHED ITS OBLIGATIONS UNDER ARTICLE 1105 OF NAFTA

### A.    NAFTA Article 1105 and the Customary International Law Standard of Fair and Equitable Treatment

154.    The standard of 'fair and equitable treatment' set out in NAFTA Article 1105 has been unanimously recognized by all three NAFTA Parties as being required under customary international law.[188]  Application of the standard in any given case is a context-specific endeavor.[189]  It requires due respect for the right of a sovereign State to regulate in the best interests of its citizens,[190] as balanced against the obligations of good faith and fair dealing required under international law.[191]  The standard is neither static nor frozen in time, and evidence of a Party's egregious or bad faith conduct is not required for a tribunal to find that the standard has been breached.  As confirmed in the NAFTA Free Trade Commission (FTC) statement on the interpretation of Article 1105, dated 1 July, 2001, and observed by the tribunal in *Mondev* v. *USA*:

---

[187]    *Mayagna (Sumo) Awas Tingni Community* v. *Nicaragua*, at 140.

[188]    T.H. Cheng, "Precedent and Control in Investment Treaty Arbitration" 30 FDMILJ 1014 at 1031 (2007), where Prof. Cheng unambiguously observes:  "The fair and equitable standard undoubtedly forms part of customary investment law."

[189]    *Mondev International Ltd. v. United States of America*, Award, ICSID Case No. ARB(AF)/99/2 (11 October 2002), at para. 118.

[190]    See, e.g.: *Eastern Sugar BV* v *Czech Republic*, Partial Award, SCC 088/2004 (27 March 2007), at para's 272-274: "A violation of a BIT does not only occur through blatant and outrageous interference.  However, a BIT may also not be invoked each time the law is flawed or not fully and properly implemented by a state.  Some attempt to balance the interests of the various constituents within a country, some measure of inefficiency; a degree of trial and error; a modicum of human imperfection must be over-stepped before a party may complain of a violation of a BIT."

[191]    *Técnicas Medioambientales, TECMED S.A.* v *United Mexican States*, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para's. 155-158.

*Grand River, et al v. U.S.A.*  /61
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> [Since the opening decades of the 20th century] … both the substantive and procedural rights of the individual in international law have undergone considerable development.  In the light of these developments it is unconvincing to confine the meaning of 'fair and equitable treatment' and 'full protection and security' of foreign investments to what those terms—had they been current at the time—might have meant in the 1920s when applied to the physical security of an alien.  To the modern eye, what is unfair or inequitable need not equate with the outrageous or the egregious. In particular, a State may treat foreign investment unfairly and inequitably without necessarily acting in bad faith.

> … the FTC interpretations incorporate current international law, whose content is shaped by the conclusion of more than two thousand bilateral investment treaties and many treaties of friendship and commerce. Those treaties largely and concordantly provide for 'fair and equitable' treatment of, and for 'full protection and security' for, the foreign investor and his investments.[192]

155.   And as the Tribunal in *MCI Power v. Ecuador* observed about the minimum standard provision contained within Respondent's BIT with Ecuador:

> The Tribunal notes that fair and equitable treatment conventionally obliges State parties to the BIT to respect the standards of treatment required by international law. The international law mentioned in Article II of the BIT refers to customary international law, i.e., the repeated, general, and constant practice of States, which they observe because they are aware that it is obligatory. Fair and equitable treatment, then, is an expression of a legal rule. Inequitable or unfair treatment, like arbitrary treatment, can be reasonably recognized by the Tribunal as an act contrary to law.[193]

156.   The Article 1105 standard of fair and equitable treatment is both informed by, and required under, customary international law.   It is a general standard that can be manifested in many ways, depending upon the context of the case in question.   As summarized by the Tribunal in *Waste Management II*:

> The search here is for the Article 1105 standard of review, and it is not necessary to consider the specific results reached in the cases discussed above. But as this survey shows, despite certain differences of emphasis a general standard for Article 1105 is emerging. Taken together, the *S.D. Myers*, *Mondev*, *ADF* and *Loewen* cases suggest that the minimum standard of treatment of fair and

---

[192]   *Mondev International Ltd* v *United States*, Award, ICSID Case No ARB(AF)/99/2 (11 October 2002), at para's. 116 and 125.

[193]   *MCI Power Group LC and New Turbine Inc v Ecuador*, Award, ICSID Case No ARB/03/6 (31 July 2007), at para. 369; citing *Técnicas Medioambientales, TECMED S.A.* v *United Mexican States*, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para. 102.

*Grand River, et al v. U.S.A.*                                                                    /62
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> equitable treatment is infringed by conduct attributable to the State and harmful
> to the claimant if the conduct is arbitrary, grossly unfair, unjust or idiosyncratic,
> is discriminatory and exposes the claimant to sectional or racial prejudice, or
> involves a lack of due process leading to an outcome which offends judicial
> propriety - - as might be the case with a manifest failure of natural justice in
> judicial proceedings or a complete lack of transparency and candour in an
> administrative process. In applying this standard it is relevant that the treatment
> is in breach of representations made by the host State which were reasonably
> relied on by the claimant.[194]

157.   Customary international law protections afforded to individuals, vis-à-vis the State, are
       articulated in a wide array of international instruments. It is generally accepted that the
       instruments that best articulate the meaning and scope of the rights vouchsafed under the
       UN and OAS Charters are the *Universal Declaration of Human Rights*; the *American
       Declaration on the Rights and Duties of Man*; and the *American Convention on Human
       Rights*.   Both of the aforementioned declarations also form part of the customary
       international law tapestry of protection for indigenous peoples.   Respondent is a party to
       both the *Charter of the United Nations* and the *Charter of the Organization of American
       States*, whose ratification requires an undertaking to promote human rights. [195]
       Ratification of the latter also obliged Respondent to recognize good faith as a principle
       that shall govern its relations with other parties to the Charter, including the other Parties
       to the NAFTA.

158.   Evidence that Respondent believes all States to be bound by the principles contained
       within these instruments can be seen in its adoption of the *Universal Declaration of
       Human Rights* as the basis for its evaluation of the human rights records of other States
       conducted annually by its State Department.[196]   Indeed, Respondent proclaims that it will
       continue to: "Hold governments accountable to their obligations under universal human

---

[194]   *Waste Management, Inc* v *Mexico*, Award, ICSID Case No ARB(AF)/00/3 (30 April 2004), at para. 98.

[195]   *Charter of the United Nations*, 26 June 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153, entered into force 24
        October 1945, Articles 1(3) & 55(c); *Charter of the Organization of American States* art. 106, 119 U.N.T.S.
        3, entered into force 13 December 1951; amended by *Protocol of Buenos Aires*, 27 February 1967, 721
        U.N.T.S. 324; amended by *Protocol of Cartagena*, approved 5 December 1985, 25 I.L.M. 527; amended by
        *Protocol of Washington*, approved 14 December 1992, 33 I.L.M. 1005; amended by *Protocol of Managua*,
        adopted 10 June 1993, 33 I.L.M. 1009.

[196]   Claimant's Evidentiary Stmts. Ex. 48.

*Grand River, et al v. U.S.A.*                                                                 /63
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

rights norms and international human rights instruments" and "Promote the rule of law, seek accountability, and change cultures of impunity" with respect to those rights.[197]  As a matter of good faith, Respondent must also believe itself to be bound by the same standards against which it judges other nations, and it should be held to them by any tribunal authorized to use applicable international law in coming to its decision.[198]

159.    Within the context of the present case, Respondent's obligation to ensure fair and equitable treatment for Claimants' investment is manifested in three ways:

i.      Violation of Respondent's customary international law obligation to act in accordance with basic principles of fairness and due process in designing and applying their measures; and

ii.     Claimants' detrimental reliance upon the legal regime under which they expanded their investment would remain stable and transparent, and not be abruptly changed or ignored in an arbitrary or discriminatory manner, contrary to the customary international law principle of good faith; and the legitimate expectation that Respondent's administrative and elected officials would respect international

---

[197]    Claimant's Evidentiary Stmts. Ex. 49.

[198]    These is also evidence that Respondent does not disagree with the proposition that some of the norms articulated in another important international instrument concerning the rights of First Nations groups and individuals may be binding or at least evocative of customary international law obligations.  That instrument is the United Nations Declaration on the Rights of Indigenous Peoples, 13 September 2007, A/RES/61/295. In its statement of observations on the Declaration, which was issued conterminously with its adoption, Respondent pledges that it will continue to oppose "racial discrimination against indigenous individuals and communities and continue to press for full indigenous participation in democratic electoral processes throughout the world." *See* United States, Mission to the United Nations, "Explanation of vote by Robert Hagen, U.S. Advisor, on the Declaration on the Rights of Indigenous Peoples, to the UN General Assembly, September 13, 2007," at http://www.un.int/usa/press_releases/20070913_204.html, last visited 1 April 2008.

Indeed, with its observations Respondent does not appear to reject or even criticize the obligations reflected in Articles 19, 20, 36 or 37 of the Declaration, which were contained in a document attached to the statement it issued conterminously with adoption of the Declaration by the United Nations General Assembly.  This statement of observations purports to constitute Respondent's "views with respect to the core provisions of the text."  One can therefore only assume that if it vehemently rejected any of the obligations contained within Articles 19, 20, 36 and 37 of the Declaration, it would have said so in its statement.  As described below, the obligations reflected in Articles 19, 20, 36 and 37 of the Declaration are all relevant within the context of the present case.  Moreover, just because Respondent may have chosen not to recognize certain core obligations, as identified in its statement of observations, does not mean that they are not binding as a matter of customary international law.  Respondent's is but one voice among many in the international community, the vast majority of whom supported the Declaration in its entirety, as being expressive of the kind of conduct that should be undertaken by States in their intercourse with indigenous peoples.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 124 of 270

*Grand River, et al v. U.S.A.*                                                                /64
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

law protections for indigenous peoples and specific treaty promises made for the
benefit of the Haudenosaunee; and

iii.     Violation of Respondent's customary international law obligation to avoid both *de
jure* and *de facto* discrimination against indigenous peoples, including the
obligation to consult with indigenous groups and individuals prior to imposing a
discriminatory measure.

160.    What follows is an explanation of the legal basis upon which these claims will be made
further below.

### a.    Good Faith, Legitimate Expectations and Detrimental Reliance

161.    The essence of the protection afforded to investors under the 'fair and equitable
treatment' standard, as confirmed generally customary international law, is reflected in
the principle of good faith.  In application, the customary international law principle of
good faith requires Respondent to treat the investment of a foreign national in a manner
that "will not affect the basic expectations that were taken into account by foreign
investor to make the investment."[199]

162.    Recent NAFTA and investment treaty case law supports application of the principle of
good faith in defining the meaning of 'fair and equitable treatment.'  In short, an investor
who relies upon a legitimate expectation of treatment from a Party to his detriment is
entitled to compensation for losses caused thereby.[200]  As stated in this oft-cited passage
from the award in *Tecmed* v. *Mexico*, the customary international law standard of fair and
equitable treatment requires a State:

> … to provide to international investments treatment that does not affect the basic
> expectations that were taken into account by the foreign investor to make the investment.
> The foreign investor expects the host State to act in a consistent manner, free from
> ambiguity and totally transparently in its relations with the foreign investor, so that it may
> know beforehand any and all rules and regulations that will govern its investments, as
> well as the goals of the relevant policies and administrative practices or directives, to be

---

[199]     *Sempra Energy International* v *Argentina*, Award and partial dissenting opinion, ICSID Case No
ARB/02/16 (28 September 2007), at para. 298; citing *Técnicas Medioambientales, TECMED S.A.* v *United
Mexican States*, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para. 254.

[200]     *Siemens AG* v *Argentina*, Award, ICSID Case No ARB/02/8 (06 February 2007), at para. 299.

*Grand River, et al v. U.S.A.*                                                                          /65
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

able to plan its investment and comply with such regulations. Any and all State actions conforming to such criteria should relate not only to the guidelines, directives or requirements issued, or the resolutions approved thereunder, but also to the goals underlying such regulations. The foreign investor also expects the host State to act consistently, i.e. without arbitrarily revoking any pre-existing decisions or permits issued by the state that were relied upon by the investor to assume its commitments as well as to plan and launch its commercial and business activities. The investor also expects the state to use the legal instruments that govern the actions of the investor or the investment in conformity with the function usually assigned to such instruments, and not to deprive the investor of its investment without the required compensation.[201]

163.   Investors are entitled to reasonably rely upon promises made by a State, both implicit and explicit. The less ambiguous the promise, the more reasonable the expectation.[202] The more specific the promise, the more reasonable the expectation.[203] Application of the principle is contextual, depending upon the facts of a given case. Still, where an investor detrimentally relies upon a promise made specifically to him as an individual or as the member of a group, the breach will be manifest.

### b.   Stability and Transparency of the Host State's Legal Regime

164.   An investor is entitled to protection for its reasonable expectations arising from its reasoned and prudent assessment of "the state of the law and the totality of the business environment" at the time its investment decision was made.[204] Absent other applicable international obligations, no investor may reasonably expect that the circumstances prevailing at the time its original investment was made would remain totally unchanged. Nonetheless, it can still expect that the subsequent conduct of the host State will be fair and equitable, rather than arbitrary, discriminatory or non-transparent.

---

[201]   *Técnicas Medioambientales, TECMED S.A.* v *United Mexican States*, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para. 154; approved in: *MTD Equity Sdn Bhd and MTD Chile SA v Chile, Award*, ICSID Case No ARB/01/7, (25 May 2004), at para's. 114-115.

[202]   *International Thunderbird Gaming Corp. v. United Mexican States*, Sep. Opn, UNCITRAL Arbitration (26 January 2006), at para's. 241-243.

[203]   *PSEG Global Inc and Konya Ilgin Elektrik Üretim ve Ticaret Limited Širketi* v *Turkey*, Award, ICSID Case No ARB/02/5 (19 January 2007), at para's 241-243.

[204]   *PSEG Global Inc and Konya Ilgin Elektrik Üretim ve Ticaret Limited Širketi* v *Turkey*, Award, ICSID Case No ARB/02/5 (19 January 2007), at para. 255; citing *Saluka Investments BV* v *Czech Republic*, Partial Award, UNCITRAL Arbitration (17 March 2006), at para. 305.

*Grand River, et al v. U.S.A.*                                                                    /66
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

165.    In other words, legitimate expectations can be reasonably founded upon a host State's

obligation to provide a transparent and predictable business and regulatory climate:

> This interpretation suggests that where an investment treaty does not expressly
> provide for transparency, but does for fair and equitable treatment, then
> transparency is implicitly included in the treaty. Secondly, where a foreign
> investor wishes to establish whether or not a particular State action is fair and
> equitable, as a practical matter, the investor will need to ascertain the pertinent
> rules concerning the State action; the degree of transparency in the regulatory
> environment will therefore affect the ability of the investor to assess whether or
> not fair and equitable treatment has been made available in any given case.[205]

166.    Accordingly, in cases where the violated expectation arises from a legal regime of

general application, the presence of a "roller coaster effect" of regulatory change will also

require compensation under the customary international law standard of fair and

equitable treatment.[206]  As noted above, the investor is entitled to expect a certain degree

of stability and certainty, based upon the state of the regulatory landscape when its

original or subsequent investment decisions were made.[207]  The longer that a general

policy remains in place, and is not immediately corrected by officials the more reasonable

an investor's grounds for reliance will be.[208]

167.    As demonstrated in *CME* v. Czech Republic: "the evisceration of the arrangements in

reliance upon which the foreign investor was induced to invest" constitutes a breach of

the fair and equitable treatment obligation and the principle of good faith under

customary international law.   And as Professor Wälde observed in *Thunderbird* v.

*Mexico*:

> Investors need to rely on the stability, clarity and predictability of the
> government's regulatory and administrative messages as they appear to the

---

[205]    1999 UNCTAD Report on Fair and Equitable Treatment, at p. 51 (see; also: the 2004 UNCTAD Report on Transparency, at p. 71).

[206]    *PSEG Global Inc and Konya Ilgin Elektrik Üretim ve Ticaret Limited Širketi* v *Turkey*, Award, ICSID Case No ARB/02/5 (19 January 2007), at para's. 248-250.

[207]    See, also: *Eureko BV* v *Poland*, Partial Award, UNCITRAL Arbitration (19 August 2005), at para's. 235 and 242.

[208]    *Eastern Sugar B.V. (Netherlands)* v. *Czech Republic*, Partial Award, 27 March 2007, UNCITRAL Arbitration, SCC No. 088/2004, at para. 244

*Grand River, et al v. U.S.A.*                                                                                                    /67
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> investor when conveyed – and without escape from such commitments by ambiguity and obfuscation inserted into the commitment identified subsequently and with hindsight. This applies not less, but more with respect to smaller, entrepreneurial investors who tend to be inexperienced but provide the entrepreneurial impetus for increased trade in services and investment which NAFTA aims to encourage. Taking into account the nature of the investor is not formulation of a different standard, but of adjusting the application of the standard to the particular facts of a specific situation.

> … under developed systems of administrative law, a citizen – even more so an investor -  should be protected against unexpected and detrimental changes of policy if the investor has carried out significant investment with a reasonable, public-authority initiated assurance in the stability of such policy.... Such protection is, however, not un-conditional and ever-lasting. It leads to a balancing process between the needs for flexible public policy and the legitimate reliance on particular investment-backed expectations... The "fair and equitable standard" can not be derived from subjective personal or cultural sentiments; it must be anchored in objective rules and principles reflecting, in an authoritative and universal or at least widespread way, the contemporary attitude of modern national and international economic law.  The wide acceptance of the "legitimate expectations" principle therefore supports the concept that it is indeed part of "fair and equitable treatment" as owed by governments to foreign investors under modern investment treaties and under Art. 1105 of the NAFTA.[209]

168.    In summary, when a foreign investor is making key decisions in respect of the establishment, expansion or operation of its investment in the territory of the Host State, it is entitled – under the customary international law standard of fair and equitable treatment – to enjoy stability and predictability in the regulatory environment in which such decisions were made.[210]  The investor is not entitled to expect that things will never change, but it is entitled to expect none of the changes, nor the process by which changes are made, will be arbitrary, discriminatory or non-transparent, as a matter of customary international law.

### c.    Respect for the Customary International Law Rights of Indigenous People

---

[209]    *International Thunderbird Gaming Corp. v. United Mexican States*, Separate Opinion, UNCITRAL/NAFTA (26 January 2006), at para's 5 & 30.

[210]    *CMS Gas Transmission Company* v *Argentina*, Award, ICSID Case No ARB/01/8 (12 May 2005), para's. 274-277; and *CMS Gas Transmission Company* v *Argentina*, Annulment Decision, ICSID Case No ARB/01/8 (25 September 2007), at para. 89.

*Grand River, et al v. U.S.A.*                                                                    /68
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

169.   As described above, because Claimants are Haudenosaunee, all of the norms protecting the economic rights of indigenous peoples serve as "applicable international law" for the purposes of this dispute, as per Articles 102(2) and 1131(1) of the NAFTA.  They cover the same subject matter: guaranteeing a minimum standard of fair and equitable treatment to them under international law.  The NAFTA provides a remedy for 'investors' to seek 'fair and equitable treatment in accordance with international law' and it directs tribunals to 'decide issues in dispute in accordance with the Agreement and applicable rules of international law.'  Thus, international rights safeguarding the interests of indigenous peoples should be applied in the interpretation of what "fair and equitable treatment" means in the instant case.

170.   Such applicable rules also include individual rights afforded to indigenous peoples in international human rights law, as demonstrated both by custom and convention, which are oftentimes based upon universal human rights, such as the right to property referred to in Article 21 of the *Inter-American Convention on Human Rights*,[211] as well as in Article 17 of the *Universal Declaration of Human Rights*,[212] to which Respondent is bound as a signatory to the United Nations Charter,[213] which provides:

> Article 17.
>
> (1) Everyone has the right to own property alone as well as in association with others.
>
> (2) No one shall be arbitrarily deprived of his property.

171.   In addition, both Article 19 of the *United Nations Declaration on the Rights of Indigenous Peoples*, and Article 6(1)(a) of ILO Conv. No. 169 make reference to the

---

[211]   *American Convention on Human Rights*, O.A.S.Treaty Series No. 36, 1144 U.N.T.S. 123, entered into force July 18, 1978.

[212]   *Universal Declaration of Human Rights*, G.A. res. 217A (III), U.N. Doc A/810 at 71 (1948).  See, also: Article XXXIII of the *American Declaration of the Rights and Duties of Man*, O.A.S. Res. XXX, adopted by the Ninth International Conference of American States (1948), reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 17 (1992).

[213]   Charter of the United Nations, 26 June 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153, entered into force 24 October 1945.

*Grand River, et al v. U.S.A.* /69
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

international law principle of good faith, which has also been consistently accepted by international investment tribunals as the foundation stone for the customary international law standard of fair and equitable treatment.[214]  The obligation to take pro-active steps to engage in good faith consultations with indigenous peoples  – before imposing a measure that impairs individual or group property rights and/or indigenous economic activities – is based upon the principle of good faith, which is a substantive norm recognized in customary international law.

172.  As the Inter-American Court of Human Rights observed in *Hilaire, Constantine and Benjamin et al.* vs. *Trinidad and Tobago*:

> The rule of *pacta sunt servanda*, which incorporates the concept of good faith (bona fides) effectively transcends the law of treaties, being characterized by doctrine, whether as a norm of customary law or as a general principle of international law.
>
> Its inclusion in the Vienna Convention reconstituted the *pacta sunt servanda* as an axiomatic paradigm: it came to form part of a convention on codification, which undeniably established its broad scope. However, long before the enshrinement of the *pact sunt servanda* in the Vienna Convention of 1969, it had become, more than a general rule of treaty interpretation, a norm of 'customary international law' or a veritable general principle of international law, endowed with wide jurisprudential recognition.
>
> Treaty law is closely related to the tenets of International Law, including the area of law concerning the international responsibility of States. The scope of the *pacta sunt servanda* rule, as with the previous issue of the validity of International Law norms, transcends the sphere of treaty law. Regardless, the *pacta sunt servanda* rule finds itself profoundly rooted in the system of International Law as a whole. I trust that Trinidad and Tobago will know, in light of the international obligations that it has assumed, and bearing in mind the established principle of international law *pact sunt servanda*, to fulfill, in good faith, the obligations of the present Judgment of the Inter-American Court of Human Rights on the merits and reparations in the Hilaire, Constantine and Benjamin et al Case.[215]

---

[214]  See, e.g.: *Técnicas Medioambientales, TECMED S.A. v United Mexican States*, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para. 153.

[215]  *Hilaire, Constantine and Benjamin et al.* vs. *Trinidad and Tobago* - Series C No. 94 [2002] IACHR 4 (21 June 2002), at para's. 41-43.  In applying the principle of good faith, the Court did not accept the argument that because Trinidad and Tobago had denounced the *American Convention on Human Rights* before the proceeding, the Respondent was not bound to the obligations contained therein.

*Grand River, et al v. U.S.A.*                                                                                                              /70
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

173.    The Tribunal in *AMCO Asia* v. *Indonesia* has stated that good faith is a general principle
        upon which investment treaty claims can be founded, because all foreign investors are
        entitled: "to realize the investment, to operate it with a reasonable expectation to make
        profit and to have the benefit of the incentives provided by law" without suffering the
        arbitrary exercise of a right which would prevent such enjoyment.[216]  That good faith is a
        substantive requirement of international law; there can be little doubt.   Governmental
        discretion must be exercised in good faith or else the conduct would be considered
        arbitrary, and therefore contrary to the customary international law minimum standard of
        fair and equitable treatment.   This position is in accord with the opinions of the
        International Court of Justice and the most highly qualified publicists in international
        law:

> The principle of good faith in international law is a fundamental principle from
> which the *pacta sunt servanda* and other legal rules distinctively and directly
> related to honesty, fairness and reasonableness are derived, and the application of
> these rules is determined at any particular time by the compelling standards of
> honesty, fairness and reasonableness prevailing in the international community at
> that time.[217]

> The principle of good faith requires that every right be exercised honestly and
> loyally.  Any fictitious exercise of a right for the purpose of evading either a rule
> of law or a contractual obligation will not be tolerated.   Such an exercise
> constitutes an abuse of the right, prohibited by law.[218]

> . . . [D]iscretion must be exercised in good faith, and the law will intervene in all
> cases where this discretion is abused . . . .   Whenever, therefore, the owner of a
> right enjoys a certain discretionary power, this must be exercised in good faith,
> which means that it must be exercised reasonably, honestly, in conformity with
> the spirit of the law and with due regard to the interest of others.[219]

174.    As such, Respondent's obligation to conduct itself in genuine good faith includes taking
        pro-active steps to consult with indigenous investors prior to imposing a measure that
        will impact upon them or their community, especially when such measure provides less

---

[216]    *AMCO Asia* v. *Indonesia*, 1 ICSID Reports, 377 at 490 & 493.  See, also: the Sapphire Award (1963) 35
         ILR 136 at 181.

[217]    J.F. O'Connor, *Good Faith in International Law* (Dartmouth: Aldershot, 1991), at p. 124.

[218]    *Anglo-Norwegian Fisheries Case* (1951) ICJ Reports 116 at 142.

[219]    Bin Cheng, *General Principles of Law* (Grotius Press: 1987, Cambridge UK) at 132-134.

*Grand River, et al v. U.S.A.*                                                    /71
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

favorable treatment to indigenous peoples than others.  Good faith is a source of legal

rules respecting all manner of Respondent's interaction with First Nations individuals or

groups.  As observed in Article 37 of the United Nations Declaration on the Rights of

Indigenous Peoples:

> 1. Indigenous peoples have the right to the recognition, observance and enforcement of treaties, agreements and other constructive arrangements concluded with States or their successors and to have States honour and respect such treaties, agreements and other constructive arrangements.
>
> 2. Nothing in this Declaration may be interpreted as diminishing or eliminating the rights of indigenous peoples contained in treaties, agreements and other constructive arrangements.[220]

175.  When Respondent fails to uphold the obligations it solemnly undertook in a previous

treaty, such as Article III of the Jay Treaty,[221] it does not just breach that treaty.  Such

conduct can also serve as evidence that its conduct did not meet the customary

international law minimum standard of fair and equitable treatment – because innocent

parties may have relied upon such promises, to their detriment. This does not mean that

the breach of a different treaty provision automatically constitutes a breach of NAFTA

Article 1105, but such conduct is relevant in a determination of whether State conduct

falls below the minimum standard expected as a matter of customary international law.

This is because a State that fails to conduct itself in accordance with the terms of a treaty

to which it is bound is frustrating legitimate expectations arising from the promises it

makes, and which it must keep.

176.  In cases where the State has long since enjoyed the benefits of a treaty, but now no longer

seems willing to honor the obligations owed under that treaty, it is committing an abuse

of right, contrary to the principle of good faith in international law.  Such conduct would

be directly germane to a tribunal's determination of whether the standard of fair and

equitable treatment has been met in any given case.

---

[220]   United Nations Declaration on the Rights of Indigenous Peoples, 13 September 2007, A/RES/61/295, Article 37.

[221]   In fact, Respondent actually made a specific undertaking, in Article XXVIII, to observe its obligations under the *Jay Treaty* "with punctuality and the most sincere regard to good faith."

*Grand River, et al v. U.S.A.*                                                                                        /72
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

177.    In this case, such conduct would speak to the legitimate expectations of First Nations investors to enjoy treaty obligations undertaken for their benefit, such as those contained within the *Jay Treaty*, as described above.  Also as described above, the obligation to honor treaty obligations is arguably magnified under customary international law in cases where would-be beneficiary of a treaty obligation is an indigenous group or one of its members.

178.    In summary, by operation of the customary international law principles of non-discrimination (equality) and good faith, Respondent is under a positive duty to consult with First Nations investors prior to taking decisions that impact significantly upon their investments.  It is simultaneously under a duty to engage in such consultation in a good faith manner.  In addition, Respondent is obligated to avoid according treatment to First Nations investors that is less favorable than that which has been offered to other, non-Native American competitors.  Finally, Respondent must ensure that its conduct does not compromise the legitimate expectations of First Nations investors to enjoy rights guaranteed to them under customary international law or convention.  State action contrary to these principles stands as evidence that Respondent has failed to live up to the fair and equitable treatment standard that must be met under NAFTA Article 1105 and international law.

  **d.    Even-Handedness and Fair Dealing in the Prevention of Discrimination Against First Nations Investors**

179.    The customary international law protections owed by Respondent to foreign investors in its territory are complemented by the customary international law protections owed more generally by Respondent as fundamental human rights.  In circumstances such as the present case, these obligations exist conterminously with current and emerging norms of customary international law for the protection of the human rights of indigenous peoples.  As the United Nations Committee on the Elimination of Racial Discrimination has observed: "the situation of indigenous peoples has always been a matter of close attention and concern..." and "… [that therefore] all appropriate means must be taken to combat

*Grand River, et al v. U.S.A.*                                                                      /73
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

and eliminate [discrimination involving indigenous persons]."[222]  These principles are relevant to any international tribunal called upon to decide a dispute in accordance with 'applicable rules of international law,' including this Tribunal, as per NAFTA Article 1131(1).

180.   Freedom from discrimination on the basis of race is an *ergo omnes* obligation of customary international law.[223]  It is also one of the fundamental norms emerging in the context of the customary international law protection for the individual and communal rights of indigenous peoples.   The present claim involves the assertion of Claimants' individual rights, but the impact of the measures about which they complain have affected the Six Nations communities in which they are based, both through job losses and reduced tax revenue that would have been earned, but for impositions of the measures at issue.[224]

181.   For First Nations investors, the right to be free from discrimination means *de facto* equality as between themselves and non-indigenous investors; not just *de jure* equality on the face of the measure at issue.   As recalled in Article 4(d) of the United Nations Committee on the Elimination of Racial Discrimination's General Recommendation XXIII on the Rights of Indigenous Peoples, States are under a special obligation to "ensure that members of indigenous peoples have equal rights in respect of effective participation in public life."[225]  This principle is embedded in the international prohibition

---

[222]   Committee on the Elimination of Racial Discrimination, General Recommendation 23, Rights of indigenous peoples (Fifty-first session, 1997), U.N. Doc. A/52/18, annex V at 122 (1997), reprinted in Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.6 at 212 (2003), Article 1.

[223]   *Re: Barcelona Traction, Light and Power Company (Belgium v. Spain)*, Judgment (Second Phase), 1970 ICJ Reports 3. at 514-517.   See, also: *Juridical Condition and Rights of the Undocumented Migrants*, Advisory Opinion OC-18/03, 17 September 2003, Inter-Am. Ct. H.R. (Ser. A) No. 18 (2003) at 23.

[224]   J. Montour Stmt. at 2; Statement of Chief William Montour, at para. 4.

[225]   Committee on the Elimination of Racial Discrimination, General Recommendation 23, Rights of indigenous peoples (Fifty-first session, 1997), U.N. Doc. A/52/18, annex V at 122 (1997), reprinted in Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.6 at para. 212 (2003), Article 4(d); *see also* CERD, *Conclusions and Recommendations of the Committee on the Elimination of Racial Discrimination: Australia*, at para. 9, U.N.

(continued…)

*Grand River, et al v. U.S.A.*                                                                    /74
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

against discrimination on the basis of race.[226]  For example, as noted by the European Committee of Social Rights:

> …equal treatment requires a ban on all forms of indirect discrimination, which can arise by failing to take due and positive account of all relevant differences or by failing to take adequate steps to ensure that the rights and collective advantages that are open to all are genuinely accessible by and to all.[227]

182.    And as the Inter-American Court of Human Rights has recently observed:

> In international human rights law, the principle of non-discrimination enshrines equality between persons and imposes certain prohibitions on States. Distinctions based on gender, race, religion or national origin, are specifically prohibited in relation to the enjoyment and exercise of the substantive rights embodied in international instruments.  Regarding these categories, any distinction that States make in the application of benefits or privileges must be carefully justified on the grounds of a legitimate interest of the State and of society, "which cannot be satisfied by non-discriminatory means."
>
> **International human rights law prohibits not only deliberately discriminatory policies and practices, but also policies and practices with a discriminatory impact on certain categories of persons, even though a discriminatory intention cannot be proved.**
>
> …
>
> **At times the principle of equality requires States to adopt positive measures to reduce or eliminate the conditions that cause or facilitate the perpetuation of the discrimination prohibited by the treaties.**
>
> …
>
> The rights embodied in the human rights treaties may be regulated reasonably and the exercise of some of them may be subject to legitimate restrictions.  The establishment of such restrictions must respect the relevant formal and substantive limits; in other words, it must be accomplished by law and satisfy an urgent public interest.  Restrictions may not be imposed for discriminatory purposes, nor may they be applied in a discriminatory manner.  Furthermore,

---

(…continued)

Doc. CERD/C/304/Add.101 (Apr. 19, 2000); and, generally: Theodore Meron, *Human Rights and Humanitarian Norms and Customary International Law* (Oxford: Clarendon, 1991).

[226]    See, e.g.: *Connors* v *United Kingdom*, (ECHR), Case No. 66746/01 (27 May 2004 ), 16 B.H.R.C. 639, (2005) 40 E.H.R.R. 9, [2004] H.L.R. 52, [2004], at para. 84; U.N. Comm. on Econ., Soc. & Cultural Rts., 5th Sess., The Nature of States' Parties Obligations, P 10, U.N. doc. E/1991/23, Annex III, at pp. 9-11.

