UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

STATE OF NEW YORK,

             Plaintiff,

      -vs-

GRAND RIVER ENTERPRISES SIX
NATIONS, LTD. and NATIVE
WHOLESALE SUPPLY COMPANY, INC.

             Defendants.

**DECISION and ORDER**
**No. 1:14-cv-00910-MAT-LGF**

## INTRODUCTION

On March 4, 2013, the State of New York ("Plaintiff") instituted this action against defendant Grand River Enterprises Six Nations, Ltd. ("GRE") and Native Wholesale Supply Company, Inc. ("NWS") (collectively, "Defendants"), alleging violations of the Contraband Cigarettes Trafficking Act of 1978 ("CCTA"), as amended, 18 U.S.C. § 2341-46; the Prevent All Contraband Trafficking Act ("PACT Act"), 18 U.S.C. §§ 375-78, Pub. L. No. 111-154, 124 Stat. 1087 (2010); and New York Tax Law ("N.Y. Tax L.") §§ 471, 471-e, 1814 and 480-b. This matter is before the Court upon United States Magistrate Judge Leslie G. Foschio's August 30, 2016 Report and Recommendation ("the R&R") (Docket No. 97), which recommends granting GRE's Motion to Dismiss and for a Stay of Discovery (Docket No. 81), granting NWS's Motion to Dismiss (Docket No. 79),

and dismissing Plaintiff's Second Amended Complaint ("SAC")[1] (Docket No. 76) without leave to replead.

Plaintiff filed Objections ("Pl. Obj.") (Docket No. 100) and a Declaration in Support ("Pl. Decl.") (Docket No. 101). NWS filed a Response to Plaintiff's Objections ("NWS Resp.") (Docket No. 102). GRE filed a Reply/Response to Plaintiff's Objections ("GRE Resp.") (Docket No. 103). The matter was transferred to the undersigned on October 24, 2018 (Docket No. 108). For the reasons discussed herein, the Court rejects the R&R in its entirety.

## BACKGROUND

The following summary is based on the SAC's allegations, which are accepted as true for purposes of determining a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

GRE is a corporation formed under the laws of the Six Nations of Indians and engaged in the business of manufacturing, selling, transferring, transporting, and shipping cigarettes for profit throughout the United States, including into and throughout New York State. GRE's principal place of business is located at Ohsweken, Ontario, Canada. SAC ¶ 8.

NWS is a for-profit corporation formed under the laws of the Sac and Fox Nation of Oklahoma. It is not controlled by the Sac and Fox Nation of Oklahoma tribe or operated for government purposes.

---

[1] Plaintiff has amended its original complaint twice. The first amendment, on August 2, 2013, was required to comply with the stay order issued in NWS's bankruptcy proceeding in the United States Bankruptcy Court for the Western District of New York; the second amendment occurred with Defendants' consent upon the transfer of the case from the Eastern District of New York to this District.

*Id.* ¶ 9. NWS is engaged in the business of purchasing, transporting, distributing, and reselling GRE's tobacco products for profit throughout the United States, including in New York. *Id.* The only tobacco products NWS imports into the United States are manufactured by GRE. *Id.* ¶ 10. NWS's principal place of business is located in Perrysburg, New York. *Id.* ¶ 9.

GRE manufactures Seneca® brand cigarettes in Ontario, Canada. *Id.* ¶ 55. GRE then sells, transfers or assigns the cigarettes to NWS, "FOB Canada," at GRE's Canada facility. *Id.* Title to the cigarettes transfers from GRE to NWS in Canada. *Id.* NWS, holding title for the cigarettes manufactured by GRE, then imports and distributes the cigarettes inside the United States, including into and throughout New York State. *Id.* ¶ 57.

GRE and NWS are engaged as business partners or "co-venturers" in a joint venture for the specific purpose of manufacturing, distributing, shipping, and selling untaxed and unstamped contraband cigarettes into the State of New York. *See id.* ¶¶ 66-83. Since November 22, 2011, and continuing through to the present, GRE and NWS have knowingly shipped, transported, transferred, sold, and distributed millions of unstamped and unreported cigarettes to various on-reservation wholesalers in New York State, such as Seneca Imports, Tonawanda Seneca Nation Distribution, and Tuscarora Nation. *Id.* ¶ 58. None of GRE's cigarette packages was stamped with the required New York State cigarette excise tax stamp, and none of those packages was reported to the New York State Department of

Taxation and Finance ("NYSDTF"). *Id.* ¶ 64. In addition, no New York State-licensed stamping agent has reported any sales of GRE's Seneca® brand cigarettes to the NYSDTF. *Id.* ¶ 65.