[227]    *ERRC* v *Italy* (2006) 43 E.H.R.R. SE7, at para. 20.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 135 of 270

*Grand River, et al v. U.S.A.*                                                                    /75
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

"any permissible restriction of rights may never imply the total negation of the right."[228] [**emphasis added**]

183.   Professor Garcia-Amador, a former Special Rapporteur on State Responsibility for the International Law Commission, recognized decades ago that an "international principle of non-discrimination" applies to the conduct of States as a "… well-established rule of traditional international law."[229]   A number of investment treaty tribunals have also observed that the standard of fair and equitable treatment "should be understood to be treatment in an even-handed and just manner, conducive to fostering the promotion of foreign investment."[230]

184.   It is impossible to act in a just and even-handed manner with First Nations investors if *de facto* inequalities between indigenous and non-indigenous investors are brought about by operation of the State's measure.   States act in an arbitrary manner, and therefore contrary to the customary international law standard of fair and equitable treatment, when their actions or measures have an unnecessarily discriminatory impact upon members of a protected group, such as First Nations investors.   As Professor Schwarzenberger observed:

> Arbitrariness in any form is – or ought to be – abhorrent to *homo juridicus*.  His whole professional outlook is dominated by the attitude that, in the eyes of the law, equal situations require equal remedies.[231]

185.   In addition, the Article 1105 term: 'fair and equitable treatment' must be interpreted in accordance with pre-emptory norms of customary international law such as non-

---

[228]   *Juridical Condition and Rights of the Undocumented Migrants*, Advisory Opinion OC-18/03, 17 September 2003, Inter-Am. Ct. H.R. (Ser. A) No. 18 (2003) at 23.

[229]   F.V. Garcia-Amador, *The Changing Law of International Claims*, Vol. I (New York: Oceana, 1984) at 277 & 285-287.  See, also: Andreas Hans Roth, *The Minimum Standard of International Law Applied to Aliens* (Geneva: Sijthoff, 1949) at 65.

[230]   *MTD Equity Sdn Bhd and MTD Chile SA v Chile, Award*, ICSID Case No ARB/01/7, (25 May 2004), at para. 113; approved by the *Ad Hoc* Committee in its Annulment Decision (16 February 2007), at para's. 70-71; *Siemens AG* v *Argentina*, Award, ICSID Case No ARB/02/8 (06 February 2007), at para. 290; and *Azurix Corp. v. Argentina*, ICSID Case No. ARB/01/12, Final Award at para. 391 (14 July 2006), at para. 360.

[231]   Schwarzenberger (1971) at pp. 100-101.

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 136 of 270

*Grand River, et al v. U.S.A.*                                                      /76
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

discrimination.  Article 53 of the *Vienna Convention on the Law of Treaties* provides that treaty terms must not be interpreted in a manner that conflicts with pre-emptory norms of international law, or else the treaty provision is to be considered void to the extent of the inconsistency.  Given that Article 1105 itself indicates that the Parties must act in accordance with "international law, including fair and equitable treatment" it is inconceivable that these terms could be construed in a manner that does not reflect a pre-emptory norm applicable in the instant case.

186.    The International Labor Organization's *Convention No. 169* ('ILO Conv. No. 169') has been recognized as providing a basis for identifying emerging customary international law rights of indigenous peoples.[232]  This is not to say that every obligation included in the ILO Conv. No. 169 has necessarily acquired the status of customary international law. Rather, its provisions are demonstrative of obligations that – when recognized and regarded as binding by States through subsequent international practice – are either included, or in the process of being included, within the corpus of customary international law applicable to the rights and interests of indigenous peoples.

187.    Article 2 of ILO Conv. No. 169 provides, in part:

> 1. Governments shall have the responsibility for developing, with the participation of the peoples concerned, co-ordinated and systematic action to protect the rights of these peoples and to guarantee respect for their integrity.
>
> 2. Such action shall include measures for:
>
> (a) Ensuring that members of these peoples **benefit on an equal footing from the rights and opportunities which national laws and regulations grant to other members of the population**… [emphasis added]

188.    Respondent does not meet the obligation to ensure that its measures do not discriminate against First Nations individuals and groups when its officials effectively marginalize members of indigenous groups from decision-making that directly impacts upon their

---

[232]    Lenzerini, "Sovereignty Revisited: International Law and Parallel Sovereignty of Indigenous Peoples" 42 TXILJ 155 at 180 (2006); A. Fodella, "International Law and the Diversity of Indigenous Peoples" at 577 (1996) The Convention was ratified by Mexico on 5 September 1990, but has not yet been ratified by the other two NAFTA Parties.

*Grand River, et al v. U.S.A.* /77
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

economic livelihood.  Indeed, customary international law arguably requires States to particularly ensure that indigenous peoples are granted "effective participation, at all levels of decision-making, in decisions which may affect them."[233]  As the Report of the United Nations Seminar on the Effects of Racism and Racial Discrimination on the Social and Economic Relations between Indigenous Peoples and States stated:

> The discrimination is of a dual nature: on the one hand, gradual destruction of the material and spiritual conditions [required] for the maintenance of their [economic and social prosperity], on the other hand, **attitudes and behaviour signifying exclusion or negative discrimination when indigenous peoples seek to participate in the dominant society**.[234] [emphasis added]

189.  As a customary international law norm, the nature of this obligation to engage in meaningful consultation with members of First Nations, prior to adopting measures that directly impact upon the economic well being of their communities, is both positive and mandatory.   It is also reflected in the language of the Articles 38 and 19 of the United Nations Declaration on the Rights of Indigenous Peoples, which was recently adopted by an overwhelming majority of the members of the General Assembly:

> Article 38
>
> States in consultation and cooperation with indigenous peoples, shall take the appropriate measures, including legislative measures, to achieve the ends of this Declaration.
>
> Article 19
>
> States shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free, prior and informed consent before adopting and implementing legislative or administrative measures that may affect them.

190.  And as Article 6(1)(a) of ILO Conv. No. 169 similarly provides:

---

[233]  F. Lenzerini, "Sovereignty Revisited: International Law and Parallel Sovereignty of Indigenous Peoples" 42 TXILJ 155 at 188 (2006).

[234]  *Report of the United Nations Seminar on the Effects of Racism* and Racial Discrimination on the Social and Economic Relations between Indigenous Peoples and States, U.N. Doc. E/CN.4/2989/22, HR/PUB/89/5 at 5.

*Grand River, et al v. U.S.A.*                                                    /78
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> 1. In applying the provisions of this Convention, Governments shall:
>
> (a) Consult the peoples concerned, through appropriate procedures and in particular through their representative institutions, whenever consideration is being given to legislative or administrative measures which may affect them directly;
>
> …
>
> 2. The consultations carried out in application of this Convention shall be undertaken, in good faith and in a form appropriate to the circumstances, with the objective of achieving agreement or consent to the proposed measures.[235]

191.    In other words, in order to ensure that *de facto* discrimination is not visited upon a member or members of an indigenous community, Respondent's officials are required to pro-actively engage in good faith consultations with affected members of indigenous communities prior to imposing a measure that will have a significant impact upon their property; their way of life; or their commercial activities.   This is so because such activities most often sustain the economic well being of entire First Nations communities.

192.    Both the obligation to avoid imposition of discriminatory measures against First Nations investors and the obligation to pro-actively consult with them prior to taking legislative action that will have a substantial impact upon them should accordingly be regarded as norms of customary international law. In the instant case, these human rights norms augment and/or reinforce the customary international law obligation Respondent owes to all foreign investors: to refrain from engaging in arbitrary or discriminatory conduct, and to otherwise refrain from acts that would violate a sense of fair dealing or even-handedness in the mind of an objective observer.   They are therefore applicable in this case both directly, under Article 1105, and indirectly, as a means of interpreting the term 'fair and equitable treatment.'

   **e.    Fundamental Due Process, Equality and the Right to be Heard**

---

[235]    International Labour Organisation, *Convention Concerning Indigenous and Tribal Peoples in Independent Countries* (Sept. 5, 1991), adopted by the General Conference of the ILO on June 27, 1989, in force beginning Sept. 5, 1991, Article 6; available at http:// www.ilo.org/ilolex/english/convdisp1.htm; last visited 1 April 2008.

*Grand River, et al v. U.S.A.*                                                                                     /79
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

193.    Due process and basic procedural fairness are fundamental elements of the customary international law standard of fair and equitable treatment.[236]  The customary international law requirement to afford due process of law means providing a foreign investor with her day in court before imposing measures that impair her investment.[237]  Due process is particularly essential in cases where similarly situated enterprises have been afforded that right but not one or more foreign investments.

194.    Freeman wrote that international law demanded States to provide access to courts to safeguard "personal and property rights so that the alien's defense of these interests may be effectively raised."[238]  As the Tribunal in *ADC* v. *Hungary* observed:

> Some basic legal mechanisms, such as reasonable advance notice, a fair hearing and an unbiased and impartial adjudicator to assess the actions in dispute, are expected to be readily available and accessible to the investor to make such legal procedure meaningful.   In general, the legal procedure must be of a nature to grant an affected investor a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard.   If no legal procedure of such nature exists at all, the argument that "the actions are taken under due process of law" rings hollow.   And that is exactly what the Tribunal finds in the present case.[239]

195.    The Tribunal in *Myers* v. *Canada* has explained how "Article 1105 imports into the NAFTA the international law requirements of due process, economic rights, obligations of good faith and natural justice."   In his treatise on denials of justice, Paulsson noted how the Tribunal in *Mondev* recognized that the NAFTA Article 1105 standard evolved out of the doctrine of denial of justice commonly found in early 20th Century decisions

---

[236]    See, e.g.: *International Thunderbird Gaming Corp. v. United Mexican States*, Award, UNCITRAL Arbitration (26 January 2006), at para's. 197-198; *Waste Management, Inc v Mexico*, Award, ICSID Case No ARB(AF)/00/3 (30 April 2004), at para. 98; *BG Group Plc.* v. *Argentina*, Award, UNCITRAL Arbitration (24 December 2007), at para. 341; *Saluka Investments BV* v *Czech Republic*, Partial Award, UNCITRAL Arbitration (17 March 2006), at para. 308; *Loewen Group Inc and Loewen* v *United States of America*, Award, ICSID Case No ARB(AF)/98/3 (25 June 2003), at para. 132.

[237]    *American Manufacturing & Trading, Inc.* v *Republic of Zaire*, Award, ICSID Case No. ARB/93/1 (21 February 1997), at para. 7.18.

[238]    A.V. Freeman, *The International Responsibility of States for Denial of Justice*, (Kraus: New York, 1970), at 547.

[239]    *ADC Affiliate Limited and ADC & ADMC Management Limited* v. *Hungary*, Award, ICSID Case No ARB/03/16 (2 October 2006), at para. 435.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 140 of 270

*Grand River, et al v. U.S.A.*                                                           /80
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

of mixed claims commissions.[240]  Saluting him as the "true intellectual grandfather of denial of justice," Paulsson then cites Vatell's 1758 treatise for the proposition that the failure of a State to provide access to a forum for the adjudication of an alien's rights has always constituted a denial of justice that triggers State responsibility,[241] concluding:

> The right of access to courts is fundamental and uncontroversial; its refusal the most obvious form of denial of justice.  Legal rights would be illusory if there were no entitlement to a procedural mechanism to give them effect.[242]

196.   Again, as indicated in the UN Committee on the Elimination of Racial Discrimination's General Recommendation XXIII, States are considered by many to be under a special obligation to "ensure that members of indigenous peoples have equal rights in respect of effective participation in public life."  Obviously a State cannot provide indigenous peoples with an equal right to be heard before its local courts and tribunals when it permits one group of enterprises to enjoy a right to defend their business interests in civil court, and even to elect to settle claims by government entitites against them on most favorable terms, while effectively stripping the same opportunities from a First Nations enterprise, and imposing payment obligations on it in the event that it later decides to take the First Nations enterprise to court.  As noted above, imposition of such an obligation upon a First Nations enterprise is particularly egregious if the State fails to take the necessary, proactive steps required to engage in full consultation with that enterprise before imposing the measure.[243]

---

[240]   J. Paulsson, *Denials of Justice in International Law* (Cambridge, 2005) at 68; citing *Mondev International Ltd. v. United States of America*, Award, ICSID Case No. ARB(AF)/99/2 (11 October 2002), at para. 99.

[241]   J. Paulsson, *Denials of Justice in International Law* (Cambridge, 2005) at 65 & 75.

[242]   J. Paulsson, *Denials of Justice in International Law* (Cambridge, 2005) at 134.

[243]   Committee on the Elimination of Racial Discrimination, General Recommendation 23, Rights of indigenous peoples (Fifty-first session, 1997), U.N. Doc. A/52/18, annex V at 122 (1997), reprinted in Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.6 at para. 212 (2003), Article 4(d).

*Grand River, et al v. U.S.A.*                                                                /81
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

197.    The right to have one's own day in court is a bedrock principle of international law, as demonstrated by its inclusion in a number of human rights conventions and declarations relevant to Respondent's conduct,[244] including the following:

> *Universal Declaration of Human Rights*,[245]
>
> Article 10.
>
> Everyone is entitled **in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations** and of any criminal charge against him.
>
> *American Convention on Human Rights*,[246]
>
> Article 8.
>
> 1. **Every person has the right to a hearing**, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal, previously established by law, in the substantiation of any accusation of a criminal nature made against him or **for the determination of his rights and obligations of a civil, labour, fiscal, or any other nature**.
>
> Article 24.
>
> All persons are equal before the law. Consequently, they are entitled, without discrimination, to equal protection of the law.
>
> *International Convention on the Elimination of All Forms of Racial Discrimination*,[247]
>
> Article 5.

---

[244]    See, also: Article II of the *American Declaration of the Rights and Duties of Man*, O.A.S. Res. XXX, adopted by the Ninth International Conference of American States (1948), reprinted in Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L.V/II.82 doc.6 rev.1 at 17 (1992); and Article 3(l) of the *Charter of the Organization of American States* art. 106, 119 U.N.T.S. 3, entered into force 13 December 1951; amended by *Protocol of Buenos Aires*, 27 February 1967, 721 U.N.T.S. 324; amended by *Protocol of Cartagena*, approved 5 December 1985, 25 I.L.M. 527; amended by *Protocol of Washington*, approved 14 December 1992, 33 I.L.M. 1005; amended by *Protocol of Managua*, adopted 10 June 1993, 33 I.L.M. 1009.

[245]    Universal Declaration of Human Rights, G.A. Res. 217 A(III), 10 December 1948.

[246]    American Convention on Human Rights, O.A.S.Treaty Series No. 36, 1144 U.N.T.S. 123 (in force 18 July 1978).

[247]    International Convention on the Elimination of All Forms of Racial Discrimination, 7 March 1966, 660 U.N.T.S. 195, 5 I.L.M. 352 (in force 4 January 1969).

*Grand River, et al v. U.S.A.*                                              /82
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> In compliance with the fundamental obligations laid down in article 2 of this Convention, States Parties undertake to prohibit and ***to eliminate racial discrimination in all its forms and to guarantee the right of everyone***, without distinction as to race, colour, or national or ethnic origin, to equality before the law, notably in **the enjoyment of the following rights**:
>
> (a) **The right to equal treatment before** the tribunals and all other **organs administering justice**;

198.   In summary, customary international law requires a State to provide equal access to its courts in order to adjudicate claims concerning the property rights of foreign investors, and certainly before such property is confiscated.  As noted by leading arbitrators in the field,[248] the obligation to accord due process to individuals, including access to courts for the adjudication of civil claims brought against them under domestic law, is also supported as a bedrock principle in the international law of human rights.

199.   This obligation extends all the more to a State's treatment of indigenous peoples, to whom it owes the highest standard of care.

## B.      Respondent's Breaches of Article 1105

200.   Respondent's breaches of Article 1105 and the customary international law standard of 'fair and equitable' treatment fall into the four following categories:

(a)    Failure to meet the Investors' legitimate expectation that Respondent would provide them with a transparent and predictable business and regulatory climate within which to invest;

(b)    Failure to honor Respondent's obligation to prevent measures from resulting in *de facto* discrimination against First Nations investors, and failure to proactively consult with those investors in order to prevent such discrimination from occurring;

(c)    Failure by Respondent's officials to act in accordance with either the treaty obligations it owed for the benefit of the Haudenosaune or the domestic constitutional law rules to which its states are expected to conform, and upon which investors were entitled to rely; and

---

[248]   See, e.g.: J. Paulsson, *Denials of Justice in International Law* (Cambridge, 2005) at 75-78; and T. Buergenthal, "The Proliferation of Disputes, Dispute Settlement Procedures and Respect for the Rule of Law", Address delivered to the Colloquium on Consolidation of Proceedings in Investment Arbitration, organized by Geneva University and the Project on International Courts and Tribunals (21 April 21 2006).

*Grand River, et al v. U.S.A.*                                                                 /83
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

(d)     Failure to honor Respondent's obligation to ensure that all tobacco enterprises, and especially First Nations tobacco enterprises, received the equal opportunity to choose whether to face tort allegations against it within the context a civil trial, and to actually be held liable for an actionable wrong first, before being forced to make millions of dollars in payments, ostensibly in order to permit state officials to collect at some future moment in time, should they ever attempt to pursue any sort of action in tort against Claimants in respect of their US business venture.

201.    Each of these breaches stands on its own as independent and sufficient reason to award Claimants the damages claimed, as described in the damages section below.   It is not necessary for the Tribunal to find that all four species of breach have occurred in order for liability to attach.[249]

a.    **Respondent Failed to Provide a Transparent and Predictable Business and Regulatory Climate**

202.    The customary international law standard of fair and equitable treatment obliges Respondent to ensure that a transparent and predictable framework for foreign investment exists and is made available to Claimants.   The first NAFTA case to address the issue was *Metalclad* v. *Mexico*, chaired by Sir Eli Lauterpacht.   In that case, a local government imposed measures upon the investor that effectively destroyed the value of its investment, contrary to the investor's legitimate expectations, which it formed by familiarizing itself with the local regulatory framework that would govern the establishment of its investment, and through investor-initiated contacts with local officials.   The *Metalclad* Tribunal found that, in the totality of the circumstances, Mexico "failed to ensure a transparent and predictable framework for Metalclad's business planning and investment" and that therefore it breached the expectation rightfully held by

---

[249]    For example, it is not necessary to find that Claimants have not been accorded fair and equitable treatment because of Respondent's failure to accord treatment to them owed because they are First Nations investors. The egregious conduct at issue in this claim would constitute a violation of Article 1105 even if Claimants were not Haudenosaunee.   That Claimants were treated as poorly as they were, given their special rights under international law as indigenous peoples, only demonstrates how Respondent's failure to accord fair and equitable treatment to Claimants is even more manifestly egregious than it might have otherwise been.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 144 of 270

*Grand River, et al v. U.S.A.*                                                        /84
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

that investor to be treated in a "fair and just" manner as required under Article 1105.[250]
It stated:

> An underlying objective of NAFTA is to promote and increase cross-border investment opportunities and ensure the successful implementation of investment initiatives. (NAFTA Article 102(1)).
>
> Prominent in the statement of principles and rules that introduces the Agreement is the reference to "transparency" (NAFTA Article 102(1)). The Tribunal understands this to include the idea that all relevant legal requirements for the purpose of initiating, completing and successfully operating investments made, or intended to be made, under the Agreement should be capable of being readily known by all affected investors of another Party. There should be no room for doubt or uncertainty on such matters. Once the authorities of the central government of any Party (whose international responsibility in such matters has been identified in the preceding section) become aware of any scope for misunderstanding or confusion in this connection, it is their duty to ensure that the correct position is properly determined and clearly stated so that investors can proceed with all appropriate expedition in the confident belief that they are acting in accordance with all relevant laws.[251]

Similar conclusions have been drawn by other more recent tribunals.[252]

203.    The MSA regime, implemented through introduction of the Escrow Statutes, represented a unilateral offer from states to tobacco producer/distributors: either join the MSA regime or comply with the escrow payment regime. The Claimants chose the latter, on the understanding that if they restricted their sales to only a limited number of state markets they would be entitled to obtain a refund reflecting their proportionate share of the

---

[250]   In a much-criticized decision, seen as an unacceptable substitution of the Court's opinion for that of a tribunal chaired by Sir. Eli Lauterpacht, a British Columbia trial level judge named Tysoe purported to annul the Tribunal's finding upon judicial review of the award. His judgment, which was clearly made in excess of his jurisdiction under the local UNCITRAL Model Law legislation, was appealed. However, the Government of Mexico made payment on the Award before the appeal could be heard.

[251]   *Metalclad Corp.* v. *Mexico*, Final Award, UNCITRAL Arbitration (2 September 2000), at ¶¶ 75-76

[252]   See, e.g.: *Waste Management, Inc.* v. *The United Mexican States*, Award, ICSID Case No. ARB(AF)/3 (30 April 2004), para. 98; Técnicas Medioambientales, TECMED S.A. v United Mexican States, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para. 154; *Saluka Investments BV* v *Czech Republic*, Partial Award, UNCITRAL Arbitration (17 March 2006), at para. 499; *Iurii Bogdanov, Agurdino-Invest Ltd., Agurdino-Chimia* JSC v *Government of the Republic of Moldova*, Award, SCC Inst. (22 September 2005), at sec. 4.2.4.

*Grand River, et al v. U.S.A.*                                                                    /85
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

national market as defined under the MSA.  As Respondent was only too keen to point
out earlier in these proceedings:

> There was widespread media coverage of the MSA and its provisions, as
> evidenced by the numerous news reports on the establishment of the MSA
> regime submitted by the United States with its Objection.  These reports – all
> pre-dating March 12, 2001 – discussed the negotiation of the MSA, its impact on
> all cigarette manufacturers with sales in the U.S. market, and the opportunity for
> manufacturers other than the original participating manufacturers ("OPMs") to
> join and receive an exemption from payment.  Similarly, media coverage pre-
> dating March 12, 2001 reported on the enactment of the Escrow Statutes and
> MSA states' enforcement efforts, including enforcement against Grand River.
>
> … Reports about the MSA, in any event, were also carried on public radio,
> public television, and other broadcast media, and included accounts of the
> MSA's impact on cigarette manufacturers other than the OPMs.  The reasonable
> step for a market participant to have taken upon hearing even a "passing
> reference" to a development as monumental as the MSA would have been to
> review its publicly available text and determine what its impact would be, either
> with or without the assistance of counsel.[253]

204.   While Claimants and Respondent clearly disagree as to the date upon which Claimants
should have become fully informed about the MSA and the impact it had upon the US
tobacco industry as a whole, the fact remains that Claimants did eventually realize the
magnitude of the circumstances in which they found themselves, and so in May 2002
they retained counsel to retrench and review their options.  By the Summer of 2002, with
the MSA the Escrow Statues firmly fixed as a permanent part of the regulatory landscape,
Claimants were prepared to amend their collective business model so as to conform to the
rules of the new regime.[254]

205.   As reasonable and prudent investors, Claimants took note of the fact that the Escrow
Statutes were the product of careful refinement by forty-six states attorneys general, as
well as a host of regulatory lawyers and civil litigators.  They also noted that, after years
of negotiation and consensus building, forty-six different legislatures enacted identical
versions of the same measure.  They therefore felt confident that they could rely on the

---

[253]   Respondent's Reply on Jurisdiction, 6 February 2006, at pp. 22-23.

[254]   J. Montour Stmt. at 51.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 146 of 270

*Grand River, et al v. U.S.A.*                                                          /86
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

framework of the new regulatory regime, which they reasonably assumed would not easily amenable to sudden change.[255] There was no obvious indication, at the time they began to establish their brand off-reserve in 2002, that any aspect of the new regime, especially the allocable share release mechanisms included in each statute, was conditional, accidental or otherwise unintended.

206. As such, during the summer of 2002 Claimants undertook a careful analysis of both the risks and opportunities presented under the new regime. The investment decisions they took as a result were not entered into lightly, as they represented a wholesale change in the manner in which they had planned to grow their business. By the end of the year, Grand River had started terminating all of its contractual relationships for private label product runs[256] and the investors had started the process establishing their Seneca® and Opal® brands in five state markets: North Carolina, South Carolina, Oklahoma, Arkansas and Georgia, employing the services of a third-party distributor.[257]

207. The decision to establish the Seneca® and Opal® brands in new markets was not entered into lightly. Claimants had learned that at least one tobacco enterprise had actually decided not to join the MSA – even when offered a grandfathered exemption – because it served a regional market and would fare better under the allocable share mechanisms included in each Escrow Statute.[258] The incentive to dedicate one's business to serving regional markets was obviously intended with the inclusion of the allocable share mechanisms in each Escrow Law. There was no other reason to include such a mechanism in the measures. Claimants had no reason to believe that, in the coming years,

---

[255]   J. Montour Stmt. at 51.

[256]   J. Montour Stmt. at 34.

[257]   J. Montour Stmt. at 42.

[258]   R. Parloff, "Is the $200 Billion Tobacco Deal Going Up in Smoke?" *Fortune Magazine* March 7, 2005 at 126; found at Tab 1, Factual Materials, Claimants' Counter Memorial on Jurisdiction.

*Grand River, et al v. U.S.A.*                                                    /87
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

NAAG officials would be holding private meetings with representatives of the OPMs on the immediate elimination of these very same mechanisms.[259]

208.   Over the next four years, before the first of the Allocable Share Amendments would come into effect, Claimants were very successful in establishing and growing their Seneca® brand in these selected state markets.[260]   Particularly in respect of the Seneca brand, their marketing strategies, the composition of their products, their manufacturing processes and their prices were all directed towards achieving success in these particular markets.[261]   Their success was achieved due, in part, to their reliance on the availability of a mechanism found in each Escrow Statute clearly intended to encourage regional tobacco enterprises to refrain from competing on a national basis.   The allocable share mechanisms provided Claimants with one additional option under the original legislation: take your brands national, and join the MSA; or choose to focus on a smaller, regional market and pay only a proportionate amount of the total escrow obligations that would be owing had one been distributing nationally.

209.   It is important to remember the public mantra repeated so often by state officials when the measures were originally introduced: the Escrow Statutes were allegedly intended to provide industry members with a 'level playing field.'[262]   Claimants were entitled to take them at their word, as the inclusion of an allocable share mechanism was obviously intended both to provide a level playing field as between NPMs and non-exempt SPMs and to provide a level playing field for regional brands, vis-à-vis the national value brands of SPMs for which a grandfathered exemption had been provided.   Again, there was no obvious reason to suspect that within a few years' time, the same officials would be referring to the MSA regime as critically flawed because of the allocable share release 'loophole.'

---

[259]   Claimant's Evidentiary Stmts. Ex. 38 Meeting Notes.

[260]   J. Montour Stmt. at 46-50.

[261]   J. Montour Stmt. at 46-50.

[262]   Claimant's Evidentiary Stmts. Ex. 50.

*Grand River, et al v. U.S.A.*                                                                    /88
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

210.    In other words, Claimants reasonably entertained a legitimate expectation that the expansion of their brand to a limited number of new state markets was encouraged under the MSA regulatory framework.  They would not learn until 2004 that state officials were planning to remove the very basis upon which this new investment had been made.  As explained above, the customary international law principle of good faith serves to protect the legitimate expectations of foreign investors under the standard of 'fair and equitable treatment.'    Investors are entitled to rely upon public pronouncements, and clearly defined legislative frameworks when making their investment decisions.  They do not expect that the officials responsible for those measures will secretly meet with their commercial competitors in order to plot changes to the regime intended specifically to impair the investments made in reliance on its provisions.

211.    The same requirements, of stable, transparent and even-handed treatment that US investors have come to expect to receive when investing abroad under the protection of a bilateral investment treaty, are also owed by Respondent's own state governments.  As affirmed by the NAFTA Parties themselves, the standard of fair and equitable treatment has passed into customary international law and, founded upon the principle of good faith, it has been used by more than one US investor to receive compensation where its reasonably held investment-backed expectations have been thwarted by host government action.  Claimants request no more, and no less.

212.    Had the MSA states not reneged on the NAFTA and customary international law promise of fair and equitable treatment for investors who chose to focus on development of their brands in a limited number of states, Claimants would still be enjoying continued growth and profitability, rather than pursuing a NAFTA claim.[263]

---

[263]    To be clear, had Claimants never been subjected to the MSA regime in the first place, they would have been able to establish their brands on a national basis, reaping even greater cash flows from their investment.  The second best scenario, in an imperfect world, would have been for them to continue to enjoy the success they had achieved in restricting sales of their brands to a small number of state markets, while continuing to sell their products on reserve, without any diminution of the brand suffered as a result of the illegal application of the measures to their business on First Nations territory in the United States.

*Grand River, et al v. U.S.A.* /89
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

**b.  Respondent Breached its Obligation to Proactively Consult First Nations Investors**

213.  As described below, state officials failed twice in respect of their obligation to observe Respondent's customary international law obligation to proactively consult Claimants, as First Nations investors with commercial activities likely to be significantly affected by their measures. This obligation is owed as a function of the *erga omnes* rule prohibiting discrimination against special and/or disadvantaged groups.  As demonstrated above, this fundamental norm prohibiting discrimination on the basis of race is owed, of necessity, as an element of the 'fair and equitable treatment' standard included in NAFTA Article 1105.  It imposes an obligation upon the State to ensure that First Nations members do not receive less favorable treatment, on a *de facto* basis, under its measures.

214.  In order to properly ensure that a measure does not fall disproportionately upon indigenous persons in particular, Respondent's officials should have taken the proactive step of consulting Claimants and other First Nations tobacco enterprises before imposing the Escrow Laws in the first place, and they certainly should have consulted Claimants before amending their measures to remove the allocable share mechanisms from each of them. By 2004, state officials were certainly well aware of Claimants' active participation in these particular state markets, as they had been receiving their escrow payments and processing refunds for them for one to two years before even announcing the Allocable Share Amendments.[264]  Given that they were demanding payment of escrow fees as early as 2002, it is obvious that state officials could have sought out Grand River before agreeing with the Majors to revoke the allocable share release mechanisms from their measures.

215.  When they decided to draft and impose the Contraband Laws to 'complement' enforcement of the Escrow Statutes, the MSA states were also under an obligation to seek

---

[264]  Claimants are not entitled to such treatment because they just so happened to be First Nations individuals fortunate enough to benefit from the current state of customary international law with respect to a fundamental norm of non-discrimination.  They were entitled to be proactively consulted by the MSA states before these measures were imposed because the commercial activities represented in their US investment were, and remain, crucial to the economic wellbeing of over two hundred indigenous families.

*Grand River, et al v. U.S.A.*                                                    /90
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

out, and consult with, First Nations tobacco enterprises.  Engaging in consultation could have permitted the parties to ensure that the MSA respected their constitutional obligations towards First Nations tobacco enterprises in imposing and enforcing these measures.  Because they failed to do so, today Claimants are finding even their on-reserve markets being impaired by the reputational impact of having one's flagship brand be deemed contraband and subjected to seizure by overzealous officials working in individual states.[265]

216.    Similarly, Respondent's states were under a duty to proactively consult with Claimants and any other First Nations tobacco enterprise known to them before making significant amendments to their Escrow Statutes.  Removal of the allocable share release mechanisms was a significant change that the states ought to have known might substantially impair the commercial activities of a First Nations enterprise such as that of the Investors.  Indeed, the record demonstrates that state officials did know that the contemplated changes would result in dramatic impairment of the ability of an enterprise pursuing a regional brand strategy to compete; that is precisely why these measures were imposed.[266]  It was therefore incumbent upon the state officials to identify whether First Nations investors would be among any of those whose businesses would be impaired by introduction and enforcement of the new measure.

217.    Had state officials consulted with the Investors prior to imposing the Allocable Share Amendments, just as they had consulted with SPMs prior to imposing the original Escrow Statutes, an acceptable resolution could have been identified.  For example, they could have agreed on providing the Investors with an exemption from the allocable share revocation for sales of Seneca® and Opal® brands based upon the same grandfathering formula they had used for NPMs years earlier.   Instead, it appears as if the only tobacco enterprises that benefited from proactive consultations with state officials when the

---

[265]    A. Montour Stmt. at 23-27.

[266]    Claimant's Evidentiary Stmts. Ex. 40.

*Grand River, et al v. U.S.A.*                                                    /91
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

allocable share amendments were being designed were the OPMs that stood to benefit from them.

218.    It was not in accordance with the customary international law standard of fair and equitable treatment for the MSA states to have removed the allocable share release mechanisms without first attempting to ameliorate the resulting impact upon Claimants, as First Nations investors.  In imposing these new measures, state officials created at least two classes of small tobacco enterprise: the NPMs that were still benefitting from the exemption granted to them years ago in exchange for their joining the MSA; and those whose per-carton compliance costs were about to skyrocket by over $4 per carton because they had relied upon the allocable share release mechanisms originally provided under each measure.

219.    Imposition of the Allocable Share Amendments thus gravely impaired Claimants' ability to enjoy the returns they reasonably expected from having successfully established their brands in North Carolina, South Carolina, Oklahoma, Arkansas and Georgia. Respondent has therefore failed to satisfy its customary international law obligation to avoid discrimination against the Claimants generally, and as First Nations investors in particular, by taking proactive steps to consult with them and by mitigating the effects of their new measures upon them.  Claimants were entitled to receive treatment on a *de facto* basis that was no less that that which was being received by their competitors, the exempt SPMs, for whose benefit the Allocable Share Mechanisms were designed.