## STANDARD OF REVIEW

Recommendations made by a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) "need not be automatically accepted by the district court." *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir. 1989). Should either party object to a magistrate judge's report and recommendation, "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The Second Circuit has clarified that "[e]ven if neither party objects to the magistrate's recommendation, the district court is not bound by the recommendation of the magistrate." *Grassia*, 892 F.2d at 19. Rather, "'[a] judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.'" *Id.* (quoting 28 U.S.C. § 636(b)(1); citing *Mathews v. Weber*, 423 U.S. 261, 271 (1976); *McCarthy v. Manson*, 714 F.2d 234, 237 n. 2 (2d Cir. 1983)).

## DISCUSSION

I. **Plaintiff's Objections to the R&R's Recommendation Regarding the PACT Act Claim (Pl.'s Obj. at 3-9)**

   A. **Overview of the PACT Act**

The PACT Act provides that "[a]ny person who sells, transfers, or ships for profit cigarettes or smokeless tobacco in [1] *interstate commerce*, whereby such cigarettes or smokeless tobacco are shipped [2] *into a State, locality, or Indian country of an Indian tribe taxing the sale or use of cigarettes or smokeless tobacco*, or who advertises or offers cigarettes or smokeless tobacco for such a sale, transfer, or shipment, shall" comply with certain filing and reporting requirements. 15 U.S.C. § 376(a) ("§ 376(a)") (emphases supplied).

"[I]nterstate commerce" is defined in the PACT Act as (1) "commerce between a State and any place outside the State," (2) "commerce between a State and any Indian country in the State," or (3) "commerce between points in the same State but through any place outside the State or through any Indian country." 15 U.S.C. § 375(9)(A).

In the PACT Act, "State" is defined as "each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States." 15 U.S.C. § 375(11). The statute defines "Indian country" by cross-referencing the definition of that term found at 18 U.S.C. § 1151, which provides that Indian country includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government," "all dependent Indian communities within the borders of the United States . . . whether within or without the limits of a state," and "all Indian

allotments, the Indian titles to which have not been extinguished."
18 U.S.C. § 1151 (cross-referenced in 15 U.S.C. § 375(7)(A)).

**B.    The R&R Erred in Finding That Plaintiff Failed to Plead the Elements of a "Destination" Covered by the Act and "Interstate Commerce"**

In the SAC, Plaintiff alleges that GRE and NWS are engaged in a joint venture whereby GRE manufactures cigarettes in Ontario, Canada; GRE sells the untaxed cigarettes to NWS, who takes custody of them FOB at GRE's manufacturing facility in Canada; and NWS then ships the untaxed cigarettes "into New York State," a jurisdiction which "tax[es] the sale . . . of cigarettes," from Ontario, Canada, a "place outside the State"; NWS then sells and distributes the untaxed cigarettes to buyers, including "to various on-reservation wholesalers in New York State." SAC ¶¶ 55-58, 125-32. Plaintiff asserts that it therefore has fulfilled all of the elements of a PACT Act claim against NWS and GRE, under a joint venture theory of liability as to GRE.

The R&R concluded that § 376(a)'s requirements do not apply to Defendants because (1) Plaintiff does not allege that the cigarettes were shipped "into" one of the three "destinational elements," R&R at 34, set forth in § 376(a), which the R&R interprets disjunctively as "State", "locality", *or* "Indian country of an Indian tribe taxing the sale or use of cigarettes," *see* R&R at 32-34; and (2) Plaintiff does not sufficiently allege "interstate commerce" as defined in the PACT Act, *see* R&R at 33-38. The Court considers these findings in turn below.

-6-

According to the R&R's construction of § 376(a), if the termination point of a tobacco shipment is in Indian country, it must be alleged that the tribe of that reservation taxes the sale or use of cigarettes because, under § 376(a), the shipment will not also be considered to be into the State in which the Indian country is located. *See* Pl. Obj. at 5 (citing R&R at 32-33). The R&R thus essentially interpreted the terms "State" and "Indian country of an Indian tribe taxing the sale or use of cigarettes" as mutually exclusive. *See* Pl. Obj. at 4-9 (citing R&R at 32-35). Plaintiff disputes this conclusion, urging that the proper construction of § 376(a) is that "Indian reservations, such as those associated with the Seneca Indian Nation, are considered not only as 'Indian country,' but also as being within New York State, as well as a 'place' and a 'locality' under the reporting requirements." Pl. Obj. at 6. Consequently, Plaintiff argues, whether the Seneca Nation has its own regulatory scheme for taxing the sale or use of cigarettes is immaterial; cigarette shipments to any New York State Indian reservations also constitute shipments "into a State" for purposes of § 376(a). *Id.* at 6-7.