   **c.    Claimants had a Legitimate Expectation that Respondent Would Honor its Obligations Toward Haudenosaunee Investors Under Applicable International and Domestic Laws**

220.    As demonstrated above, not unlike any other investor, Claimants were entitled to hold a reasonable expectation concerning the conduct they could expect from each state government, based upon customary international law obligations owed by Respondent. However, whereas any investor who pursued a regional brand strategy was entitled to expect that state officials would not conspire to remove the legislative mechanism upon which it was based, Claimants were entitled to hold even greater expectations.

*Grand River, et al v. U.S.A.*                                                                                    /92
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

221.    As Professor Clinton has explained, at the time of the negotiation and ratification of the 1794 *Jay Treaty*, Respondent fully understood that it could not, and would not, attempt to assert its regulatory jurisdiction over the commercial activities of Haudenosaunee individuals and enterprises.[267]   It has also been clearly established by Professors Warrick and Brandao that the Haudenosaunee have been engaged in the tobacco trade, throughout the territories that they still inhabit today, since well before European contact.[268]

222.    Professor Clinton explains that even as the United States of America took shape, well into the 19th Century, Respondent still believed itself to be bound to the people of the Six Nations in respect of the treaty promises it had made to them, and to the Crown – now held in the Right of Canada – for their benefit.[269]   Indeed, almost a century later Respondent still demonstrated that it appeared to believe itself to be bound to its commitment to leave Haudenosaunee Nations and their commerce undisturbed, under its own laws dealing with Native American tribes.[270]   It was not until later in the 19th Century that Respondent began to reinterpret its obligations under the *Jay Treaty*,[271] contrary to customary international law and the principle of good faith expressed in the *pacta sunt servanda* rule.[272]

223.    Regardless of whether Respondent's courts have re-cast its obligations under the *Jay Treaty*, Claimants are entitled to receive the full benefit of them, as they were originally understood by Respondent and their forbearers at the time it was negotiated.   Accordingly,

---

[267]    Statement of Professor Robert Clinton, at page 33-34.

[268]    Statement of Professor Gary Warrick, at page 37-46; Statement of Professor Jose Brandao, at page 16-17.

[269]    Statement of Professor Robert Clinton, at page 34-43.

[270]    Statement of Professor Robert Clinton, at page 43-44.

[271]    Statement of Professor Robert Clinton, at page 44.

[272]    Of course, a State is not permitted to unilaterally re-interpret the extent of its treaty obligations by recourse to the operation of its domestic legal system.  As affirmed by the Tribunal in *TECMED* v. *Mexico*: "An Act of State must be characterized as internationally wrongful if it constitutes a breach of an international obligation, even if the act does not contravene the State's internal law – even if under that law, the State was actually bound to act that way."  See: Técnicas Medioambientales, TECMED S.A. v United Mexican States, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para. 120, citing: J. Crawford, The International Law Commission's Articles on State Responsibility (Cambridge, 2002), at p. 84.

*Grand River, et al v. U.S.A.*                                                                    /93
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

Claimants were entitled to hold an expectation that none of the transactions made by them anywhere on Six Nations territory – including the Six Nations of the Grand Territory – would have ever been subjected to any element of the MSA regime.  All sales of product produced on Haudenosaunee land are protected by the original terms of the *Jay Treaty*, which remains in force today.  As provided in Article IX of the *Treaty Ghent*, all of the rights promised to the Haudenosaunee in the *Jay Treaty* were restored after the War of 1812 ended.

224.    As set out below, that same provision of the *Treaty of Ghent* also restored the state of 'perpetual peace' agreed as between Respondent and the Haudenosaunee under the 1794 *Treaty of Canandaigua*:

> **The United States of America engage** to put an end immediately after the Ratification of the present Treaty to hostilities with all the Tribes or Nations of Indians with whom they may be at war at the time of such Ratification, and **forthwith to restore to such Tribes or Nations respectively all the possessions, rights, and privileges which they may have enjoyed or been entitled to in one thousand eight hundred and eleven previous to such hostilities. Provided <u>always</u> that such Tribes or Nations shall agree to desist from all hostilities against the United States of America**, their Citizens, and Subjects upon the Ratification of the present Treaty being notified to such Tribes or Nations, **and shall so desist accordingly**. And His Britannic Majesty engages on his part to put an end immediately after the Ratification of the present Treaty to hostilities with all the Tribes or Nations of Indians with whom He may be at war at the time of such Ratification, and forthwith to restore to such Tribes or Nations respectively all the possessions, rights, and privileges, which they may have enjoyed or been entitled to in one thousand eight hundred and eleven previous to such hostilities. Provided always that such Tribes or Nations shall agree to desist from all hostilities against His Britannic Majesty and His Subjects upon the Ratification of the present Treaty being notified to such Tribes or Nations, and shall so desist accordingly. [273]

225.    Moreover, as Professors Clinton and Fletcher both explain, while it appears that under the present state of its domestic law, Respondent has unilaterally reserved to itself the right to tax and license the Haudenosaunee tobacco trade at the federal level, it has still

---

[273]    Treaty of Ghent (United States – United Kingdom), executed 24 December 1814; See: http://www.yale.edu/lawweb/avalon/diplomacy/britain/ghent.htm

*Grand River, et al v. U.S.A.*                                                                    /94
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

prohibited state officials from doing the same.[274]  In other words, under US Federal Indian Law, state officials are not permitted to impose any of the measures that were indeed imposed upon Native American commerce in implementation of the MSA. Whereas a line of cases has developed in respect of the states' right to tax non-Native American purchasers of tobacco and to gather information from First Nations traders for that limited purpose,[275] there is no authority under Respondent's law – today or as of the date Claimants established their US investment together in the 1990's – for the proposition that a state government can impose an obligation on a First Nations tobacco enterprise to place funds into escrow in relation to sales of their product.[276]

226.   What is true for all First Nations tobacco enterprises under applicable domestic law is even more applicable when Haudenosaunee investors are involved, because they are entitled to all of the rights and privileges promised to them and other border nations under the *Jay Treaty* and *Treaty of Ghent*.  It must be recalled that the *Moe* line of cases, referred to in note 28 of the Tribunal's Award on Jurisdiction, actually concerned First Nations traders who were merely importing and selling tobacco at the retail level.[277] Such business activity is a far cry from an enterprise that actually manufactures its own brand of products at a state of the art facility located on First Nations territory and distributing it at the wholesale level, which is what the investors do.

227.   In summary, arising out of Respondent's good faith obligation to honor its treaty commitments for the benefit of the Haudenosaunee, Claimants were entitled to expect that they could participate, nationwide, in the US tobacco industry without any interference from state governments.  They were entitled to hold this expectation both when they originally established the Seneca® brand in 1999, and marketed it exclusively on First Nations territories, and when they expanded their marketing efforts to establish

---

[274]   Statement of Professor Robert Clinton, at pages 43-44; Statement of Professor Matthew Fletcher, at ¶¶14-15a.

[275]   Statement of Professor Robert Clinton, at page 45; Statement of Professor Matthew Fletcher, at ¶¶18-20.

[276]   Statement of Professor Robert Clinton, at page 43; Statement of Professor Matthew Fletcher, at ¶¶21-22

[277]   Statement of Professor Robert Clinton, at page 45.

*Grand River, et al v. U.S.A.*                                                                                    /95
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

the brand in the States of North Carolina, South Carolina, Oklahoma, Arkansas and Georgia.

228.    Claimants were originally operating their investment in the United States on the expectation that as Six Nations members, state measures could not legally be applied to their business.[278]  They were entitled to hold this expectation under the *Jay Treaty* and *Treaty of Ghent* and Respondent has breached its obligations under Article 1105 and customary international law whenever state officials have purported to have the authority to impose any MSA measures on Claimants, or when it has been impaired by operation of their measures. Claimants were also entitled to hold the same expectation on the basis of Respondent's own domestic law, at least with respect to all of their business activities on First Nations territories and arguably with respect to the entirety of their business.[279]

229.    While Claimants ultimately decided to embrace the MSA regime in 2002, relying upon the inclusion of allocable share mechanisms in every Escrow Statute to establish their brands in regional markets, if Respondent had honored its treaty obligations to the Haudenosaunee in the first place, Claimants would have been entitled to establish their brands on a national basis, without incurring any escrow obligations at all.  As the reports of Professors Clinton and Fletcher demonstrate, they were entitled to expect exactly that level of treatment.   Because it was not forthcoming, Respondent failed to meet its obligations under Article 1105 and customary international law.

**d.    Equality and Due Process:  Claimants had a Right to their Day in Court**

230.    Claimants' due process claim is not complicated.  The Escrow Statutes establish a reserve fund into which deemed manufacturers of tobacco products must make millions of dollars in deposits, on a 25-year rolling basis, in perpetuity.   The only other alternatives are going out of business or 'joining' the MSA on less favorable terms than were made available to a privileged group of Exempt SPMs in 1999.  The stated purpose for enacting

---

[278]      See, also: J. Montour Stmt. at 38; A. Montour Stmt. at 29-30;

[279]      Statement of Professor Robert Clinton, at page 43.

*Grand River, et al v. U.S.A.*                                                                    /96
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

the Escrow Statutes was in order to establish a fund against which judgments obtained by a state against a NPM, for some indeterminate form of future, 'culpable conduct' on the part of that NPM.[280]

231.   It has also been stated that imposition of escrow obligations on NPMs somehow "levels the playing field" as between the OPMs and any deemed 'manufacturer.'[281]   The logic of this justification seems to be that it would be unfair for the OPMs to honour their obligations under the MSA if persons who were not sued by the states were not forced to bear a similar burden of compliance by force of some statutory means.   The problem with this logic is that it presumes that the states would have and could have held Claimants liable in tort for any reason.

232.   The basis upon which the OPMs were sued, and apparently settled, was not just that they made a product, the use of which could be proved as a proximate cause of losses to state treasuries responsible for the operation of Medicaid programs.   To date, no public authority in the United States has ever succeeded in proving such a case in tort.   In fact, the case against the OPMs was much worse (i.e. theoretically easier for state officials to prove).   The claim was that a small cabal of multinational corporations had both conspired and succeeded together in promoting tobacco use through a campaign of intentional deceit and misrepresentation.

233.   Even more importantly, there is absolutely no evidence on the record that the use of Claimants' tobacco products has caused any state to suffer any loss, in sufficient proximity, arising out of the operation of their public health insurance programs.   There is also not a shred of evidence on the record that Claimants ever engaged in a conspiracy with the OPMs – or anybody else – for the purpose of promoting tobacco use through a campaign of deceit and misrepresentation.   There is also no evidence on the record that any state has ever sued, or even contemplated suing, Claimants in tort for any reason related to their production and distribution of Seneca® branded cigarettes in certain

---

[280]   Claimant's Evidentiary Stmts. Ex. 35.

[281]   Claimant's Evidentiary Stmts. Ex. 37.

*Grand River, et al v. U.S.A.*                                                              /97
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

portions of Respondent's territory – other than actions related to the operation of the MSA regime.   Nonetheless, as of March 31, 2008, escrow deposits for cigarettes produced by Claimants are in excess of $28 million and an additional amount of not less than $500,000 in penalties.

234.   The most rudimentary norms of equality and due process require that Claimants should not be made to pay anything to any state until after they have had their day in court.   The OPMs had an opportunity to defend themselves against the accusations leveled against them and they were provided with opportunities to settle those claims on an individualized basis.   Claimants have not even been accused of committing a tort by any of the states that have demanded and received millions of dollars in payments from them. It is fundamentally unfair and inequitable for Claimants to be forced to perpetually dedicate millions of dollars to a rolling fund in order to satisfy judgments for tort claims that have not even been conceived, much less proved.

235.   Again, while Claimants ultimately decided to work within the MSA regime in 2002, in reliance upon the promise of being able to obtain allocable share releases, had Respondent honored its customary international law obligations to Claimants in the first place, they would have been entitled to establish the Seneca® and Opal® brands on a national basis, without incurring any escrow obligations at all.   It is fundamentally unfair for Claimants to be made to make multimillion dollar payments to Respondent's states to satisfy theoretical tort claims that would likely never be launched, must less result in judgments against them.

### SECTION IV        RESPONDENT HAS BREACHED ITS OBLIGATIONS UNDER NAFTA ARTICLES 1102 AND 1103 OF THE NAFTA.

### A.        Respondent's Obligations under Articles 1102 and 1103

236.   In relevant part, NAFTA Article 102 provides:

**Article 102: Objectives**

*Grand River, et al v. U.S.A.* /98
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> 1. The objectives of this Agreement, **as elaborated more specifically through its principles and rules, including national treatment, most-favored-nation treatment and transparency,** are to:
>
> a) eliminate barriers to trade in, and facilitate the cross-border movement of, goods and services between the territories of the Parties;
>
> b) promote conditions of fair competition in the free trade area;
>
> c) increase substantially investment opportunities in the territories of the Parties;
>
> d) provide adequate and effective protection and enforcement of intellectual property rights in each Party's territory;
>
> …
>
> 2. The Parties shall interpret and apply the provisions of this Agreement in the light of its objectives set out in paragraph 1 and in accordance with applicable rules of international law.
>
> **[emphasis added]**

237. NAFTA Article 102(1) provides that 'national treatment' and 'most favored nation treatment' and 'transparency' are the "principles and rules" that are to be understood as elaborating "more specifically" the objectives of the NAFTA set out in Article 102(1). Those objectives include: "the promotion of conditions of fair competition in the free trade area" and substantially increasing "investment opportunities in the territories of the Parties." It is therefore apparent that the Parties to the NAFTA wanted to ensure that these objectives would be seriously considered and employed in a broad and remedial fashion in the interpretation of specific provisions of the Agreement.

238. Articles 1102 and 1103 represent the obligations that ensure NAFTA investors enjoy national treatment and most favored nation treatment from the Parties. As such their terms could not possibly be construed in a narrow fashion. These terms must instead be construed on the basis of their plain and ordinary meaning, in light of the objectives described above. They promise 'treatment no less favorable' than that which is received by another investor or investment in like circumstances.

239. There is simply no room in the language of these provisions for reading-in the requirement for an investor to either prove that the measures according less favorable

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 159 of 270

*Grand River, et al v. U.S.A.*                                                    /99
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

treatment were imposed on the basis of his or her nationality; or to demonstrate that the impact of the measures fell disproportionately on investors of his or her nationality as opposed to those of the host state or another.  The Investor's burden under either Article 1102 or 1103 is to prove that more favorable treatment has been granted to another investor in like circumstances, than that which has been accorded to him.

240.    As the *Feldman* Tribunal noted, national treatment is a "fundamental obligation" of the NAFTA, which can be analogized to its use in other international agreements, such as Article III:4 of *GATT 1947*.[282]  And as the *S.D. Myers* Tribunal has noted "Article 1102 of NAFTA addresses not only the way in which an enterprise has operated or currently operates, but also its expansion."[283]  The United Nations Conference on Trade and Development has also defined the national treatment standard in the manner required under the NAFTA:

> National Treatment can be described as a principle whereby a host country extends to foreign investors treatment that is at least as favourable as the treatment it accords to national investors in like circumstances. In this way the national treatment standards seek to ensure a degree of competitive equality between national and foreign investors.[284]

241.    The same can be said in respect of the MFN standard, only that the comparison of treatment to be undertaken is between the investor and an investor from another State, rather than the host State.  As in all discrimination cases, there will be a class of winners and a class of losers (although each could be a class of many or a class of one).  In this case, the class of winners includes both foreign enterprises and US enterprises.  As such, Claimants will concentrate the remainder of their arguments primarily on national

---

[282]    *Marvin Feldman* v. *Mexico*, Final Award, Case No. ARB(AF)/99/1 at para. 165; see, also: See, e.g.: *Pope & Talbot, Inc.* v. *Canada*, NAFTA/UNCITRAL Tribunal, Final Merits Award, UNCITRAL Arbitration (10 April 2001), at para's. 45-63.

[283]    *S.D. Myers, Inc.* v. *Canada*, Second Partial Merits Award, NAFTA/UNCITRAL Tribunal (21 October 2002) at para. 115

[284]    United Nations Conference on Trade and Development, *National Treatment* (UN Publications, New York: 1999) at 1.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 160 of 270

*Grand River, et al v. U.S.A.*                                    /100
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

treatment under Article 1102, but they apply equally to MFN treatment under Article 1103.

242.   NAFTA Article 1102 provides:

> 1. Each Party shall accord to investors of another Party treatment no less favourable than that it accords, in like circumstances, to its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

> 2. Each Party shall accord to investments of investors of another Party treatment no less favourable than that it accords, in like circumstances, to investments of its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

> 3. The treatment accorded by a Party under paragraphs 1 and 2 means, with respect to a state or province, treatment no less favourable than the most favourable treatment accorded, in like circumstances, by that state or province to investors, and to investments of investors, of the Party of which it forms a part.

243.   Starting with the interim award of the Tribunal in *Pope & Talbot* v. *Canada*, and confirmed by other NAFTA tribunals,[285] the determination of an alleged national treatment breach under Article 1102 involves three analytical steps:

    (a)   Identify domestic investors and/or investments in a comparable position with the claimant;

    (b)   Determine whether more favorable treatment has been provided to the domestic investor/investment; and

    (c)   Determine whether the circumstances of the application of the measure justify the difference in treatment.

244.   Subsequent tribunals have observed the same approach because the analysis is faithful to the plain and ordinary meaning of the text of Article 1102, as understood in context and in light of the explicit objectives of the NAFTA, elaborated more specifically by the

---

[285]   See, e.g.: *Pope & Talbot, Inc.* v. *Canada*, NAFTA/UNCITRAL Tribunal, Final Merits Award, UNCITRAL Arbitration (10 April 2001), at para's 31-81, and para. 78, in particular.  For a similar BIT test with the same result, see also: *Parkerings–Compagniet AS* v *Lithuania*, Award, ICSID Case No ARB/05/8 (11 September 2007), at para. 371.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 161 of 270

*Grand River, et al v. U.S.A.*                                                      /101
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

principles of non-discrimination and transparency.   For example, in *Thunderbird* v.

*Mexico*, the Tribunal observed:

> In construing Article 1102 of the NAFTA, the Tribunal gives effect to the plain
> wording of the text. The obligation of the host NAFTA Party under Article 1102
> of the NAFTA is to accord non–discriminatory treatment towards the investment
> or investor of other NAFTA Parties. It must therefore be established that
> discriminatory treatment was accorded to the foreign investment or investor.
>
> The burden of proof lies with Thunderbird, pursuant to Article 24(1) of the
> UNCITRAL Rules. In this respect, Thunderbird must show that its investment
> received treatment less favourable than Mexico has accorded, in like
> circumstances, to investments of Mexican nationals.
>
> It is not expected from Thunderbird that it show separately that the less favorable
> treatment was motivated because of nationality. The text of Article 1102 of the
> NAFTA does not require such showing.  Rather, the text contemplates the case
> where a foreign investor is treated less favorably than a national investor. That
> case is to be proven by a foreign investor, and, additionally, the reason why there
> was a less favorable treatment.[286]

**a.   Identification of Appropriate Comparators**

245.   Articles 1102 and 1103 are comparative standards.   The scope for comparison of the
       investor/investment and the comparator (whether local or domestic) is based upon the
       treatment accorded to them – i.e. the results of the measure being applied.   In cases
       where the measure applied is specific to a certain industry, the comparison will naturally
       be made between enterprises operating within that same industry (rather than all
       enterprises in the territory, such as under a general tax measure).[287]

246.   The object of the comparison is to ensure that an equality of competitive opportunity is
       maintained as between the investor/investment and domestic, or other foreign, enterprises

---

[286]   *International Thunderbird Gaming Corp. v. United Mexican States*, Award, UNCITRAL Arbitration (26
        January 2006), at para's. 175-177 (emphasis added).

[287]   See, e.g.: *Occidental Exploration and Production Company* v. *Ecuador*, Award, LCIA Case No UN 3467,
        (1 July 2004), where the measure was a value added tax regime and the treatment was the receipt of refunds
        for taxes paid by some enterprises engaged in exporting their products but not the investor in exporting its
        products.

*Grand River, et al v. U.S.A.*                                                                                        /102
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

operating in like circumstances.[288]  The circumstance of 'treatment' received by the comparators is to be understood within the context of the competitive relationship between enterprises affected by the measure, and the manner in which the measure impacts upon their respective ability to compete.

247.    The *Pope & Talbot* Tribunal thus concluded that, "as a first step, the treatment accorded to a foreign owned investment protected by Article 1102(2) should be compared with that accorded domestic investments in the same business or economic sector…," although the Tribunal cautioned that this was but a first step.  This rationale is confirmed by the OECD *Declaration on National Treatment for Foreign-Controlled Enterprises*, which provides, in part:

> As regards the expression 'in like situations,' the comparison between foreign-controlled enterprises established in a Member country and domestic enterprises in that Member country is valid only if it is made between firms operating in the same sector.[289]

248.    All NAFTA tribunals have thus far undertaken the initial step of identifying comparators based upon the industry of the investor/investment in question.  For example, in the *Feldman* case, the Tribunal started with a determination that the "applicable universe" of comparable investors and investments was made up of those businesses engaged in purchasing and reselling cigarettes, rather than a wider group, which would have included manufacturers.  The measure at issue in the *Feldman* case was a rebate on export taxes.[290]  The comparison in *UPS* v. *Canada* was between the national postal service and a privately owned courier company in respect of the impact of measures on competition between them in the expedited courier business.

---

[288]    See, e.g.: *Korea – Measures Affecting Imports of Fresh, Chilled and Frozen Beef*, WTO Appellate Body Report, WT/DS161/AB/R (11 December 2000), at para's. 142-148.

[289]    Organization for Economic Co-operation and Development, *National Treatment for Foreign-Controlled Enterprises* (OECD, Paris: 1993) at 22.  Mexico is an OECD Member country.  As a consequence of Membership, Mexico is obliged to adhere to OECD declarations such as this one, pursuant to Article 5(b) of the 1960 *Convention on the Organization for Economic Co-operation and Development*.

[290]    *Marvin Feldman v United Mexican States, Award, ICSID Case No. ARB(AF)/99/1 (16 December 2002),* , at para's. 171-172.

*Grand River, et al v. U.S.A.*                                                                                    /103
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

249.   The comparison in *US – Cross Border Trucking Services* involved trucking businesses operating between Mexico and the United States.[291]   The measure at issue was a prohibition on most Mexican-owned carriers operating in all but a tiny fraction of the United States market.   The comparison in *ADF* v *USA* was between steel products fabricated by the investor (a steel fabricator) versus steel products fabricated by domestic investors, with respect to their potential use in a highway project.[292]   In *S.D. Myers, Inc.* v. *Canada*, the Tribunal held that the appropriate basis for comparison – involving a measure that banned the export of PCB wastes from Canada in comparison – was between service providers offering PCB waste destruction.[293]   It found, for example:

> The concept of "like circumstances" invites an examination of whether a non-national investor complaining of less favorable treatment is in the same "sector" as the national investor.   The Tribunal takes the view that the word "sector" has a wide connotation that includes the concepts of "economic sector" and "business sector."   From the business perspective, it is clear that SDMI and Myers Canada were in "like circumstances" with Canadian operators such as Chem-Security and Cintec.   They all were engaged in providing PCB waste remediation services...[294]

250.   In summary, the guiding principle and objective of establishing the 'universe of enterprises' against which the investor and/or investment must be compared is preservation of an equality of competitive opportunity between enterprises.   Accordingly, the starting point for identifying comparators receiving treatment under a measure is to determine the nature of the competitive landscape against which the measure has been applied, and treatment thereby accorded by the Party that imposed it.

**b.   Treatment No Less Favourable**

251.   Under Articles 1102 and 1103, the investors and their investment enterprise are entitled to enjoy the best treatment accorded under a measure to comparable enterprises operating

---

[291]   *United States – In the Matter of Cross-Border Trucking Services*, Panel Report, USA-MEX-98-2008-01, 6 February 2001, at para's. 252-257 & 291-294

[292]   *ADF Group Inc.* v. *United States of America*, Award, 6 ICSID Reports 470, at 155.

[293]   *S.D. Myers, Inc.* v. *Canada*, NAFTA/UNCITRAL, NAFTA/UNCITRAL Tribunal, First Partial Award (13 November 2000)  at 251.

[294]   *S.D. Myers, Inc.* v. *Canada*, NAFTA/UNCITRAL, NAFTA/UNCITRAL Tribunal, First Partial Award (13 November 2000) at para's 250-251.

*Grand River, et al v. U.S.A.*                                                                                     /104
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

in like circumstances.   The focus of this stage of the analysis is on the impact of the

measure; not on whether there is any evidence of intent to accord less favorable treatment

on the basis of nationality.   As the *Myers* Tribunal noted:

> Intent is important, but protectionist intent is not necessarily decisive on its own.
> The existence of an intent to favour nationals over non-nationals would not give
> rise to a breach of [Article 1102] if the measures in question were to produce no
> adverse effect on the non-national complainant.   The word "treatment" suggests
> that practical impact is required to produce a breach of Article 1102, not merely
> a motive or intent that is a violation of Chapter 11.[295]

252.    And as the *Pope & Talbot* Tribunal has noted:

> Canada contends that these [various WTO] cases are distinguishable because
> they involve *de jure*, rather than *de facto*, discrimination.   We have already seen
> that it is not always clear whether a measure is a *de jure* or *de facto* case, but
> even if it were, Canada has presented no reasons to justify treating the two forms
> of disadvantage differently.   Indeed, the recognition that national treatment can
> be denied through *de facto* measures has always been based on an unwillingness
> to allow circumvention of that right by skilful or evasive drafting.   Applying
> Canada's proposed more onerous rules to *de facto* cases [which would require
> proof that foreigners, as a group, were proportionately disadvantaged in
> application of a measure] could quickly undermine that principle.   That result
> would be inconsistent with the investment objectives of [the] NAFTA, in
> particular Article 102(1)(b) and (c), to promote conditions of fair competition and
> to increase substantially investment opportunities.[296]

253.    Another example can be found in *Siemens* v. *Argentina*, where the Tribunal undertook a

national treatment analysis within the context of a 'fair and equitable treatment' provision.

It summarized the state of the law on national treatment as follows:

> Whether intent to discriminate is necessary and only the discriminatory effect
> matters is a matter of dispute.   In *S.D. Myers*, the tribunal considered intent
> "important" but not "decisive on its own."   On the other hand, the tribunal in
> *Occidental Exploration and Production Company* v. *Republic of Ecuador* found
> intent not essential and that what mattered was the result of the policy in question.
> The concern with the result of the discriminatory measure is shared in *S.D.
> Myers*: "The word 'treatment' suggests that practical impact is required to

---

[295]     *S.D. Myers, Inc. v. Canada*, NAFTA/UNCITRAL, NAFTA/UNCITRAL Tribunal, First Partial Award (13
November 2000) at para. 254.

[296]     *Pope & Talbot v. Canada*, NAFTA/UNCITRAL, Award on the Merits, Phase 2, (10 April 2001), at para.
70.

*Grand River, et al v. U.S.A.* /105
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> produce a breach of Article 1102, not merely a motive or intent." The discriminatory results appear determinative in *Marvin Roy Feldman Karpa* v. *United Mexican States*, where the tribunal considered different treatment on a de facto basis to be contrary to the national treatment obligation under Article 1102 of NAFTA. The Tribunal concurs that intent is not decisive or essential for a finding of discrimination, and that the impact of the measure on the investment would be the determining factor to ascertain whether it had resulted in non-discriminatory treatment.[297]

254.   Because proof of intent to discriminate on the basis of nationality is not necessary for a finding that less favorable treatment has been accorded under a measure, determining whether treatment was more or less favorable does not involve a global comparison of treatment received by foreigners and domestic investors.   For example, sometimes measures accord more favorable treatment to a 'national champion' enterprise, to the disadvantage of all others (domestic or foreign).   Sometimes measures accord more favorable treatment to a chosen group of foreigners and/or domestic enterprises, to the disadvantage of all other competitors.   When an individual investor claims 'treatment no less favorable,' the analysis is specific to the treatment being accorded to that claimant under the measure, vis-à-vis its competitors.   As the *Pope & Talbot* Tribunal stated:

> The Tribunal believes that the language of Article 1102(3) was intended simply to make clear that the obligation of a state or province to provide investments of foreign investors with the best treatment it accords *any* investment of its country, not just the best treatment it accords to investments of *its* investors.   Since, as noted, the treatment of states and provinces in Article 1102(3) is expressly an elucidation of the requirement placed on the NAFTA Parties by Articles 1102(1) and (2), that interpretation lends support to the conclusion that, like states and provinces, national governments cannot comply with [the] NAFTA by according foreign investments less than the most favorable treatment they accord to their own investments.
>
> … The Tribunal thus concludes that "no less favorable" means equivalent to, not better or worse than, the best treatment accorded to the comparator.[298]

255.   Treatment accorded under a measure is less favorable when an investor demonstrates that a comparable enterprise, operating in like circumstances, has enjoyed a competitive economic advantage, as between it and the investor/investment.   The burden rests upon a

---

[297]   *Siemens AG* v *Argentina*, Award, ICSID Case No ARB/02/8 (06 February 2007), at para's. 320-321.

[298]   *Pope & Talbot v. Canada*, NAFTA/UNCITRAL, Award on the Merits, Phase 2, (10 April 2001), at para's. 41 & 42.

*Grand River, et al v. U.S.A.*                                                                                    /106
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

claimant investor to prove it has suffered loss or damage because of the treatment accorded under a given measure.  It does so by demonstrating that, but for the application of the measure, the investor/investment would have performed better, economically, within the circumstances of the relevant industry, than it actually did.

### c.   Like Circumstances

256.   Once an investor has established that *prima facie* breach of either Article 1102 or Article 1103 has occurred, the analysis turns to the question of whether the difference in treatment was justifiable in the circumstances.  As the Panel in *U.S. Trucking Services* observed, differences in treatment received under a measure could be justified if the comparators did not deserve to receive the same treatment because of the circumstances in which the measure applied to them.  The Tribunal also cautioned, however, that this 'like circumstances exception' must be construed so narrowly as to strip the national treatment obligation of any true meaning.[299]

257.   The justification for applying what is effectively a 'like circumstances exception' in national treatment cases has been explained by various tribunals.  For example, in dealing with a 'fair and equitable treatment' clause, the Tribunal in *Parkerings* v. *Lithuania* stated:

> Discrimination is to be ascertained by looking at the circumstances of the individual cases.  Discrimination involves either issues of law, such as legislation affording different treatments in function of citizenship, or issues of fact where a State unduly treats differently investors who are in similar circumstances.  Whether discrimination is objectionable does not in the opinion of this Tribunal depend on subjective requirements such as the bad faith or the malicious intent of the State: at least, Article IV of the Treaty does not include such requirements.   However, to violate international law, discrimination must be unreasonable or lacking proportionality, for instance, it must be inapposite or excessive to achieve an otherwise legitimate objective of the State.   An objective justification may justify differentiated treatments of similar cases.  It would be necessary, in each case, to evaluate the exact circumstances and the context.[300]

---

[299]   *United States – In the Matter of Cross-Border Trucking Services*, Panel Report, USA-MEX-98-2008-01, 6 February 2001, at 258-260.

[300]   *Parkerings–Compagniet AS* v *Lithuania*, Award, ICSID Case No ARB/05/8 (11 September 2007), at para. 368.

*Grand River, et al v. U.S.A.*                                                                                                /107
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

258.    As suggested by the Awards in *Thunderbird* v. *Mexico*,[301] and *UPS* v. *Canada*,[302] an evidentiary burden rests upon the investor to make out a *prima facie* case that more favorable treatment was accorded under a measure.  Once a tribunal concludes that this burden has been met, it must then consider whether the differential treatment accorded was the reasonable and proportionate outcome of a legitimate governmental policy.

259.    In establishing its *prima facie* case, it is naturally impossible for an investor to address the universe of reasons that might be invoked by a Party to justify the treatment accorded under its measure.  Past tribunals have accordingly looked to the respondent to provide such justification.  Some have referred to this practice as a 'burden shift.'  While the legal burden obviously remains with the claimant, once a *prima facie* case has been made out, it behooves the respondent to provide an explanation of how the differential treatment received under the measure was reasonable and proportionate in relation to the objectives claimed for the measure at the time it was imposed.  As explained by the Tribunal in *Pope & Talbot*:

> Differences in treatment will presumptively violate Article 1102(2), unless they have a reasonable nexus to rational government policies that (1) do not distinguish, on their face or *de facto*, between foreign-owned and domestic companies, and (2) do not otherwise unduly undermine the investment liberalizing objectives of [the] NAFTA.
>
> In one respect, this approach echoes the suggestion by Canada that Article 1102 prohibits treatment that discriminates on the basis of the foreign investment's nationality.  The other NAFTA Parties have taken the same position.  However, the Tribunal believes that the approach proposed by the NAFTA Parties would tend to excuse discrimination that is not facially directed at foreign owned investments.  A formulation focusing on the like circumstances question, on the other hand, will require addressing *any* difference in treatment, demanding that it be justified by showing that it bears a reasonable relationship to rational policies not motivated by preference of domestic or other foreign owned investments.  That is, once a difference in treatment between a domestic and a foreign-owned investment is discerned, the question becomes, are they in like

---

[301]    *International Thunderbird Gaming Corporation* v. *United Mexican States*, Award, UNCITRAL Arbitration (26 January 2006), at para. 176.

[302]    *United Parcel Service v. Canada*, UNCITRAL/NAFTA, Award (24 May 2007) at para. 84.