NWS and GRE counter that "to trigger § 376(a)'s reporting requirements, NWS must ship tobacco into a State, locality, *or* Indian country of an Indian tribe that taxes such tobacco." NWS Resp. at 7 (emphasis in original). NWS and GRE urge that the R&R's interpretation of the statute is correct, and that Plaintiff's claim fails because it "does not allege that the destination of the

shipments, the Seneca Nation, is a tribe that taxes the sale of tobacco." *Id.* (footnote omitted).[2] According to Defendants, § 376(a)'s "taxes the sale" language only modifies "Indian country," and does not modify "State" or "locality." *Id.* at 8; *see also id.* at 10-11.

There is a dearth of case law on this specific issue. However, the cases seem to assume that Plaintiff's construction of § 376(a)'s destination requirement is the correct one. *See City of New York v. Wolfpack Tobacco*, No. 13 CIV. 1889 DLC, 2013 WL 5312542, at *3 (S.D.N.Y. Sept. 9, 2013) ("[T]he [PACT Act] requires sellers of cigarettes who ship them to *states or localities that impose taxes on them* to file with those states and localities each month 'a memorandum or a copy of the invoice covering each and every shipment of cigarettes . . . made during the previous calendar month.'") (quoting 15 U.S.C. § 376(a); emphasis supplied; ellipsis in original); *City of New York v. Gordon*, 1 F. Supp.3d 94, 100-01 (S.D.N.Y. 2013) ("[T]he PACT Act requires '[a]ny person who sells, transfers, or ships for profit cigarettes . . . in interstate commerce' into a *state or city that taxes 'the sale or use of cigarettes'* to file 'a memorandum or a copy of the invoice

---

[2]

    Plaintiff points out that contrary to the R&R's implicit assertion that the Seneca Nation of Indians does not tax the sale of cigarettes within its reservation's borders, *see* R&R at 42, it does impose a tax on imported cigarettes. Pl. Obj. at 7 n. 4 (citing *Seneca Nation of Indians v. Paterson*, No. 10-CV-687A, 2010 WL 4027796, at *1 (W.D.N.Y. Oct. 14, 2010) (noting that in 2006, the plaintiff enacted its own import-export law to combat cigarette trafficking and to create a tax stamp system, under which it assesses a 7.5 cents-per-pack tax on all imported cigarettes sold on its property), *aff'd sub nom. Oneida Nation of New York v. Cuomo*, 645 F.3d 154 (2d Cir. 2011).

covering each and every shipment of cigarettes' with the "chief law enforcement officers of the local governments . . . that apply their own local . . . taxes on cigarettes.' 15 U.S.C. § 376(a). All Of Our Butts shipped cigarettes from an Indian reservation to New York City residents, thus selling cigarettes in interstate commerce to a locality that taxes cigarette sales. The Gordon Defendants do not dispute that under the PACT Act, they are required to report these sales to the chief law enforcement officer of New York City.") (emphasis supplied; ellipses in original).

Thus, courts have assumed that the "taxes the sale" language not only modifies "Indian country," but also modifies "State" or "locality." The Court agrees that based on common rules of English grammar, this is the correct reading of the statute. Defendants argue that if Congress intended such a meaning, it would have placed a comma between "tribe" and "that." However, that comma placement not only would be grammatically incorrect, it would be entirely gratuitous. In short, it would have no effect whatever on the meaning of the phrase.

Moreover, in this Court's view, Plaintiff's interpretation is the only one that harmonizes with the purpose of the statute. If, as Defendants argue and the R&R found, the "taxes the sale" language *only* applies to an "Indian in Indian country," this would mean that *any* "State" or *any* "locality"—regardless of whether it "taxes the sale" of cigarettes—is subject to § 376(a)'s reporting requirements. That simply does not make sense. The purpose of the

PACT Act's reporting requirements is to ensure that cigarettes shipped by sellers to destinations that *do* levy cigarette taxes are accounted for.

In sum, the Court rejects the notion that "Indian country" and "State" are mutually exclusive for purposes of the PACT Act. To the contrary, the Court finds that Indian reservations can be both located in "Indian country" and in "a State" for purposes of the PACT Act. Nothing about the statute's separate definitions of "State" and "Indian country" indicates that the two terms are mutually exclusive. *Cf. Ho-Chunk, Inc. v. Sessions*, 253 F. Supp.3d 303, 307-08 (D. D.C. 2017) (rejecting the argument that the term "State" excludes "Indian country" under the CCTA, which defines both terms similarly to the PACT Act; noting that "courts have unanimously held that these provisions apply to Indian country, meaning that for purposes of the CCTA, 'State' has been *impliedly* read to include tribal territory") (emphasis in original), *aff'd*, 894 F.3d 365 (D.C. Cir. 2018).