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 168 of 270

*Grand River, et al v. U.S.A.*                                                                    /108
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

circumstances?  It is in answering that question that the issue of discrimination may arise.[303]

260.     As such, where an investor has made out a *prima facie* claim that it has received less favorable treatment under a measure than one or more of its competitors in like circumstances, and the respondent has refused to provide a reasonable, proportionate and contemporaneous justification for the treatment received, the claim succeeds.[304]  As Professor Cass stated in *UPS* v. *Canada*:

> It is possible for two investors or enterprises to be in the same sector or to be in competition and nonetheless be quite unlike in respect of some characteristic critical to a particular treatment.  The most natural reading of NAFTA Article 1102, however, gives substantial weight to a showing of competition between a complaining investor and an investor of the respondent Party in respect of the matters at issue in a NAFTA dispute under Article 1102.  Article 1102 focuses on protection of investors and investments against discriminatory treatment.  A showing that there is a competitive relationship and that two investors or investments are similar in that respect establishes a *prima facie* case of like circumstances.  Once the investor has established the competitive relationship between two investors or investments, the [strategic] burden shifts to the respondent Party to explain why two competing enterprises are not in like circumstances.[305]

> Although a bald discrimination on the basis of nationality cannot be salvaged by assertion of governmental policy objectives, where the claim of national treatment violation rests on the effects of decisions not expressly predicated on nationality a different standard applies… There must be limits to the reach of policy justifications offered to support national treatment discriminations – that is, of justification offered to establish the unlikeness of circumstances under Article 1102…  But in my view, those limits should not be imposed through an overly critical examination of governmental policy choices by arbitral tribunals.[306]

261.     Once the claimant investor and the tribunal have heard the respondent's answer to the prima facie claim of differential treatment, the strategic burden obviously returns to the

---

[303]     *Pope & Talbot v. Canada*, NAFTA/UNCITRAL, Award on the Merits, Phase 2, (10 April 2001), at para's. 78-79.

[304]     *Marvin Feldman v United Mexican States, Award, ICSID Case No. ARB(AF)/99/1 (16 December 2002),* , at 177.  The accompanying note provides: "*United States – Measures Affecting Imports of Woven Wool Shirts and Blouses from India*, Adopted 23 May 1997, WT/DS33/AB/R, p. 14. Accordingly, *Asian Agricultural Products Limited* v. *Republic of Sri Lanka*, ICSID Reports, pp. 246, 272, 1990. ("In case a party adduces some evidence which prima facie supports his allegation, the burden of proof shifts to his opponent.").

[305]     *United Parcel Service v. Canada*, Separate Opinion, UNCITRAL/NAFTA (24 May 2007), at para's 16-17.

[306]     *United Parcel Service v. Canada*, Separate Opinion, UNCITRAL/NAFTA (24 May 2007), at para's. 118-120.

*Grand River, et al v. U.S.A.*                                                                    /109
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

claimant to rebut any justification provided.  At the end of the day, the tribunal will determine, on a balance of probabilities, whether the claimant investor made out a valid claim or whether the respondent succeeded in providing a reasonable and proportionate justification for the less favorable treatment received.

## B.      Respondent's Breaches of Articles 1102 and 1103

262.   NAFTA Articles 1102 & 1103 are designed to promote an equality of competitive opportunity for Canadian and Mexican nationals and their investments in the United States.  As such, the normal starting point for a national treatment or MFN analysis is identification of the appropriate comparators who are in commercial competition with the investor and/or its investment.[307]

### a.   Comparators

263.   In this case, the process is straightforward.  Claimants have marketed two 'value' brands, Seneca® and Opal®, which were specifically designed and priced by them to appeal to a particular kind of US consumer.[308]  The primary class of competitors is enterprises that market other value brands in the same territories.[309]  This group includes Exempt SPMs, in addition to other SPMs and NPMs.[310]  The less direct class of Claimants' competitors are the OPMs marketing premium name brands.  Consumers of premium brands are generally loyal to their brand, but there will be a tipping point for each of them at which they will choose to switch to a value brand (normally whenever the price differential between value brands and premium brands is broad enough and the overall price is high enough to force a change in consumer preferences).

---

[307]   In this case, one of the Exempt SPMs that is receiving better treatment for its brands than Claimants are for their brands is Japan Tobacco, a corporation organized under the laws of Japan.  Accordingly, to the same extent that better treatment being accorded, as a result of the Allocable Share Amendments, to U.S. enterprises, such as Liggett or Premiere, constitutes evidence of a prima facie breach of Article 1102, it also constitutes an overlapping breach of Article 1103.

[308]   J. Montour Stmt. at 23.

[309]   Wesley Stmt. at 6-9; Phillips Stmt. at 14.

[310]   J. Montour Stmt. at 5 ; Expert Report of David Eisenstadt dated July 10, 2008 ("Eisenstadt Report").

*Grand River, et al v. U.S.A.*                                                                              /110
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

###### b.    Treatment No Less Favorable

264.    All three of the measures primarily at issue in this case[311] were explicitly designed to restrict competition in the tobacco industry. As originally drafted, the Escrow Laws were designed to prevent NPMs operating on a national scale from taking market share away from Participating Manufacturers.[312] The Contraband Laws were designed to more effectively and immediately impose prohibitions against the distribution of the value brands marketed by NPMs. These prohibitions were attainable under the Escrow Statutes, but only after recourse to judicial procedures contemplated under them.  The Allocable Share Amendments were designed to remove the rebate that had permitted smaller tobacco enterprises to operate on relative par with Exempt SPMs.[313]

265.    In the years following implementation of the MSA regime, the measures worked so well that the OPMs were able to take advantage of the protection they offered to raise their prices much higher than would have been necessary to merely cover the costs of compliance with their MSA obligations.[314]  They succeeded in doing so by leveraging the relative inelasticity of demand for their premium brands, thereby maximizing profits with price increases until the point at which any further increase would result in corresponding defections by their customers to a value brand.[315]

266.    The OPMs could not lose in pursuing this strategy, because if their price increases finally did generate such a disparity between the price of their brands and those of value-brands offering comparable taste and quality, so as to result in customer defection, they would be entitled to attempt blaming the MSA states for their subsequent loss of market share, as contemplated under the terms of the MSA itself. In fact, over the past two years the

---

[311]    Michigan's Equity Assessment Law similarly had the effect of reducing competition as between NPMs and OPMs and SPMs because it only applied significantly higher taxes on NPMs.

[312]    Claimant's Evidentiary Stmts. Ex. 34 at (d) (2)(E).

[313]    Claimant's Evidentiary Stmts. Ex. 37 & 50..

[314]    Claimant's Evidentiary Stmts. Ex. 40 & 41.

[315]    Claimant's Evidentiary Stmts. Ex. 13.

*Grand River, et al v. U.S.A.* /111
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

OPMs appear to have pursued this very strategy.[316]  They have even alleged that it is a violation of the MSA for states to forbear from imposing escrow obligations on First Nations tobacco enterprises whose products are not even intended for sale in non-First Nations markets.[317]

> **i.    The Allocable Share Amendments Have Accorded Better Treatment to Exempt SPMs**

267.    At the time that the lawyers who negotiated the MSA set out to convince smaller tobacco enterprises to cooperate with the OPMs and state officials, two reasonably comparable options existed to other investors in the tobacco industry.  They could either join the MSA and market their brands nationally, receiving a generous exemption from escrow requirements based upon a formula applied to their sales in the previous two years; or they could chose to remain NPMs, receiving allocable share releases if they to restricted their brands to only a few states.  Some chose to become exempt SPMs and others chose to take advantage of the allocable share release mechanisms, remaining as fully compliant NPMs.[318]

268.    Settling States were well aware of the potential for the regime they were contemplating to accord less favorable treatment to NPMs than would be received by Participating Manufacturers.  They understood that substantive equality of opportunity could not be maintained under a regime where NPMs, SPMs and OPMs were not being required to bear the same relative payment burdens.  For example, as one state legislator sponsoring an Allocable Share Amendment candidly admitted:

> The original purpose of this provision [the Allocable Share Release Mechanism] was to make sure that the financial obligations on the NPMs were not more onerous than the burdens on participating manufacturers

---

[316]    Claimant's Evidentiary Stmts. Ex. 31.

[317]    Claimant's Evidentiary Stmts. Ex. 51.

[318]    Claimant's  Evidentiary Stmts. Ex. 39 Smoking Buddies.

Case 1:14-cv-00910-RJA-LGF Document 76 Filed 12/15/14 Page 172 of 270

*Grand River, et al v. U.S.A.*                                                    /112
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

joining the MSA which might provide the basis for an equal protection
challenge to the model escrow act.[319]

269.    What motivated state officials to impose the Allocable Share Amendments – thereby
        abrogating the one and only option for a small NPM to compete under the MSA regime –
        was fear of losing any portion of the payments promised by the OPMs under the terms of
        the MSA.[320]   These amendments were obviously supported by OPM representatives in
        their discussions with state officials, because removal of the allocable share release
        mechanisms would have the same deleterious effect on regional NPM brands as the
        original Escrow Statutes had on national NPM brands.[321]   The object of these
        amendments was no less the eradication of heretofore compliant, regional NPM brands
        from the marketplace, by rendering them uncompetitive vis-à-vis the national value
        brands marketed by SPMs who chose to join the MSA in exchange for grandfathered
        escrow payment exemptions.

270.    The new measures have succeeded, ultimately forcing Claimants to withdraw their
        Seneca® and Opal® brands from the market in states such as Oklahoma, Arkansas,
        Kansas.[322]   This is because the price at which these brands attracted their customer base
        was not sustainable for Claimants to offer, once the allocable share releases were no
        longer forthcoming in each of these states.[323]

271.    The impact of the Allocable Share Amendments has been as predictable as it was
        devastating to Claimants' investment in all of state territories in which they had expanded
        their brands.  The Seneca® brand is now only found off-reserve in four states: Georgia,
        Tenessee, North Carolina and South Carolina, ███████████████████████
        ████████████████████████████████████████████████

---

[319]   Senator Jim Jensen, Chairperson, Health and Human Services Committee, Government of Nebraska,
        Statement of Intent for LB 944 at 1, January 23, 2004.  Claimant's Evidentiary Stmts. Ex. 52.

[320]   Claimant's Evidentiary Stmts. Ex. 40.

[321]   Claimant's Evidentiary Stmts. Ex. 13.

[322]   J. Montour Stmt. at 62.

[323]   Claimant's Evidentiary Stmts. Ex. 13.

NAFTA/UNCITRAL Arbitration
Memorial of the Investor

██████████████████████████████████████████████████

████████████████████████████████ Claimants were no longer able to price their
brands competitively enough to retain their brands' customer base.[324]   Once Grand River
has been adjudged by state officials to be in arrears under amended Escrow Statute,
injunctions have been obtained, and Contraband Laws have operated, so as to prohibit
any future sales of the Seneca® or Opal® brands in each such territory.[325]

272.   Without the benefit of allocable share releases, Claimants' brands have simply been
rendered uncompetitive, because the consumer base for which their products were
targeted do not stay loyal to the Seneca® and Opal® brand when far less expensive
alternatives have been available.  The products that replaced Seneca® and Opal® brands
on store shelves in these various states and captured Claimant's market share are largely
manufactured by exempt SPMs.[326]

273.   Whereas it could have once been argued that, as between exempt SPMs and the OPMs
who adopted a regional brand strategy, both were receiving effectively similar treatment
in result, the Allocable Share Amendments have eliminated the possibility.  In short,
removal of the allocable share release mechanism does not level the playing field
between these competitors; it arbitrarily tilts the field over to one side.

274.   In imposing the Allocable Share Amendments, state officials have offered more favorable
treatment to exempt SPMs than they were now willing to offer NPMs who had adopted
regional brand strategies in reliance on the availability of allocable share releases.  As
Claimants had adopted the kind of regional brand strategy encouraged under the original
Escrow Statutes, they received less favorable treatment than enterprises such as Liggett
and others, who have continued to enjoy their escrow payment exemptions under the
amended measures.  That is why their brands have replaced Seneca® and Opal® branded
products on store shelves in various states.

---

[324]   Claimant's Evidentiary Stmts. Ex. 13.

[325]   J. Montour Stmt. at 56.

[326]   Eisenstadt Report;  Phillips Stmt. at 14

*Grand River, et al v. U.S.A.*                                                                    /114
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

### ii.    The Ongoing Regulatory Dialogue Launched With the MSA Accorded Better Treatment to OPMs

275.    From a commercial standpoint, the OPMs are also in a much better position under the measures vis-à-vis Claimants.  The OPMs were provided with an opportunity to co-design the Escrow Statutes with the Settling States,[327] and to consult in private on future changes such as the Allocable Share Amendments.[328]  In addition, MSA membership, which has been unreasonably withheld from Claimants,[329] entitles a manufacturer to have access to more potential retail customers, as many of the larger retail chains are too risk adverse to contemplate dealing with a non-MSA supplier, much less a NPM whose brands are deemed to be contraband by one or more state governments.[330]

### iii.    Michigan's Equity Assessment Measure Accords Better Treatment to All Other Tobacco Enterprises, Other Than NPMs

276.    With respect to Michigan's Equity Assessment Act, all OPMs and SPMs are in an obviously better position than Claimants.  Claimants, by virtue of being classified as a 'NPM,' must undergo an annual certification procedure; pay any assessments previously assessed since the measure was imposed in January 2004; and pre-pay any assessment for the coming year, before they will be permitted to introduce the Seneca® brand anywhere in Michigan, including on Native American land.  Only NPMs pay the assessment under this measure, which almost doubles the costs of compliance (to approximately $8 per carton, at current rates).  This measure makes Michigan the most prohibitively expensive place in which Claimants could do business in the United States, in spite of the fact that its major urban centre, Detroit, is located less than three hours' drive from where Seneca® and Opal® branded products are made.

277.    Claimants have accordingly been deprived of a nearby market for their brands, even on-reserve, without any reasonable grounds.  They are covered by the measure simply by

---

[327]    Claimant's Evidentiary Stmts. Ex. 31.

[328]    Claimant's Evidentiary Stmts. Ex. 38 Meeting Notes.

[329]    J. Montour Stmt. at 59-60.

[330]    M. Wesley Stmt at 10-14

*Grand River, et al v. U.S.A.*                                                                /115
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

virtue of GRE being classified as a NPM under the state's Escrow Law and Contraband Statute.  This measure obviously magnifies the unfairness of the application of the MSA regime for Claimants vis-à-vis their competitors. The more favorable treatment offered under Michigan's Equity Assessment Act is obviously offered to any enterprise that escapes its application, including OPMs and SPMs, and smaller First Nations enterprises that have thus far escaped enforcement by any MSA state officials.

### c.   Like Circumstances

278.   'Treatment no less favorable' is only required of the NAFTA Parties where like circumstances exist amongst investors or investments.   On a *prima facie* basis, all tobacco enterprises appear to operate in like circumstances.   Their tobacco brands compete on the basis of successful marketing, price and blending to taste.  They succeed when their brands find a clientele based upon these simple factors.  They fail when their brands do not attract a customer base, or when one of these elemental factors is suddenly and dramatically altered.  The measures at issue introduced exactly that kind of dramatic alteration of circumstances, without reasonable justification.

279.   The original justification provided for imposing the Escrow Statutes on enterprises was that they were necessary to 'level the playing field' between OPMs and all other tobacco enterprises.   The original justification provided by state officials for imposing the Allocable Share Amendments was also to ensure 'a level playing field.'  However, this latter excuse was premised on the contradictory and disingenuous notion that the new measures were necessary to remove a 'loophole' from the original legislation.[331]  As demonstrated below, both premises are arbitrary and discriminatory on their face.

280.   There was no need for the Settling States to take legislative steps to provide a level playing field as between the OPMs and Claimants because – unlike the OPMs – Claimants were never even accused of doing the kinds of things alleged by the states in their tort case against the OPMs.  In effect, the states arbitrarily deemed OPMs and other

---

[331]     Claimant's Evidentiary Stmts. Ex. 44.

*Grand River, et al v. U.S.A.*                                                                                          /116
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

tobacco enterprises as being no longer in like circumstances because of the obligations that would be borne by the OPMs under the MSA.  There was no reason, however, for any other enterprise to be saddled with those obligations, absent evidence that it could have been somehow joined to the civil cases brought against the OPMs.  It makes no sense to argue that an economic playing field needs to be leveled if the players were not playing by the same rules in the first place.

281. No government in the United States has ever collected damages in a tort action against a member of the tobacco industry, large or small, on the grounds that tobacco use was the proximate cause of Medicaid costs.[332]  There is no reason to suspect that the OPMs would have sought any kind of settlement with any state if those were the only kind of tort claim at issue.  The OPMs did not settle when the United States Federal Government brought exactly that kind of tort claim against them, and they prevailed.[333]  If the grounds were the same in these cases, why would the OPMs have settled with the states when but not with the Federal Government?  The fact is that the OPMs settled because there were other claims pending against them and their senior management, and a decision was obviously made to reduce their risk of financial exposure.  Claimants have never borne the same risks because they have never engaged in the kind of conduct that was alleged against the OPMs and were never sued for such conduct by any state.

282. The OPMs, have skillfully used the regime they co-designed with state officials as an excuse to raise prices and maximize their own profits.[334]  Each Settling State has shared directly in these profits by agreeing to shield the OPMs' brands from competition with value brands marketed by much smaller competitors, including Claimants.[335]  They co-opted a group of smaller industry members by offering them escrow exemptions based upon a formula that essentially grandfathered their existing market share, as of the date

---

[332]   See fn. 60 *United States v. Philip Morris, Inc.*.

[333]   Ibid.

[334]   Claimant's Evidentiary Stmts. Ex. 41.

[335]   Claimant's Evidentiary Stmts. Ex. 34 at (d)(2)(E).

*Grand River, et al v. U.S.A.*                                                                                                     /117
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

they 'joined' the MSA.  They bought peace from other industry members, including new entrants, by providing a strong incentive for them to only establish regional brands, in exchange for a *de facto* refund of escrow payments that allowed them to compete on a reasonably fair footing with SPMs.

283.    There is no evidence on the record to suggest that these allocable share release mechanisms operated in anyway otherwise than exactly as intended.  They generated strong incentives for NPMs not to introduce any value brands at the national level, as they would have competed directly with the brands of OPMs, potentially reducing their market share and ultimately threatening the size of the portion of the OPM's profits that had been promised to each state under the MSA.  Respondent and its state officials are disingenuous to claim, after the fact, that use of the allocable share release mechanism was "unintended and unforeseen" and that it "undermined the intent of the escrow statutes."[336]

284.    More to the point, Respondent can no more justify imposition of the Allocable Share Amendments, on the basis of alleged equality of circumstances between NPMs and OPMs, than it can for imposition of the original escrow statutes.  The OPMs settled tort claims for conduct that no one has ever alleged against Claimants, now or then. Why should Claimants be made to bear what is alleged by Respondent to be roughly the same burden as these multinational corporations bear, even though Claimants have not even been accused of the same conduct that led the OPMs to settle with state officials?

285.    Further, how does forcing Claimants to place significant funds into escrow level the so-called playing field as between them and the OPMs, who were forced into the MSA because of civil suits arising out of their own conduct?  Every single dollar in escrow payments thus far made by every single NPM has allegedly been dedicated towards

---

[336]    Statement of Defense to the Allocable Share Claim, at para's. 6 to 8. The evidence on the record demonstrates that if anything was unintended or unforeseen by the MSA states, it was that their erstwhile partners, the OPMs, would take advantage of them so blatantly as to reap incredible profits from price gouging consumers while leaving it to the states to adopt further means to safeguard their market share, lest they risk losing out on their promised cut of the proceeds of this arrangement.

*Grand River, et al v. U.S.A.*                                                    /118
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

nothing more than a theoretical fund for what can only be most charitably characterized as phantom civil claims.  How then does the removal of Claimants' entitlement to an allocable share release actually level the playing field as between them and exempt SPMs, who were also never subject to these phantom civil suits but who have nonetheless enjoyed a substantial exemption from making escrow payments, in perpetuity?

286.    It is obvious that the real goal behind introduction of the Allocable Share Amendments was to protect the Settling States' entitlement to their cut of the profits being enjoyed by the OPMs and SPMs under the measures they agreed to implement under the MSA.  In any event, regardless of whether one accepts the 'level playing field' theory or the obvious reason for the Settling States' decision to impose the Allocable Share Amendments, the bottom line is that there is no justification for their having accorded more favorable treatment to exempt SPMs than was provided to Claimants.

287.    The Allocable Share Amendments violate Respondent's national treatment obligation because they were not introduced under the same circumstances as the original Escrow Statutes had been introduced.  Introduction of the original measures included an offer to industry members to join the MSA in return for receiving a payment exemption that effectively grandfathered their existing market share based upon a simple, two-year formula.  There is no reason why the same offer could not be made to the Investors in this case.  Had the Settling States done so, they would have actually leveled the playing field as between NPMs with regionally based brands, including Claimants, and exempt SPMs.

288.    Moreover, as described above, under applicable international law Respondent also bears a special obligation towards Claimants, as First Nations Investors, in respect of the development and implementation of the Allocable Share Amendments.  The terms of Article 1102 must be construed consistently with applicable rules of international law.  Respondent's obligation to avoid discrimination against indigenous peoples required its state officials to take proactive steps to consult Claimants and to take steps to ameliorate discriminatory measures such as the Allocable Share Amendments.  Within this context, Respondent's claim that its officials were only trying to 'level the playing field' with these measures rings even more hollow.

*Grand River, et al v. U.S.A.*                                                                /119
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

289.   Instead, state officials have arbitrarily decided not to make the same offer to industry members with demonstrable track records, even though they have radically changed the regulatory regime under which all had been operating.   The last time they radically altered the regulatory landscape, with introduction of the Escrow Statutes, state officials offered to grandfather those enterprises with vested interests in the exploitation of one or more brands.  This time they chose not to do so, without any reasonable justification.


### SECTION V          EXPROPRIATION

#### A.      Respondent's Obligations Under Article 1110

290.   NAFTA Article 1110 requires Respondent to pay compensation equivalent to the fair market value (FMV) of an 'investment' taken through the imposition of a governmental measure.   As specified in Article 1110(1), compensation must be paid regardless of whether the taking is for a public purpose, non-discriminatory or otherwise in accordance with due process and the minimum standard of treatment.[337]

291.   Article 1110 states, in relevant part:

> 1. No Party may directly or indirectly nationalize or expropriate an investment of an investor of another Party in its territory or take a measure tantamount to nationalization or expropriation of such an investment ("expropriation"), except:
>
> (a) for a public purpose;
>
> (b) on a non-discriminatory basis;
>
> (c) in accordance with due process of law and Article 1105(1); **and**
>
> (d) on payment of compensation in accordance with paragraphs 2 through 6.
>
> 2. Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriation took place ("date of expropriation"), and shall not reflect any change in value occurring because the intended expropriation had become known earlier. Valuation criteria shall

---

[337]   *Marvin Feldman* v *United Mexican States*, Award, ICSID Case No. ARB(AF)/99/1 (16 December 2002) at 98.

*Grand River, et al v. U.S.A.*                                                                                                  /120
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

include going concern value, asset value including declared tax value of tangible property, and other criteria, as appropriate, to determine fair market value.

3. Compensation shall be paid without delay and be fully realizable.

4. If payment is made in a G7 currency, compensation shall include interest at a commercially reasonable rate for that currency from the date of expropriation until the date of actual payment.

5. If a Party elects to pay in a currency other than a G7 currency, the amount paid on the date of payment, if converted into a G7 currency at the market rate of exchange prevailing on that date, shall be no less than if the amount of compensation owed on the date of expropriation had been converted into that G7 currency at the market rate of exchange prevailing on that date, and interest had accrued at a commercially reasonable rate for that G7 currency from the date of expropriation until the date of payment.

6. On payment, compensation shall be freely transferable as provided in Article 1109. [**Emphasis added.**]

292.    Article 1110 specifies that the focus of an expropriation analysis should be on the extent of deprivation of the investor's ability to derive benefits from an 'investment,' as defined under Article 1139.  On its face, Article 1110 is not restricted to takings of real property or, alternatively, the formal expropriation of an entire investment enterprise.[338]  The obligation requires compensation to be paid by Respondent for the imposition of a measure that directly or indirectly nationalizes or expropriates 'an investment' of an investor of another Party in its territory.

293.    Impairment caused by regulatory action rises to the level of an indirect expropriation under Article 1110 when it results in a substantial deprivation of the investor's ability to enjoy the reasonably expected benefits of that investment.[339] The Tribunal in *S.D. Myers* v. *Canada* referred to the required level of impairment as amounting "… to a lasting removal of the ability of an owner to make use of its economic rights" in that

---

[338]    *Pope & Talbot, Inc.* v. *Canada*, Interim Merits Award, NAFTA/UNCITRAL Tribunal, 26 June 2000, at para's. 95 & 96-98.

[339]    *Pope & Talbot, Inc.* v. *Canada*, Interim Merits Award, NAFTA/UNCITRAL Tribunal, 26 June 2000, at 102.

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 181 of 270

*Grand River, et al v. U.S.A.* /121
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

investment.[340]  Likewise, the Tribunal in *Metalclad* v. *Mexico* described regulatory expropriation as taking place under Article 1110 when imposition of the measure "has the effect of depriving the owner, in whole or in significant part, of the use or reasonably to be expected economic benefit of property even if not necessarily to the obvious benefit of the host State."[341]

294.  Another way of describing the level of impairment required under Article 1110 is to use the "merely ephemeral" standard adopted in cases such as *Tippets, Abbett, McCarthy, Stratton v. TAMS-AFFA* and *Wena Hotels*:

> [W]hile assumption of control over property by a government does not automatically and immediately justify a conclusion that the property has been taken by the government, thus requiring compensation under international law, such a conclusion is warranted whenever events demonstrate that the owner has been deprived of fundamental rights of ownership and it appears that this deprivation is not merely ephemeral.[342]

295.  The line between legitimate acts of governmental regulation and compensable takings under international law was also described in commentary (g) to Section 712 of the *Third U.S. Restatement on International Law*, as follows:

> A state is responsible as for an expropriation of property under Subsection (1) when it subjects alien property to taxation, regulation, or other action that is confiscatory, or that prevents, unreasonably interferes with, or unduly delays, effective enjoyment of an alien's property or its removal from the state's territory... A state is not responsible for loss of property or for other economic disadvantage resulting from bona fide general taxation, regulation, forfeiture for crime, or other action of the kind that is

---

[340]  *S.D. Myers, Inc. v. Canada*, NAFTA/UNCITRAL, NAFTA/UNCITRAL Tribunal, First Partial Award (13 November 2000) at 283 & 287.

[341]  *Metalclad Corp.* v. *Mexico*, Final Award, UNCITRAL Arbitration (2 September 2000), at para. 103; cited by: *CME Czech Republic BV* v *Czech Republic*, Partial Award, UNCITRAL Arbitration (13 September 2001), at para. 606.

[342]  *Tippets, Abbett, McCarthy, Stratton* v. *TAMS-AFFA Consenting Engineers of Iran et al.*, Iran-U.S. Claims Tribunal, Award No. 141-7-2, June 22, 1984, at para. 225; *Wena Hotels Limited* v *Egypt*, Award, ICSID Case No ARB/98/4 (8 December 2000), at para. 99.

Case 1:14-cv-00910-RJA-LGF  Document 76  Filed 12/15/14  Page 182 of 270

*Grand River, et al v. U.S.A.*                                                    /122
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

commonly accepted as within the police power of states, if it is not discriminatory....[343]

296.   'Investment" is defined broadly in the NAFTA, and therefore it is defined broadly for purposes of Article 1110.  As Professor Loewenfeld observed:

> It seems clear from the cases here excerpted and others that expropriation as governed by the BITs is defined by the deprivation to the investor, not by the gain to the host state.  Thus destruction of the investor's property may come within the definition of expropriation if the actions are attributable to the host state, even if the state does not acquire the property in question.  Further, intangible rights, such as the right to import or export a given product or to participate in a given industry, may be subject to the constraints on expropriation set out in the BITs.  However, a regulation of temporary duration, or a regulation that reduces the profitability of an investment but does not shut it down completely and leaves the investor in control, will generally not be seen as expropriation, even when it gives rise to liability on the part of the host state for violation of national treatment and fair and equitable treatment clauses.[344]

297.   Under Article 1139(g), 'investment' includes intangible "property… used for the purpose of economic benefit or other business purposes."  As previously shown, other investment treaty tribunals have found that goodwill is an intangible form of property capable of protection as an investment.  In industries such as tobacco, goodwill is represented in an investor's ability to establish and profit from the brands upon which its business has been based.  When a measure substantially interferes with the intellectual property rights supporting use of the brand, a direct taking has occurred.  When a measure substantially interferes with the investor's ability to generate profits from the business venture it has based upon a brand, an indirect taking has occurred.  In either case, the goodwill built up in the brand will have been depleted by the measure and the investor's ability to enjoy the income stream previously produced by its investment will have been effectively destroyed.

---

[343]   *Marvin Feldman* v *United Mexican States*, Award, ICSID Case No. ARB(AF)/99/1 (16 December 2002) at 105.

[344]   Andreas F. Lowenfeld, *International Economic Law* (Oxford, Cambridge: 2002) at 479-480.

*Grand River, et al v. U.S.A.*                                                                    /123
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

298.    Recognizing the relationship between modern regulatory takings and the value of geographically delimited markets, the Tribunal in *Pope & Talbot* v *Canada* has observed that effectively depriving an investor of its access to a regional market may constitute an indirect expropriation of the economic value of the enterprise that depends upon such access.[345]   The *Pope & Talbot* Tribunal's analysis provides an indication of when and why access to a market should be relevant in determining whether a regulatory taking has occurred.   As it explained: "terminology should not mask the fact that the true interests at stake are the Investment's asset base, the value of which is largely dependent on its export business."

299.    In summary, indirect or expropriation occurs where an investor is "radically deprived of the economical use and enjoyment of its investments, as if the rights related thereto – such as the income or benefits related to the [investment] or to its exploitation – had ceased to exist.   In other words, if due to the actions of the Respondent, the assets involved have lost their value or economic use for their holder and the extent of the loss."[346]   As demonstrated in the *TECMED* case:

> … it is understood that the measures adopted by a State, whether regulatory or not, are an indirect de facto expropriation if they are irreversible and permanent and if the assets or rights subject to such measure have been affected in such a way that "…any form of exploitation thereof…" has disappeared; i.e. the economic value of the use, enjoyment or disposition of the assets or rights affected by the administrative action or decision have been neutralized or destroyed.134 Under international law, the owner is also deprived of property where the use or enjoyment of benefits related thereto is exacted or interfered with to a similar extent, even where legal ownership over the assets in question is not affected, and so long as the deprivation is not temporary.   The government's intention is less important than the effects of the measures on the owner of the assets or on the benefits arising from such assets affected by the measures; and the form of the deprivation measure is less important than its actual effects.[347]

---

[345]   *Pope & Talbot, Inc.* v. *Canada*, Interim Merits Award, NAFTA/UNCITRAL Tribunal, 26 June 2000, at para. 98.

[346]   Técnicas Medioambientales, *TECMED S.A. v United Mexican States*, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para. 113.

[347]   Técnicas Medioambientales, *TECMED S.A. v United Mexican States*, Award, ICSID Case No. ARB/AF/00/2 (29 May 2003), at para. 116.

*Grand River, et al v. U.S.A.*   /124
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

### B.   Respondent's Breaches of Article 1110

300.   Claimants invested significant capital and other resources into establishing the Seneca and Opal brands in of North Carolina, South Carolina, Oklahoma, Arkansas and Georgia. The goodwill that these investors developed in their brands over the years, as well as the intellectual property rights that underlie them, constitute the 'investment' that has been taken in this case.   As explained by the *Sola Tiles* Tribunal:

> Goodwill can best be defined, at least for the purposes of the present case, as that part of a company's value attributable to its business reputation and the relationship it has established with its suppliers and customers.[348]

301.   When measures are implemented that prohibit sales and distribution on the basis of one's brand, the value of the enterprise dependent upon use of the now-proscribed brand can be destroyed.   This is because the prohibitions obtained under Escrow Statute court actions and maintained under Contraband Laws effectively deter all industry members (i.e. manufacturers, importers, distributors, wholesalers and retailers) from trading in products bearing the trademark of a product deemed to be contraband.   Once a tobacco brand is eliminated from a market, it is extremely difficult – if not impossible – to re-establish it again,[349] because consumers and distributors will have lost faith in its quality and its future availability, and because they will have found substitutes immediately after the brand becomes unavailable.[350]   As evidenced by the reports of Claimant's experts, but for imposition of the Allocable Share Amendments, Claimants would have been enjoying a steady cash flow and increasing penetration of their brand at the retail level of North Carolina, South Carolina, Oklahoma, Arkansas and Georgia.

---

[348]   *Sola Tiles Inc.* v. *Iran*, Partial Award, 14 IRAN-U.S.C.T.R. 223 (1987), at para. 62.   For lost profits analysis, see para's. 161-164.   See, also: *Asian Agricultural Products* v. *Sri Lanka*, (1996) 4 ICSID Rep. 246 at 292.

[349]   M. Wesley Stmt. at 10-14; Phillips Stmt. at 14.

[350]   M. Wesley Stmt. at 10-14.