### C. The R&R Erred in Finding That Plaintiff Did Not Sufficiently Plead the Element of "Interstate Commerce"

The R&R concluded that the SAC's allegations do not fulfill the PACT Act's definition of interstate commerce because the alleged shipments, which originate in Canada, subsequently terminate on the Cattaraugus reservations, i.e., "Indian country." According to the R&R, "State" and "Indian country" must be treated as being mutually exclusive because the PACT Act supplies two

separate definitions for the terms "State" and "Indian country." The R&R reasons that a termination point on the Cattaraugus reservations cannot also be considered to be in a State. Therefore, it concludes that shipments from Canada to the Cattaraugus reservations cannot be said to be commerce between a State and any place outside the State. *See* R&R at 33-36. Defendants agree that Plaintiff confuses "into" with "through," and that "'into' means the destination to which 'cigarettes . . . are delivered,' *not* a jurisdiction through which shipments travel." NWS Resp. at 11 (ellipsis and emphasis in original).

This Court disagrees with the R&R's conclusion based on the plain language of the PACT Act, as discussed further below. To the contrary, the Court finds that Plaintiff's allegations regarding Defendants' shipments of cigarettes plausibly allege "interstate commerce" within the meaning of the statute.

As noted above in Section I.A, one of the definitions of "interstate commerce" in the PACT Act includes "commerce between a State and any place outside the State." 15 U.S.C. § 375(9)(A). And Congress defined "State" in the PACT Act to mean "each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States." *Id.* § 375(11). There is no doubt that New York is one of the "several States of the United States." *Id.* In light of these terms' ordinary meaning, the SAC plausibly alleges "interstate commerce" because it alleges that the cigarette

shipments initially occur between Canada, a "place outside the State," and "a State," i.e., New York State (as well as Indian reservations within the State).

In contending that its cigarette shipments do not constitute "interstate commerce," GRE argues that Indian country is not part of any "State," as that term is defined under the PACT Act, and that GRE's cigarettes thus went from Indian country in Canada to Indian country in New York, without actually arriving "into" any State at all. In other words, Defendants contend, interstate reservation-to-reservation transactions do not constitute commerce "between a State and any place outside of the State."

The Court finds that this argument improperly ignores the commonsense meaning of the PACT Act's definition of "State," i.e., each State, the District of Columbia, Puerto Rico, and all other territories of the United States. 15 U.S.C. § 375(11). Ordinarily, as Supreme Court precedent illustrates, an "Indian reservation is considered part of the territory of the State" in which it is located. *Nevada v. Hicks*, 533 U.S. 353, 361-62 (2001) (quotation marks omitted); *see also Organized Vill. of Kake v. Egan*, 369 U.S. 60, 72 (1962) ("[B]y 1880 the [Supreme] Court no longer viewed reservations ad [sic] distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law.") (citation omitted). Under a straightforward application of this general rule, transactions

between Indian reservations located within different States would qualify as transactions between States.

When interpreting statutory text, "the words to be interpreted are not considered in isolation; rather, [the court] 'look[s] to the statutory scheme as a whole and plac[e] the particular provision within the context of that statute.'" *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) (quotation omitted). With this precept in mind, reading the sections at issue in the context of the PACT Act demonstrates that Congress intended to adhere to the common understanding, as expressed in *Nevada v. Hicks*, *supra*, that Indian country is a territorial part of the State in which it is located. For example, Congress provided that the term "Indian country" includes two specific Indian communities "*within* the State of Alaska," 15 U.S.C. § 375(7)(A) (emphasis added), as well as dependent Indian communities "*within* or without the limits of a state," 18 U.S.C. § 1151 (emphasis added). The PACT Act requires cigarette sellers to provide reports to both the State into which cigarettes are shipped and certain Indian tribes "operating *within* the borders of [the] State." 15 U.S.C. § 376(a)(3) (emphasis added).

Notably, the PACT Act defines "interstate commerce" in part to include "commerce between points in the same State but through any place outside the State *or* through any Indian country." 15 U.S.C. § 375(9)(A) (emphasis added). Thus, the PACT Act expands the definition of "interstate commerce" to include *intra*state shipments

of cigarettes that travel through Indian country, which shows Congress' recognition that Indian country is located "in a State." 15 U.S.C. § 375(9). And, by using the disjunctive "or" to distinguish "any place outside of the State" from "Indian country" in § 375(9), Congress indicated its understanding that Indian country may exist *within* a State. Under Defendants' contrary interpretation, the latter clause of this definition—"or through any Indian country"—would be extraneous, because Indian country would already be encompassed by the former clause—"any place outside the State." This goes against the "'most basic of interpretative canons'" that "statutes should be read to avoid superfluity." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 392–93 (2013) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009); further quotation omitted).