*Grand River, et al v. U.S.A.*                                                                                      /125
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

303.   Under the new measures, Claimants have been obliged to raise their prices dramatically
in order to meet the new escrow demands from each amended measure. Exempt SPMs –
whose brands compete with Claimants in the affected states – know this too. They can
now take advantage of their permanent payment exemptions to offer their brands at a
price just low enough to eliminate Seneca and Opal from each market. Under the new
measures their brands will immediately become more profitable ▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, with the promise of even greater profits, after
Claimants' brands have been eliminated from the market and they are then able to raise
their prices further. There is only so much retail shelf space for competing tobacco
brands, and wherever Claimants have been forced to raise their prices, the Seneca brand
has lost its place on store shelves.[351]

304.   The record demonstrates the substantial deprivation that has been suffered by Claimants,
as a result of being unable to exploit the goodwill they had established in their brands.
The Allocable Share Amendments have rendered their brands useless because they can
no longer be offered at a competitive price point – which is an essential element of any
brand marketing strategy.

305.   As evidenced in the reasons given by state officials for imposition of the Allocable Share
Amendments,[352] the measures are aimed at a specific group: NPMs marketing regional
value brands. As the Tribunal in *Sempa Energy* v. *Argentina* has noted, a measure that
effectively destroys the value of the investment of a particular group, which has either
been singled out for harsher treatment or excluded from receiving better treatment,

---

[351]   Phillips Stmt. at 14

[352]   Claimant's Evidentiary Stmts. Ex. 50.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 186 of 270

*Grand River, et al v. U.S.A.*                                                                            /126
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

constitutes an illegal taking under international law, because it is discriminatory in application.[353]

306.    The Allocable Share Amendments were clearly not the product of extensive consultation with the stakeholders who would be most affected by them – i.e. NPMs with regional brand strategies such as the Investors.   The amendments also reversed an allocation policy that satisfied basic principles of fairness as between competing tobacco enterprises. Claimants, and others like them, should not have been forced to bear the costs of escrow payments made for the benefit of all 46 state governments if they were not marketing their brands in more than a handful of states.   That is why the Escrow Statutes included the allocable share release mechanism in the first place.   In *Eastern Sugar*, when the Czech Government amended its sugar quota regime to benefit certain manufacturers at the expense of others, in violation of their reasonable expectations to the contrary, such conduct was also found to constitute a breach of the fair and equitable treatment standard, which is prohibited under Article 1110.[354]

307.    Before determining whether a measure results in substantial impairment of an investment, however, the principle of territorial sovereignty must be applied.   The same is true for its domestic analogue: territorial jurisdiction.   This principle applies so as to limit the scope of application for any given measure to the territory of the political body responsible for its imposition, unless the measure explicitly provides otherwise.[355]   In its submissions before another NAFTA Tribunal, Respondent has itself recognized presumption against extra-territoriality in international law, going further to add that the same principle is embedded in its own constitutional law.   In the United States, absent explicit language to

---

[353]    *Sempra Energy International* v *Argentina*, Award and partial dissenting opinion, ICSID Case No ARB/02/16 (28 September 2007), at para. 319

[354]    *Eastern Sugar B.V. (Netherlands)* v. *Czech Republic*, Partial Award, 27 March 2007, UNCITRAL Arbitration, SCC No. 088/2004, at ¶¶ 313-314, 332 & 335.

[355]    See, e.g.: I. Brownlie, *Principles of Public International Law*, 5th ed., (Oxford: 1998), at pp. 105-107 & 113-114; *R. v. Keyn L. R.*, 2 Ex. Div. 63; or *U. S. v. Bowman*, 260 U. S. 94, 98.

*Grand River, et al v. U.S.A.*                                                                              /127
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

the contrary, legislation is not presumed to have effect beyond the jurisdiction of the body that enacted it (territorial or otherwise).[356]

308.    This territoriality principle is also reflected in Article 29 of the *Vienna Convention on the Law of Treaties*, which applies the same limits of territorial jurisdiction to treaties.  The NAFTA Parties are all federal States, and accordingly they have provided for application of the obligations they have undertaken at the sub-State level of provincial and state governments, particularly under Article 105.   As such, the federal level of government answers all claims under NAFTA Chapter 11, even when a state or provincial government is responsible for the measure in question.   When a lower level of government imposes a measure, however, the principle of territorial sovereignty applies to the effect that the measure is not presumed to have effect – or to have been intended to have any application – beyond the territorial jurisdiction of the government responsible for it.

309.    The amended Escrow Statutes and the Contraband Laws impose economic sanctions on the basis of each MSA state's territorial jurisdiction.  No state purports to ban the distribution of a tobacco brand beyond its territorial jurisdiction by means of either measure.[357]  Similarly, while the Settling States have wrongfully attempted to extend the personal jurisdiction of their courts to impose obligations on non-residents with no ties to their territory, each state nonetheless purports to be imposing its escrow obligations and penalties solely on the basis of tobacco products sold in its respective territory.  Collectively these measures impose what amounts to a nation-wide oligopoly, by imposing identical restrictions on access to each state's territorially delineated marketplace.   The only alternative currently provided under these measures is for an enterprise to attempt to join the oligopoly on less favorable terms than the original

---

[356]    Re: *Consolidated Canadian Cattle Cases* [United States], NAFTA/UNCITRAL Tribunal, Submissions of the Respondent: 1 December 2006, at note 35; and 1 May 2007 at pp. 9-11.

[357]    The issue of whether these measures actually do have extra-territorial effect is one of the issues in Claimants' Federal Court action.   Claimants state that the cumulative effect of these measures is to collectively establish a national regulatory scheme that exceeds the jurisdiction of each state under US constitutional law.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 188 of 270

*Grand River, et al v. U.S.A.*                                                     /128
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

members.  Clearly the Settling States are acting in common cause, in contravention of US constitutional law, but they are purporting to do so on a state-by-state basis.

310.    As described above, before their removal each allocable share mechanism provided incentives for an NPM to restrict marketing and distribution of their brands to a regional market composed of only a handful of states.  The commercial activity thus encouraged by the Settling States, working in concert, was dictated by the territorial jurisdiction of each measure.   For example, had Claimants recognized an opportunity to extend distribution of the Seneca brand into a neighbouring county in a state adjacent to one in which they were active (e.g. expanding into Kentucky or Virginia), they would have had to be prepared to receive a significantly reduced allocable share rebate.  This is because Claimants would have been deemed to intend their products to be sale throughout the entire state, rather than in a small portion of it.

311.    In other words, by specific operation of the measures, the Settling States shaped the markets within which Claimants' brand could be economically promoted outside of First Nations territories.  In order to assess what has been indirectly taken by amendment of the Escrow Statutes and application of the Contraband Laws thereafter, the Article 1110 analysis should be focused on the territories in which Claimants intended for the Seneca brand to be established, as well as those states in which it had managed to satisfy escrow demands, using cash flow from the allocable share releases (i.e. Tennessee, Louisiana, Kansas and Nebraska).

312.    As demonstrated in both the Wilson Report and the Eisenstadt Report, amendments to the Escrow Statutes were designed, and had the effect, of substantially interfering with Claimants' ability to exploit the establishment of their Seneca and Opal brands in North Carolina, South Carolina, Oklahoma, Arkansas and Georgia.  As amended, each state's Escrow Statute requires Claimants to raising prices so unsustainably high – just in order to pay the escrow demands – that they can no longer make use of the goodwill they built up in these brands.

*Grand River, et al v. U.S.A.*                                                                         /129
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

313.    As amended, the Escrow Statutes effectively destroy the value – and indeed the very utility – of the Seneca brand as a basis for marketing tobacco products in Georgia, North Carolina, South Carolina, Oklahoma and Arkansas.   As such, each amended Escrow Statute results in an indirect, uncompensated expropriation of Claimants investment in the territory of each relevant state.

**SECTION VI         DAMAGES**

314.    The MSA measures, as originally imposed and enforced collectively by each state government, damaged Claimants' sales on First Nations land.   The Amendments later made to those measures also foreclosed on Claimants' ability to profit from sales made beyond reservation territories.   Ultimately, these measures provided Claimants with a stark choice: pay millions of dollars into escrow for 25 years, rendering the Seneca brand uncompetitive; or pay even more directly into a fund established by state officials under the MSA – a private litigation settlement agreement to which Claimants were never, nor should ever have been, a party.   By wrongfully imposing these measures upon Claimants business activities, Respondent has destroyed the value of their investment in the United States, violating its obligations under the NAFTA and applicable international law.

315.    NAFTA Article 1135 provides that when a finding of State responsibility under Part A of Chapter 11 has been established, reparation may be awarded either in monetary damages or restitution, or a combination thereof.   This provision reflects the customary international law principle of restitution that reparations must place the wronged party back into the position it would have occupied, but for the act or omission from which the State's responsibility arose.   As observed by the PCIJ in the *Chorzów Factory* case:

>        [Reparation] must, so far as possible wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability have existed if that act had not been committed.   Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear.[358]

---

[358]    Case Concerning Certain German Interests in Polish Upper Silesia (Germany v. Poland) ("Factory at Chorzów"), Permanent Court of International Justice Proceeding, Merits 1928, P.C.I.J. Series A. No. 17, 21 at 47.

*Grand River, et al v. U.S.A.*    /130
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

316.  The quantum of monetary damages ordered must be "commensurate with the loss, so that the injured party may be made whole."[359]  This approach to damages has been codified in Article 35 of the *International Law Commission Draft Articles on Responsibility of States for Internationally Wrongful Acts*, which constitute an authoritative statement on the applicable law of damages for reparation in investment treaty arbitrations.  Article 36(2) of the Draft Articles on State Responsibility also affirms: "[the] State is under an obligation to compensate for the damage caused thereby… [and that compensation] … shall cover all financially assessable damage including loss of profits insofar as it is established."

317.  And as observed by the Tribunal in *Siemens* v. *Argentina*:

> The key difference between compensation under the *Draft Articles* and the *Factory at Chorzów* case formula, and Article 4(2) of the Treaty is that under the former, compensation must take into account "all financially assessable damage" or "wipe out all the consequences of the illegal act" as opposed to compensation "equivalent to the value of the expropriated investment" under the Treaty.  Under customary international law, Siemens is entitled not just to the value of its enterprise as of May 18, 2001, the date of expropriation, but also to any greater value that enterprise has gained up to the date of this Award, plus any consequential damages.[360]

318.  As per Article 1131(1) of the NAFTA, the applicable rules of international law in determining the extent of damages in this case can be found in the *Draft Articles on State Responsibility*.  In addition, the NAFTA provides explicit direction as to how expropriations should be compensated, under Article 1110(2).  Tribunals have thus determined that compensation for any NAFTA breach must place a claimant back into the same position that it would have been 'but for' the occurrence of the international wrongful act that constitutes the breach.  Damages can therefore include the present value of the investment as reflected in the cash flows that would have achieved through its operation, but for the breach.[361]  The same approach has been followed by ICSID

---

[359]   Lusitania Cases, UNRIAA, vol. VII, at 39.

[360]   *Siemens AG* v *Argentina*, Award, ICSID Case No ARB/02/8 (06 February 2007), at para. 352.

[361]   *See* also *S.D. Myers, Inc. v. Canada*, NAFTA/UNCITRAL, NAFTA/UNCITRAL Tribunal, First Partial Award (13 November 2000) at para. 315 "This Tribunal has recognized that the *Chorzow Factory* case
(continued…)

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 191 of 270

*Grand River, et al v. U.S.A.*                                                    /131
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

tribunals, such as *Amco Asia Corp.* v. *Indonesia*, which also adopted the *Chorzow Factory* case as a precedent for the law of compensation in international claims.[362]

319.    NAFTA Article 1116 provides that an investor is entitled to damages for a breach of Chapter 11 without territorial restriction.   "To be recoverable, a loss must [only] be linked causally to interference with an investment located in a host state.   There is no provision that requires that all of the investor's losses must be sustained within the host state in order to be recoverable.   The test is that the loss to the (foreign) investor must be suffered as a result of the interference with its investment in the host state."[363]   As indicated by the *S.D. Myers* Tribunal:

> The purpose of virtually any investment in a host state is to produce revenues for the investor in its own state.   The investor may recover losses it sustains when, as a proximate cause of a Chapter 11 breach, there is interference with the investment and the financial benefit to the investor is diminished.   The Tribunal concludes that compensation should be awarded for the overall economic losses sustained by SDMI that are a proximate result of CANADA's measure, not only those that appear on the balance sheet of its investment.[364]

320.    Regardless of which NAFTA provision is breached, full restitution value should be adopted as the standard by which all loss adequately connected to the breach is measured.[365]   Full restitution for a breach of international law will normally include compensation for lost profits on the grounds that:

---

(…continued)

supports the principle that '*compensation should undo the material harm inflicted by a breach of an international obligation*'".

[362]    *Amco Asia Corp.* v. *Indonesia*, Merits Award, 1 ICSID Rep. 377, at 500.

[363]    *S.D. Myers, Inc.* v. *Canada*, Second Partial Merits Award, NAFTA/UNCITRAL Tribunal (21 October 2002) at para. 118.

[364]    *S.D. Myers, Inc.* v. *Canada*, Second Partial Merits Award, NAFTA/UNCITRAL Tribunal (21 October 2002) at para. 121.

[365]    *Marvin Feldman* v *United Mexican States*, Award, ICSID Case No. ARB(AF)/99/1 (16 December 2002) at 194; cited by *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1 Decision on Liability, (25 July 2007) at para. 44.   See, also: *Petrobart Limited v. Kyrgyz Republic*, Arb. No. 126/2003, Arbitration Institute of the Stockholm Chamber of Commerce, (Energy Charter Treaty), pp. 77-78 (29 March 2005);

*Grand River, et al v. U.S.A.*                                                                                                      /132
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

> Just compensation implies a complete restitution of the status quo ante, based, not upon future gains of the United States or other powers, but upon the loss of profits of the Norwegian owners as compared with the other owners of similar property.[366]

321.    As acknowledged by the Governing Council of the United Nations Compensation Commission:

> In principle, the economic value of a business may include loss of future earnings and profits where they can be ascertained with reasonable certainty. In the case of the loss of businesses and their earning capacity resulting from the invasion and occupation of Kuwait, it can be expected that a number of such businesses can be or could have been rebuilt and resumed. The method of a valuation should therefore be one that focuses on past performance rather than on forecasts and projections into the future. Compensation should be provided if the loss can be ascertained with reasonable certainty based on prior earnings or profits. For example, the loss of any earnings or profits during the relevant time period could be calculated by a multiple of past earnings and profits corresponding to that time period.[367]

322.    Although it determined that an expropriation had not occurred in that case, the *S.D. Myers* Tribunal nonetheless determined that the appropriate measure of compensation for markets lost to the investor because of the imposition of a discriminatory measure should reflect all net income streams that would have been generated from the investment.  The Tribunal stated:

> The quantification of loss of future profits claims can present special challenges.  On the one hand, a claimant who has succeeded on liability must establish the quantum of his claims to the relevant standard of proof; and, to be awarded, the sums in question must be neither speculative nor too remote.  On the other hand, fairness to the claimant requires that the court or tribunal should approach the task both realistically and rationally.  The challenges become more acute in start up situations where there is little or no relevant track record.  The Tribunal has taken due notice of SDMI's successful experience of seizing market opportunities in the USA, but at the same time acknowledges that the Canadian market has certain distinctive features.

---

[366]    Norwegian Shipowners' Claims (Nor. v. U.S.), 1 R.I.A.A. 307 at 338 (Perm. Ct. Arb. 1922).  Accordingly the compensation awarded for the seizure of ships under construction in US dockyards by US authorities, and the concordant assumption of the Norwegians' rights in the contracts for their construction, included the high value of shipping contracts in the open market as of the date of requisition, rather than the end of the First World War, when economic circumstances had irrevocably changed.

[367]    Decision 9, Proposition and Conclusions on Compensation for Business Losses: Types of Damages and Their Valuation; S/AC/.26/1992/9 (March 1992).

*Grand River, et al v. U.S.A.*                                                                          /133
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

As stated above, the Tribunal has determined that the appropriate primary measure of compensation is the value of SDMI's lost net income stream.[368]

323.    The *S.D. Myers* Tribunal also included an award of compound interest in that case.  It did so because an award of interest must recognise the fact that the injured party cannot use or invest the amounts of money due, from the date of the illegal act or omission to the date of that a damages award has been satisfied.  Otherwise the investor would not receive 'full' reparation, as required under customary international law.  Recent practice supports an award that includes compound interest to a victorious claimant, in order to adequately reflect modern economic realities.[369]

### A.    Damages for the Loss of Off-Reserve Sales in Five State Markets Because of the Allocable Share Amendments

324.    Claimants are entitled to receive the full restitution value for that which has been effectively lost to them because of the imposition of the Allocable Share Amendments.  In this case, the same essential compensation analysis applies regardless of whether liability is established under Articles 1102, 1105 or 1110.  As the Tribunal in *Sempra Energy* observed:

> Although there is some discussion about the appropriate standard applicable in such a situation, several awards of arbitral tribunals dealing with similar treaty clauses have considered that compensation is the appropriate standard of reparation in respect of breaches other than expropriation, particularly if such breaches cause significant disruption to the investment made.  In such cases it might be very difficult to distinguish the breach of fair and equitable treatment from indirect expropriation or other forms of taking and it is thus reasonable that the standard of reparation might be the same.[370]

---

[368]    *S.D. Myers, Inc.* v. *Canada*, Second Partial Merits Award, NAFTA/UNCITRAL Tribunal (21 October 2002) at paras. 173-174.

[369]    *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic*, ICSID Case No. ARB/02/1 Decision on Liability, (25 July 2007) at para. 55; *MTD* v. *Chile* at para. 251; *Compania del Desarrollo de Santa Elena, S.A. v. Republic of Costa Rica,* Case No. ARB/96/1 (February 17, 2000). at para's. 101-106; *Siemens AG* v *Argentina*, Award, ICSID Case No ARB/02/8 (06 February 2007), at para's. 395-400.

[370]    *Sempra Energy International* v *Argentina*, Award and partial dissenting opinion, ICSID Case No ARB/02/16 (28 September 2007), at para. 403.

*Grand River, et al v. U.S.A.*    /134
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

325.    Claimants have lost their ability to enjoy the increasing revenue streams they had been
generating by their investment, which they had been experiencing since 2002, when they
established and began promoting their Seneca and Opal brands in five state markets:
North Carolina, South Carolina, Oklahoma, Arkansas and Georgia.  In order to place
Claimants back into the position they would have been in, but for the imposition of the
Allocable Share Amendments, they should be awarded damages equivalent to an
exemption from the Allocable Share Amendments, which is effectively what they would
have been entitled to enjoy had these measures never been imposed upon them.

█████The costs of impairment suffered by Claimants under the Allocable Share Amendments
can be regarded as the value of an exemption withheld from Claimants. The value of an
exemption withheld from Claimants may be determined by application of the same
formula used by the Settling States to assign exemptions to SPMs in 1999, as applied to
the previous two years of performance by Claimants' Seneca and Opal brands in North
Carolina, South Carolina, Oklahoma, Arkansas and Georgia (i.e. a 'formula' analysis)
under the original escrow statutes.  That is to say, an appropriate measure of damages is
the value of a volumetric exemption from the Allocable Share Amendments (but not the
original escrow statutes).  The Wilson Report calculates a range of values for such an
exemption.  The Wilson Report also calculates a range of values for the loss sustained in
this regard by reference to foregone sales as a measure of lost markets.  ████████

██████████████████████████████████████████████████████

████████████

327.    Prior to imposition of the Allocable Share Amendments in each of these markets,
Claimants were enjoying significant cash flows from the successful deployment of their
Seneca and Opal brands in these states.  Had Claimants at least been provided with the
same type of exemption enjoyed by the SPMs against whom their brands had been
successfully competing, Claimants would still be generating the same kinds of cash flows
from sales of their Seneca® and Opal® brands today.  This is the standard of
compensation owed – to be placed back in the position in which the Claimants would
have been but for the breach.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 195 of 270

*Grand River, et al v. U.S.A.*                                                    /135
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

### B.   Impairment of On-Reserve Sales

328.   In addition to the above, Claimants are also entitled to compensation for the manner in which performance of their brands marketed exclusively on First Nations territory has been impaired.

329.   Claimants' on-reserve marketing and distribution activities have been increasingly impaired by the enforcement of the amended Escrow Statutes and the Contraband Laws. Tribes and First Nations wholesalers on territories located in various states have either suffered unlawful seizures by state officials, purportedly on the authority of MSA measures, or have chosen to refrain from dealing with Claimants' brands to avoid such misfortune.[371]

330.   Claimants have also been forced to defend against enforcement activities targeted directly at on-reserve distribution of their brands, such as the most recent demand letter sent by the Attorney General of California to NWS.[i]   They have also been subjected to escrow demands and penalties in respect of sales of their brands in cases where state officials have refused to disclose whether the products in question were originally sold by Claimants on First Nations territories to other First Nations persons and organizations.

331.   As Professors Clinton and Fletcher have opined, in the entirety of their expert reports, both under United States Federal Indian Law and under the *Jay Treaty*, Claimants were entitled to expect that none of their business activities would ever be subjected to the Escrow Statutes, the Allocable Share Amendments, the Contraband Laws or any Equity Assessment Legislation.   That these measures were ever imposed upon Claimants' investment accordingly constitutes a breach of Article 1105 because Respondent was bound to respect and uphold Claimants' legitimate expectations that the rule of law would properly govern the conduct of state officials, preventing them from seeking to regulate First Nations investment for which they have no legitimate rights to regulate.

---

[371]      Statement of Professor Matthew Fletcher, at ¶17; A. Montour Stmt. at 22-28.

*Grand River, et al v. U.S.A.*                                                    /136
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

332.    Article 1105 was also breached in this case by the very imposition of the Escrow Statutes, both original and amended.  Claimants were forced to make millions of dollars in payments to the Settling States ostensibly to satisfy unspecified, phantom liabilities under Respondent's tort laws. While it would therefore appear that Respondent's officials were never entitled to employ any of these measures against Claimants' business, regardless of where its brands were sold, the Tribunal has determined that Claimants are time-barred from seeking damages in respect of application of the original Escrow Statutes to sales of its brands off-reservation.[372]

333.    It is accordingly essential to know exactly what the basis was for each of the demands made of the Investors by any state official under the authority of an original Escrow Statute.  Unfortunately, Claimants remain unaware of the full extent to which Respondent's state government officials were including on-reserve sales in their calculation of Claimants' alleged obligations under their original Escrow Statutes. Claimants adopted a practice of requesting that information whenever they learned of an escrow demand made, or default judgment obtained, against them.  They requested the same information in discovery in the Federal Court case; and they sought this information again in this arbitration.  Although given every opportunity, however, Respondent has failed to produce evidence that would allow Claimants to identify exactly which states have recorded Seneca products sold on-reserve as requiring escrow payments under these measures.

334.    Claimants know where their products were originally sold and to whom, both on-reserve and off-reserve.  Claimants know the compliance costs they have borne, including escrow payments and penalties paid.  Only Respondent knows, however, which of its states have illegally imposed their measures on sales of Claimants' brands on First Nations territories. As such, Claimants submit that all of their compliance costs, save and except for those incurred with respect to Claimants' off-reserve sales in North Carolina, South Carolina, Oklahoma, Arkansas and Georgia, must be compensated by Respondent unless and until

---

[372]    Decision on Jurisdiction, at ¶ 103.

Case 1:14-cv-00910-RJA-LGF   Document 76   Filed 12/15/14   Page 197 of 270

*Grand River, et al v. U.S.A.*                                    /137
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

it reveals exactly which of the states that have imposed their measures on Claimants have failed to exclude all on-reserve sales from their enforcement activities.

███ The Wilson Report also calculates damages sustained as a result of impairments to on-reserve sales under two different discounted cash flow models. ███████████

███████████████████████████████████████████████████████████████████

██████████████████████

## C.    Professional Fees

336.    In addition to the foregoing, claimants have spent well in excess of $2 million over the last 6 or more years contesting the wrongful application of the measures to their Investment. These costs include, but are not limited to, fees for attorneys and expert witnesses in connection with various litigated matters. These damages continue to accrue on a daily basis and Claimants shall make a fuller accounting of these damages at the time of the hearing.

*Grand River, et al v. U.S.A.*                                                      /138
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

## PART III:
## RELIEF REQUESTED

337.    As set out above, Claimants seek the following:

    i.      Damages of not less than US$175 million for imposition of the Allocable Share Amendments contrary to the NAFTA;

    ii.      Costs associated with these proceedings, including all professional fees and disbursements;

    iii.      Pre-award and post-award interest at a rate to be fixed by the Tribunal;

    iv.      Payment of a sum of compensation equal to any tax consequences of the award, in order to maintain the award's integrity; and

    v.      Such further relief as counsel may advise and that the Tribunal deems appropriate.

All of which is respectfully submitted.

*Grand River, et al v. U.S.A.*                                                    /139
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

All of which is respectfully submitted.

Dated: July 10, 2008

By: _____

**T.J. Grierson Weiler**
#19-2014 Valley Run Blvd.
London, Ontario N6G 5N1

**Chantell MacInnes Mountor**
Inch Hammond Professional Corporation
1 King Street, West Suite 500
Hamilton, Ontario L8P 4X8

**Leonard Violi**
Law Offices of Leonard Violi, LLC
910 East Boston Post Road
Mamaroneck, New York 10543

**Robert J. Luddy**
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019

**Arif Hyder Ali**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004

**Counsel to Grand River Enterprises Six
Nations, Ltd., Jerry Montour, Kenneth Hill
And Arthur Montour, Jr.**

*Grand River, et al v. U.S.A.*                                                                /140
NAFTA/UNCITRAL Arbitration
Memorial of the Investor

Served To:

Mark E. Feldman, Esq.

Office of International Claims and Investment Disputes

Department of State

United States of America

2430 E Street, N.W.

Suite 203, South Building

Washington, D.C. 20037-2800

And To:

Claudia Frutos-Peterson

International Centre for Settlement of Investment Disputes

World Bank

1818 H Street, N.W.

Washington, D.C. 20433

## Table 1-1

## Chronology of Claimants Investments in the U.S.

| Date | Jerry Montour and Kenneth Hill | Arthur Montour | Grand River |
|------|-------------------------------|----------------|-------------|
| Pre – 1990 | Involved in wholesale and retail distribution of proprietary and non-proprietary brands on Indian land in Canada and U.S. as sole proprietors; contract with manufacturer headquartered in Virginia to manufacture proprietary brands | Construction worker for company owned by Lawrence Skidders | |
| 1990 | Five partners invested a total $1,000,000 into a venture with Lawrence Skidders to construct a cigarette manufacturing facility on a Mohawk Reservation in New York; Racket Pointe begins manufacture of proprietary brands that are distributed on Indian land in U.S. | Becomes sales agent for Racket Pointe facility and investors' proprietary brands | |
| January 1991 | Lawrence Skidders dies and parties continue business with Skidders Estate | Continues as sales agent for Racket Pointe under management of Skidders wife | |
| 1993 | Investors terminate relationship with Skidders Estate | Continues distribution of proprietary and non-proprietary brands on Indian land in U.S. as sole proprietor | |
| 1994 | Invest $100,000 each along with 8 other investors to form Grand River Enterprises partnership | Continues distribution of proprietary and non-proprietary brands on Indian land in U.S. as sole proprietor | Formed as partnership to manufacture proprietary brands |
| 1996 | Enter into joint venture with Omaha Tribe of Nebraska to construct and operate cigarette manufacturing facility | Enters into agreement with Jerry Montour and Kenneth Hill to be exclusive distributor in | Converted from partnership to corporation |

| Date | Jerry Montour and Kenneth Hill | Arthur Montour | Grand River |
|------|-------------------------------|----------------|-------------|
| | | U.S. | |
| 1997 -1998 | Jerry Montour moves to Nebraska to oversee venture and initial operations; guarantees payment of refurbishing costs for venture's machinery; Kenneth Hill remains in Canada to oversee Grand River | Continues to distribute tobacco products supplied by Omaha Tribe venture and other Native American manufacturers | Continues manufacturing operations in Canada |
| 1999 | Enter into venture with Arthur Montour and Ross John to manufacture and distribute proprietary Seneca ® brand on Indian land in U.S.; causes Grand River to extend long term credit on receivables for startup of venture | Incorporates Native Tobacco Direct and obtains U.S. ATF tobacco importer permit; obtains federal trademark for Seneca® brand | Enters into exclusive manufacturing and trademark cross-licensing agreement with Arthur Montour and Native Tobacco Direct |
| 2000 | Terminate relationship with Ross John and assist Arthur Montour with financing buyout of Ross John from venture; continue to receive compensation from venture as shareholder of Grand River and consultant to Native Tobacco Direct | Buys out Ross John from venture and establishes Native Wholesale Supply to continue venture | Continues venture with Native Wholesale Supply and subordinates right to receivables |
| 2001-2004 | Continues venture relationship with Arthur Montour; agrees with Arthur Montour to license use of Seneca® trademark to Tobaccoville USA, Inc. for sales off of Indian land in U.S.; causes Opal® trademark to be filed by Grand River; continue receiving compensation from venture as shareholder of Grand River and consultant to Native Wholesale | Continues distribution of Seneca® brand on Indian land in the U.S.; agrees to license brand for sales off Indian land in return for payment of license fee | Begins production of Seneca® and Opal® brands for Tobaccoville and production of non-proprietary brands for other importers on limited basis |
| 2004 – Present | Experience increasing harm caused by amended measures that Respondent seeks to apply to Seneca® brand sales on and off Indian land; direct Grand River to cease production of non-proprietary brands | License fees substantially reduced by amended measures' effect on Seneca® brand sales off reservation; harmed by Respondent's | Adoption of amended measures causes substantial reduction in production and sales of Seneca® and Opal® brands for |

| Date | Jerry Montour and Kenneth Hill | Arthur Montour | Grand River |
|------|-------------------------------|----------------|-------------|
|      |                               | application of measures on Indian land | Native Wholesale Supply and Tobaccoville |

## CHRONOLOGY OF STATES MEASURES

| Date | Conduct of Respondent's States | Conduct of Respondent |
|---|---|---|
| 1994 | States' private trial lawyers obtain stolen documents from Brown & Williamson Tobacco Co.; begin filing lawsuits against major tobacco companies | Respondent's Congress launches investigation against major tobacco companies based on information revealed in stolen documents |
| 1994-1996 | Additional States represented principally by personal injury lawyers and former partners or friends of Attorneys General file lawsuits against major tobacco companies | Mississippi trial lawyer and brother of Senate Majority Leader requests President Clinton's participation in lawsuits against tobacco companies |
| 1997 | Mississippi settles lawsuit with tobacco companies; remaining states seek approval of Federal Proposal to settle all litigation; additional States settle lawsuits on individual basis | Federal Proposal presented to Congress for review and approval; Respondent's Federal Trade Commission considers Federal Proposal to be anticompetitive |
| April 1998 |  | Federal Proposal ultimately rejected by Congress |
| May 1998 | Remaining States continue settlement negotiations despite rejection by Federal Government; major tobacco companies demand protection from competition from smaller manufacturers as condition to settlement |  |
| November 1998 | Master Settlement Agreement entered into by major tobacco companies and 46 Settling States and 6 U.S. territories |  |
| 1999 | States' private attorneys negotiate with select group of manufacturers to join MSA within 90 days to receive payment exemptions under MSA; States are briefed on inapplicability of Escrow Statutes to foreign manufacturers and Indian land; States begin to adopt Escrow Statutes |  |
| 2001 | States begin notifying Claimants regarding Escrow Statute requirements |  |

| Date | Conduct of Respondent's States | Conduct of Respondent |
|---|---|---|
| 2002 | State representatives admit that decrease in MSA payments not due to unfair advantage of NPMs but, rather, unprecedented price increases of Participating Manufactures; States and MSA's Participating Manufacturers take part in non-public meetings and communications relating to (i) enforcement of Escrow Statutes against NPMs; (ii) adoption of Contraband Laws;  and (iii) possibility of terminating refunds so as to increase burdens on NPM under Escrow Statutes; Participating Manufacturers' market share decreases from 98% (pre-MSA) to 92%; States begin filing lawsuits against Claimants under Escrow Statutes | |
| 2002-2004 | State representatives circulate memo saying that States must reduce NPM sales because of their effect and MSA payments; Participating Manufacturers and States draft Contraband Laws and Allocable Share Amendment to Escrow Statute; Attorneys General enlist aid of Participating Manufacturers and their lobbyists to lobby State Legislatures to pass Contraband Laws and Allocable Share Amendment; NAAG slide show shows dramatic decline in NPM sales where Allocable Share Amendment adopted | |
| 2004 – present | All Settling States (except Missouri) adopt Contraband Laws and Allocable Share Amendment; some States adopt NPM tax legislation, which imposes fee on NPMs in addition to escrow payment requirements. | |

# EXHIBIT C

**10896**

**NATIVE WHOLESALE SUPPLY COMPANY**
**OPERATING ACCOUNT**
10965 LOGAN RD
SENECA NATION TERRITORY
PERRYSBURG, NY 14129
(716) 532-6136

THE UPSTATE NATIONAL BANK
CORPORATE & PROFESSIONAL BANKING CENTER
ROCHESTER, NY 14614   7
50-1046-213

1/7/2009

PAY TO THE
ORDER OF      APT Transportation, Inc                                      $ **23,119.50

Twenty-Three Thousand One Hundred Nineteen and 50/100*********************************************************** DOLLARS

APT Transportation, Inc
P.O. Box 4668
Omaha, NE 68104-4668

MEMO
Inv #LV79723, 80749, 80752, 81346, 81345, 80812, 80879, 8076

AUTHORIZED SIGNATURE

⑈010896⑈ ⑆          0465⑈ 800 141⑈

51163

1067

**NATIVE WHOLESALE SUPPLY COMPANY**
**OPERATING ACCOUNT**
16955 LOGAN RD
SENECA NATION TERRITORY
PERRYSBURG, NY 14129
(716) 532-6138

THE UPSTATE NATIONAL BANK
CORPORATE & PROFESSIONAL BANKING CENTER
ROCHESTER, NY 14814   7
50-1046-213

12/4/2008

PAY TO THE
ORDER OF   APT Transportation, Inc

$ **20,100.00

Twenty Thousand One Hundred and 00/100********************************************************************************************** DOLLARS

APT Transportation, Inc
P.O. Box 4668
Omaha, NE 68104-4668

AUTHORIZED SIGNATURE

MEMO
Inv #LV79723, 80749, 80752, 81346, 81345, 80812, 80879, 80760

⑆010671⑆ ⑈          0465⑈ 800 141⑈

Check#:

003

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

In Re                                             Case No. 11-14009-CLB
                                                  Chapter 11
NATIVE WHOLESALE SUPPLY COMPANY

                                    Debtor

-------------------------------------------------------------


### AMENDED JOINT CONSENSUAL DISCLOSURE STATEMENT FOR JOINT CONSENSUAL PLAN OF REORGANIZATION OF NATIVE WHOLESALE SUPPLY COMPANY, AND THE STATES[1]


Dated: Buffalo, New York
          June 13, 2014

                                    GROSS, SHUMAN, BRIZDLE &
                                    GILFILLAN, P.C.
                                    Robert J. Feldman, Esq.
                                    Janet G. Burhyte, Esq.
                                    *Attorneys for Debtor*
                                    465 Main Street, Suite 600
                                    Buffalo, New York   14203
                                    Tel:    (716) 854-4300
                                    Fax:    (716) 854-2787

                                    NATIONAL ASSOCIATION OF
                                    ATTORNEYS GENERAL
                                    Karen Cordry, Esq.
                                    *Attorneys for the States*
                                    2030 M Street, NW
                                    Washington, DC 20036
                                    Tel:  (202) 326-6251

---

[1] The "States" are all signatories to the Tobacco Master Settlement Agreement that are appearing herein collectively through their counsel at the National Association of Attorneys General.