Additionally, the fact that the PACT Act's definition of interstate commerce also encompasses "commerce between a State and *any Indian country in the State*," 15 U.S.C. § 375(9)(A) (emphasis added), further reflects Congress's understanding that Indian country is located within the territory of a State. Indeed, Congress's decision to define "State" and "Indian country" separately in the PACT Act, and to include distinct references to "States" and "Indian country" in the statute's definition of "interstate commerce," evidences the intent to *expand* the traditional understanding of interstate commerce rather than to narrow it. The references to Indian country in the definition of

"interstate commerce" are intended to distinguish between a State and Indian country within the *same* State, and to specify that even some intrastate shipments of cigarettes (i.e., those between a State and Indian country within the State's own borders) qualify as interstate commerce. *See* 15 U.S.C. § 375(9). It was unnecessary for Congress to specify that transactions between Indian country in different States similarly qualify as interstate commerce, because such transactions constitute "interstate commerce" under the plain meaning of that term. It would make no sense for the PACT Act to apply to wholly *intra*state shipments that travel through Indian country, while exempting genuinely *inter*state shipments that similarly travel through Indian country.

In sum, the Court finds that for purposes of the PACT Act's definition of "interstate commerce," Indian reservations can be both located in "Indian country" and in "a State." Therefore, the Court rejects the R&R's finding that the SAC did not sufficiently allege that the cigarette shipments at issue occurred in "interstate commerce."

## II. Plaintiff's Objections to the R&R's Recommendation Regarding Dismissal of the CCTA Claim (Pl. Obj. at 11-17)

### A. Overview of the CCTA

Congress enacted the CCTA in 1978 "to remedy 'the serious problem of organized crime and other large scale operations of interstate cigarette bootlegging'—i.e., untaxed cigarette trafficking—and to 'provide law enforcement assistance and relief

to cities and states' in support of that effort." *Ho-Chunk, Inc.*, 253 F. Supp.3d at 304-05 (quoting Rep. 95-962, at 3, reprinted in 1978 U.S.C.C.A.N. 5518, 5518; other citation omitted). The CCTA makes it a crime for "any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco." 18 U.S.C. § 2342(a). "[C]ontraband cigarettes" are "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication . . . [of] payment of cigarette taxes." 18 U.S.C. § 2341(2).

In 2006, Congress enacted the USA PATRIOT Improvement and Reauthorization Act of 2005, *see* Pub. L. No. 109-177, Mar. 9, 2006, 120 Stat. 192, which amended the CCTA to, among other things, add reporting requirements to federal and state authorities for non-face-to-face "delivery" sales and provide for State, local, and private civil enforcement of the CCTA. *Id.* To mitigate concerns regarding tribal sovereignty, Congress added an explicit tribal government exemption from the reporting requirement. 18 U.S.C. § 2343(b). Congress also exempted Indian tribes from private enforcement actions. *See* 18 U.S.C. § 2346(b)(1) ("No civil action may be commenced under this paragraph against an Indian tribe or an Indian in Indian country (as defined in section 1151 [of Title 18 U.S.C.])."). "Congress has intended the definition of 'person' in

1 U.S.C. § 1 to apply in [the CCTA]. Government agencies and instrumentalities are not included in that definition." 45 Fed. Reg. 48,612. See also H.R. CONF. REP. 95-1778, 1978 U.S.C.C.A.N. 5535 at 5538 (deleting the definition of "person" from the CCTA "because 'person' is defined in 1 U.S.C. 1 for all act [sic] of Congress").

## B. The R&R Erred in Finding That NWS Is Exempted From a Civil Suit Under the CCTA

Defendants argue that NWS falls within the "Indian in Indian country" exemption set forth in 18 U.S.C. § 2346(b)(1) ("§ 2346(b)(1)"). The R&R agreed, relying on a decision from the Eastern District of New York on a summary judgment motion, *State of New York v. Mountain Tobacco*, No. 12-CV-6276(JS)(SIL), 2016 WL 3962992 (E.D.N.Y. July 21, 2016) ("*Mountain Tobacco*"). The district court in *Mountain Tobacco* applied § 2346(b)(1)'s prohibition on "civil action[s]" brought by States or localities against an "Indian tribe or an Indian in Indian country" in granting summary judgment for a tribal corporation against the State of New York. 2016 WL 3962992, at *4-*7. Plaintiff objects to the R&R's conclusion on this issue and argues that *Mountain Tobacco* was incorrectly decided. The Court has reviewed *Mountain Tobacco*, a non-binding and unpublished decision, and respectfully disagrees with the district court's analysis. Instead, the Court finds persuasive the analysis by the Circuit Court of Appeals for the District of Columbia ("D.C. Circuit") in *Ho-Chunk, Inc. v.*

*Sessions*, 894 F.3d 365, 367-69 (D.C. Cir. 2018) (holding that the CCTA and its implementing regulations do not exempt wholly-owned corporations of a federally-recognized Indian tribe from coverage), *aff'g* 253 F. Supp.3d 303 (D. D.C. 2017).