# I.   INTRODUCTION

The Debtor and Debtor-in-Possession, Native Wholesale Supply Company ("NWS" or "Debtor") and the States (the Debtor and the States are collectively referred to as the "Plan Proponents") hereby provide this Amended Joint Consensual Disclosure Statement for its proposed Joint Consensual Plan of Reorganization (the "Disclosure Statement"), including all attached and/or accompanying exhibits, which are incorporated herein as an integral part hereof, to the holders of all claims against the Debtor and all other parties in interest, pursuant to Section 1125 of Title 11 of the United States Code, 11 U.S.C. Section 101, et. seq. (the "Bankruptcy Code").

## A.   Purpose of the Disclosure Statement.

The purpose of this Disclosure Statement is to provide parties asserting claims against the Debtor with information regarding the treatment of their claims under the proposed Amended Joint Consensual Plan of Reorganization (the "Plan").  More particularly, this Disclosure Statement should provide parties whose claims are impaired under the Plan with adequate information to make an informed and prudent judgment when voting on the Plan.

This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition history, why the Debtor filed Chapter 11, and significant events that have occurred in this Chapter 11 case.  This Disclosure Statement also describes the Plan, certain alternatives to the Plan, certain effects of the confirmation of the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement outlines the confirmation process and the voting procedures that holders of claims in impaired classes must follow for the votes to be counted.

This Disclosure Statement is not intended to replace a careful review of the Plan. Rather, it is submitted as an aid and supplement to the review of the Plan and in an effort to explain the terms and implications of the Plan. Every effort has been made to fully explain the various aspects of the Plan because it affects all claimants. However, you are urged to review the Plan and this Disclosure Statement with your respective counsel.

**B.      Disclaimer.**

All creditors are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan.

The information contained in this Disclosure Statement is based upon the representations made by the Debtor in the chapter 11 petition, schedules, lists and other documents filed with the Bankruptcy Court, as well as other documents and business records obtained and/or maintained by the Debtor and provided to counsel for the Debtor. The information contained in this Disclosure Statement is believed by the Debtor to be accurate, but it has not been subjected to a certified audit or review. Therefore, no representations or warranties are made as to its accuracy or completeness. Portions of this Disclosure Statement constitute summaries of orders of the Bankruptcy Court and various pleadings, motions, applications, schedules and other documents which are on file with the Bankruptcy Court and which may be examined at the Office of the Bankruptcy Court Clerk, U.S. Bankruptcy Court, Olympic Towers, 300 Pearl Street, Suite 250, Buffalo, New York 14202.

This Disclosure Statement has been prepared in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and not necessarily in accordance with federal or state securities law or other law.

This Disclosure Statement shall not be construed as advice on the tax or other legal effects of the reorganization as to holders of claims against the Debtor.  Creditors and parties in interest should consult independent legal counsel or tax advisors on any questions or concerns regarding tax or other legal consequences of the Plan.

Certain information contained in this Disclosure Statement is forward looking and contains estimates, assumptions and projections that may be materially different from actual future results.  Except as otherwise specifically stated herein, this Disclosure Statement does not reflect any events that may occur after the date hereof and that may have a material impact on the information contained in this Disclosure Statement.

> NO REPRESENTATIONS CONCERNING THE DEBTOR, PARTICULARLY AS TO FUTURE BUSINESS OPERATIONS OR THE VALUE OF THE DEBTOR'S ASSETS, ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

**C.      Definitions.**

Unless otherwise defined, all capitalized terms contained in this Disclosure Statement shall have the same meaning applied to such terms in the Bankruptcy Code and the Plan.

## II.      VOTING AND CONFIRMATION PROCEDURES

The Plan is the method by which the Debtor satisfies the claims of its creditors. Whether the Debtor implements the Plan depends upon the acceptance of the Plan by creditors and the Bankruptcy Court's confirmation of the Plan.

**A.      Creditors Eligible to Vote.**

This Disclosure Statement is being transmitted to all creditors of the Debtor. However, the Bankruptcy Code provides that only those classes of creditors whose claims are "impaired" under the Plan will be entitled to vote on acceptance or rejection of

the Plan. Generally, (and subject to the specific provisions of section 1124 of the

Bankruptcy Code), a class is "impaired" if the Plan modifies the legal, equitable or

contractual rights of the claims of that class.  Unimpaired classes are deemed to have

accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the

Debtor is not required to solicit the votes of those unimpaired classes.  In determining the

acceptances of the Plan, votes will be counted only if submitted by the holder of an

Allowed Claim. Holders of Disputed Claims are not entitled to vote on the Plan unless

they request, pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure, that

the Bankruptcy Court temporarily allow their claim in appropriate amounts solely for the

purpose of enabling such holders to vote on the Plan.

**B.**     **Notice to Claimants.**

The Bankruptcy Court has approved this Disclosure Statement as containing

information of a kind and in sufficient detail to enable holders of claims against the

Debtor to make an informed judgment with respect to the acceptance or rejection of the

Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE

STATEMENT DOES NOT CONSTITUTE A VERIFICATION OF THE ACCURACY

OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, NOR DOES

IT CONSTITUTE AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY

COURT.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ARE ENCOURAGED

TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY

AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT

OR REJECT THE PLAN.  THIS DISCLOSURE STATEMENT CONTAINS

IMPORTANT INFORMATION ABOUT THE PLAN, CONSIDERATIONS PERTINENT TO ACCEPTANCE OR REJECTION OF THE PLAN, AND DEVELOPMENTS CONCERNING THE CHAPTER 11 CASE.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED BY THE DEBTOR IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitations of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor or its Plan other than the information contained herein.

**C.      Solicitation Package.**

Accompanying this Disclosure Statement are copies of the following:  (1) the Plan; (2) the notice of, among other things, the time for submitting ballots to accept or reject the Plan, the date, time and place of the confirmation hearing for the Plan, and the time for filing objections to confirmation of the Plan (the "Notice"); and (3) a ballot, instructions and return envelope to be used in voting to accept or reject the Plan.  IF ANY OF THESE ITEMS ARE MISSING, PLEASE CONTACT THE UNDERSIGNED COUNSEL FOR THE DEBTOR IMMEDIATELY.

**D.      Voting Procedures, Ballots and Voting Deadline.**

After careful review of the Plan, this Disclosure Statement and the detailed instructions accompanying the attached ballot (see Exhibit A), please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot.  Please complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

IN ORDER FOR YOUR VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS AND RECEIVED NOT LATER THAN JULY 25, 2014 BY THE U.S. BANKRUPTCY COURT, WESTERN DISTRICT OF NEW YORK, OLYMPIC TOWERS, 300 PEARL STREET, BUFFALO, NEW YORK 14202.  Any late filed ballots may not be counted.

Whether or not a creditor votes on the Plan, each creditor will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Bankruptcy Court. Except to the extent otherwise ordered by the Bankruptcy Court, a creditor who does not vote will not be included in the calculation of votes in connection with confirmation of the Plan.

**E.      Confirmation of the Plan.**

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the requirements of Chapter 11 of the Bankruptcy Code.  The Bankruptcy Court must determine that this Disclosure Statement concerning the Plan is adequate and includes information concerning all payments made or promised by the Debtor in connection with the Plan.  The Bankruptcy Court must determine that the Plan is proposed in good faith and not by any means forbidden by law, and under Rule 3020(b)(2), the Bankruptcy Court may do so without receiving evidence if no objection is timely filed.

In particular, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (1) the Plan has been accepted by the requisite votes of all classes of impaired claims namely, two-thirds in dollar amount of allowed claims and greater than one-half in number of allowed claims unless approval will be sought under section

1129(b) of the Bankruptcy Code in spite of the dissent of one or more such classes; (2) the Plan is feasible, which means that after confirmation, the Debtor will be able to perform its obligations under the Plan and continue to operate without further financial reorganization or liquidation; and (3) the Plan is in the best interests of the holders of all claims, which means that such holders will receive at least as much under the Plan as they would in a liquidation under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all classes of impaired claims vote for the Plan, the Bankruptcy Court must make an independent finding that the Plan conforms to the Bankruptcy Code requirements.

**F.    Confirmation Hearing.**

THE BANKRUPTCY COURT HAS SET JULY 28, 2014 AT 1:00 P.M. AS THE DATE AND TIME OF THE HEARING ON CONFIRMATION AND OBJECTIONS TO THE PLAN (the "Confirmation Hearing"). OBJECTIONS TO CONFIRMATION OF THE PLAN WILL BE ALLOWED UP TO THE TIME OF THE CONFIRMATION HEARING.

The Confirmation Hearing will be held at the U.S. Bankruptcy Court, Western District of New York, Part II, Third Floor, Olympic Towers, 300 Pearl Street, Buffalo, New York 14202. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether the Plan is feasible and whether it is in the best interests of the creditors. The Bankruptcy Court will also consider the votes for acceptance or rejection of the Plan by the parties entitled to vote. The Debtor reserves the right, pursuant to section 1126(e), to request the Bankruptcy Court to strike any acceptance or rejection of the Plan by any

claimant as not being in good faith.  Creditors and parties in interest may attend the

Confirmation Hearing.  The Confirmation Hearing may be adjourned from time to time

without further notice except for in-court announcements.

**G.      Recommendation.**

THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE

GREATEST POSSIBLE RECOVERY TO ALL CREDITORS.  THE PLAN

PROPONENTS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST

INTERESTS OF ALL CREDITORS AND RECOMMEND THAT ALL CREDITORS

VOTE TO ACCEPT THE PLAN.

### III.      HISTORY OF THE DEBTOR.

**A.      Formation and Growth of the Debtor's Business.**

Native Wholesale Supply Company ("NWS" or the "Debtor") is a corporation

chartered by the Sac and Fox Tribe of Oklahoma and maintains its offices on the Seneca

Cattaraugus Indian Territory in Gowanda which is within the geographic boundaries of

Western New York.  NWS is engaged in the business of importing cigarettes and other

tobacco products from Native Americans in Canada and selling them to Indian Nations

and Tribes within the United States.  The tobacco products the Debtor imports are

manufactured by Grand River Enterprises Six Nations, Ltd. ("GRE") on the Grand River

Reservation in Ontario, Canada.

The Debtor was formed on February 25, 2000.  Its sales grew with each

subsequent year of operation.  The year prior to the Petition, the annual sales were at a

level of approximately $200,000,000 and it has continued at that level for the majority of

the Chapter 11 administration period.  It currently has only four employees, having

restructured its business during the pendency of its Chapter 11 proceeding so that the marketing function it had previously performed is performed by the manufacturer at a fixed cost to the Debtor.

**B.      Bankruptcy Filing Was Triggered by Dispute with USDA.**

The Debtor's Chapter 11 filing was triggered by an unfavorable decision rendered by Judge John Curtin in a lawsuit by the United States Department of Agriculture ("USDA") against the Debtor.  Based upon the Curtin decision, the USDA was poised to enter judgment against NWS for assessments made by the USDA against the Debtor pursuant to the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA") and the Tobacco Transition Payment Program ("TTPP").  The Debtor was forced to file its bankruptcy case to avoid the entry and execution of what would have been a judgment in excess of $43,000,000.  Under the Plan, the USDA's total prepetition claim is $45,539,114.30 (the "USDA Prepetition Claim"), $24,866,757.38 of which the USDA asserts is entitled to priority under 11 U.S.C. §507(a)(8)(E)(ii) ("USDA Priority Claim").

**C.      The Chapter 11 Case.**

**(1)      Commencement.**

The Debtor filed a voluntary petition under the provisions of Chapter 11 of the United States Bankruptcy Code on November 21, 2011.  The Debtor's schedules and statement of financial affairs were filed on December 13, 2011.

**(2)      Cash Collateral.**

At the time of the Debtor's bankruptcy filing, the Debtor's debt to GRE was approximately $19,200,000.  Of this amount, only about $9 million represents existing liabilities; the balance are contingent liabilities that are not allowable claims under the Bankruptcy Code unless and until GRE is called upon to actually satisfy such

amounts.  All of the Debtor's indebtedness to GRE is secured by a blanket lien in all of

the Debtor's assets.  In order to continue using its cash and to continue doing business

post-petition, the Debtor entered into an agreement with GRE which permitted it to use

the proceeds of its accounts receivable and inventory.  Under the Cash Collateral

Agreement, GRE was given a continuing postpetition lien in the same assets it held pre-

petition, to the same extent and priority as GRE held as of the Petition Date.  An order

allowing the Debtor temporary use of cash collateral was entered on the Petition Date,

with a final order entered on December 13, 2011, after notice and a hearing.  GRE is the

only secured creditor of the Debtor and it continues to sell the tobacco products to the

Debtor that the Debtor imports and sells in Indian Country.

    **(3)**    **The Professionals.**

On the Petition Date, the Debtor was defending lawsuits in the States of

California, Oklahoma, Idaho and New Mexico.  During the post-petition administration

period, a lawsuit was commenced by the State of New York.  Accordingly, in addition to

bankruptcy counsel and accountants, as well as counsel most familiar with the Debtor's

operations, complex bond issues and its business model, it was necessary for the Debtor

to employ counsel to continue to or to begin their legal work in defending the Debtor in

these respective lawsuits.  The law firms and the accountants for whom the Debtor

obtained employment approval orders and their respective fee awards in this case are as

follows:

| Name | Description | Date Approved | Fees and Expenses Awarded | Total Fees and Expenses Received |
|------|-------------|---------------|---------------------------|----------------------------------|
| Gross, Shuman, Brizdle & Gilfillan, P.C. | General Bankruptcy Counsel | 12/20/11 | $191,098.35 $4,375.46 $70,632.45 $1,547.83 $123,559.50 $1,614.43 $43,749.60 $137.94 $67,384.40 $1,258.58 | $195,473.81 $72,180.28 $125,173.93 $43,887.54 $68,642.98 |
| Law Offices of Leonard Violi, LLC | Special Counsel | 2/6/12 | $20,000.00 $233.61 $30,000.00 $2,181.59 | $20,233.61 $32,181.59 |
| Windels Marx Lane & Mittendorf, LLP | Special Counsel | 12/19/11 | $8,022.00 | $8,022.00 |
| Jaeckle Fleischmann & Mugel, LLP | Special Counsel | 12/20/11 | $3,262.00 | $1,518.00 |
| Fredericks Peebles & Morgan LLP | Special Counsel – California | 1/10/12 | $25,000.00 $200,000.00 $17,526.92 $115,552.00 $16,964.03 | $25,000.00 $217,526.92 |
| Eberle, Berlin, Kading, Turnbow & McKlveen, Chartered | Special Counsel – Idaho | 2/9/12 | $20,776.50 $64.29 | $20,840.79 |
| Phillips Murrah, P.C. | Special Counsel – Oklahoma | 6/21/12 | _____ | _____ |
| Cuddy & McCarthy, LLP | Special Counsel – New Mexico | 5/31/13 | _____ | _____ |
| Gable & Gotwals, P.C. | Special Counsel | 5/16/13 | $166,323.00 $6,122.42 | $172,445.42 |
| Webster Szanyi LLP | Special Counsel | 6/10/13 | $58,628.25 $2,287.77 $11,864.25 $13.98 $12,946.50 $272.47 | $60,916.02 $11,878.23 $13,218.97 |
| Mengel Metzger Barr & Co. LLP | Accountants | 12/20/11 | $64,981.25 $34,943.75 | $64,981.25 $34,943.75 |

- 11 -

**(4)     Bond Issues.**

As stated above, the Debtor is engaged in the business of importing cigarettes and other tobacco products from Canada (the "Goods") and selling them to Indian Nations and Tribes within the United States.  In order to import the Goods, U.S. Customs and Border Protection ("U.S. Customs") requires importers such as the Debtor to post bonds or other security for protection of the revenue in the form of customs duties payable to the United States on the importation of product subject to such customs duties. The purpose of the customs bond is to protect the pecuniary interests of the United States in connection with importation of Goods.

The Debtor's customs bond was jeopardized at and around the Petition Date when U.S. Customs notified the Debtor that it needed to increase its existing $9,300,000 bond and replace it with one in the amount of $12,400,000 due to the increase in the Debtor's sales/importation figures.  Although the Debtor recognized the need for an increase in the bond amount, U.S. Customs was requiring that the $9,300,000 bond stay in place for six months while it liquidated the entries brought into the country on that bond while simultaneously requiring that a new and increased bond in the amount of $12,400,000 also be maintained.  This practice is commonly referred to as bond "stacking".  The Debtor simply did not have sufficient collateral to secure $21,700,000 worth of bonds.  After many attempts to resolve this critical issue after the Petition Date, the Debtor started an adversary proceeding seeking an injunction against U.S. Customs (A.P. No. 11-1123).  A temporary restraining order was issued and the bond issue was resolved by allowing the Debtor to increase the bond amount by $3,100,000, for a total of $12,400,000 and U.S. Customs accelerated the liquidation of the old entries.

The Debtor's customs bond was threatened again the following year during the latter part of 2012, when the Debtor's bonding company, Capitol Indemnity Corporation ("CIC"), sought relief from the automatic stay to notify the Debtor of the termination of CIC's bonds. In an effort to satisfy the bonding company, the Debtor obtained Bankruptcy Court authorization to increase the collateral securing the customs bonds. In the end, however, CIC terminated its bonds with the Debtor, forcing the Debtor to engage an alternate bonding company, Great American Alliance Ins. Co. The transition from one bond to the other required the Debtor, with assistance of U.S. Customs, to accelerate the liquidation of import entries under a bond of CIC which would allow CIC to release collateral being held by it for use in the collateralization of its new bond. As a result of the liquidation of the entries and the consequent delay in releasing the collateral to the new bonding company, the Debtor actually had to stop all importing for approximately two months. Although it was still able to obtain additional inventory through another importer, such purchases had a lower profit margin than those obtained directly from GRE. Obviously, this negatively impacted the Debtor's business, but only temporarily.

**(5)      Creditors.**

This case is basically a three party case – the Debtor, the USDA and the States. Thus it made abundant sense for the three main parties to reach agreement as to how each creditor will be paid and when. The result is the Plan being proposed, which generally provides as follows with respect to each of the three main creditors of the Debtor:

a.      USDA: As described in Section III. B. hereof, the Debtor's bankruptcy case was triggered by an unfavorable ruling of District Court Judge John

- 13 -

Curtin that would have resulted in the entry and execution of a judgment against the Debtor in an amount in excess of $43,000,000 for unpaid assessments made by the USDA against the Debtor under FETRA and TTPP.  In connection with the resolution of this case, the Debtor and the USDA have stipulated that the total amount of the USDA Claim is $45,539,114.30, $24,866,757.38 of which has priority under 11 U.S.C. 507(a)(8)(E).  Under the Plan, within thirty (30) days after the Effective Date, the Debtor will be required to pay $3,000,000 to the USDA in partial satisfaction of the USDA Priority Claim.  The Debtor has made all its TTPP payments on a current basis throughout the Chapter 11 case and its continued payment of its TTPP payments on a current basis after confirmation of the Plan is a requirement under the Plan.  The balance of the USDA Priority Claim and the USDA Prepetition Claim (which is an unsecured claim) will be paid as described in Section V of this Disclosure Statement.

      b.    The States – California, New Mexico, Idaho, Oklahoma and New York:  Each of California, New Mexico, Idaho, Oklahoma, and New York  has a lawsuit pending against the Debtor or had a suit pending as of the Petition Date.  Except for the New York Litigation, the lawsuits were commenced prior to the filing of the Debtor's bankruptcy case.  The Idaho state court determined that the appeal pending before it was excepted from the automatic stay by the police and regulatory exception in Section 362(b)(4).  In March of 2012, California, New Mexico, and Oklahoma, sought and obtained an order from the Bankruptcy Court modifying the automatic stay to permit the Prepetition actions to continue.  No relief was necessary to commence the New York Litigation with respect to postpetition violations and New York's suit currently does not contain any allegations with respect to Prepetition sales by the Debtor.  Although

- 14 -

judgments have been entered in the suits involving Idaho, and Oklahoma, no Final Order

has yet been obtained by any of the States with respect to any of the lawsuits.  The Plan is

designed to pay only Allowed Claims in accordance with the priority scheme of the

Bankruptcy Code.  The States' claims, if Allowed by virtue of a Final Order in their

respective lawsuits, will include Prepetition Unsecured Claims and/or Postpetition

Administrative Expense Claims, depending on whether the claims arose in connection

with the Debtor's Prepetition sales activities or Postpetition sales activities.  Below is a

list of the State and the types of claim(s) that would likely result if that State successfully

obtained a Final Order.

i.    <u>California</u>

Because the State of California has alleged that there were

continuing violations during the Postpetition time frame, the Debtor and California have

agreed that if California prevails in the California Litigation, in addition to a Prepetition

Claim related to the Debtor's Prepetition sales, it would also hold an Administrative

Expense Claim in the amount of $350,000 with respect to the penalties sought by

California with respect to those Postpetition sales.  In addition, California may also seek

an award of attorneys' fees and costs in connection with amounts expended since the

Petition Date in connection with such litigation.

Under the Plan, the Debtor has agreed to hold $350,000 in

a separate escrow account for the California Administrative Expense Claim to be paid to

California if California prevails in the California Litigation and obtains a Final Order

awarding penalties, attorneys' fees and/or costs in that amount or more pursuant to the

terms of the California Escrow Agreement ("California Escrow Agreement") annexed as

Exhibit E to the Creditor Escrow Agreement, which is annexed to the Plan as Exhibit A.

Any remaining Administrative Expense Claim and any Prepetition Claim of California, if California obtains a Final Order, will be an Allowed Unsecured Claim, which claims will be paid from the Creditor Escrow Account as further described in Section V of this Disclosure Statement.

        ii.    <u>Oklahoma</u>

In its lawsuit brought with respect to Prepetition sales activity by the Debtor, Oklahoma obtained a judgment in the amount of $47,767,795.20, on May 9, 2013 (exclusive of costs, interest, and attorneys fees) at the trial court level, which was affirmed on appeal by the Supreme Court of the State of Oklahoma on June 10, 2014 (the "Oklahoma Judgment"). If Oklahoma obtains a Final Order sustaining all or any part of the Oklahoma Judgment, that amount will be paid first from the Oklahoma Reserve and the balance from the Creditor Escrow Account further described in Section V of this Disclosure Statement.

        iii.    <u>Idaho and New Mexico.</u>

The lawsuits commenced by Idaho and New Mexico involved only Prepetition sales activity of the Debtor and the Debtor. The Unsecured Prepetition Claims of Idaho in the amount of $263,765.07 and New Mexico in the amount of $1,068.24 have been placed in the Class 4, which claims will be paid 30 days after the Effective Date of the Plan, without any admission of liability. Payment of the claims in Class 4 does not constitute an acknowledgment by the Debtor of any facts alleged in connection with such claims or that the Debtor is legally obligated to satisfy such claims.

iv.   New York

New York's case currently includes only allegations relating to Postpetition sales by the Debtor, but it is expected that, after confirmation of the Plan, New York will amend its complaint to include allegations relating to the Debtor's Prepetition Sales.  Accordingly, if New York is successful, it will have both a Prepetition Unsecured Claim for Prepetition sales and an Administrative Expense Claim related to Postpetition sales.  Such claims of New York will be paid from the Creditor Escrow Account as set forth in Section V of this Disclosure Statement.

**(6)    Proof of Claim Bar Dates.**

a.    Creditor Bar Date:  A claims bar date of February 10, 2012 was set by the Bankruptcy Court, by which creditors, other than Governmental Units, were required to file proofs of claim.

b.    Governmental Unit Claims Bar Date:  The Governmental Unit Claims Bar Date, the date by which Governmental Units were required to file proofs  of claim, was set for April 8, 2013.

**(7)    Significant Events During the Chapter 11.**

a.    The Customs Bond "Stacking" Problem Presented and Resolved:  In December of 2011, the Customs Bond "stacking" issue discussed in Section III(c)(4) was resolved favorably for the Debtor at the outset of the case.

b.    States Obtain Relief From the Automatic Stay:  In March, 2012, the States of California, New Mexico, and Oklahoma sought and obtained relief from the automatic stay to continue the Prepetition lawsuits.

c.    Conditional Dismissal of the Case:  In September, 2012 the Debtor reached an agreement in principle with the USDA which, upon certain conditions, appeared to have paved the way for the Debtor to exit its Chapter 11 case, especially since the States of California, New Mexico, and Oklahoma, had obtained relief from the automatic stay to proceed with their respective lawsuits.  Accordingly, the Debtor made its first motion to dismiss the Chapter 11 case, and the Bankruptcy Court conditionally dismissed the case by an order dated September 27, 2012.  The Court's dismissal of the case was conditioned upon the Debtor paying all outstanding United States Trustee's fees and establishing a reserve/escrow account for the benefit of the State of California containing $350,000, the agreed amount of the State of California's potential Administrative Expense Claim in the California Litigation.  As it turned out, the Debtor did not complete the conditions necessary for dismissal in order to stay in bankruptcy because two major events occurred which would have destroyed the Debtor's business, but for the existence of its pending bankruptcy case and the protection afforded by the automatic stay.  These events were (a) the nonrenewal of the Debtor's customs bond by its surety (see discussion of same in Section III(C)(4) hereof) and (b) the entry of the Oklahoma Judgment in the amount of approximately $47,700,000.

d.    Oklahoma Judgment:  After the Customs Bond issue was resolved and the dismissal documents were in final form and dismissal of the case was imminent, the State of Oklahoma obtained a judgment against the Debtor in the approximate amount of $47,700,000 at the trial court level, which was affirmed on appeal to the Supreme Court of the State of Oklahoma on June 10, 2014 (defined herein as the "Oklahoma Judgment").  If the Chapter 11 case had been dismissed, this massive judgment could

have been executed upon unless the Debtor obtained a bond in the amount of the

judgment, which it could not afford. The Debtor clearly needed the continued protection

afforded by the automatic stay to allow it to resolve this issue.

From April to early May, 2013, the Debtor tried but failed to

obtain an agreement from the Attorney General's Office for the State of Oklahoma to

stay the enforcement of judgment pending the Debtor's appeal of the judgment, in

exchange for a nonrefundable deposit (nonrefundable even if the Debtor ultimately won

in Oklahoma). The agreement offered but refused by the Attorney General's Office

would have afforded the Debtor a stay outside of bankruptcy and dismissal could have

been effectuated without harm to the Debtor.

The only remaining option left to the Debtor was to move in

Oklahoma state court for a reduction in the bond required to be posted pending its appeal.

At the bond hearing on that motion on June 21, 2013, the Court reduced the amount of

the bond that would need to be posted pending appeal to $1 million, an amount the

Debtor will be able to afford. Now that judgment has been entered in the Oklahoma

Litigation, a bond is no longer required; instead, a reserve in the amount of $1 million

(the Oklahoma Reserve) will be held in the Creditor Escrow Account to be used to satisfy

any Final Order obtained by Oklahoma.

e.      New York Litigation: In March of 2013, the State of New York

commenced its lawsuit against the Debtor in the District Court for the Eastern District of

New York seeking to recover damages for alleged violations of the New York tax law.

This action is being pursued with respect to alleged violations of several state and federal

statutes during the Postpetition period. In view of the existence of the automatic stay

with respect to the Prepetition period, the State of New York is not currently pursuing

litigation with respect to the Debtor's Prepetition sales that allegedly violated the same

statutes, but such litigation is expected to be commenced after the confirmation of the

Plan.

    f.   Conditional Order of Dismissal Vacated:  In August, 2013, the

States sought and obtained an order of the Bankruptcy Court vacating the Court's

conditional order of dismissal and the Debtor, the States and the United States started the

process of negotiating the terms of the Plan.

## IV. FINANCIAL INFORMATION AND THE VALUE OF THE DEBTOR'S ASSETS

### A. The Debtor's Assets.

  The Debtor's principal assets are its cash, accounts receivable and inventory.  It

also has some miscellaneous automobiles, office equipment and a forklift.  As of

February 28, 2014, the assets of the Debtor were as follows:

**(1) Cash**

| | | |
|---|---|---:|
| a. | M&T Operating Account | $9,665,563.16 |
| b. | M&T Money Market Account | 11,211.09 |
| c. | M&T Payroll Account | 11,472.22 |
| d. | M&T Deduction Account | 1,464.32 |
| e. | M&T Letter of Credit Account | 2,008,424.32 |
| f. | M&T Letter of Credit II Account | 1,103,990.86 |
| g. | M&T CA Escrow Account | 350,665.14 |
| | | 19,202,791.11 |

**(2) Accounts Receivable\***        18,019,999.46

**(3) Other Current Assets**

| | | |
|---|---|---:|
| a. | Tax Stamps | 102,600.00 |
| b. | Inventory | <u>3,186,840.59</u> |
| | | 3,289,440.59 |

**(4) Fixed Assets (Equipment less depreciation)**   373,691.61

**(5)    Other Assets**

|     |                 |              |              |
|-----|-----------------|--------------|--------------|
| a.  | Employee Loan   | 92,083.12    |              |
| b.  | Surety Deposits | 1,100,000.00 |              |
|     |                 |              | 1,192,083.12 |

TOTAL ASSETS                                        $42,078,005.89

*Many of these Accounts Receivable are stale and should be discounted accordingly –
see discussion in IV Section B and V Section B(9) of this Disclosure Statement.

**B.    Liquidation Analysis.**

In a liquidation, GRE, the Debtor's only secured creditor, would be entitled to the

amount of its claim, which, at most, would be $19,200,000.  Its claim would be Allowed

only up to the existing liability of approximately $9 million; any claims above that

amount would be Allowed only to the extent that GRE was actually required to satisfy

any of those contingent liabilities.  Thereafter, the USDA, would assert a priority claim of

$24,866,757.38.  These two claims alone represent approximately $34 million dollars.

While that is less than the stated value of the Debtor's assets, of the stated $18 million in

accounts receivable, at least 50% do not reflect accounts making current payments and

there are serious questions about their collectability.  As a result, a more accurate

statement of the value of the existing assets is approximately $33 million; the liquidation

value thereof would likely be substantially less than that figure.  The probable result is

that only the secured creditor, GRE and, to an extent, the United States would receive any

payment on their claims.  Therefore, use of revenues generated from the Debtor's

continued operations is expected to provide a greater payment to creditors over time than

if the Debtor were liquidated.

Approval of this Disclosure Statement by the Bankruptcy Court does not

constitute a finding by the Bankruptcy Court that the Debtor's opinion of the value of its

assets is accurate. Creditors are not precluded from raising conflicting evidence regarding the value of the Debtor's assets.

## V.  PLAN OF REORGANIZATION

The following is a summary of the Plan. This summary should not be relied on for voting purposes. Creditors are urged to read the entire Plan and to consult with their legal counsel to fully understand the Plan. Prior to the filing of the Plan and Disclosure Statement, the Debtor established a Plan Funding Account at M&T and deposited therein $5.5 million on February 4, 2014 and an additional $500,000 was deposited therein on February 14, 2014. An additional $500,000 will be deposited in the Plan Funding Account on each succeeding 15th day of each month (or the first business day after the 15th) beginning in March, 2014 until the Plan is confirmed. Funds contained in the Plan Funding Account will be used to pay $3,000,000 to the USDA on the USDA Priority Claim. The remaining money in the Plan Funding Account shall be transferred to the Creditor Escrow Account established under the terms of the Plan to be administered by a Creditor Escrow Agent on the Effective Date. The Effective Date of the Plan will be the date upon which the Confirmation Order has become a Final Order and upon which all of the conditions precedent to the Plan have been fully satisfied or effectively waived. The Debtor estimates that assuming there is no stay of or appeal from the Confirmation Order, the Effective Date will be within not more than fourteen (14) days of the Confirmation Date. The Plan designates the various Classes of creditors as "Impaired" or "Unimpaired" Claims. The treatment provided for Allowed Claims under the Plan is in full settlement, satisfaction and discharge of all such claims.