Similarly to Defendants here, the plaintiff corporations' "main argument" in *Ho-Chunk, Inc.* was that "§ 2343(a)—the recordkeeping provision—applies only to '[a]ny person' and they are not 'persons.' They are not 'persons' . . . because they are 'tribal instrumentalities,' which assumes that a tribal instrumentality—and for that matter, a tribe itself—cannot be a 'person.'" *Ho-Chunk, Inc.*, 894 F.3d at 368. The D.C. Circuit found both "assumptions" to be "mistaken." *Id.* The D.C. Circuit found "several flaws" in the corporations' argument, "[t]he most obvious [of which] is that the [CCTA]'s recordkeeping requirements do not turn on any territorial determination." *Ho-Chunk, Inc.*, 894 F.3d at 367 (citing 18 U.S.C. § 2343(a)). Whether the corporations had their principal place of business on a tribal reservation "sa[id] nothing about whether federal law requires them to keep records." *Id.* Moreover, the D.C. Circuit explained, "if the corporations were correct that the [CCTA]'s regulation of contraband cigarettes does not apply to sales to non-Indians in Indian country, this would not only be senseless but would also contravene decades of settled law upholding enforcement of the [CCTA] against individuals and entities operating on reservations." *Id.* at 367-68 (collecting cases).

The D.C. Circuit also noted that since the CCTA does not define "person," the Dictionary Act, 1 U.S.C. § 1 must be consulted, "as the Conference Committee on the [CCTA] acknowledged, H.R. Rep. No. 95-1778, at 10 (1978) (Conf. Rep.)." *Ho-Chunk*, *Inc.*, 894 F.3d at 368. The Dictionary Act provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 18 U.S.C. § 1. "[T]he obvious progression," based on the Dictionary Act, was that "the [CCTA]'s § 2343(a) recordkeeping requirements apply to '[a]ny person'; under federal law, 'person' includes 'corporations'; these appellants are 'corporations'; they are therefore 'persons' and the [CCTA]'s recordkeeping requirements apply to them." *Ho-Chunk*, *Inc.*, 89 F.3d at 368 (quoting 18 U.S.C. § 1).

Statutory context supplied an additional reason for concluding that Congress did not exempt the corporate appellants from the CCTA's recordkeeping requirement. *Ho-Chunk*, *Inc.*, 894 F.3d at 369 (citing *United States v. Persichilli*, 608 F.3d 34, 37 (1st Cir. 2010) ("But with or without a presumption, [statutory] context still controls."); other citations omitted). Subsection (a) of § 2343 specifies the recordkeeping requirements applicable to "[a]ny person." 18 U.S.C. § 2343(a). Subsection (b) of § 2343 "requires periodic reports to the United States Attorney General of large

cigarette transactions." *Ho-Chunk*, 894 F.3d at 369. Subsection (b) applies to "[a]ny person, except for a tribal government" who distributes cigarettes. 18 U.S.C. § 2343(b). The D.C. Circuit "[a]ssume[d] the corporate appellants . . . are 'a tribal government' even though they seem to be exclusively involved in commercial transactions[,]" *Ho-Chunk*, *Inc.*, 894 F.3d at 369, an assumption that would exempt them from 18 U.S.C. § 2343(b)'s reporting requirements. *Id.* However, as in the case before this Court, the issue in *Ho-Chunk, Inc.*, revolved around 18 U.S.C. § 2343(a)'s recordkeeping requirements. "Subsection (a) contains no exception for 'a tribal government,' let alone for a corporation formed under tribal law and engaged in the cigarette business." *Ho-Chunk*, 894 F.3d at 369. Therefore, the D.C. Circuit concluded, the "exception in [§ 2343](b) for tribal governments would have been unnecessary if 'persons' in § 2343 did not include tribes." *Ho-Chunk*, 894 F.3d at 369 (citing *Ho-Chunk, Inc.*, 253 F. Supp.3d at 311). Based on  the reasoning articulated by the courts in the *Ho-Chunk, Inc.* case, the Court finds that Plaintiff here has plausibly alleged that Defendants are "persons" within the meaning of the CCTA, and therefore Plaintiff has plausibly alleged a violation of the CCTA.