A.    **Classification and Treatment of Classified Claims.**

For purposes of the Plan, Allowed Claims will be placed in the following Classes and will receive the following treatment:

(1)    **The Allowed USDA Priority Claim.**

The USDA Priority Claim in the amount of $24,866,757.38 is not subject to classification, pursuant to 11 U.S.C. 1123(a)(1).  This claim is partially secured to the extent of the USDA's allocated share of the amounts held in the Creditor Escrow Account as determined under Section 7.1 of the Plan.

Under the terms of the Plan, the Debtor will pay the USDA $3,000,000 within thirty (30) days after the Effective Date of the Plan to be applied to the USDA Priority Claim.  The balance of the USDA Priority Claim will be paid from the Creditor Escrow Account in accordance with the priorities set forth in Section 7.1 of the Plan.

(2)    <u>Class 1.</u>  **Allowed Secured Claim.  Class 1 is Impaired.**

This Class consists of the Allowed Secured Claim of GRE which had a claim on the Petition Date in the approximate amount of $9,000,000 (and any additional amount of the contingent liabilities currently asserted by GRE against the Debtor that GRE has satisfied during the term of the Plan).  GRE's claim is secured by a blanket lien on all of the assets of the Debtor.  GRE has agreed, by virtue of the forbearance and subordination agreement annexed to the Plan as Exhibit C (the "Forbearance Agreement"), to forbear from exercising its rights as a secured creditor for so long as the Debtor complies with its obligations under the Plan.  GRE has further agreed that, even in the event of a default under the Plan, it will not contest any of the payments theretofore made under the Plan and will not contend in any legal or equitable proceeding of any nature that it is entitled to recovery or payment of any of the funds then held in the

- 23 -

California Escrow Account; the Debtor's funds, to the extent of $3 million (plus accrued interest thereon) securing the Debtor's Surety Bonds; the Plan Funding Account; or the Creditor Escrow Account.  Payments by the Debtor to GRE on its Allowed Secured Claim will be permitted on a limited basis under the terms of the Forbearance Agreement entered into between GRE and the USDA and the States annexed to the Plan as Exhibit C.  This is only a general description of the Forbearance Agreement; its actual terms are controlling over any contrary provision in this Disclosure Statement or the Plan.

 (3) <u>Class 2.</u>  **Allowed Administrative Expense Claims Of California and New York.  Class 2 is impaired.**

  a. California Administrative Expense Claim.  An Allowed California Administrative Expense Claim will arise only if California obtains a favorable Final Order in the California Litigation with respect to its Administrative Expense Claim in whole or in part.  This Administrative Expense Claim is secured to the extent of $350,000, an amount which will be deposited by the Debtor in a segregated escrow account for the benefit of the State of California for the California Administrative Expense Claim (the "California Escrow") on the Effective Date pursuant to the terms of the California Escrow Agreement entered into by the Debtor, the State of California and the Escrow Agent.  A copy of the California Escrow Agreement is annexed as Exhibit E to the Creditor Escrow Agreement, which is annexed to the Plan as Exhibit A.

  Upon entry of a Final Order in the California Litigation, any amounts owed thereunder with respect to the Debtor's Postpetition sales, shall be paid over in accordance with the provisions of Section 7.1 of the Plan.  If California does not obtain a favorable Final Order in the California Litigation or prevails in an amount less

than $350,000, any unused portion of the funds in the California Escrow Account not used to satisfy that Final Order shall be paid to the Creditor Escrow Account.

   b. New York Administrative Expense Claim. An Allowed New York Administrative Expense Claim will arise only if and to the extent New York obtains a favorable Final Order in the New York Litigation with respect to its Administrative Expense Claim. This is a Disputed Administrative Claim that will become an Allowed Administrative Expense Claim if and to the extent the State of New York prevails in the New York Litigation and obtains a Final Order against the Debtor that an Administrative Expense Claim is owing by the Debtor to the State of New York. This claim, if allowed, will be paid from the Creditor Escrow Account in accordance with the priorities set forth in Section 7.1 of the Plan and described in Section E below.

   (4) **Class 3.** **Allowed Non-Priority Claims.** This Class is impaired and consists of the following:

   a. The Allowed Unsecured Non-Priority Tax Claim of the USDA in the Amount of $20,672,386.92 arising as a result of conduct by the Debtor occurring more than three years prior to the Petition Date, inclusive of interest. This is an Allowed Claim and will be paid in accordance with the priorities set forth in Sections 7.1 of the Plan and as described in Section E below.

   b. The California Unsecured Prepetition Claim, if any, arising from Prepetition sales by the Debtor, which will become an Allowed Claim upon, and to the extent of the entry of a favorable Final Order in the California Litigation and will be paid in the order of priorities set forth in Section 7.1 of the Plan and as described in Section E below.

c.      The Oklahoma Prepetition Claim, if any, arising from Prepetition sales, which will become an Allowed Claim, upon, and to the extent of the entry of a favorable Final Order in the Oklahoma Litigation.  The first $1 million of any such Claim shall be secured by the Oklahoma Reserve; the balance of any such Claim is unsecured and will be paid in the order of priorities set forth in Section 7.1 of the Plan and as described in Section E below.

d.      The New Mexico Prepetition Unsecured Claim, if any, arising from Prepetition sales by the Debtor, which will become an Allowed Claim, upon and to the extent of the entry of a favorable Final Order in the New Mexico Litigation and will be paid in the order of priorities set forth in Section 7.1 of the Plan and as described in Section E below.

e.      The New York Prepetition Unsecured Claim, if any, arising from Prepetition sales by the Debtor, which will become an Allowed Claim, upon and to the extent of the entry of a favorable Final Order in the New York Litigation and will be paid in the order of priorities set forth in Section 7.1 of the Plan and as described in Section E below.

(5)      **Class 4. (Convenience Class)  Class 4 is unimpaired.**

a.      Creditors with Claims Listed on Schedule F (i) not indicated as contingent, unliquidated or disputed or (ii) as to which the Debtor has not objected by the objection deadlines contained in Section 1 hereof or (iii) which otherwise become Allowed Claims, but excluding Claims falling within Classes 1, 2 or 3.

b.      The Idaho Prepetition Unsecured Claim, which the Debtor agrees are Allowed Claims in the amount of $256,779.27 (inclusive of interest through the

- 26 -

Petition Date) in Case No. CV-OC-0815228, and in the amount of $6,985.80 (inclusive of interest through the Petition Date) in Case No. 08-CV-396-S-EJL.

    c.    The New Mexico Prepetition Unsecured Claim, arising from Prepetition sales in the amount of $1,068.24 based on a default judgment entered on December 18, 2006, which the Debtor agrees is an Allowed Claim.

    Creditors with Allowed claims scheduled in Class 4 hold Claims that will be paid by the Debtor within thirty (30) days after the Effective Date of the Plan. Payment of the claims in Class 4 will not constitute an acknowledgment by the Debtor of any facts alleged in connection with such claims or that the Debtor is legally obligated to satisfy such claims.

    **(6)**    **Class 5. Class 5 consists of the Interest of the Debtor principal, Arthur Montour.**

**B.**    **Plan Funding: Establishing Creditor Escrow Account Administered by the Creditor Escrow Agent.**

    **(1)**    Payments to creditors in Class 4 will be paid directly by the Debtor within 30 days after the Effective Date of the Plan. Payments for Administrative Expense Claims owed to parties other than the States will also be paid directly by the Debtor in accordance with Section 2.2 of the Plan.

    **(2)**    Payment for Classes 2 and 3 when they become Allowed Claims will be paid from the Creditor Escrow Account upon the rendering of a Final Order in the New York Litigation as described in Section 7.1 of the Plan.

    **(3)**    Creditor Escrow Account. The Creditor Escrow Account will be established by the terms of the Plan to receive deposits from the Debtor and will be

administered by the Creditor Escrow Agent pursuant to the terms of the Creditor Escrow Agreement annexed to the Plan as Exhibit A.

(4)     Debtor's Plan Payments.  Any money remaining in the Plan Funding Account after making the $3 million payment to the USDA, shall be deposited in the Creditor Escrow Account on the Effective Date.  In addition, the Debtor shall deposit into the Creditor Escrow Account a Monthly Deposit (as calculated below in B(5)) on the fifteenth day of each month (or on the first business day following the fifteenth day of the month) of every month as set forth in B(5) below commencing on the first business day on or after the fifteenth of the month following the Effective Date, and on the first business day on or after the fifteenth of the month each and every month thereafter until the Debtor has paid the Creditor Escrow Agent  a sufficient amount to pay all Allowed Claims in full and to provide reserves for all Disputed Claims as provided in Article 7.1(c) of  the Plan.  Under the Plan, the Debtor is required to send Notice to NAAG and the USDA of its making the Monthly Deposit within three (3) business days after making the Monthly Deposit and to providing a copy of the deposit receipt with such notice.

(5)     Plan Payments Amount.  The Monthly Deposit shall be in the amount of $500,000 per month beginning in November, 2013.  Beginning on January 15, 2015, and on each succeeding January 15, that amount shall be increased by 1% each year over the amount being paid during the prior calendar year; i.e., on January 15, 2015, the Monthly Deposit amount shall be $505,000 and on January 15, 2016, the amount shall be $510,050, etc.

(6)     Oklahoma Reserve.  Under the Plan, the Debtor is required to create the Oklahoma Reserve within the Creditor Escrow Account.  If Oklahoma receives a Final

Order in the Oklahoma Litigation in an amount equal to or greater than the amount of funds held in the Oklahoma Reserve, Oklahoma will be entitled to payment of the Oklahoma ReserveIf the Final Order in the Oklahoma Litigation results in a determination that Oklahoma is owed less than the $1,000,000 in the Oklahoma Reserve, any amounts of that Reserve not paid over to Oklahoma will remain in the Creditor Escrow Account and will be available for payments to other parties under Section 7.1 of the Plan.

(7)     California Escrow Account.  If the Final Order in the California Litigation results in a determination that California is owed less for its Administrative Expense Claim than the $350,000 being held in the California Escrow, any remaining balance in the California Escrow, following the determination made under Section 9.5 of the Plan, shall be paid into to the Creditor Escrow Account.

(8)     Amounts Released in Connection with Surety Accounts Held to Secure Federal Excise Tax Payments.  At such time, if any, as the Debtor is no longer subject to the requirement to maintain some or all of its Surety Bonds, the Debtor shall move immediately to take all necessary steps to terminate those Surety Bonds, including seeking review and liquidation of all pending entries by the Customs Service.  After that process is completed, the amount of any collateral of the Debtor securing any such Surety Bonds (subject to any reduction needed to pay for any federal excise taxes owed at that time, but including any interest earned on such collateral while being held to secure the Surety Bonds) that is no longer required to be held will be added to the Creditor Escrow Account, provided however, that the amount of the current or replacement Surety Bonds to which this transfer of collateral requirement applies (and which are subject to the

Forbearance Agreement) shall not exceed the $3 million of such Surety Bonds currently maintained by the Debtor, and further provided that should the Debtor replace any Surety Bonds secured by its funds with Surety Bonds secured by GRE during the term of the Plan, the collateral supporting any such replaced Surety Bonds (and the interest earnings thereon) shall be immediately added to the Creditor Escrow Account upon its release. The United States shall not assert any right to have the amount of any such collateral applied to any amounts owed on the USDA Prepetition Claim, except as provided in Section 7.1 of the Plan. Nothing in this paragraph shall be construed as a release by the United States of any claim against any surety or non-debtor third party. As provided in the Forbearance Agreement, nothing in the section shall require transfer of any collateral provided by GRE to obtain any Surety Bonds for the Debtor to the Creditor Escrow Account.

(9)   Under the terms of the Plan, the Debtor agrees that to the extent it obtains any recoveries on certain accounts receivable identified on Exhibit E annexed to the Plan as a "Stale Accounts Receivable", it will add two thirds of any such amounts (net of expenses, fees and disbursements incurred in the recovery of any such Stale Accounts Receivable) to the Creditor Escrow Account.

C.     **Other Plan Provisions.**

(1)    **Interest Rate on Allowed Claim of the USDA.** The federal judgment rate of interest as of the Effective Date. Interest will start to accrue on the Allowed USDA Claim on the Effective Date.

(2) **Interest Rate on the States' Claims.** Upon the entry of a Final Order, interest will begin to run on the later of the date the Claim becomes an Allowed Claim or the Effective Date and shall be compounded quarterly. Interest shall accrue

(3) a) on the Oklahoma Prepetition Claim

i. at the rate of 3% if the Final Order judgment amount is $10,000,000 or less;

ii. at the rate of 2% if the Final Order judgment amount is between $10,000,000 and $20,000,000; and

iii. at the rate of 1% if the Final Order judgment amount exceeds $20,000,000.

b) on the claims of all other States at the rate of 3%.

(4) **Officer's Salary; Non-Ordinary Course Expenses.** Arthur Montour's salary shall not exceed $20,000 per month. During the term of the Plan, no additional or different benefits may be paid to Mr. Montour than those currently being paid. No dividends, distributions, loans, or other payments may be made to Mr. Montour during the Plan term, apart from his salary as determined hereunder and any allowed benefit. Further, the Debtor shall only incur expenses (including but not limited to capital expenses) that are part of the ordinary, necessary, and reasonable costs of operating its current business of importing and distributing tobacco products.

(5) **Annual Travel and Entertainment Expense Limitation.** The Debtor shall spend no more than 36,000 annually on Travel and Entertainment expenses as those expenses have been accounted and categorized in the Debtor's Monthly Operating Reports filed with the Bankruptcy Court, so long as there are any Allowed Claims or Administrative Expense Claims not paid in full under the terms of the Plan.

(6)     **Forbearance and Subordination of GRE.**  Pursuant to the Forbearance

Agreement entered into by GRE and the Plan Proponents, GRE has agreed to forbear

from enforcing its security interest or requiring the Debtor to make any payment on its

Secured Claim (except in limited circumstances) and shall subordinate its security

interest to the Allowed Claimants for so long as there is any amount outstanding on any

Allowed Claim under the Plan.  The Forbearance Agreement is annexed to the Plan as

Exhibit C.

(7)     **Taxes.**  The Debtor shall be required to stay current on the payment of all

its taxes, including its obligations under the Fair and Equitable Tobacco Reform Act of

2004 and the Tobacco Transition Payment Program ("Tax").

(8)     **Events of Default: Payment Default.**  The following shall constitute

events of default under the Plan:

   a.     The Debtor fails to:

   i.     make any Monthly Deposit to the Creditor Escrow Account

   ii.    give Notice of the Monthly Deposit to NAAG and USDA
          as required under the Plan

   iii.   make current Tax payments required under this Plan

   iv.    provide a Quarterly Financial Report pursuant to the
          requirements of paragraph 9.10 of the Plan

within ten (10) days of when such Monthly Deposit, Notice, Tax Payment or Quarterly

Financial Report is due, and such default is not cured within ten (10) business days of the

Debtor's and counsel's receipt of Notice sent by certified mail, return receipt requested

from any Plan Proponent or their respective counsel asserting that there has been such a

default (with such uncured defaults being referred to herein as a "Payment Default"); or

b.      The Debtor fails to make or submit a Monthly Deposit, Tax

Payment, or Quarterly Financial Report or give Notice thereof within ten (10) days of

when due more than three times in any twelve (12) month period (a "Recurring Default"),

whether or not such failure is cured within the time period set our in subparagraph (a).

c.      The Debtor provides any materially false information regarding the

Debtor's operations during the case or after confirmation (whether in discovery or in the

Monthly or Quarterly Operating Reports or otherwise) (a "False Statement Default").

With respect to determining whether a False Statement Default has occurred, either the

States or the United States may give Notice and evidence of the provision of any

materially false information.  Within ten days of either the States or the United States

giving notice of an asserted False Statement Default, the Debtor may make a motion

requesting that the Court issue an order finding either that (i) no materially false

information has been provided or (ii) that the materially false information was not

provided with knowledge of its falseness or with a conscious disregard for the accuracy

of the information shown to be materially false.  Unless the Debtor makes a timely

motion and the Court issues an order finding either that (i) no materially false information

has occurred or (ii) that the materially false information was not provided with

knowledge of its falseness or with a conscious disregard for the accuracy of the

information shown to be materially false, a False Statement Default shall be deemed to

have occurred.

d.      Upon the occurrence of any of Payment Defaults, Recurring

Defaults or False Statement Defaults, the Plan Proponents shall automatically have access

to the remedies under Paragraph 9.16 of the Plan.

- 33 -

(9)     **Events of Default: Other Defaults.**  The occurrence of the following

shall constitute an "Other Default" under the Plan:

a.     The payment of funds to Arthur Montour not authorized or

contemplated by the Plan;

b.     The expenditure of funds by the Debtor that are not authorized or

contemplated by Section 9.8(b) of the Plan;

c.     The payment of funds to GRE on its Secured Claim in violation of

the terms of the Plan and/or the Forbearance Agreement; or

d.     The payment of funds in excess of $36,000 annually (measured

from the Effective Date) on Travel and Entertainment expenses not authorized by the

Plan.

e.     The failure to comply with the obligations set out herein with

respect to the Oklahoma Reserve and the California Escrow Account.

f.     Any other failure of the Debtor to comply with the Confirmation

Order or subsequent order of the Bankruptcy Court.

(10)     **Resolution of Other Defaults.**

a.     Upon the occurrence of an Other Default, the States and the United

States, either individually or jointly, shall give Notice to the Debtor of the Other Default.

After receiving Notice of an Other Default, the Debtor must cure the Other Default in

thirty (30) days after receiving the notice unless it gives Notice that it disputes that an

Other Default has occurred.  If the Debtor fails to cure the Other Default or to give Notice

that it disputes that the Other Default has occurred within thirty (30) days, the States or

the United States shall have access to the remedies described in paragraph 9.16 of the

Plan and set forth in paragraph C(12) below.

- 34 -

b.      If the Debtor disputes that an Other Default has occurred, the Debtor must give Notice to the States or the United States that it disputes that an Other Default has occurred and an explanation of the basis of its dispute within 10 days of receiving Notice of the Other Default.  Upon receiving the Debtor's notice, the States or the United States may, within ten (10) days of receiving Notice of the Debtor's dispute and upon Notice to the other Plan Proponents and the United States, move to reopen the Bankruptcy Case and request that the Debtor be ordered to cure the Other Default.  If the Court finds that an Other Default has occurred and the Debtor fails to cure the Other Default within thirty (30) days of the Court's ruling, the States or the United States shall have access to the remedies described in paragraph 9.16 of the Plan and as set forth in paragraph C(12) below.

(11)   **Waiver of Defaults.**  The States or the United States  may, in their sole discretion, and with the unanimous consent of any State or the United States that have not been paid in full at that time, choose to waive any default or to request the Bankruptcy Court to use its powers under Plan provision 9.17(e) (a Waiver"), rather than exercise their remedies under Plan provision paragraph 9.16, by giving Notice to the Debtor of the decision to provide such a Waiver.  The decision to provide a Waiver for any specific occurrence of Default shall not be a waiver with respect to any future event of Default.

(12)   **Remedies Available After Uncured Default.**  If a Payment Default occurs, or an Other Default occurs and is not cured according to the provisions of paragraph 9.14 of the Plan or waived under paragraph 9.15 of the Plan, the States or the United States and other parties in interest shall be permitted to enforce all rights and exercise all remedies available under state or other applicable law, including the

- 35 -

Bankruptcy Code, against the Debtor and its property subject only to the provisions of the

Creditor Escrow Agreement and this Plan with respect to the allocation of any funds held

in the Creditor Escrow Account or to be added thereto, and the Forbearance Agreement.

Such rights include the right to complete any litigation, to obtain injunctive relief, to

pursue immediate collection of any and all amounts then owing or later determined to be

owing by the Debtor, whether for Claims or Administrative Expense Claims, or to

request conversion of the case to Chapter 7.  As more fully described in the Forbearance

Agreement, GRE may exercise its rights as a secured creditor if such an uncured default

occurs, but may not contest any payments made heretofore under the Plan or the use of

funds in the Creditor Escrow Account.

    **(13)**   **Retention of Jurisdiction.** Under the Plan, the Bankruptcy Court will

retain such jurisdiction of the present chapter 11 proceedings as is legally permissible

pursuant to all applicable provisions of the Bankruptcy Code, Rules, and other applicable

law for all purposes, including, without limitation, the following:

        a.      to hear and adjudicate objections to Claims and Interests and any

other issues relating to the allowance, payment and priority of Claims and Interests

except to the extent such issues are being litigated elsewhere pursuant to the provisions of

the Plan;

        b.      to hear, adjudicate and authorize payment of Administrative

Expense Claims and compensation under Section 330 of the Bankruptcy Code;

        c.      to hear and adjudicate the validity and allowance of any Claims

resulting from the rejection of an Executory Contracts or Unexpired Leases;

d.    to hear and adjudicate all controversies arising from the provisions of the Plan;

e.    to construe and take any action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

f.    to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan;

g.    to protect the property of the estate reverting in the Debtor from Claims against and interference with such property, including actions to quiet title to such property based upon the terms and provisions of the Plan;

h.    to hear and adjudicate all applications, motions, adversary proceedings, lawsuits, contested matters or any other litigated matters related to these chapter 11 proceedings, whether commenced before or after the Effective Date, except to the extent such matters are being heard in other forums pursuant to the provisions of the Plan;

i.    to modify the Plan pursuant to the Bankruptcy Code, to remedy any defect or omission in the Plan, or to reconcile any inconsistency in the Plan so as to carry out its intent and purposes;

j.    to hear and adjudicate whether a Final Order has been achieved;

k.    to hear and adjudicate whether the asserted Classification of a Claim provided for in a Final Order is accurate;

l.    to issue injunctions or to take such other actions as may be necessary or appropriate to avoid interference with the Plan or its execution or implementation by any person or party;

- 37 -

m.     to hear and adjudicate any other matter not inconsistent with the Bankruptcy Code and the Plan; and

n.     to enter a final decree closing the present chapter 11 proceedings. The Plan provides that nothing in the jurisdictional section described will be construed to grant the Bankruptcy Court jurisdiction over any action or contested matter against the United States, its agencies, or its officers arising out of or related to any laws or matters listed or otherwise described in section 1581 of Title 28 of the United States Code. The Debtor also agrees under the Plan that the exclusive forum for any such action or contested matter is the United States Court of International Trade.

**(14)  Ex Parte Motion to Reopen the Bankruptcy Case.** In the event that Bankruptcy Court involvement is required to resolve any issue addressed in this Plan, its enforcement or interpretation, by the terms of this Plan, the Plan Proponents and the United States are authorized, singly or collectively, to file an Ex Parte Motion to reopen the Bankruptcy Case.

**D.     Plan Litigation Trustee**

**(1)     Plan Litigation Trustee Under the Plan.** Under the Plan, on or before the Effective Date, the Debtor shall execute the Plan Litigation Trustee Agreement annexed to the Plan as Exhibit B with the Plan Litigation Trustee. On the Effective Date, the Debtor shall transfer to the Plan Litigation Trustee all of its rights, title and interest to pursue all Recovery Actions. The Debtor will cooperate with the Plan Litigation Trustee's investigation of the Recovery Actions, including by promptly making all requested relevant documents available at reasonable places and times, and providing the

Debtor's personnel, including but not limited to Arthur Montour, as requested by the Trustee for questions and/or depositions at mutually agreed reasonable places and times.

     **(2)**     **The Recovery Actions.** Pursuant to the Plan Litigation Trustee Agreement, the Plan Litigation Trustee will investigate and assert, if appropriate, claims to avoid Prepetition transfers to Arthur Montour pursuant to paragraph 6.5 of the Plan.

     **(3)**     **Funding the Expenses of the Plan Litigation Trust.** In accordance with the Plan Litigation Trustee Agreement attached to the Plan as Exhibit B, the expenses of the Plan Litigation Trustee shall be funded initially with a $50,000 advance from the first Monthly Deposit made after the Effective Date. Any additional costs or expenses above the initial advance shall be provided by the Plan Litigation Trustee at his own expense. The Plan Litigation Trustee shall be paid attorneys' fees on a contingent basis based upon the net amount of recovery, if any from any Recovery Actions.

     **(4)**     **Transfer of Cash Assets to Creditor Escrow Account.** Upon final resolution of the Recovery Actions, and after accounting for and paying all expenses of the Plan Litigation Trustee in pursuing any Recovery Actions. the Plan Liquidation Trustee shall deposit all Cash held by him (including any amounts from the initial $50,000 deposit not used in the litigation) in the Creditor Escrow Account.

**E.**     **Order of Priorities in Plan Payments.** Except with respect to disbursement of the Oklahoma Reserve as provided for above, there will be no Plan disbursements from the Creditor Escrow Account until there is a Final Order in the New York Litigation. After there is a Final Order in the New York Litigation, the Creditor Escrow Agent shall make an initial Distribution within twenty (20) days thereafter. Subsequent distributions shall be made on a quarterly basis.

(1)      If New York prevails in the New York Litigation (with respect to its Administrative Expense Claim) and obtains a Final Order directing payment in excess of what is then on deposit in the Creditor Escrow Account, 85% of the funds on deposit or thereafter deposited in the Creditor Escrow Account shall be paid by the Creditor Escrow Agent to New York as the holder of an Allowed Administrative Expense Claim (Class 3b) and the remaining 15% of the funds on deposit or thereafter deposited in the Creditor Escrow Account shall be paid *pro rata* to the United States for its Allowed Priority USDA Tax Claim, and to California to the extent that its holds an Allowed California Administrative Expense Claim that exceeds the amount held in the California Escrow Account (the "Excess California Administrative Expense Claim").  If California does not yet hold an Allowed California Administrative Expense Claim at such time as payments commence under this section, the entire 15% shall be paid to the United States until such date, if any, that California does hold an Allowed Administrative Expense Claim that would trigger *pro rata* payment under this section.  If New York loses the New York Litigation or wins the New York Litigation but for an amount less than the balance in the Creditor Escrow Account, or at such time as payments are made to New York and other creditors according to the formula set forth above in an amount equal to the Allowed New York Administrative Expense Claim as determined in the New York Litigation, all funds then remaining on deposit in the Creditor Escrow Account and all subsequent Monthly Deposits into the Creditor Escrow Account shall be paid *pro rata* to the USDA for the USDA Priority Claim and to California for the California Excess Administrative Expense Claim until those claims are paid in full.

(2)     Upon completion of payments to the USDA Priority Claim and the California Excess Administrative Expense Claim, all subsequent Monthly Deposits shall be distributed Pro-Rata amongst the States with Allowed Prepetition Claims and the USDA with respect to its Allowed Non-Priority Claim until all such claims are paid in full.  Any State that does not have an Allowed Claim at the time when Pro-Rata distributions commence will not receive payments from the Creditor Escrow Account until such time as it holds an Allowed Claim, at which time its Allowed Claim will be added to the balances remaining for payments to the other States and the USDA and will be entitled to share Pro-Rata in the distributions from the Creditor Escrow Account from that point forward.  If any State still has a pending Disputed Claim at the time all other amounts are paid hereunder, that State may request that the Court order that a reserve be established in the maximum amount of its Disputed Claim and that Monthly Deposits be required to be continued to the Creditor Escrow Account until that reserve is fully funded.  Such Claim will be paid from the Creditor Escrow Account when and to the extent that a Final Order is entered providing for payment of such claim, and the Final Order is reviewed and the Claim is allowed for payment under Paragraph 9.5.  No reserve need be established for a claim unless there is filed and pending litigation at the time the reserve is requested.

(3)     If, and only if, all Allowed Claims are paid in full and all Disputed Claims for which reserves have been determined are fully provided for with funds retained in the Creditor Escrow Account, then all funds remaining in the Creditor Escrow Account, other than the funds reserved for payment of Disputed Claims, shall be returned to the Debtor and no further Monthly Deposits will be required.  If a reserve has been provided for one

or more of the Disputed Claims and Final Orders are obtained disallowing the Disputed Claim(s) in whole or in part, the balance of the reserve not needed to satisfy those Disputed Claims shall then be returned to the Debtor and the Creditor Escrow Account shall be terminated.

THE FOREGOING IS ONLY A SUMMARY OF THE ESSENTIAL PROVISIONS OF THE PLAN.  CREDITORS ARE ADVISED TO REVIEW THE PLAN CAREFULLY.

## VI.   MANAGEMENT OF THE REORGANIZED ENTITY

Following confirmation of the Plan, the Debtor will continue to be managed by the current management team, consisting of Arthur A. Montour and Earl Hill.  Arthur Montour, the 100% stockholder of the Debtor, will continue to receive his monthly salary of $20,000.  The other employees shall continue to be paid their current rate of salary and benefits, with annual reviews and increases in pay and benefits for such employees to be determined and within the discretion of management.

## VII.   TAX CONSEQUENCES OF THE PLAN

The Plan may have tax consequences to the Debtor and to the holders of Claims.

NO OPINION OF COUNSEL HAS BEEN SOUGHT OR OBTAINED WITH RESPECT TO ANY TAX CONSEQUENCES OF THE PLAN AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT. NO RULINGS OR DETERMINATIONS OF THE INTERNAL REVENUE SERVICE ("IRS") OR ANY OTHER TAX AUTHORITIES HAVE BEEN OBTAINED OR SOUGHT WITH RESPECT TO THE PLAN, AND NOTHING HEREIN IS BINDING UPON THE IRS OR OTHER TAX AUTHORITIES.

No representations are made regarding the particular tax consequences of the Plan to any holder of a Claim. The tax consequences of the Plan to holders of Claims are in many cases uncertain and may vary depending on the holder's individual circumstances. Each holder of a Claim is strongly urged to consult its own tax advisor regarding the federal, state, local and foreign tax consequences of the transactions described herein and in the Plan.

## VIII.   FINANCIAL STATEMENTS

**A.**     **Forecasted Statement of Net Income.**

The Debtor continues to operate its business of importing tobacco products from Canada.  The Debtor believes that income from the operation of the business will be sufficient to fund the Plan. Attached as Exhibit A is a projected statement of net income (loss) for the next ten (10) years. This forecast is the Debtor's best estimate of its future income. As with all projections and forecasts, actual figures may differ significantly from the estimated figures in the projected statements.  Moreover, although the States are Plan Proponents, they have had no role in preparing the projections annexed hereto as Exhibit A and they express no opinion about the validity of the projections or the feasibility of the Plan payments described herein.

**B.**     **Feasibility of the Plan**

The projections contained within Exhibit A demonstrate the feasibility of the Debtor's ability to make the Monthly Deposit and stay current with its other obligations and to make the proposed payments to all Allowed Claimants over time.  If one or more of the contingent claims of the States are defeated, the duration of the Plan will be shortened.  Conversely, the Plan's duration will be indefinite if all of the contingent claims become Allowed Claims or Allowed Administrative Expense Claims.  The Plan

proponents recognize that the Plan is a vehicle to receive payments if their respective lawsuits are successful.

## IX.   BEST INTERESTS OF CREDITORS

Notwithstanding acceptance of the Plan by creditors, the Bankruptcy Court must independently determine that this Plan is in the best interest of all classes of claims. The "best interest" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired class of claims a recovery which has a present value that is at least equal to the present value of the distribution which each class member would receive from the Debtor's estate if the estate were liquidated under Chapter 7 on the Effective Date. The Plan Proponents believe that the proposed consensual Plan is in the best interest of all creditors and passes this test.

Under Chapter 7, a secured creditor whose claim is fully secured would be entitled to payment, including interest, from the proceeds of the sale of its collateral. Unless its Claim is nonrecourse, a secured creditor whose collateral is insufficient to pay its Claim in full would be entitled to assert an unsecured claim for its deficiency. Claims entitled to priority under the Bankruptcy Code would be paid in full before any distribution to general unsecured creditors. Only the funds, if any, remaining after payment of secured claims and priority claims would be distributed pro rata to general unsecured creditors.  In this case, as set forth in Section IV of this Disclosure Statement, the total value of the Debtor's assets, even at fair market value, is enough only to pay the secured creditor, GRE, its $9,000,000 Allowed Secured Claim and the USDA Priority Claim, which calculation does not even include the substantial Chapter 11 administration expenses anticipated.  Unsecured creditors in this case would certainly receive nothing.

Moreover, the Plan Proponents believe that liquidation under Chapter 7 would result in substantial diminution of the value of the Debtor's estate because of additional administrative expenses arising from the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee; additional expenses and claims, some of which would be entitled to priority, that would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations; and failure to realize the far greater going concern value of the Debtor's assets.

Creditors will receive at least as much under this Plan as they would if the case were to be converted to a case under Chapter 7 and the Debtor's assets were liquidated by a Chapter 7 Trustee. In particular, the unsecured creditors will receive more under the Plan than they would if the case were converted to Chapter 7.  As stated above, in a Chapter 7 liquidation, a majority of the proceeds of the sale of the Debtor's assets would be consumed by liens, administrative expense claims, and the costs of sale, such that unsecured creditors would receive nothing.

## X.    CONCLUSION

The Debtor AND the States submit that the Plan complies in all respects with

Chapter 11 of the Bankruptcy Code and recommend that creditors who are entitled to

vote on the Plan, vote to accept the Plan.