**III. Plaintiff's Objections to the R&R's Recommendation Regarding the "Joint Venture" Allegations (Pl. Obj. at 17-24)**

    **A.    The R&R Improperly Drew an Adverse Inference Against Plaintiff Based on the Failure to Specify Choice of Law**

The R&R found that Plaintiff's allegations were weakened by its failure to state under which State's law it was attempting to plead a joint venture claim. This Court finds that the parties have impliedly consented to the application of New York law. First, in its memorandum of law in support of its motion to dismiss, GRE analyzed the elements of a joint venture under New York law. Second, Plaintiff analyzed the issue under New York law in its opposition brief. Third, NWS did not contest that New York law applies in either of its briefs in support of its motion to dismiss. Therefore, the Court finds that the parties have impliedly consented to the application of New York law. *See*, *e.g.*, *Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) ("The parties' briefs . . . rely on New York law. Under the principle that implied consent to use a forum's law is sufficient to establish choice of law, we will apply New York law to this case.") (internal citation omitted).

**B.    The R&R Erred in Finding That Plaintiff Failed to State a Joint Venture Claim**

**1.    Elements of Joint Venture Claim Under New York Law**

"Under New York law, a joint venture is formed when [1] two or more persons enter into an agreement to carry on a venture for profit; [2] the agreement evinces their intent to be joint venturers; [3] each contributes property, financing, skill, knowledge, or effort; [4] each has some degree of joint control over

-21-

the venture; and [5] provision is made for the sharing of both profits and losses." *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 341 (2d Cir. 2004) (citing *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990)). "All of these elements must be present before joint venture liability may be imposed." *Itel Containers Int'l Corp.*, 909 F.2d at 701.

## 2. The R&R's Findings

The R&R found that the "joint venture theory fail[ed] at the threshold," R&R at 22, because the SAC alleges that GRE sells the Seneca® brand cigarettes to NWS "FOB Canada," SAC ¶¶ 55-56, and a "joint venture cannot be predicated on a buyer-seller relationship as it is contrary to the requirement that the putative joint-venturers contribute property to the joint venture over which the venturers have joint control." R&R at 22-23 (citing *Slip-N-Slide Records, Inc. v. Island Def Jam Music Group*, No. 13-cv-04450(ALC), 2014 WL 2119857, at *2 (S.D.N.Y. May 21, 2014); *Wagner v. Derecktor*, 306 N.Y. 386 (1954)). The Court finds that neither of these cases forecloses a finding that Plaintiff has plausibly pleaded a joint venture. *Slip-N-Slide Records, Inc., supra* is in apposite insofar as the agreement there was "a product of an arm's length commercial transaction between the parties" which "*expressly disavow[ed]* a joint venture." 2014 WL 2119857, at *2 (emphasis supplied). In *Wagner*, the New York Court of Appeals simply disagreed with the Appellate Division's finding that, contrary to a jury's verdict, the

agreement at issue was, as a matter of law, a joint venture. *Wagner*, 306 N.Y. at 390. Rather, the Court of Appeals found, the agreement's character, "[a]t best," was "a question of fact for the jury. . . ." *Id.* This holding underscores the inappropriateness of determining the joint venture question on a motion to dismiss for failure to state a claim, where the standard is "facial plausibility[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The R&R also found that, at most, Plaintiff's allegations suggest that the individual principals of GRE and NWS, rather than the corporate defendants themselves, agreed to share in the profits of any joint business enterprise. R&R at 22. "[W]hile a joint venture may not be carried on by individuals through a corporate form, corporations clearly may be parties to a joint venture agreement." *In re Roxy Roller Rink Joint Venture*, 67 B.R. 479, 484 (S.D.N.Y. 1986) (citing NY Jur2d, Business Relationships, § 1580 at 256 (1981)). And, it is also well settled that "a corporation cannot act for itself," and thus "the acts of the corporate officers on behalf of the corporation are deemed to be the acts of the corporation itself." *Cinema N. Corp. v. Plaza at Latham Assocs.*, 867 F.2d 135, 140 (2d Cir. 1989). Plaintiff argues, and the Court agrees, that this reasoning elevates form over substance.