Dated:        Buffalo, New York
              June 13, 2014

                              Respectfully submitted,

                              NATIVE WHOLESALE SUPPLY
                              COMPANY


                              By:_____s/ Arthur Montour, Jr._____
                                          Arthur Montour, Jr.
                              Title:  President

                              GROSS, SHUMAN, BRIZDLE &
                              GILFILLAN, P.C.


                              By:_____s/ Janet G. Burhyte_____
                                          Robert J. Feldman, Esq.
                                          Janet G. Burhyte, Esq.
                              *Attorneys for Debtor*
                              465 Main Street, Suite 600
                              Buffalo, New York   14203
                              Tel:    (716) 854-4300
                              Fax:    (716) 854-2787


                              NATIONAL ASSOCIATION OF
                              ATTORNEYS GENERAL


                              By:___s/ Karen Cordry_____
                                          Karen Cordry, Esq.
                              *Attorneys for the States*
                              2030 M Street, NW
                              Washington, DC 20036
                              Tel:  (202) 326-6251

Doc #410416.16

- 46 -

# EXHIBIT A

<u>NATIVE WHOLESALE SUPPLY COMPANY</u>
<u>(DEBTOR IN POSSESSION)</u>

<u>GOWANDA, NEW YORK</u>

<u>COMPILED PROJECTED FINANCIAL STATEMENTS</u>

<u>OTHER FINANCIAL INFORMATION</u>

<u>AND</u>

<u>INDEPENDENT ACCOUNTANT'S</u>
<u>COMPILATION REPORT</u>

<u>FOR THE YEARS ENDING DECEMBER 31, 2014 – 2024</u>
<u>(UNAUDITED)</u>

DRAFT FOR REVIEW AND DISCUSSION PURPOSES ONLY

MMB DRAFT #4
02/11/2014

# CONTENTS

COMPILED PROJECTED FINANCIAL STATEMENTS                                    PAGE

    Independent Accountant's Compilation Report on Projected Financial Statements        3

    Projected Balance Sheets                                                             4

    Projected Statements of Income                                                       6

    Projected Statements of Cash Flows                                                   7

    Summary of Significant Assumptions and Accounting Policies                           8

OTHER FINANCIAL INFORMATION

    Projected Costs of Sales                                                            12

    Projected Statements of Operating Expenses                                          13

DRAFT FOR REVIEW AND DISCUSSION PURPOSES ONLY

MMB DRAFT #4
02/11/2014

INDEPENDENT ACCOUNTANT'S COMPILATION REPORT
ON PROJECTED FINANCIAL STATEMENTS
(UNAUDITED)

Native Wholesale Supply Company (Debtor in Possession)
Gowanda, New York

We have compiled the accompanying projected balance sheets for Native Wholesale Supply Company (Debtor in Possession) for the years ending December 31, 2014 through December 31, 2024, the projected statements of income and cash flows for the years then ending and the other compiled financial information, which is presented only for supplementary analysis purposes, in accordance with attestation standards established by the American Institute of Certified Public Accountants. The accompanying projected financial statements have been prepared to assist Native Wholesale Supply Company (Debtor in Possession) in developing a bankruptcy reorganization plan and to assist the company in negotiating a repayment plan of its chief liability (TTPP Assessment) with the USDA.

A compilation is limited to presenting in the form of projected financial information that is the representation of management and does not include evaluation of the support for the assumptions underlying the projection. We have not examined the projections and, accordingly, do not express an opinion or any other form of assurance on the accompanying statements or assumptions. Furthermore, even if the hypothetical assumptions described in Note A materialize, there will usually be differences between the projections and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

The accompanying projection and this report are intended solely for the information and use of Native Wholesale Supply Company (Debtor in Possession) and the USDA, and are not intended to be and should not be used by anyone other than these specified parties.

Rochester, New York
February 5, 2014

- 3 -

MMB DRAFT #4
02/11/2014

**NATIVE WHOLESALE SUPPLY COMPANY**
**(DEBTOR IN POSSESSION)**

**PROJECTED BALANCE SHEETS**

**FOR THE YEARS ENDING DECEMBER 31, 2014 THROUGH 2024 (PROJECTED)**

**(SEE SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES AND ACCOUNTANT'S COMPILATION REPORT)**

**(UNAUDITED)**

| | (Projected) December 31, 2014 | (Projected) December 31, 2015 | (Projected) December 31, 2016 | (Projected) December 31, 2017 | (Projected) December 31, 2018 | (Projected) December 31, 2019 | (Projected) December 31, 2020 | (Projected) December 31, 2021 | (Projected) December 31, 2022 | (Projected) December 31, 2023 | (Projected) December 31, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | ASSETS | | | | | | |
| **CURRENT ASSETS** | | | | | | | | | | | |
| Cash and cash equivalents | $ 6,074,000 | $ 10,962,000 | $ 12,708,000 | $ 14,248,000 | $ 16,192,000 | $ 18,520,000 | $ 21,845,000 | 31,416,000 | $ 41,486,000 | $ 52,070,000 | $ 63,189,000 |
| Accounts receivable | 19,133,000 | 19,133,000 | 19,722,000 | 20,327,000 | 20,948,000 | 21,586,000 | 22,241,000 | 22,913,000 | 23,603,000 | 24,312,000 | 25,040,000 |
| Inventories | 3,000,000 | 3,000,000 | 3,092,000 | 3,187,000 | 3,284,000 | 3,384,000 | 3,487,000 | 3,592,000 | 3,700,000 | 3,811,000 | 3,925,000 |
| TOTAL CURRENT ASSETS | 28,207,000 | 33,095,000 | 35,522,000 | 37,762,000 | 40,424,000 | 43,490,000 | 47,573,000 | 57,921,000 | 68,789,000 | 80,193,000 | 92,154,000 |
| **PROPERTY AND EQUIPMENT** | | | | | | | | | | | |
| Warehouse improvements | 97,000 | 97,000 | 97,000 | 97,000 | 97,000 | 97,000 | 97,000 | 97,000 | 97,000 | 97,000 | 97,000 |
| Office furniture and equipment | 144,000 | 154,000 | 164,000 | 174,000 | 184,000 | 194,000 | 204,000 | 214,000 | 224,000 | 234,000 | 244,000 |
| Transportation equipment | 1,321,000 | 1,321,000 | 1,321,000 | 1,321,000 | 1,321,000 | 1,321,000 | 1,321,000 | 1,321,000 | 1,321,000 | 1,321,000 | 1,321,000 |
| | 1,562,000 | 1,572,000 | 1,582,000 | 1,592,000 | 1,602,000 | 1,612,000 | 1,622,000 | 1,632,000 | 1,642,000 | 1,652,000 | 1,662,000 |
| Less allowances for depreciation | (1,326,000) | (1,442,000) | (1,504,000) | (1,523,000) | (1,536,000) | (1,549,000) | (1,562,000) | (1,575,000) | (1,588,000) | (1,601,000) | (1,614,000) |
| Net Property & Equipment | 236,000 | 130,000 | 78,000 | 69,000 | 66,000 | 63,000 | 60,000 | 57,000 | 54,000 | 51,000 | 48,000 |
| **OTHER ASSETS** | | | | | | | | | | | |
| Surety deposit | 1,100,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,100,000 | 1,100,000 |
| Employee loan receivable | 91,000 | 89,000 | 87,000 | 84,000 | 82,000 | 79,000 | 77,000 | 74,000 | 71,000 | 68,000 | 65,000 |
| | 1,191,000 | 1,189,000 | 1,187,000 | 1,184,000 | 1,182,000 | 1,179,000 | 1,177,000 | 1,174,000 | 1,171,000 | 1,168,000 | 1,165,000 |
| TOTAL ASSETS | $ 29,634,000 | $ 34,414,000 | $ 36,787,000 | $ 39,015,000 | $ 41,672,000 | $ 44,732,000 | $ 48,810,000 | $ 59,152,000 | $ 70,014,000 | $ 81,412,000 | $ 93,367,000 |

See independent accountant's compilation report and accompanying notes
which are an integral part of the projected financial statements.

-4-

MMB DRAFT #4
02/11/2014

NATIVE WHOLESALE SUPPLY COMPANY
(DEBTOR IN POSSESSION)

PROJECTED BALANCE SHEETS, Cont'd

FOR THE YEARS ENDING DECEMBER 31, 2014 THROUGH 2024 (PROJECTED)

(SEE SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES AND ACCOUNTANT'S COMPILATION REPORT)

(UNAUDITED)

| | (Projected) December 31, 2014 | (Projected) December 31, 2015 | (Projected) December 31, 2016 | (Projected) December 31, 2017 | (Projected) December 31, 2018 | (Projected) December 31, 2019 | (Projected) December 31, 2020 | (Projected) December 31, 2021 | (Projected) December 31, 2022 | (Projected) December 31, 2023 | (Projected) December 31, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **LIABILITIES AND STOCKHOLDER'S (DEFICIT) EQUITY** | | | | | | | | | | | |
| **LIABILITIES NOT SUBJECT TO COMPROMISE** | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | |
| Accounts payable | $ 3,000,000 | $ 3,000,000 | $ 3,092,000 | $ 3,187,000 | $ 3,284,000 | $ 3,384,000 | $ 3,487,000 | $ 3,592,000 | 3,700,000 | $ 3,811,000 | $ 3,925,000 |
| Accrued excise taxes | 3,000,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 |
| TOTAL CURRENT LIABILITIES | 6,000,000 | 5,500,000 | 5,592,000 | 5,687,000 | 5,784,000 | 5,884,000 | 5,987,000 | 6,092,000 | 6,200,000 | 6,311,000 | 6,425,000 |
| **LIABILITIES SUBJECT TO COMPROMISE** | | | | | | | | | | | |
| Accrued TTPP assessment | 36,544,000 | 30,521,000 | 24,432,000 | 18,275,000 | 12,052,000 | 5,762,000 | - | - | - | - | - |
| TOTAL LIABILITIES | 42,544,000 | 36,021,000 | 30,024,000 | 23,962,000 | 17,836,000 | 11,646,000 | 5,987,000 | 6,092,000 | 6,200,000 | 6,311,000 | 6,425,000 |
| **STOCKHOLDER'S (DEFICIT) EQUITY** | | | | | | | | | | | |
| Common stock, no par value: | | | | | | | | | | | |
| Authorized - 20 shares | | | | | | | | | | | |
| Issued and outstanding - 10 shares | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Additional paid-in capital | 44,900 | 44,900 | 44,900 | 44,900 | 44,900 | 44,900 | 44,900 | 44,900 | 44,900 | 44,900 | 44,900 |
| (Accumulated deficit) retained earnings | $ (12,955,000) | $ (1,652,000) | $ 6,718,000 | $ 15,008,000 | $ 23,791,000 | $ 33,041,000 | $ 42,778,000 | $ 53,015,000 | 63,769,000 | $ 75,056,000 | $ 86,897,000 |
| | $ (12,910,000) | $ (1,607,000) | $ 6,763,000 | $ 15,053,000 | $ 23,836,000 | $ 33,086,000 | $ 42,823,000 | $ 53,060,000 | 63,814,000 | $ 75,101,000 | $ 86,942,000 |
| **TOTAL LIABILITIES AND STOCKHOLDER'S (DEFICIT) EQUITY** | $ 29,634,000 | $ 34,414,000 | $ 36,787,000 | $ 39,015,000 | $ 41,672,000 | $ 44,732,000 | $ 48,810,000 | $ 59,152,000 | 70,014,000 | $ 81,412,000 | $ 93,367,000 |

See independent accountant's compilation report and accompanying notes
which are an integral part of the projected financial statements.

- 5 -

MMB DRAFT #4
02/11/2014

**NATIVE WHOLESALE SUPPLY COMPANY**
**(DEBTOR IN POSSESSION)**

**PROJECTED STATEMENTS OF INCOME**

**FOR THE YEARS ENDING DECEMBER 31, 2014 THROUGH 2024 (PROJECTED)**

**(SEE SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES AND ACCOUNTANT'S COMPILATION REPORT)**

**(UNAUDITED)**

| | (Projected) December 31, 2014 | (Projected) December 31, 2015 | (Projected) December 31, 2016 | (Projected) December 31, 2017 | (Projected) December 31, 2018 | (Projected) December 31, 2019 | (Projected) December 31, 2020 | (Projected) December 31, 2021 | (Projected) December 31, 2022 | (Projected) December 31, 2023 | (Projected) December 31, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross revenues | $ 196,360,000 | $ 196,360,000 | $ 202,401,000 | $ 208,605,000 | $ 214,976,000 | $ 221,519,000 | $ 228,238,000 | $ 235,136,000 | $ 242,220,000 | $ 249,492,000 | $ 256,959,000 |
| Cost of sales | 175,211,000 | 171,687,000 | 176,934,000 | 182,320,000 | 187,848,000 | 193,525,000 | 199,348,000 | 205,325,000 | 211,458,000 | 217,754,000 | 224,213,000 |
| GROSS PROFIT | 21,149,000 | 24,673,000 | 25,467,000 | 26,285,000 | 27,128,000 | 27,994,000 | 28,890,000 | 29,811,000 | 30,762,000 | 31,738,000 | 32,746,000 |
| Marketing Expenses | 11,370,000 | 11,370,000 | 11,720,000 | 11,842,000 | 11,965,000 | 12,087,000 | 12,209,000 | 12,332,000 | 12,454,000 | 12,577,000 | 12,699,000 |
| Operating Expenses | 1,863,000 | 1,828,000 | 1,748,000 | 1,680,000 | 1,649,000 | 1,681,000 | 1,713,000 | 1,745,000 | 1,778,000 | 1,811,000 | 1,845,000 |
| INCOME FROM OPERATIONS BEFORE OTHER INCOME (EXPENSE) AND CORPORATE TAXES | 7,916,000 | 11,475,000 | 11,999,000 | 12,763,000 | 13,514,000 | 14,226,000 | 14,968,000 | 15,734,000 | 16,530,000 | 17,350,000 | 18,202,000 |
| Other Income (Expenses): | | | | | | | | | | | |
| Interest Income | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Interest Expense | (44,000) | (37,000) | (31,000) | (24,000) | (17,000) | (10,000) | (3,000) | - | - | - | - |
| | (29,000) | (22,000) | (16,000) | (9,000) | (2,000) | 5,000 | 12,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| INCOME BEFORE CORPORATE TAX EXPENSE | 7,887,000 | 11,453,000 | 11,983,000 | 12,754,000 | 13,512,000 | 14,231,000 | 14,980,000 | 15,749,000 | 16,545,000 | 17,365,000 | 18,217,000 |
| Corporate Tax Expense | 150,000 | 150,000 | 3,613,000 | 4,464,000 | 4,729,000 | 4,981,000 | 5,243,000 | 5,512,000 | 5,791,000 | 6,078,000 | 6,376,000 |
| NET INCOME | $ 7,737,000 | $ 11,303,000 | $ 8,370,000 | $ 8,290,000 | $ 8,783,000 | $ 9,250,000 | $ 9,737,000 | $ 10,237,000 | $ 10,754,000 | $ 11,287,000 | $ 11,841,000 |
| Projected Price Per Carton | $ 17.27 | $ 17.27 | $ 17.62 | $ 17.97 | $ 18.33 | $ 18.69 | $ 19.07 | $ 19.45 | $ 19.84 | $ 20.23 | $ 20.64 |
| Projected Cartons Sold per Year | 11,370,000 | 11,370,000 | 11,490,000 | 11,610,000 | 11,730,000 | 11,850,000 | 11,970,000 | 12,090,000 | 12,210,000 | 12,330,000 | 12,450,000 |

See independent accountant's compilation report and accompanying notes
which are an integral part of the projected financial statements.

- 6 -

MMB DRAFT #4
02/11/2014

**NATIVE WHOLESALE SUPPLY COMPANY**
**(DEBTOR IN POSSESSION)**

**PROJECTED STATEMENTS OF CASH FLOWS**

**FOR THE YEARS ENDING DECEMBER 31, 2014 THROUGH 2024 (PROJECTED)**

**(SEE SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES AND ACCOUNTANT'S COMPILATION REPORT)**

**(UNAUDITED)**

| | (Projected) December 31, 2014 | (Projected) December 31, 2015 | (Projected) December 31, 2016 | (Projected) December 31, 2017 | (Projected) December 31, 2018 | (Projected) December 31, 2019 | (Projected) December 31, 2020 | (Projected) December 31, 2021 | (Projected) December 31, 2022 | (Projected) December 31, 2023 | (Projected) December 31, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOWS - OPERATING ACTIVITIES** | | | | | | | | | | | |
| Net Income | $ 7,737,000 | $ 11,303,000 | $ 8,370,000 | $ 8,290,000 | $ 8,783,000 | $ 9,250,000 | $ 9,737,000 | $ 10,237,000 | $ 10,754,000 | $ 11,287,000 | $ 11,841,000 |
| Adjustments to reconcile net income to net cash provided from operating activities: | | | | | | | | | | | |
| Depreciation | 151,000 | 116,000 | 62,000 | 19,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| Changes in certain assets and liabilities affecting operations: | | | | | | | | | | | |
| Accounts receivable | (580,000) | - | (589,000) | (605,000) | (621,000) | (638,000) | (655,000) | (672,000) | (690,000) | (709,000) | (728,000) |
| Inventories | (1,000,000) | - | (92,000) | (95,000) | (97,000) | (100,000) | (102,000) | (105,000) | (108,000) | (111,000) | (114,000) |
| Accounts payable | (1,041,000) | - | 92,000 | 95,000 | 97,000 | 100,000 | 103,000 | 105,000 | 108,000 | 111,000 | 114,000 |
| Accrued excise taxes | - | (500,000) | - | - | - | - | - | - | - | - | - |
| Accrued plan payments | (8,956,000) | (6,023,000) | (6,089,000) | (6,157,000) | (6,223,000) | (6,290,000) | (5,762,000) | - | - | - | - |
| NET CASH (USED FOR) PROVIDED FROM OPERATING ACTIVITIES | (3,609,000) | 4,896,000 | 1,754,000 | 1,547,000 | 1,952,000 | 2,335,000 | 3,333,000 | 9,578,000 | 10,077,000 | 10,591,000 | 11,126,000 |
| **CASH FLOWS - INVESTING ACTIVITIES** | | | | | | | | | | | |
| Purchases of fixed assets | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| Change in employee loan receivable, net | 3,000 | 2,000 | 2,000 | 2,000 | 2,000 | 3,000 | 2,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| NET CASH USED FOR INVESTING ACTIVITIES | (7,000) | (8,000) | (8,000) | (8,000) | (7,000) | (8,000) | (7,000) | (7,000) | (7,000) | (7,000) | (7,000) |
| **CASH FLOWS - FINANCING ACTIVITIES** | | | | | | | | | | | |
| NET CASH USED FOR FINANCING ACTIVITIES | - | - | - | - | - | - | - | - | - | - | - |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (3,616,000) | 4,888,000 | 1,746,000 | 1,540,000 | 1,944,000 | 2,328,000 | 3,325,000 | 9,571,000 | 10,070,000 | 10,584,000 | 11,119,000 |
| Cash and cash equivalents at beginning of year | 9,690,000 | 6,074,000 | 10,962,000 | 12,708,000 | 14,248,000 | 16,192,000 | 18,520,000 | 21,845,000 | 31,416,000 | 41,486,000 | 52,070,000 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 6,074,000 | $ 10,962,000 | $ 12,708,000 | $ 14,248,000 | $ 16,192,000 | $ 18,520,000 | $ 21,845,000 | $ 31,416,000 | $ 41,486,000 | $ 52,070,000 | $ 63,189,000 |

See independent accountant's compilation report and accompanying notes
which are an integral part of the projected financial statements.

- 7 -

MMB DRAFT #4
02/11/2014

NATIVE WHOLESALE SUPPLY COMPANY
(DEBTOR IN POSSESSION)

SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES

FOR THE YEARS ENDING DECEMBER 31, 2014 THROUGH DECEMBER 31, 2024

(UNAUDITED)

NOTE A – NATURE OF PRESENTATION

The accompanying projected financial statements have been prepared to assist Native Wholesale Supply Company (Debtor in Possession) (hereinafter referred to as the Company) in developing a bankruptcy reorganization plan and to assist the Company in achieving a repayment plan of its chief liability (TTPP Assessment) with the USDA.

On November 21, 2011, Native Wholesale Supply Company (Debtor in Possession) (the Debtor) filed petitions for relief under Chapter 11 of the federal bankruptcy laws in the United States Bankruptcy Court for the Western District of New York State. This generally delays payment of liabilities incurred prior to filing those petitions while the Company develops a plan of reorganization that is satisfactory to its creditors and allows it to continue as a going concern. The carrying amounts of assets and liabilities are unaffected by the proceedings, but liabilities are presented according to the status of the creditors. Under Chapter 11, certain claims against the Debtor in existence prior to the filing of the petitions for relief under the federal bankruptcy laws are stayed while the Debtor continues business operations as Debtor-in-possession. These claims are reflected in the balance sheet as "Liabilities subject to compromise." Additional claims (liabilities subject to compromise) may arise subsequent to the filing date resulting from rejection of executor contracts, including leases, from the determination by the court of allowed claims for contingencies and other disputed claims. Claims secured against the Debtor's assets (secured claims) also are stayed, although the holders of such claims have the right to move the court for relief from the stay. Secured claims are secured primarily by liens on the Debtor's inventory.

The Debtor received approval from the Bankruptcy Court to pay or otherwise honor certain of its prepetition obligations, including employee wages and product warranties.

The projections present, to the best of management's knowledge and belief, the expected operating and cash flow results of the Company for the projection periods. Accordingly, the projections reflect its judgment as of February 5, 2014, the date of these projections, of the expected conditions and its expected course of action. The assumptions disclosed herein are those that management believes are significant to the projections. There will usually be differences between the projected and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.

NOTE B – BASIS OF ACCOUNTING

The accompanying projections use the accrual method of accounting. The Company's fiscal year end is December 31. For this projection all twelve month periods will also use a December 31st fiscal year end.

- 8 -

MMB DRAFT #4
02/11/2014

NATIVE WHOLESALE SUPPLY COMPANY
(DEBTOR IN POSSESSION)

SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES, Cont'd

FOR THE YEARS ENDING DECEMBER 31, 2014 THROUGH DECEMBER 31, 2024

(UNAUDITED)

NOTE C – USDA ASSESSMENT

During the last quarter of 2004, the U.S. Department of Agriculture initiated assessments on tobacco products. This assessment is part of the TTPP program (Tobacco Transition Payment Program) and is a ten year program facilitated by the USDA, ending December 31, 2014. The Company incorporated these assessment costs into the billing prices of its products as of January 1, 2008. The accrued balance of the assessment is estimated at $45,500,000 as of the date of the projection. The Company expects to make a down payment of $3 million during 2014 and payments of approximately $6 million each year, increasing 1% annually, with interest at 0.11% starting in January 2014 through November 2020.

NOTE D – REVENUES

The Company anticipates sales of approximately 950,000 cartons per month (11,370,000 annually) of cigarettes for the years ending December 31, 2014 and 2015. Each carton has a selling price of approximately $17.27. These sales amounts will keep the Company within its import bond limitations based on gross federal excise taxes per year. The Company expects sales to increase by 10,000 cartons per month each year and the sales price per carton to increase by 2% per year, beginning January 1, 2016, and is confident that it will proportionately be able to achieve necessary increases in its bond limitations.

NOTE E – COST OF SALES

Cost of sales is projected to be made up of the following rates per carton. These rates are indexed at a rate of 2% inflation beginning with the year ending December 31, 2016.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase cost | $ 3.90 | $ 3.90 | $ 3.98 | $ 4.06 | $ 4.14 | $ 4.22 | $ 4.31 | $ 4.39 | $ 4.48 | $ 4.57 | $ 4.66 |
| Federal excise taxes | 10.07 | 10.07 | 10.27 | 10.48 | 10.69 | 10.90 | 11.12 | 11.34 | 11.57 | 11.80 | 12.03 |
| USDA assessment | 0.59 | - | - | - | - | - | - | - | - | - | - |
| Duty | 0.32 | 0.32 | 0.33 | 0.33 | 0.34 | 0.35 | 0.35 | 0.36 | 0.37 | 0.37 | 0.38 |
| FDA assessment | 0.37 | 0.65 | 0.66 | 0.67 | 0.68 | 0.69 | 0.70 | 0.71 | 0.72 | 0.73 | 0.74 |
| Delivery | 0.03 | 0.03 | 0.03 | 0.03 | 0.03 | 0.03 | 0.03 | 0.03 | 0.03 | 0.04 | 0.04 |
| Handling and storage | 0.13 | 0.13 | 0.13 | 0.14 | 0.14 | 0.14 | 0.14 | 0.15 | 0.15 | 0.15 | 0.16 |

- 9 -

MMB DRAFT #4
02/11/2014

NATIVE WHOLESALE SUPPLY COMPANY
(DEBTOR IN POSSESSION)

SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES, Cont'd

FOR THE YEARS ENDING DECEMBER 31, 2014 THROUGH DECEMBER 31, 2024

(UNAUDITED)

## NOTE F – OPERATING EXPENSES

Operating expenses have been projected based on five employees and the expenses related to their work. There are four employees that have been projected to be paid annual gross wages of approximately $70,000 and one officer with an annual gross wage of $240,000.  The payroll taxes are projected to be approximately 10% of the total gross wages per year.

The expenses related to their work have been projected based on historical use related to these five employees and are made up of automobile expense, supplies and maintenance, telephone expense, postage and UPS, and travel and entertainment costs. These expenses are projected to be approximately $27,000 per month.

Facilities expenses have also been projected based on the costs to maintain the facility the business operates within.  These expenses include insurance, utilities, and waste removal and are projected to total approximately $4,600 per month.

Bank and import bond charges are projected to be approximately $360,000 annually. The bond allows the Company to import the product into commercial free trade zones located in the United States and then pay the Federal Excise taxes and duty once the cartons are shipped to its customers. Depreciation expense is projected based on the total property and equipment the Company owns and is currently depreciating at December 31, 2014.

The professional fees are projected to be approximately $400,000 annually and include legal, accounting and payroll processing fees necessary to operate the Company.  Professional fees are anticipated to decline following the completion of the bankruptcy and initial post-bankruptcy periods.

Marketing activities will be fully subcontracted to a separate company.  These costs are estimated to be $1 per carton, increasing 2% annually beginning with the year ending December 31, 2016.

All operating expenses have been indexed for a 2% inflation increase beginning with the year ended December 31, 2016.

## NOTE G - CORPORATE FEDERAL INCOME TAXES

As of the date of this projection, the Company has confirmed with the IRS that it is a C Corporation and is required to pay federal corporate income taxes. The Company will file all open federal corporate income tax returns through the year ended December 31, 2013. It is estimated the Company currently has approximately $21 million in net operating losses to be utilized during this projection period. Accordingly, years 2014 through 2015 show the benefits of utilizing the net operating losses resulting in estimated alternative minimum tax and years 2016 through 2024 show an estimated corporate income tax based upon rates as of the date of this projection.

- 10 -

MMB DRAFT #4
02/11/2014

**NATIVE WHOLESALE SUPPLY COMPANY (DEBTOR IN POSSESSION)**

**OTHER FINANCIAL INFORMATION**

**(UNAUDITED)**

DRAFT FOR REVIEW AND DISCUSSION PURPOSES ONLY

MMB DRAFT #4
02/11/2014

**NATIVE WHOLESALE SUPPLY COMPANY**
**(DEBTOR IN POSSESSION)**

**PROJECTED COSTS OF SALES**

**FOR THE YEARS ENDING JUNE 30, 2014 THROUGH 2024 (PROJECTED)**

**(SEE SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES AND ACCOUNTANT'S COMPILATION REPORT)**

**(UNAUDITED)**

| | (Projected) December 31, 2014 | (Projected) December 31, 2015 | (Projected) December 31, 2016 | (Projected) December 31, 2017 | (Projected) December 31, 2018 | (Projected) December 31, 2019 | (Projected) December 31, 2020 | (Projected) December 31, 2021 | (Projected) December 31, 2022 | (Projected) December 31, 2023 | (Projected) December 31, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchases (net) | $ 44,343,000 | $ 44,343,000 | $ 45,707,000 | $ 47,108,000 | $ 48,547,000 | $ 50,025,000 | $ 51,542,000 | $ 53,100,000 | $ 54,699,000 | $ 56,342,000 | $ 58,028,000 |
| Federal excise taxes | 114,496,000 | 114,496,000 | 118,018,000 | 121,636,000 | 125,351,000 | 129,166,000 | 133,084,000 | 137,108,000 | 141,236,000 | 145,477,000 | 149,831,000 |
| USDA assessment | 6,708,000 | - | | | | | | | | | - |
| Duty | 3,638,000 | 3,638,000 | 3,750,000 | 3,865,000 | 3,983,000 | 4,105,000 | 4,229,000 | 4,357,000 | 4,488,000 | 4,623,000 | 4,761,000 |
| FDA | 4,207,000 | 7,391,000 | 7,583,000 | 7,779,000 | 7,976,000 | 8,177,000 | 8,378,000 | 8,584,000 | 8,791,000 | 9,001,000 | 9,213,000 |
| Delivery | 341,000 | 341,000 | 352,000 | 362,000 | 373,000 | 385,000 | 396,000 | 408,000 | 421,000 | 433,000 | 446,000 |
| Handling and storage | 1,478,000 | 1,478,000 | 1,524,000 | 1,570,000 | 1,618,000 | 1,667,000 | 1,718,000 | 1,770,000 | 1,823,000 | 1,878,000 | 1,934,000 |
| | 130,868,000 | 127,344,000 | 131,227,000 | 135,212,000 | 139,301,000 | 143,500,000 | 147,806,000 | 152,225,000 | 156,759,000 | 161,412,000 | 166,185,000 |
| | $ 175,211,000 | $ 171,687,000 | $ 176,934,000 | $ 182,320,000 | $ 187,848,000 | $ 193,525,000 | $ 199,348,000 | $ 205,325,000 | $ 211,458,000 | $ 217,754,000 | $ 224,213,000 |
| Projected Cartons | 11,370,000 | 11,370,000 | 11,490,000 | 11,610,000 | 11,730,000 | 11,850,000 | 11,970,000 | 12,090,000 | 12,210,000 | 12,330,000 | 12,450,000 |

DRAFT FOR REVIEW AND DISCUSSION PURPOSES ONLY

**See independent accountant's compilation report.**

- 12 -

MMB DRAFT #4
02/11/2014

### NATIVE WHOLESALE SUPPLY COMPANY
### (DEBTOR IN POSSESSION)

### PROJECTED STATEMENTS OF OPERATING EXPENSES

### FOR THE YEARS ENDING JUNE 30, 2014 THROUGH 2024 (PROJECTED)

### (SEE SUMMARY OF SIGNIFICANT ASSUMPTIONS AND ACCOUNTING POLICIES AND ACCOUNTANT'S COMPILATION REPORT)

### (UNAUDITED)

| | (Projected) December 31, 2014 | (Projected) December 31, 2015 | (Projected) December 31, 2016 | (Projected) December 31, 2017 | (Projected) December 31, 2018 | (Projected) December 31, 2019 | (Projected) December 31, 2020 | (Projected) December 31, 2021 | (Projected) December 31, 2022 | (Projected) December 31, 2023 | (Projected) December 31, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Travel and entertainment | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 | 36,000 | 36,000 | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 |
| Salaries | 520,000 | 520,000 | 530,000 | 541,000 | 552,000 | 563,000 | 574,000 | 585,000 | 597,000 | 609,000 | 621,000 |
| Payroll taxes | 52,000 | 52,000 | 53,000 | 54,000 | 55,000 | 56,000 | 57,000 | 58,000 | 59,000 | 60,000 | 61,000 |
| Bank charges | 360,000 | 360,000 | 367,000 | 374,000 | 381,000 | 389,000 | 397,000 | 405,000 | 413,000 | 421,000 | 429,000 |
| Postage and UPS | 60,000 | 60,000 | 61,000 | 62,000 | 63,000 | 64,000 | 65,000 | 66,000 | 67,000 | 68,000 | 69,000 |
| Professional fees | 400,000 | 400,000 | 350,000 | 300,000 | 250,000 | 255,000 | 260,000 | 265,000 | 270,000 | 275,000 | 281,000 |
| Vehicle expenses | 84,000 | 84,000 | 86,000 | 88,000 | 90,000 | 92,000 | 94,000 | 96,000 | 98,000 | 100,000 | 102,000 |
| Depreciation | 151,000 | 116,000 | 62,000 | 19,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 |
| Supplies and maintenance | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 |
| Telephone | 120,000 | 120,000 | 122,000 | 124,000 | 126,000 | 129,000 | 132,000 | 135,000 | 138,000 | 141,000 | 144,000 |
| Insurance | 42,000 | 42,000 | 43,000 | 44,000 | 45,000 | 46,000 | 47,000 | 48,000 | 49,000 | 50,000 | 51,000 |
| Utilities | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Waste Removal | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| | $ 1,863,000 | $ 1,828,000 | $ 1,748,000 | $ 1,680,000 | $ 1,649,000 | $ 1,681,000 | $ 1,713,000 | $ 1,745,000 | $ 1,778,000 | $ 1,811,000 | $ 1,845,000 |

DRAFT FOR REVIEW AND DISCUSSION PURPOSES ONLY

**See independent accountant's compilation report.**

MMB DRAFT #4
02/11/2014