As to first and second elements of a joint venture claim, the R&R faulted Plaintiff for failing to allege that the putative joint venture formed by GRE and NWS was pursuant to a written agreement. However, the SAC states that in 1999, GRE and NWS entered into an

agreement pursuant to which GRE was designated by NWS as the exclusive manufacturer and packager of Seneca® branded products and NWS was designated by GRE as the (then) exclusive importer and distributor of Seneca® products in the United States, with NWS as the exclusive distributor per the agreement until the end of 2002. SAC ¶ 71 (citations omitted). In addition, there is authority for the proposition that "[a]n agreement between parties to engage in a joint venture is what is outside the scope of the statute of frauds." *Yonofsky v. Wernick*, 362 F. Supp. 1005, 1026 (S.D.N.Y. 1973) (citing *Clyde v. Schaller*, 31 N.Y.S.2d 686 (2d Dept. 1941) (oral joint venture agreement to divide profits from a contract for the alteration of a building); *Montenegro v. Roxas*, 141 N.Y.S.2d 681, 684-86 (Sup. Ct. 1955) (oral agreement to purchase goods and sell them to customers solicited by a coadventurer held to constitute a joint venture)); *see also Nameh v. Muratex Corp.*, 34 F. App'x 808, 810 (2d Cir. 2002) (unpublished opn.) (parties formed a joint venture by an oral agreement).

The Court also finds that Plaintiff plausibly alleged Defendants' intent to become coadventurers. The Court notes that the absence of the term "joint venture" to describe an agreement "is not fatal . . . as the intent of the parties can be express or implied." *Shore Parkway Assocs. v. United Artists Theater Circuit, Inc.*, No. 92 CIV 8252 (JFK), 1993 WL 361646, at *2 (S.D.N.Y. Sept. 14, 1993) (citing *McGhan v. Ebersol*, 608 F. Supp. 277, 282 (S.D.N.Y. 1985); other citation omitted). The SAC asserts, among other things, that

Defendants negotiated a corporate structure that included two legally distinct corporate branches (GRE for manufacturing and NWS for distribution) in order to minimize their tax liability and to clarify their respective primary responsibilities. SAC ¶ 71(a). The SAC alleges that Defendants have shared a common interest in the establishment and growth of the Seneca® brand and have reinvested significant amounts of the profits earned into the enterprise so as to increase its profitability. *Id.* ¶ 75(b).

As to the third element of a joint venture, the R&R found that Plaintiff failed to allege that both parties contributed "property" because the SAC merely alleged a buyer-seller relationship. However, the plain language of the caselaw illustrates that a party's contribution to the joint venture be in a form other than "property." *See*, *e.g.*, *Yonofsky*, 362 F. Supp. at 1031 (a joint venture requires "some combination of property, financial resources, effort, skill *or* knowledge") (citations omitted; emphasis supplied). The SAC alleges, as noted above, that GRE and NWS agreed to the assignment of defined roles that capitalized on each company's area of expertise; that the companies invested large amounts capital into the enterprise; and reinvested profits earned into growing the venture.

As to the fourth element, the R&R found that Plaintiff did not plausibly allege that Defendants had joint management control over the venture. However, the SAC alleges that Defendants were required to consult with each other before making important strategic

decisions about marketing and distribution of Seneca® brand tobacco products. SAC ¶ 74(c).

As to the fifth element, the R&R also concluded that there was no plausible allegation that GRE and NWS agreed to submit to the burden of making good the losses of the venture. *See* R&R at 21. However, Defendants' "agreement clearly anticipated a sharing of the profits; and, under established law, a sharing of losses is implied, absent fixed terms, in the same proportion as the sharing of profits." *Shore Parkway Assocs.*, 1993 WL 361646, at *3 (citing *Mariani v. Summers*, 52 N.Y.S.2d 750, 754 (Sup. Ct. 1944) ("[E]very party to a joint venture is bound by his relation to his associates to share with them the losses sustained. . . .") (citing *Matter of Marvin*, 168 N.Y.S. 555, 562 (3d Dept. 1917); other citation omitted), *aff'd*, 56 N.Y.S.2d 537 (1st Dept. 1945). In addition, the SAC alleges that GRE extended inventory and credit to NWS that effectively consisted a continuous loan of $1 million over a period of years. SAC ¶ 76(a). The SAC further alleges that when NWS initially filed bankruptcy in 2011, it owed a debt of approximately $19.2 million to GRE. *Id.* ¶ 82.

In sum, the Court finds that if the SAC's allegations are taken as true and construed in the light most favorable to Plaintiff—as the applicable law requires—the SAC plausibly alleges the existence of joint venture between Defendants, which plausibly implicates GRE under a theory of vicarious liability.

## CONCLUSION

For the reasons discussed above, the Court rejects the R&R (Docket No. 97) in its entirety. Accordingly, GRE's Motion to Dismiss and for a Stay of Discovery (Docket No. 81) is denied, and NWS's Motion to Dismiss (Docket No. 79) is denied. Plaintiff may proceed on the SAC (Docket No. 76). This matter is reassigned to Hon. Richard J. Arcara, United States District Judge, for further proceedings.

**SO ORDERED.**

**s/ Michael A. Telesca**

_____
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     February 11, 2019
           Rochester, New York.